## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### Charlottesville Division

| | |
|---|---|
| Dwayne PHILLIPS, Mark EHRLICH, Ryan MESZAROS, Rebecca TYSON, Rebecca LOFLIN, and Janet RIPLEY, on behalf of themselves and all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> RECTOR AND VISITORS OF THE UNIVERSITY OF VIRGINIA, Whittington W. CLEMENT, in his official capacity as Rector; Robert D. HARDIE, in his official capacity as Vice Rector; Visitors Robert M. BLUE, Mark T. BOWLES, Carlos M. BROWN, Elizabeth M. CRANWELL, Thomas A. DEPASQUALE, U. Bertam ELLIS Jr., Louis S. HADDAD; Babur B. LATEEF, Stephen P. LONG, Angela Hucles MANGANO, James B. MURRAY Jr., L.F. PAYNE, Amanda L. PILLION, James V. REYES, Douglas D. WETMORE, Susan E. KIRK, and Lily A. ROBERTS, each in her or his official capacity; K. Craig KENT, CEO UVA Health and UVA Executive Vice President for Health Affairs, in his individual and official capacities; Wendy HORTON, CEO UVA Medical Center, in her individual capacity; Mary Frances SOUTHERLAND, Chief Administrative Officer UVA Health, in her individual capacity; Melissa FREDERICK, former Assistant Vice President, UVA Health System, in her individual capacity; and John DOES 1-5, senior Human Resources personnel of UVA Health, in their individual capacities. <br><br> Defendants. | Civil Action No. <u>3:22CV00075</u> |

---

## CLASS ACTION COMPLAINT

1.      This is a religious-discrimination and civil-rights case under the Establishment and Free Exercises Clauses of the First Amendment and the Virginia Constitution, and the Equal Protection Clause of the Fourteenth Amendment. It arises out of the University of Virginia Health System's openly-expressed disdain for the religious objections that hundreds of its employees lodged regarding COVID-19 vaccines.

2.      When UVA Health mandated that employees receive a COVID-19 vaccine, it knew that it was required to accommodate religious beliefs. But it wanted to minimize accommodations, and it believed that most objections were false political beliefs from members of the political right.

3.      So UVA Health drew up a list of churches that its human-resources personnel believed had official doctrines prohibiting vaccination. It then automatically exempted members of these religions from receiving the vaccine. As to employees who were members of other faiths, UVA Health automatically dismissed their religious objections to the COVID-19 vaccine as insincere, as non-religious in nature, as based on "misinformation," or as a misinterpretation of the objector's own religious beliefs.

4.      Therefore, for employees who were not on UVA Health's list of officially approved religions, UVA Health denied exemption requests *en masse*, in brief boilerplate rejection statements, and without individual consideration. If such an employee was unwilling to violate his or her religious beliefs, UVA Health promptly fired him or her.

5.      The result was blatant—and blatantly unconstitutional—religious discrimination.

6.      Plaintiff Dwayne Phillips, for instance, told UVA Health that he believed that "the Holy Spirit of God has told me that I should not receive this vaccine." UVA Health responded, with rather shocking candor, that it thought Mr. Phillips' explanation "really related more to . . .

God speaking to him versus his religious belief" and that "a direct instruction … from God" was not what UVA Health "was looking for" or "would qualify as a religious accommodation . . . ."

7.      Mr. Phillips also informed UVA Health of a second reason he could not be vaccinated consistent with his religious beliefs. Each of the available COVID-19 vaccines had been developed or tested using cell lines derived from aborted fetuses. His faith therefore prohibited him from accepting these vaccines.

8.      Although UVA Health knew that Mr. Phillips's description of the vaccines' production and testing history was correct, it nevertheless dismissed his objection as based on "misinformation"—fake news. Other than that, UVA Health's only response was simply to disagree with Mr. Phillips's religious belief, and to argue that the available vaccines' connection with abortion is too remote to trigger any real religious or moral concerns.

9.      Like Mr. Phillips, Plaintiff Mark Ehrlich requested a religious exemption from COVID-19 vaccination. Mr. Ehrlich's Seventh-Day Adventist faith has caused him to refrain from eating meat, taking pain relievers or cold medicines, and receiving vaccines for more than 25 years.

10.      Nonetheless, UVA Health believed it was entitled to establish what was and was not religious, including Mr. Ehrlich's motivations. It "found" he was not motivated by "a *bona fide* sincerely held religious belief" and instead, was motivated by secular beliefs falsely "veiled in religious language."

11.      The other named Plaintiffs had similar experiences.

12.      If Mr. Phillips, Mr. Ehrlich, or any of the other named Plaintiffs had belonged to one of the favored religious bodies on UVA Health's list, and had submitted exactly the same

3

application for a religious accommodation, UVA Health would have granted the exemption and would not have fired them.

13.     UVA Health perpetrated this blatant discrimination on a massive scale. Hundreds of UVA Health employees saw their religious exemption requests summarily denied simply because they belong to the wrong church, or simply because UVA Health disapproved of their religious views regarding abortion and vaccines.

14.     Countless more job applicants did not even get serious consideration for the same reasons. Plaintiff Janet Ripley learned this firsthand when, months after being fired from UVA Health, her supervisor asked her to reapply and told her that she would be hired—only to find that she *still* could not get a religious exemption from the COVID-19 vaccine mandate.

15.     The U.S. and Virginia Constitutions do not permit any of this. The Supreme Court, the Fourth Circuit, and this Court have held over and over again that government must respect religious beliefs that are based on individual interpretations of scripture or doctrine, as well as beliefs officially articulated by a church body. UVA Health therefore may not constitutionally create a scheme of religious exemptions that ignores employees' actual individual beliefs and instead simply doles out benefits based on which church an employee belongs to. Moreover, UVA Health certainly may not grant or withhold religious exemptions based on UVA Health's own agreement or disagreement with an employee's religious beliefs—including beliefs about the acceptable relationship between abortion and vaccines.

16.     Because UVA Health has done both of those things, it has violated the Establishment, Free Exercise, and Equal Protection guarantees of the U.S. and Virginia Constitutions. Defendants therefore are liable for injunctive relief in their official capacities and money damages in their personal capacities.

## JURISDICTION AND VENUE

17.     This Court has original subject matter jurisdiction over this case, as it raises claims pursuant to federal statute, pursuant to 28 U.S.C § 1331 and 42 U.S.C. § 1983. This Court further has supplemental jurisdiction over Plaintiff's state law claims pursuant to 29 U.S.C § 1367.

18.     This Court has general personal jurisdiction over the Rector and Visitors of the University of Virginia because they are incorporated in, and have their principal place of business in, this District.

19.     This Court has specific personal jurisdiction over all Defendants because their actions giving rise to the causes of action asserted herein either took place in or were deliberately and knowingly directed toward this District.

20.     Venue is proper in this District under 28 U.S.C § 1391(b), as events giving rise to the causes of action asserted herein took place primarily within the District.

## NAMED PLAINTIFFS

21.     Plaintiff Dwayne Phillips is a former employee of UVA Health. From June 2019 until November 2021, he worked as an Assistant Nurse Manager at UVA Health's Kidney Center Clinic in Charlottesville, Virginia.

22.     At all relevant times, Mr. Phillips was and is a citizen of Virginia and a resident of Bremo Bluff, Virginia.

23.     Plaintiff Mark Ehrlich is a former employee of UVA Health. From November 2020 until November 2021, Mr. Ehrlich worked as a Manager Patient Friendly Access in UVA Health's digestive health department in Charlottesville, Virginia.

24.     At all relevant times. Mr. Ehrlich was and is a citizen of Virginia and a resident of Stanardsville, Virginia.

25.     Plaintiff Ryan Meszaros is a former employee of UVA Health. From 2000 until November 2021, he worked at the University of Virginia Medical Center Emergency Department in Charlottesville.

26.     Mr. Meszaros held multiple job titles that changed over time, but he worked primarily as an RN Clinician IV, an RN Clinical Supervisor, a Forensic Nurse Examiner, and as an instructor at UVA Health's Life Support Learning Center.

27.     At all relevant times, Mr. Meszaros was and is a citizen of Virginia and a resident of Madison, Virginia.

28.     Plaintiff Rebecca Tyson is a former employee of UVA Health. From August 2017 until November 2021, she worked as a Patient Access Associate, first at Northridge Clinic in Charlottesville and later at Zion Crossroads Primary Care and Specialty Clinic in Zion Crossroads.

29.     At all relevant times, Ms. Tyson was and is a citizen of Virginia and a resident of Louisa, Virginia.

30.     Plaintiff Rebecca Loflin is a former employee of UVA Health and a Registered Nurse. Until November 2021, she worked as an RN Care Coordinator in the Pediatric Endocrinology unit of UVA Health's Children's Hospital, helping care for diabetic children.

31.     At all relevant times, Ms. Loflin was and is a citizen of Virginia and a resident of Stuart's Draft, Virginia.

32.     Plaintiff Janet Ripley is a former employee of UVA Health. From 1987 until November 2021, she worked at the University of Virginia Medical Center in Charlottesville.

33.     Ms. Ripley held multiple job titles that changed over time, but she worked primarily as a Staff CT Technologist.

34.     At all relevant times, Ms. Ripley was and is a citizen of Virginia and a resident of Greenville, Virginia.

## DEFENDANTS

35.     Defendants the Rector and Visitors of the University of Virginia are the corporate board for the University of Virginia ("UVA"), which is a public corporation and an agency or instrumentality of the Commonwealth of Virginia. UVA is headquartered in Charlottesville, Virginia.

36.     University of Virginia Health System, also known as "UVA Health," is operated by, and is a division of, UVA. UVA Health is an academic health system that operates a medical center, trauma center, Comprehensive Cancer Center, UVA Children's Hospital, three community hospitals, and a network of primary and specialty care clinics throughout Virginia.

37.     UVA Health is headquartered in Charlottesville, Virginia, where its leaders establish human resources policies for its approximately 16,000 employees. UVA Health's employees work for its constituent organizations including, without limitation, UVA Medical Center, UVA School of Medicine, UVA School of Nursing, UVA Claude Moore Health Sciences Library, UVA Physicians Group, UVA Community Health Medical Group, the Transitional Care Hospital, the Health System Development Office/UVA Health Foundation, and UVA Physician Group (collectively, "UVA Health").

38.     Defendant Whittington W. Clement is the Rector of UVA. He is sued in his official capacity.

39.     Defendant Robert D. Hardie is the Vice Rector of UVA. He is sued in his official capacity.

40.     Defendants Robert M. Blue, Mark T. Bowles, Carlos M. Brown, Elizabeth M. Cranwell, Thomas A. DePasquale, U. Bertam Ellis Jr., Louis S. Haddad, Babur B. Lateef, Stephen P. Long, Angela Hucles Mangano, James B. Murray, Jr., L. F. Payne, Amanda L. Pillion, James V. Reyes, Douglas D. Wemore, Susan E. Kirk, and Lily A. Roberts are the Visitors of the University of Virginia. They are sued in their official capacities.

41.     Defendants Babur B. Lateef, Robert M. Blue, Whitting W. Clement, Stephen P. Long, James B. Murray, James V. Reyes, Douglas D. Wetmore, are the Visitor members of the UVA Health System Board. They are sued in their official capacities.

42.     K. Craig Kent, MD is Chief Executive Officer of UVA Health and UVA's Executive Vice President for Health Affairs. He is sued in his individual and official capacities.

43.     Wendy Horton is the Chief Executive Officer of UVA Medical Center. She is sued in her individual capacity.

44.     Mary Frances Southerland is the Chief Administrative Officer of UVA Health. She is sued in her individual capacity.

45.     Defendants named in paragraphs 33-44 (collectively, "UVA Health's Leaders") are responsible for management, oversight, policies, and practices of UVA Health.

46.     Defendants John Does 1-5 (collectively, the "Religious Accommodation Committee") are senior Human Resources personal of UVA Health who are the voting members of a committee established by UVA Health's Leaders to evaluate employees' religious beliefs and decide whether to grant employee requests for religious accommodations related to COVID-19 vaccination. They are sued in their individual capacities.

47. Melissa Frederick is a former Assistant Vice President of UVA Health System, and was the chairperson of UVA Health's Religious Accommodation Committee at the time the Named Plaintiffs were denied religious exemptions and fired. She is sued in her individual capacity.

48. The Religious Accommodation Committee carried out directives, policies, and/or practices established or as directed by UVA Health's Leaders.

49. UVA Health has never disclosed the names of the Religious Accommodation Committee members to Plaintiffs. When Plaintiffs learn the identities of these individuals, they intend to amend their Complaint to name each of them specifically in their individual and official capacities.

50. UVA Health's Leaders and members of the Religious Accommodation Committee are referred to collectively, hereinafter, as "Defendants" or as "UVA Health."

**DEFENDANTS MANDATE EMPLOYEE COVID-19 VACCINATION
AND CREATE AN UNCONSTITUTIONAL ACCOMMODATION PROCESS**

51. On August 25, 2021, UVA Health's Leaders announced that all UVA Health employees were required to be vaccinated against COVID-19 or be terminated on November 1, 2021. Pursuant to policy OCH-002, UVA Health's Occupational Health Screening and Maintenance Policy all employees were required to receive two doses of the Moderna or Pfizer COVID-19 vaccines, or one dose of the Johnson & Johnson COVID-19 vaccine.

52. UVA Health's Leaders anticipated that a number of employees would request religious accommodations seeking exemption from mandatory COVID-19 vaccination.

53. UVA Health's Leaders established a new process to consider religious accommodations related to COVID-19 vaccination. This new process was more restrictive than UVA Health's previous processes for considering religious accommodations.

54.     UVA Health's Leaders assembled the Religious Accommodation Committee, a committee of five Human Resources employees, Defendants John Does 1-5. This committee would review accommodation requests submitted by employees and evaluate employees' religious beliefs and practices.

55.     UVA Health has not disclosed the procedures by which the Religious Accommodation Committee operated. According to testimony under oath by a UVA human resources leader, the committee "didn't have a record keeping system."

56.     It is not known whether the Religious Accommodation Committee members voted on individual exemption requests, or—if they did vote—how many committee members participated in each vote, or how many votes were required to grant or reject an exemption.

57.     UVA Health did know that, in processing and reviewing requests for religious exemptions, it was bound to comply with the U.S. Constitution and nondiscrimination laws, including laws prohibiting discrimination based on and requiring accommodation of employees' religious beliefs and practices. UVA Health and one or more of its attorneys informed the Religious Accommodation Committee about nondiscrimination laws and purported to provide training in how to comply with them. Ex. A (PowerPoint presentation created by UVA attorney).

58.     This training noted that UVA Health must grant religious accommodations "[u]nless it would be an undue hardship on the . . . operation of its business…" Ex. A slide 13.

59.     Religious Accommodation Committee members were informed that an employee's

> belief is "religious" if it is "religious" in a person's "own scheme of things," i.e. it is a "sincere and meaningful" belief that "occupies a place in the life of its possessor parallel to that filled by…God."

> This includes theistic as well as non-theistic moral or ethical beliefs as to what is right and wrong which are sincerely held with the strength of traditional religious views.

Ex. A slide 5 (ellipsis in original).

60.     However, UVA Health did not wish to grant religious exemptions and sought to minimize the number it granted. Its leaders, human-resources staff, and attorneys accordingly formulated and applied extraordinarily narrow and biased criteria for granting religious exemptions.

## UVA HEALTH CREATES A LIST OF FAVORED CHURCHES

61.     UVA Health decided that essentially the only employees it would exempt from the COVID-19 mandate were those who belonged to churches or other religious bodies that had official doctrines forbidding all vaccines.

62.     As part of its process for training its human-resources personnel to review religious exemption requests, UVA Health established a written list of "religions that prohibited vaccination." The list included specific approved churches with "a known theological objection to vaccines" including Dutch Reformed Congregations, Faith Tabernacle, Church of the First Born, Faith Assembly, End Time Ministries, and Church of Christ, Scientist. *See* Ex. A slide 13.

63.     UVA Health instructed human resources personnel in writing that they should routinely grant exemption requests from employees who practiced these approved faiths. *See* Ex. A slide 15.

64.     The UVA Health Executive Vice President who oversaw the exemption process has repeatedly testified under oath that employees who stated they were members of these approved faiths had their exemption requests approved "automatically."

65.     UVA Health also exempted from the COVID-19 vaccine mandate any individual who had previously been granted a religious exemption from receiving annual flu vaccines. UVA Health did not require such individuals to apply for a COVID-19 vaccine exemption at all.

66.     However, UVA Health had first implemented a flu-vaccine mandate for employees only shortly before COVID-19 began spreading, and it did little to enforce the flu vaccine mandate during the pandemic, so this automatic exemption had relatively limited scope.

67.     According to UVA Health's written instructions, if an employee's religious exemption request cited religious grounds but the employee was not a member of one of the approved faiths or religious groups, the request "should be forwarded to the Committee for discussion/consideration."

68.     In reality, if a UVA Health employee did not identify as a member of an approved faith on UVA's established list, but still had individual religious beliefs precluding vaccination in general or the COVID-19 vaccines in particular, it did not matter to UVA Health what the employee's religious beliefs were, how sincere they were, or how long or how faithfully the employee had adhered to them.

69.     UVA determined that it would deny religious exemption requests by such employees as pretextual, as insincere, as simply wrong on the moral question involved, or as misinterpretations of the employee's own religious beliefs.

70.     In short, UVA Health granted religious exemptions to members of religious denominations that it favored, while denying religious exemptions to employees who held exactly the same religious beliefs about the COVID-19 vaccine, but who did not belong to one of the religious bodies on UVA Health's established list.

## UVA CATEGORICALLY DISMISSES RELIGIOUS OBJECTIONS
## <u>REGARDING VACCINES AND FETAL CELL LINES AS "MISINFORMATION"</u>

71.    The development or testing history of all COVID-19 vaccines available in the United States included the use of cell lines that originated from aborted fetuses. That is, at some point in the development or testing of each available COVID-19 vaccine, the company developing or testing the vaccine used human cells that had been growing and reproducing themselves in a lab for years, but that had originated with cells taken from an aborted fetus.[1]

72.    UVA Health was aware of this when it considered religious exemption requests.

73.    UVA Health also was aware of false claims circulating on the Internet that doses of the vaccine given to patients actually contain aborted fetal cells.

74.    UVA Health formed its own religious/moral view that the vaccines' connections with abortion are so remote that no one could harbor any sincere religious objection to them.

75.    Because of UVA Health's own moral position, it disapproved of and disagreed with the religious beliefs of employees who requested exemptions from its COVID-19 mandate based on the vaccines' connection to abortion, and it therefore decided not to grant such exemptions.

76.    Even if a UVA Health employee's information was perfectly accurate—even if the employee specifically objected on religious grounds to the use of fetal cells in the development or testing of the vaccines—that did not matter to UVA Health. UVA Health determined that, when a religious exemption request mentioned abortion, it would deny the request as based on "misinformation" or as not raising any serious moral concern.

---

[1] *See, e.g.*, Prentice, David, Charlotte Lozier Inst., *Update: COVID-19 Vaccine Candidates and Abortion-Derived Cell Lines* (Sept. 30, 2020, Updated June 2, 2021), https://lozierinstitute.org/update-covid-19-vaccine-candidates-and-abortion-derived-cell-lines/ (accessed Dec. 12, 2022.)

## UVA'S UNCONSTITUTIONAL DISCRIMINATION AGAINST
## PLAINTIFFS/CLASS REPRESENTATIVES

77.     While Plaintiffs Dwayne Phillips, Mark Ehrlich, Ryan Meszaros, Rebecca Tyson, Rebecca Loflin, and Janet Ripley had different job duties, worked in different divisions of the health system, and had different beliefs, UVA Health applied the same unconstitutional policy and practices to all Plaintiffs.

### Plaintiff Dwayne Phillips' Employment with UVA Health and
### Request for Exemption From COVID Vaccination

78.     Mr. Phillips has a bachelor's degree in nursing and a master's degree in business administration. He has been a Registered Nurse since 1997.

79.     After working for several other health care organizations, Mr. Phillips was hired as Assistant Nurse Manager for UVA Health's Kidney Center Clinic in June 2019.

80.     In this role, Mr. Phillips supervised nursing and patient care delivery, including human resources management. Mr. Phillips had oversight of the complete comprehensive program.

81.     Mr. Phillips is also a Christian. He endeavors, with God's help, to follow God's commands in all areas of his life. When faced with important decisions, he attempts to pray and read the Bible to determine God's will. Mr. Phillips believes God's Holy Spirit provides guidance to Christians today, including him.

82.     As a Christian, Mr. Phillips believes in the sanctity of human life and believes that abortion is morally wrong. His faith dictates that he may not support or benefit from abortion in any way and that to do so would be a sin against God.

83.     When Mr. Phillips learned of UVA Health's mandated vaccination for COVID-19, he promptly requested a religious exemption from the vaccine mandate, submitting three

separate documents in support of his request. As relevant here, Mr. Phillips's exemption request explained two different ways in which receiving a COVID-19 vaccine would violate his religious beliefs.

84.     First, Mr. Phillips explained that he believes that God's "Holy Spirit … reside[s] within everyone who confesses that they are a sinner and accepts Jesus as our Savior…. His Holy Spirit communicates with us and guides us in this world." Therefore, Mr. Phillips believes that "God's Holy Spirit dwells within me and communicates with me."

85.     Although he acknowledged that "[t]his may be difficult for some[one] who does not believe to understand," Mr. Phillips's exemption request explained that "God has communicated to me through His Holy Spirit that I should not accept the COVID 19 vaccine," and that "[t]he Holy Spirit has communicated to me that I should not receive these vaccines and to do so is sinful for me."

86.     Second, Mr. Phillips's exemption request explained that the available "COVID 19 vaccines have been researched, developed, tested and/or produced using … tissue … derived from fetal cells harvested in previous abortions." He believes that he must not associate himself with or benefit from abortion "in any way whether in the past, present, or future," and that this includes receiving a vaccine with this level of connection to abortion.

87.     In his exemption request, Mr. Phillips acknowledged that, in the past, he had unwittingly received other vaccines or used medicines that have a similar connection to abortion. Mr. Phillips explained that he had not known of this connection to abortion until he learned about it during the controversy over COVID-19 vaccines—and once he learned that he had previously received vaccines and used medicines like those, he had felt it necessary to "confess[] my sin to God and receive[] forgiveness for these transgressions."

88.     Having learned about the connection between COVID-19 vaccines and abortion, Mr. Phillips sincerely believed that receiving the vaccines would violate God's will for him.

### UVA Health Denies Mr. Phillips's Requested Exemption on Unconstitutional Grounds

89.     In a series of short electronic communications in September and October 2021, UVA Health denied Mr. Phillips's religious exemption request. The only explanation contained in any of the letters was a cursory statement that "none of the currently authorized/approved vaccines have fetal cells or tissues."

90.     On information and belief, other than these denial letters, UVA Health created no records of any kind to memorialize its consideration of Mr. Phillips's exemption request.

91.     After UVA Health denied Mr. Phillips's exemption request, on November 15, UVA Health gave Mr. Phillips written notice that it intended to fire him for not receiving the vaccine. UVA Health fired Mr. Phillips two days later, on November 17.

92.     Mr. Phillips filed a grievance with the Commonwealth of Virginia's Office of Employment Dispute Resolution. At the hearing, Melissa Frederick, who was the UVA Health Assistant Vice President for Human Resources who oversaw UVA Health's consideration of exemption requests, testified under oath that UVA Health denied Mr. Phillips's exemption request because it refused to recognize that Mr. Phillips's convictions about "God speaking to him" or "the … Holy Spirit speaking to him" qualified as "religious belief." As UVA's own lawyer summarized her testimony, "a direct instruction … from God is not … something that … would qualify [for] a religious accommodation here."

93.     Ms. Frederick also testified that Mr. Phillips's exemption request was based on "misinformation" that "this vaccine … contains fetal cells from aborted fetuses."

94.     Mr. Phillips's actual exemption request, however, stated exactly the opposite: "that there are not fetal cells in the vaccine itself." His real objection was that the vaccines are produced or were tested using fetal cell lines that *originated* from aborted fetal cells.

95.     Ms. Frederick testified on behalf of UVA Health that she did not know whether fetal cell lines were used in the production of any of the mandated COVID-19 vaccines.

96.     The Commonwealth's hearing officer agreed that UVA Health could disregard Mr. Phillips beliefs and that UVA Health had the right to establish what was actually required by Mr. Phillips' religious faith.

97.     The hearing officer's decision noted Mr. Phillips' statement, in his exemption request, that "my sincere belief is that God has communicated to me through His Holy Spirit that I should not accept the COVID 19 vaccine. I sincerely believe that doing so would be a sin against God and disobedient to His command to me." Ex. B. p. 4. Regarding this aspect of Mr. Phillips request, the hearing officer endorsed UVA Health's findings:

> There is little doubt that Grievant has sincerely held religious beliefs. Grievant must show that those sincerely held religious beliefs preclude him being vaccinated. Simply because an employee says his or her religion precludes vaccination does not make it true. ***
>
> [T]he nature of Grievant's communication [with the Holy Spirit] would not in itself represent a tenet of his religion.

*Id*. p. 9.

98.     The hearing officer also noted Mr. Phillips' belief that he could not be vaccinated because cell lines originating from fetuses aborted in the past were used in the manufacturing or testing of COVID-19 vaccines. The officer found that Mr. Phillips was factually correct: that the three available COVID-19 vaccines were either "manufactured using human fetal cells from an

abortion," or had "fetal cell lines … used to test [their] efficacy … while they were being researched and developed." *Id*. p. 11.

99.     Nonetheless, the hearing officer agreed that UVA Health could decide what Mr. Phillips' religious beliefs required. The decision affirmed that UVA could decide whether there was "a sufficient nexus between receiving a dose of the Moderna or Pfizer vaccine and [Mr. Phillip']s religious beliefs. A mere association with abortion is not sufficient to establish that Grievant's religious beliefs precluded vaccination." *Id*.

100.     Since being fired by UVA Health, Mr. Philips has been unable to find other work in the health care field. This has apparently brought to an end Mr. Phillips's lengthy and successful career in the health-care field.

101.     Mr. Phillips has been forced to take a different job that pays less than half the salary he earned at UVA Health, causing severe financial stress on his family.

**Plaintiff Mark Ehrlich's Employment with UVA Health and
Request for Exemption from COVID Vaccination**

102.     Mr. Ehrlich has a bachelor's degree in business administration. He has been working in health-care management for nearly 20 years.

103.     In November of 2020, UVA Health hired Mr. Ehrlich as a "Manager Patient Friendly Access" for its digestive health department in Charlottesville.

104.     In that capacity, Mr. Ehrlich managed the scheduling team for the digestive health department.

105.     Mr. Ehrlich's primary workplace was a private office, in which he had only occasional interaction with coworkers.

106.     When Mr. Ehrlich attended work meetings, he normally attended by WebEx.

107.    Whenever Mr. Ehrlich entered common spaces at work, he consistently observed masking and social distancing practices.

108.    Mr. Ehrlich willingly participated in UVA Health's regimen for unvaccinated workers, including daily health attestations and weekly COVID-19 testing.

109.    Mr. Ehrlich is a Christian and a member of the Seventh Day Adventist Church.

110.    Mr. Ehrlich's sincere religious beliefs compel him to abstain from eating meat, so he and his wife are practicing vegans. Mr. Ehrlich's beliefs similarly compel him to avoid the use of painkillers, such as acetaminophen or aspirin, as well as antihistamines and other cold and flu treatments.

**UVA Health Denies Mr. Ehrlich's Requested Exemption On Unconstitutional Grounds**

111.    Mr. Ehrlich's sincere religious beliefs are that it would be dishonoring to God for him to take certain medications, including the Influenza and COVID-19 vaccines. Accordingly, Mr. Ehrlich has never received these vaccines during his almost 20 years working in healthcare.

112.    Before Mr. Ehrlich joined UVA health, his two previous employers—both healthcare providers—granted him religious exemptions from receiving the flu vaccine.

113.    Well-known official Seventh Day Adventist teachings emphasize the relationship between physical welfare and spiritual health or holiness. Thus, Adventists are required to eat a kosher diet and abstain from using tobacco or alcohol.

114.    Many Adventists apply the principles of their faith even more strictly to their own lives. Thus, although it is not absolutely required by official church teaching, many Adventists— in some places, a majority of them—feel compelled on religious grounds to adopt a vegetarian or vegan diet.

115.    Similarly, many Adventists have concluded that their faith requires them to refrain from receiving some or all vaccines. Although the institutional Seventh-Day Adventist Church does not condemn vaccines generally or the COVID-19 vaccines in particular, it does officially recognize that "the decision to be immunized [against COVID-19] or not is the choice of each individual," which must be made "following God's leading in our lives."[2]

116.    After considering the general principles articulated by his church and seeking God's guidance through prayer and study of the Bible, Mr. Ehrlich sincerely believed that God was leading him to avoid vaccines. He believes that to disobey this conviction would be immoral and sinful.

117.    Pursuant to his religious belief, shortly after Mr. Ehrlich started work at UVA Health in November 2020, he requested a religious exemption from annual flu vaccination.

118.    UVA Health promptly changed Mr. Ehrlich's online flu-vaccine status to "compliant."

119.    When UVA Health announced its COVID-19 vaccine mandate in August 2021, it stated that previously-granted exemptions to the flu vaccine would be applied to exempt the same employees from COVID-19 vaccination. However, UVA Health human resources personnel later informed Mr. Ehrlich that his flu exemption somehow had *not* been carried over.

120.    After UVA Health fired Mr. Ehrlich, it took the position that it had never actually granted him a flu-vaccine exemption, but that he had been marked "compliant" due to a mistake or technical glitch.

---

[2] Seventh Day Adventist General Conference Health Ministries Department et al., *COVID-19 Vaccines: Addressing Concerns, Offering Counsel* (Dec. 22, 2020), https://www.healthministries.com/covid-19-vaccines-addressing-concerns-offering-counsel/?_ga =2.171863014.792021378.1668469269-1018213093.1668469269 (accessed Dec. 12, 2022.)

121.    Mr. Ehrlich tried in vain for more than six weeks to determine why his flu-vaccine exemption had not carried over, but when the deadline for COVID-19 vaccines arrived, he was forced to submit another religious exemption request.

122.    Mr. Ehrlich's exemption request explained his religious beliefs that he must not receive the flu or COVID-19 vaccines. Seventh-Day Adventist beliefs limiting believers' ingestion of food and medicines are well known and have been routinely recognized by federal courts.

123.    In a series of short electronic communications, UVA Health denied Mr. Ehrlich's exemption request.

124.    The letters gave no indication that UVA Health had given any individual consideration to Mr. Ehrlich's request. The only stated reason for denying the request was that "[t]he Medical Center cannot risk subjecting its patients or employees to unvaccinated employees providing medical care . . ."

125.    This reason is plainly false and pretextual, for at least two reasons. First, Mr. Ehrlich's job duties did not include providing medical care. Second, for other employees who *did* provide medical care, UVA Health granted vaccine exemptions if they belonged to churches on UVA Health's list of favored faiths.

126.    After UVA Health fired Mr. Ehrlich, he filed a grievance with the Commonwealth's Office of Employee Dispute Resolution. In response to Mr. Ehrlich's grievance, UVA Health took the position in writing that "Mr. Ehrlich's professed 'religious belief' was not sincere," but was merely a secular interest "veiled in religious language."

127.    The Commonwealth's hearing officer agreed—caricaturizing Mr. Ehrlich's religious conviction as a mere "aversion to harming his body," concluding as a matter of fact that

COVID-19 vaccines do not harm the body, and therefore concluding that Mr. Ehrlich's refusal to be vaccinated is a misinterpretation of his own religion.

128.    After being fired by UVA Health, Mr. Ehrlich was unable to find other suitable work for approximately 10 months. He eventually was forced to take a job paying substantially less than he had earned at UVA Health.

### Plaintiff Ryan Meszaros' Employment with UVA Health and Request for Exemption from COVID Vaccination

129.    Mr. Meszaros is a registered nurse and worked at the University of Virginia Medical Center Emergency Department, in Charlottesville, from 2000 until November 2021.

130.    At the time UVA Health imposed its COVID-19 vaccine mandate, Mr. Meszaros worked as an RN Clinician IV. In that capacity, he oversaw the day-to-day operations of the emergency department—overseeing the flow of hundreds of patients, supervising a team of around 20 nurses, and handling patient complaints.

131.    When Mr. Meszaros was not on-duty supervising the emergency department, he also served as a Forensic Nurse Examiner in the Emergency Department. This role required Mr. Meszaros to be on call in case a sexual-assault patient presented to the Emergency Department. When that happened, Mr. Meszaros would report to the hospital and provide emergency care to the patient.

132.    Mr. Meszaros worked as a Forensic Nurse Examiner at UVA Health for 18 years, and was compensated for this separately from, and in addition to, his regular salary.

133.    On days when Mr. Meszaros was not scheduled to work supervising the emergency department, he also taught courses in trauma nursing and emergency pediatric nursing through UVA Health's Life Support Learning Center. UVA Health compensated Mr. Meszaros for this teaching work separately from, and in addition to, his regular salary.

134.    Mr. Meszaros is a Catholic Christian who believes that his body is a temple of the Holy Spirit, and that God requires him to refrain from the use of ritually unclean food or injections.

135.    For this reason, Mr. Meszaros regards all vaccines as ritually impure.

136.    Mr. Meszaros' religious conviction regarding vaccines predated the COVID-19 vaccine and is not limited to it. In 2019, when UVA Health began mandating flu vaccines for its employees, Mr. Meszaros and his wife both applied to UVA Health for religious exemptions from receiving the flu vaccine.

137.    Although their stated reasons for objecting to vaccines were identical, word for word, UVA Health granted a flu-vaccine exemption to Mr. Meszaros' wife but denied one to him. UVA Health did not explain the reasons for the denial.

138.    Faced with mere days to choose between receiving a flu vaccine and being fired from UVA Health, Mr. Meszaros violated his religious beliefs and received the flu vaccine. This decision has deeply troubled his conscience ever since.

139.    In the 2020-2021 flu season, Mr. Meszaros complied with the dictates of his conscience and did not receive the flu vaccine. Although UVA Health had not granted him a formal exemption, it never disciplined him for not receiving the vaccine, and indeed never raised the issue with him at all.

140.    In 2021, when UVA Health mandated the COVID-19 vaccine, Mr. Meszaros was again determined that he would not violate his conscience. He promptly submitted an exemption application, explaining that the ingredients used in the available COVID-19 vaccines make them, to him, "the equivalent of a prohibited 'unclean food," which is "analogous to what non-kosher food is to orthodox Jews." He further explained that although the vaccines may be "completely

healthy" from the point of view of "[m]edical experts," ritual purity rules may still mean that "religious faith compels certain individuals"—including Mr. Meszaros—"to decline their consumption."

### UVA Denies Mr. Meszaros' Requested Exemption without Explanation

141.    UVA Health denied Mr. Meszaros' exemption application without explanation.

142.    On November 1, UVA Health suspended Mr. Meszaros from work for his failure to be vaccinated. Days later, UVA Health fired him.

143.    Mr. Meszaros has been forced to take lower-paying work as a nurse in another hospital's emergency department. Notably, this hospital readily granted Mr. Meszaros a religious exemption from all vaccine requirements.

144.    Mr. Meszaros's new position does not permit him to serve as a Forensic Nurse Examiner or to teach nursing courses, as he did at UVA Health. Mr. Meszaros has simply lost the income and experience that he derived from that work.

### Plaintiff Rebecca Tyson's Employment with UVA Health and Request for Exemption from COVID Vaccination

145.    Rebecca Tyson began work for UVA Health at Northridge Clinic in Charlottesville in August 2017.

146.    In 2020, Ms. Tyson made a lateral transfer to UVA Health's Zion Crossroads Primary Care and Specialty Clinic in Zion Crossroads, Virginia.

147.    As a Patient Access Associate, Ms. Tyson checked patients in and out for appointments.

148.    At the Zion Crossroads clinic, after a few months working at the front desk, Ms. Tyson's main job responsibility was answering telephone calls. She did this from an enclosed office that she shared with one other employee.

149.    Ms. Tyson is a Christian. She believes as a matter of faith that life begins at conception, that abortion is murder, and that cooperating with it in any manner is a grave sin.

150.    When UVA Health mandated that employees receive a COVID-19 vaccine, Ms. Tyson requested a religious exemption and explained these beliefs of hers.

151.    Specifically, Ms. Tyson explained that "the COVID-19 vaccines were developed, tested and/or manufactured … using human cell lines that were generated or derived from tissues of aborted fetuses," and that "it would violate my … religious beliefs to cooperate with, or otherwise be complicit in, abortion in any manner."

152.    Ms. Tyson has developed these religious beliefs over time, through prayer, study, and thought. In requesting a religious exemption from UVA Health, she acknowledged that her beliefs have "evolved" over time.

**UVA Health Denies Ms. Tyson's Requested Exemption On Unconstitutional Grounds**

153.    In a short email on September 13, 2021, UVA Health denied Ms. Tyson's exemption request without giving any explanation.

154.    When Ms. Tyson inquired about what was wrong with her application, her supervisor told her that it appeared the only employees who were receiving exemptions were Christian Scientists.

155.    In early November 2021, UVA Health suspended and then fired Ms. Tyson because she was not vaccinated against COVID-19.

156.    After her firing, Ms. Tyson filed a grievance with the Commonwealth's Office of Employment Dispute Resolution. In response to her grievance, UVA Health took the position in writing "that her professed 'religious belief' was not sincere," but instead was mere "personal beliefs … fueled by misinformation and simply veiled in religious language."

157.    UVA Health's grievance response did not corroborate its accusation about "misinformation." In fact, UVA Health conceded the "remote use of immortal fetal cell lines in [the vaccines'] testing and development."

158.    Instead, UVA Health simply declared its own religious and moral view that this "remote use" does not create any ethical problem. Specifically, UVA Health stated in writing that the connection between abortion and COVID-19 vaccines "is insufficient to establish a sincerely held belief that prohibits vaccination," and "was so remote that people of faith … have uniformly deemed vaccination morally and ethically responsible."

159.    In other words, UVA Health dismissed Ms. Tyson's religious beliefs about the acceptable connection between abortion and vaccines simply because UVA Health disagrees with them and disapproves of them, and prefers other conflicting moral or religious beliefs.

160.    The Commonwealth's hearing officer upheld Ms. Tyson's termination, agreed with UVA Health's preferred moral belief regarding abortion and vaccines, and held that Ms. Tyson had misinterpreted her own religion. The hearing officer concluded that, even if fetal cell lines were used in the production or development history of the vaccines, "[g]iving an employee the Moderna or Pfizer vaccines is not in furtherance of abortion" because "the vaccine dose Grievant would receive would not itself have been tested using fetal cells." The hearing officer concluded that the vaccines' "mere association with abortion is not sufficient to establish that Grievant's religion precluded vaccination," and that Ms. Tyson's conviction to the contrary was a misunderstanding of her own faith.

161.    Since being fired by UVA Health, Ms. Tyson has been unable to find other work in the health care field. She has been forced to take a different job with lower pay.

**Plaintiff Rebecca Loflin's Employment with UVA Health and**
**Request for Exemption from COVID Vaccination**

162.    Rebecca Loflin is a Registered Nurse and holds a bachelor's degree in nursing.

163.    In January 2020, UVA Health hired Ms. Loflin as the RN Coordinator of Pediatric Endocrinology in UVA Health's Children's Hospital.

164.    In that role, Ms. Loflin met with all patients diagnosed with diabetes and oriented them to the first steps of their hospital stay. She also helped teach patient classes and met with patients on an ongoing basis to ensure they were achieving their desired outcomes.

165.    Ms. Loflin is a born-again Christian who believes that her body is a temple of the Holy Spirit.

166.    After much prayer, she has concluded that this belief means that receiving any vaccine—not just a COVID-19 vaccine—would jeopardize her relationship with God.

167.    Ms. Loflin also believes as a matter of religious faith that all life is sacred, including the life of a child in the womb.

168.    When UVA Health announced that its employees were required to receive COVID-19 vaccinations, Ms. Loflin requested a religious exemption. Her application explained that receiving a COVID-19 vaccine would conflict with her belief that her body is a temple of the Holy Spirit.

169.    In addition, Ms. Loflin explained that "the companies that created the vaccines have used fetal cells in some capacity whether it be in the research, testing or developmental phase," and that therefore "accepting that vaccine goes against what God has asked of me and would be a sin."

170.    As part of her exemption request, Ms. Loflin additionally submitted a letter from her pastor specifying that "Rebecca beliefs that the Holy Spirit is forbidding her to accept the COVID shot" and "that to do so … would [be] sinning against our living God."

**UVA Health Denies Ms. Loflin's Requested Exemption Without Explanation**

171.    UVA Health denied Ms. Loflin's exemption request without giving any reason or explanation why.

172.    On November 7, 2021, UVA Health fired Ms. Loflin because she had not received a COVID-19 vaccine.

173.    Although Ms. Loflin has found other nursing work, the pay is substantially less than she received at UVA Health, placing a strain on her household finances.

**Plaintiff Janet Ripley's Employment with UVA Health and
Request for Exemption from COVID Vaccination**

174.    Janet Ripley is a Registered Radiologic Technologist who holds or has held certifications in Radiography, Nuclear Medicine, and Computed Tomography. She also holds a Virginia State License in Radiologic Technology.

175.    Ms. Ripley worked at UVA for 34 years, starting in 1987 while she was a student in UVA's Programs of Radiologic Technology.

176.    Over the decades, she worked her way to become the longest-tenured employee in the CT Department, in Radiology, at UVA Health's main Charlottesville hospital.

177.    Her job there, as a Staff CT Technologist, was to obtain high-quality scans of trauma, ICU, and ER patients.

178.    M. Ripley willing participated in UVA Health's regimen for unvaccinated workers, including daily health attestations and weekly COVID-19-testing.

179.   Ms. Ripley is a Christian who believes in the Bible. She also believes that innocent life is sacred to God, including the life of a child in the womb.

180.   When UVA mandated COVID-19 vaccines for its employees, Ms. Ripley requested a religious exemption. Her submissions explained that the ingredients used in the available COVID-19 vaccines make them, to her, "the equivalent of a prohibited 'unclean food," which is "analogous to what non-kosher food is to orthodox Jews." She further explained that although the vaccines may be "completely healthy" from the point of view of "[m]edical experts," ritual purity rules may still mean that "religious faith compels certain individuals"— including Ms. Ripley—"to decline their consumption."

181.   In addition, Ms. Ripley explained that "the manufacturers of the COVID vaccines have used aborted fetal cell lines as part of their research, development and testing," and that "[m]y faith prohibits me from participating in or benefitting from an abortion, no mater how far back in time that abortion occurred."

182.   Ms. Ripley's application acknowledged that "[i]n the past, I have received vaccines" with similar connections to abortion, because she was not aware of the connection.

183.   For these reasons, Ms. Ripley stated, "[i]t is my firm belief that receiving the COVID vaccine would be to sin against God, violate my conscience and jeopardize my relationship with God."

184.   UVA Health denied Ms. Ripley's exemption request with no explanation.

185.   In fact, when Ms. Ripley submitted requests for further review, she often received an electronic rejection notice within a few minutes after submission.

186.   In early November 2021, UVA Health fired Ms. Ripley for being unvaccinated.

187.    Ms. Ripley has been unable to find other work in the medical field that would allow her to continue caring for her aging father. Since leaving UVA Health, she has been attempting to start her own business and has had no source of income.

188.    Ms. Ripley's inability to work in the medical field has also complicated her ability to maintain her professional certifications.

**Ms. Ripley Is Invited to Re-Apply but Is Again Denied a Religious Exemption.**

189.    In February of 2021, the supervisor of Ms. Ripley's former department at UVA Health sent her a text message. The message stated that UVA Health had been unable to hire anyone to do Ms. Ripley's former job, and invited her to re-apply for the job and for a religious exemption from the vaccine mandate.

190.    Ms. Ripley submitted an application, and shortly thereafter was told by the supervisor that she would be hired if the religious exemption could be granted.

191.    Ms. Ripley applied for a religious exemption using a process similar to the one she had experienced before.

192.    After several weeks of waiting, Ms. Ripley was told that she still would not be allowed a religious exemption, and so would not be re-hired.

193.    On September 5, 2022, ten months after UVA Health terminated her, Ms. Ripley checked with the manager and was told that her old position was still available.

194.    On December 9, 2022, Ms. Ripley was again told that her old position remains open and that she would be welcome back.

## CLASS ALLEGATIONS

195.    Plaintiffs seek to represent and have certified two classes of plaintiffs.

**The Disfavored Religions Class**

196.     The Disfavored Religions Class, represented by all named Plaintiffs, consists of

all persons who, before the entry of judgment in this case:

(1) Were employed by or applied for employment with UVA Health, or with a UVA Heath-affiliated organization or entity that applied UVA Health's religious accommodation policies and practices.

(2) Submitted a request to UVA Health for a religious exemption from receiving a COVID-19 vaccine;

(3) Were not members of the Dutch Reformed Church; the Church of the First Born; the Church of Christ, Scientist; or any other church or religious organization appearing on the written list or lists established by UVA Health as churches, denominations, or religious bodies whose members would be exempted from the COVID-19 vaccine (collectively, "UVA's Favored Religions");

(4) After requesting a religious exemption, either

(a) were fired, suspended, disciplined, not hired, or subjected to any other adverse employment action by UVA Health as a result of not receiving a COVID-19 vaccine; or

(b) were given notice by UVA Health that they would be fired, suspended, disciplined, or subjected to any adverse employment action, but stopped working for UVA Health before the date that UVA Health identified for such adverse employment action; or

(c) were not granted an exemption by UVA Health and have not been hired by UVA Health to a position for which they applied.

197.     The Disfavored Religions Class includes hundreds of former employees of UVA

Health, rendering the class so numerous that joinder of all members is impracticable.

198.     There are many questions of law and fact common to the Disfavored Religions

Class, including:

- Whether UVA Health compiled a list of Favored Religions for which individuals who identified as affiliated would routinely be exempted from COVID-19 vaccination upon request, while denying identical exemption applications from class members who belonged to other religious traditions;

- Whether UVA Health otherwise favored—such as by applying more favorable accommodation standards or automatic exemptions—employees and applicants who

identified as affiliated with one of UVA's Favored Religions, while denying identical exemption applications from class members who belonged to other faiths or religious traditions;

- Whether UVA Health's actions, policies, or practices violated the Free Exercise rights of class members;

- Whether UVA Health's actions, policies, or practices violated the Establishment Clause;

- Whether UVA Health's actions, policies, or practices violated the Equal Protection Clause; and

- Whether UVA Health's actions, policies, or practices violated the establishment or free-exercise provisions of the Virginia Constitution.

199.     The named Plaintiffs' claims are typical of the claims of the other class members. Like the rest of the class, each of the named Plaintiffs requested a religious exemption from UVA Health's COVID-19 vaccine mandate, and UVA Health would have granted it if the named Plaintiff had stated the request was because of her or his belief or membership in one of UVA's Favored Religions.

200.     Each of the named Plaintiffs will fairly and adequately protect the interests of the class. Their interests in this matter are the same as those of the class, and they have no conflict of interest with the class.

201.     Defendants have acted on grounds that apply generally to the class because, as against each class member, Defendants took adverse employment actions that they would not have if only the class member belonged to one of UVA's Favored Religions. As a result, final injunctive relief or corresponding declaratory relief is appropriate respecting the Disfavored Religions Class as a whole.

202.     Questions of law or fact common to members of the Disfavored Religions Class predominate over any questions affecting only class members. Because UVA Health granted religious exemptions to members of its favored religious groups "automatically," with little or no

individualized consideration of their applications, whether it unlawfully discriminated against class members can be determined without examining their individual circumstances. In addition, a large portion of the damages due to class members consists of back pay or other lost wages, which can be calculated mechanically based on records maintained by UVA Health.

203.    A class action is superior to other available methods for fairly and efficiently adjudicating the claims of members of the Disfavored Religions Class. UVA Health discriminated against all class members in exactly the same way, and through the application of a uniform policy. Therefore, individual litigation of class members' claims would involve repeated re-litigation of exactly the same questions.

## The Abortion Objectors Class

204.    The Abortion Objectors Class, represented by Mr. Phillips, Ms. Tyson, Ms. Loflin, and Ms. Ripley, consists of all persons who, before the entry of judgment in this case:

(1) Were employed by or applied for employment with UVA Health, or with a UVA Heath-affiliated organization or entity that applied UVA Health's religious accommodation policies and practices; and

(2) Submitted a written request to UVA Health for a religious exemption from receiving a COVID-19 vaccine, based on the available vaccines' association with abortion or cell lines or tissue from aborted fetuses;

(3) After requesting a religious exemption, either

(a) were fired, suspended, disciplined, not hired, or subjected to any other adverse employment action by UVA Health as a result of not receiving a COVID-19 vaccine; or

(b) were given notice by UVA Health that they would be fired, suspended, disciplined, or subjected to any adverse employment action, but stopped working for UVA Health before the date that UVA Health identified for such adverse employment action; or

(c) were not granted an exemption by UVA Health and have not been hired by UVA Health to a position for which they applied.

205.     Plaintiffs cannot determine the exact number of members of the Abortion Objectors Class, since doing so would require access to UVA Health's records of class members' exemption requests. However, on information and belief, Mr. Phillips, Ms. Tyson, and Ms. Loflin estimate that the class consists of well over 100 individuals, rendering it so numerous that joinder of all members is impracticable.

206.     There are numerous questions of law and fact common to the Abortion Objectors Class, including:

- Whether Defendants took any adverse employment action—such as rejecting a request for religious exemption—on the basis of Defendants' moral or religious belief that COVID-19 vaccines' connection with abortion or fetal cell tissue is too remote or outdated to pose any moral or religious problem;
- Whether Defendants took any adverse employment action because Defendants disfavored the religious beliefs or viewpoints expressed by class members related to COVID-19 vaccines and abortion, fetal cell research, or similar issues;
- Whether such adverse employment actions violated the Free Exercise rights of class members;
- Whether such adverse employment actions violated the Establishment Clause;
- Whether such adverse employment actions violated the Virginia Constitution.

207.     The claims of Mr. Phillips, Ms. Tyson, Ms. Loflin, and Ms. Ripley are typical of the claims of the other class members. Like the rest of the class, Mr. Phillips, Ms. Tyson, Ms. Loflin, and Ms. Ripley each requested a religious exemption from the COVID-19 mandate based on the available vaccines' connection with abortion, and UVA Health denied those exemptions solely because it disagrees with or disapproves of their religious beliefs in this regard.

208.     Mr. Phillips, Ms. Tyson, Ms. Loflin, and Ms. Ripley have no conflicts of interest with the class.

209.     Defendants have acted on grounds that apply generally to the class because, as against each class member, they have taken adverse employment actions based on UVA Health's

own preferred moral and religious beliefs and viewpoints about abortion and COVID-19 vaccines. As a result, final injunctive relief or corresponding declaratory relief is appropriate respecting the Abortion Objectors Class as a whole.

210.   Questions of law or fact common to class members predominate over any questions affecting only class members. Because UVA Health denied abortion-related applications for religious exemptions based on its own moral and religious beliefs, rather than based on the circumstances or beliefs of individual class members, the lawfulness of those denials can be determined in common for the entire class. In addition, a large portion of the damages due to class members consists of back pay or other lost wages, which can be calculated mechanically based on records maintained by UVA Health.

211.   A class action is superior to other available methods for fairly and efficiently adjudicating the claims of members of the Abortion Objectors Class. UVA Health discriminated against all class members in exactly the same way, and through the application of a uniform policy. Therefore, individual litigation of class members' claims would involve repeated re-litigation of exactly the same questions.

### DEFENDANTS' UNLAWFUL ACTIONS AND OMISSIONS

212.   Each and every act of Defendants alleged herein was committed by Defendants named herein, and each and every act was committed under the color and authority of state law.

213.   The named plaintiffs and class members did not create risk for coworkers or patients. Because each participated in weekly COVID testing that UVA Health did not require for vaccinated employees, they presented a lower risk of transmission than their vaccinated coworkers.

214.    Other local hospitals and healthcare facilities have hired employees terminated by UVA Health. Those that mandate vaccination have routinely granted religious exemptions that were denied by UVA Health.

215.    Defendants' unlawful actions, policies, and practices were not compelled by any federal law or regulation. In fact, federal agencies seeking to mandate vaccination for COVID-19 expressly recognize that exemptions from vaccination are consistent with safety and may be required by applicable law because of employees' religious beliefs, practices, or observances that conflict with the vaccination.

216.    For a period of time, it was believed that UVA Health would be required to follow the Occupational Safety and Health Administration's ("OSHA") Emergency Temporary Standard on COVID-19 Vaccination and Testing published on November 5, 2021. See 86 Fed. Reg. 61402 (2021) ("ETS"). But the ETS never required or even allowed UVA Health's draconian approach to religious exemptions, for multiple reasons.

217.    Ultimately, the U.S. Supreme Court held that OSHA lacked authority to issue the ETS. But even before the Court's decision, the ETS never actually mandated vaccination—instead it expressly authorized testing as a safe alternative to vaccination. And regardless of an employer's policy, the ETS explicitly confirmed that employers must exempt employees from vaccination by providing "reasonable accommodation[s] under federal civil rights laws [if employees] have . . . sincerely-held religious beliefs, practices, or observances that conflict with the vaccination requirement."

218.    Similarly, in November 2021, the U.S. Department of Health and Human Services, Centers for Medicare & Medicaid Services issued an interim final rule that required certain providers and suppliers participating in Medicare and Medicaid programs to be

vaccinated for COVID-19, 86 Fed. Reg. 61555 (2021) (the "CMS Rule"). The CMS Rule expressly recognized that there would be "workers who cannot be vaccinated or tested because of . . . religious beliefs, practice, or observance" who may require "an exemption from their employer."

219.    CMS's final regulations mandated that the "policies and procedures" of covered healthcare facilities

> must include, at a minimum, the following components:***
>
> (vi) A process by which staff may request an exemption from the staff COVID-19 vaccination requirements based on an applicable Federal law [including accommodations of employee's religious beliefs, observances, or practices that prevented vaccination; and]
>
> (vii) A process for tracking and securely documenting information provided by those staff who have requested, and for whom the facility has granted, an exemption from the staff COVID-19 vaccination requirements ….

42 C.F.R. §§ 483.80(i)(3)(vi)-(vii).

220.    Defendants' actions, policies, and practices described herein, including the actions, policies, and practices of Defendants' subordinates at the direction or with the knowledge and approval of Defendants, deprived the named Plaintiffs and class members of their rights under the United States Constitution and federal statutes.

221.    Defendants directed their subordinates to take actions that deprived the named Plaintiffs and class members of their rights.

222.    Defendants set in motion a series of acts by their subordinates, or knowingly refused to terminate a series of acts by their subordinates, that they knew or reasonably should have known would cause the subordinates to deprive the named Plaintiffs and class members of their rights.

223.    Defendants knew that their subordinates were engaging in these acts and knew or reasonably should have known that the subordinates' conduct would deprive the named Plaintiffs and class members of their rights.

224.    Defendants failed to act to prevent their subordinates from engaging in such unlawful conduct.

225.    Defendants disregarded the known or obvious consequence that a particular deficiency of supervision, failure to supervise, omission of policy correction, omission of practice correction, or similar omission or inaction would cause their subordinates to violate the named Plaintiffs' and class members' rights.

226.    Defendants' deficiency of supervision, failure to supervise, omission of policy correction, omission of practice correction, or similar omission or inaction actually caused their subordinates to deprive the named Plaintiffs and class members of their rights.

227.    Defendants engaged in conduct that showed a reckless or callous indifference to the deprivation by their subordinates of the rights of others.

228.    Defendants' conduct was so closely related to the deprivation of the named Plaintiffs' and class members' rights as to be the moving force that caused the ultimate injury.

229.    As a result of Defendants' and their subordinates' unlawful acts, the named Plaintiffs and class members have suffered and continue to suffer economic and other damages in amounts to be proven at trial, including front pay, back pay, emotional distress damages, compensatory damages, punitive damages, and attorney fees in amounts to be determined at trial.

230.    The named Plaintiffs and/or other class representatives intend to amend this Complaint to add claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C § 2000e, *et seq.*, once they have exhausted their administrative remedies.

\*_____\*_____\*_____\*_____\*

## FIRST CAUSE OF ACTION
### Violation of the Free Exercise Clause under 42 U.S.C. § 1983
### <u>(By both classes)</u>

231.    Named Plaintiffs and the Classes restate and reallege each of the previous paragraphs.

232.    Class members have sincere religious beliefs that prevent them from receiving the COVID-19 vaccines.

233.    Defendants' mandate that class members receive the vaccines, or else lose their jobs, not be hired, or face other adverse employment actions, was a severe burden on this religious belief and practice.

234.    This mandate was not a neutral rule of general applicability, because Defendants made exceptions to this rule for other employees and job applicants—including employees and applicants who had certain medical needs, or who belonged to certain faiths or faith groups approved by Defendants, or who Defendants had previously exempted from receiving the flu vaccine.

235.    Defendants offered no such accommodations to Class members, but instead required them to choose between honoring their religious beliefs and losing their jobs, not being hired, or otherwise facing adverse employment action.

236.    This discrimination was not adequately tailored to achieve any government interest. Although government has an interest in limiting the occurrence and symptoms of COVID-19, it may not pursue that interest by arbitrarily granting religious exemptions to members of some favored faiths or faith bodies, while denying exemptions to other believers who want to engage in exactly the same religiously-motivated conduct.

237.   The lack of proper tailoring is further demonstrated by the fact that other hospital systems in Virginia and neighboring states, with similar operations to UVA Health, have managed to avoid the kind of mass firings of religious objectors that UVA Health perpetrated.

238.   Defendants engaged in this activity under color of state law.

239.   This discrimination violated well-established principles under the Free Exercise Clause of the U.S. Constitution.

240.   Because of Defendants' unlawful actions, the members of the Disfavored Religions Class suffered and continue to suffer economic and other damages in amounts to be proven at trial, including front pay, back pay, emotional distress damages, compensatory damages, punitive damages, and attorney fees in amounts to be determined at trial.

241.   In addition, Defendants' unlawful actions have caused members of the class to suffer and continue to suffer other harm not remediable by money damages.

## SECOND CAUSE OF ACTION
### Violation of the Establishment Clause under 42 U.S.C. § 1983
### (By the Disfavored Religions Class)

242.   Named Plaintiffs and the Disfavored Religions Class restate and reallege each of the previous paragraphs.

243.   In implementing UVA Health's COVID-19 vaccine mandate, Defendants compiled and/or enforced a list of religious bodies and communities whose members would routinely receive exemptions from the mandate.

244.   If the members of the Disfavored Religions Class had belonged to any of those favored religious bodies or communities, Defendants would have exempted them from UVA Health's COVID-19 vaccine mandate.

245.     Because the members of the Disfavored Faiths class belonged to other faith communities, and not the favored ones, Defendants refused to grant their exemption requests and fired them from their jobs, refused to hire them, or subjected them to other adverse employment actions.

246.     Defendants engaged in this activity under color of state law.

247.     This violated well-established principles under the Establishment Clause of the United States Constitution.

248.     Because of Defendants' unlawful actions, the members of the Disfavored Religions Class suffered and continue to suffer economic and other damages in amounts to be proven at trial, including front pay, back pay, emotional distress damages, compensatory damages, punitive damages, and attorney fees in amounts to be determined at trial.

249.     In addition, Defendants' unlawful actions have caused members of the class to suffer and continue to suffer other harm not remediable by money damages.

### THIRD CAUSE OF ACTION
### Violation of the Establishment Clause under 42 U.S.C. § 1983
### (By the Abortion Objectors Class)

250.     Mr. Phillips, Ms. Tyson, Ms. Loflin, Ms. Ripley, and the Abortion Objectors Class restate and reallege each of the previous paragraphs.

251.     Throughout history, scientists have had to grapple with ethical questions regarding the use of data or materials that were derived through immoral conduct. This has given rise to a significant religious and moral debate among bioethicists and theologians of various faiths: under what circumstances is it morally acceptable to use or benefit from products whose research-and-development histories implicate moral questions like these—and by contrast, when is it wrong or sinful to use or benefit from such products?

252.    This debate extends to and includes the moral status of medical products that were made from, or developed with the use of, tissue or cell lines that originated from aborted fetuses.

253.    At the time that each member of the Abortion Objectors Class sought religious exemptions to the COVID-19 vaccine, all varieties of COVID-19 vaccine available to them had been either produced or developed using cell lines that originated from aborted fetal tissue.

254.    Mr. Phillips, Ms. Tyson, Ms. Loflin, Ms. Ripley, and the members of the Abortion Objectors Class hold the sincere religious belief that this connection with abortion made it immoral for them to receive any of those vaccines.

255.    Defendants disagreed with this religious belief, and instead expressed their own preferred moral and religious view that the connection between COVID-19 vaccines and abortion is too remote to give rise to any ethical or religious concerns.

256.    Defendants fired, otherwise disciplined, or refused to hire each Class members because he or she refused to agree with, or conform his or her conduct to, Defendants' preferred moral and religious beliefs on this matter.

257.    Defendants engaged in this activity under color of state law.

258.    These actions violated well-established principles under the Establishment Clause of the First Amendment to the U.S. Constitution.

259.    Because of Defendants' unlawful actions, Mr. Phillips and the members of the Disfavored Religions Class suffered and continue to suffer economic and other damages in amounts to be proven at trial, including front pay, back pay, emotional distress damages, compensatory damages, punitive damages, and attorney fees in amounts to be determined at trial.

260.    In addition, Defendants' unlawful actions have caused members of the class to suffer and continue to suffer other harm not remediable by money damages.

## FOURTH CAUSE OF ACTION
### Violation of the Equal Protection Clause under 42 U.S.C. § 1983
### <u>(By the Disfavored Religions Class)</u>

261.    Named Plaintiffs and the Disfavored Religions Class restate and reallege each of the previous paragraphs.

262.    Each member of the Disfavored Religions Class could have submitted exactly the same exemption request that he or she did—and Defendants would have granted the request—had he or she belonged to the Dutch Reformed Church; the Church of the First Born; the Church of Christ, Scientist; or any other of numerous religious organizations or denominations on the written list prepared by UVA Health for that purpose.

263.    Defendants refused to grant each Class member's exemption request because he or she did not belong to any of those favored religious groups, but instead adhered to a different faith.

264.    This placed a severe burden on class members' fundamental right to practice their religious faith.

265.    This religious discrimination was not adequately tailored to achieve any government interest. Although the government has legitimate and important interests both in limiting the occurrence and symptoms of COVID-19 and in accommodating the sincere religious objections of its employees, it may not balance between those interests by arbitrarily discriminating between religious objectors, accommodating members of some faiths while firing those of other faiths who want to engage in exactly the same religiously-motivated conduct.

266.    Defendants engaged in this activity under color of state law.

267.    Defendants' discrimination based on religion violated well-established principles under the Equal Protection Clause of the U.S. Constitution.

268.     Because of Defendants' unlawful actions, Named Plaintiffs and each member of the Disfavored Religions Class suffered and continue to suffer economic and other damages in amounts to be proven at trial, including front pay, back pay, emotional distress damages, compensatory damages, punitive damages, and attorney fees in amounts to be determined at trial.

269.     In addition, Defendants' unlawful actions have caused members of the class to suffer and continue to suffer other harm not remediable by money damages.

**FIFTH CAUSE OF ACTION**
**Violation of the Virginia Constitution's Free Exercise guarantee**
**(By both classes)**

270.     Named Plaintiffs and the Classes restate and reallege each of the previous paragraphs.

271.     The class members have sincere religious beliefs that prevent them from receiving the COVID-19 vaccines.

272.     Defendants' mandate that class members receive the vaccines, or else lose their jobs, not be hired, or face other adverse employment actions, was a severe burden on this religious belief and practice.

273.     This mandate was not a neutral rule of general applicability, because Defendants made exceptions to this rule for other employees and job applicants—including employees and applicants who had certain medical needs, or who belonged to certain faiths or faith groups approved by Defendants, or who Defendants had previously exempted from receiving the flu vaccine.

274.     Defendants offered no such accommodations to class members, but instead required them to choose between honoring their religious beliefs and losing their jobs, not being hired, or otherwise facing adverse employment action.

275.   The lack of proper tailoring is further demonstrated by the fact that other hospital systems in Virginia and neighboring states, with similar operations to UVA Health, have managed to avoid the kind of mass firings of religious objectors that UVA Health perpetrated.

276.   This discrimination violated the Free Exercise Clause of the Virginia Constitution.

277.   Because of Defendants' unlawful actions, Named Plaintiffs and each Class member suffered and continue to suffer economic and other damages in amounts to be proven at trial, including front pay, back pay, emotional distress damages, compensatory damages, punitive damages, and attorney fees in amounts to be determined at trial.

278.   In addition, Defendants' unlawful actions have caused members of the class to suffer and continue to suffer other harm not remediable by money damages.

**SIXTH CAUSE OF ACTION**
**Violation of the Virginia Constitution's Establishment Clause**
**(By the Disfavored Religions Class)**

279.   Named Plaintiffs and the Disfavored Religions Class restate and reallege each of the previous paragraphs.

280.   In implementing UVA Health's COVID-19 vaccine mandate, Defendants compiled and/or enforced a list of religious bodies and communities whose members would routinely receive exemptions from the mandate.

281.   If the members of the Disfavored Religions Class had belonged to any of those favored religious bodies or communities, Defendants would have exempted them from UVA Health's COVID-19 vaccine mandate.

282.   Because the members of the Disfavored Faiths class belonged to other faith communities, and not the favored ones, Defendants denied their exemption requests and fired

45

them from their jobs, refused to hire them, or subjected them to other adverse employment actions.

283.    Through this conduct, Defendants conferred peculiar privileges or advantage upon certain specific sects or denominations, in violation of Article I, Section 6 of the Virginia Constitution.

284.    Because of Defendants' unlawful actions, each member of the Disfavored Religions Class suffered and continue to suffer economic and other damages in amounts to be proven at trial, including front pay, back pay, emotional distress damages, compensatory damages, punitive damages, and attorney fees in amounts to be determined at trial.

285.    In addition, Defendants' unlawful actions have caused members of the class to suffer and continue to suffer other harm not remediable by money damages.

## SEVENTH CAUSE OF ACTION
### Violation of the Virginia Constitution's Establishment Clause
### (By the Abortion Objectors Class)

286.    Mr. Phillips, Ms. Tyson, Ms. Loflin, Ms. Ripley, and the Abortion Objectors Class restate and reallege each of the previous paragraphs.

287.    Throughout history, scientists have had to grapple with ethical questions regarding the use of data or materials that were derived through immoral conduct. This has given rise to a significant religious and moral debate among bioethicists and theologians of various faiths: under what circumstances is it morally acceptable to use or benefit from products whose research-and-development histories implicate moral questions like these—and by contrast, when is it wrong or sinful to use or benefit from such products?

288.    This debate extends to and includes the moral status of medical products that were made from, or developed with the use of, tissue or cell lines that originated from aborted fetuses.

289.    At the time that each member of the Abortion Objectors Class sought a religious exemption to the COVID-19 vaccine, all available vaccines had been either produced or developed using cell lines that originated from aborted fetal tissue.

290.    Each member of the Abortion Objectors Class holds the sincere religious belief that this connection with abortion made it immoral for him or her to receive any of those vaccines.

291.    Defendants disagreed with this religious belief, and instead expressed their own preferred moral and religious view that the connection between COVID-19 vaccines and abortion is too remote to give rise to any ethical or religious concerns.

292.    Defendants fired, refused to hire, or otherwise disciplined each Class members because he or she refused to agree with, or conform his or her conduct to, Defendants' preferred moral and religious beliefs on this matter.

293.    Through these actions, Defendants diminished Class members' civil capacities, and/or imposed a religious test, in violation of Article I, Section 6 of the Virginia Constitution.

294.    Because of Defendants' unlawful actions, each member of the Abortion Objectors Class suffered and continue to suffer economic and other damages in amounts to be proven at trial, including front pay, back pay, emotional distress damages, compensatory damages, punitive damages, and attorney fees in amounts to be determined at trial.

295.    In addition, Defendants' unlawful actions have caused members of the class to suffer and continue to suffer other harm not remediable by money damages.

### JURY DEMAND

Named Plaintiffs and the Classes demand a trial by jury on all claims and issues for which they have a right to trial by jury.

## PRAYER FOR RELIEF

WHEREFORE, Named Plaintiffs and the Classes pray for judgment against Defendants and that this Court:

A. Adjudge, decree, and declare that Defendants are liable to all class members for their actual damages, including front pay, back pay, treble damages and statutory penalty, interest, emotional distress and pain and suffering, compensatory damages, punitive damages, and any damages or penalties available at law; and

B. Enter preliminary and permanent injunctions directing that Defendants discontinue the operation of their Religious Accommodations Committee, grant religious exemptions from COVID-19 vaccination to all Class members, reinstate the employment status of any Class member who requests it, and consider or reconsider all pending or future job applications by Class members without attaching any negative weight to their COVID-19 vaccination status;

C. Award Class members their costs, reasonable attorney fees, prejudgment interest, and any other relief permitted by statute; and

D. Award such other or further relief as the Court may deem necessary, proper, just or equitable.

Dated: December 13, 2022

Respectfully submitted,

**DWAYNE PHILLIPS, MARK EHRLICH,
RYAN MESZAROS, REBECCA TYSON,
REBECCA LOFLIN, AND JANET RIPLEY**

By their Counsel:

 s/Charles B. Molster, III
Charles B. Molster, III (VSB#23613)
Law Offices of Charles B. Molster, III PLLC
129 East Davis Street, Suite 250
Culpeper, Virginia 22701
Tel. (703) 346-1505
Email: cmolster@molsterlaw.com

Samuel W. Diehl (MN#0388371)[3]
Nicholas J. Nelson (MN#0388371)[3]
Nathan Hopkins (PA#328162) [3*]
CROSSCASTLE PLLC
333 Washington Avenue N.
Ste 300-9078
Minneapolis, MN 55401
Tel: (612) 429-8100
Fax: (612) 234-4766
Email:  sam.diehl@crosscastle.com
            nicholas.nelson@crosscastle.com
            nathan.hopkins@crosscastle.com

Joshua A. Hetzler, Esq. (VSB #89247)
Founding Freedoms Law Center
707 E. Franklin St.
Richmond, VA 23219
Tel: (804) 801-6707
Email: josh@foundingfreedomslaw.org

4856-6447-4171, v. 9

---

[3] Motion for Admission Pro Hac Vice to be filed. * Mr. Hopkins is supervised by principals of the firm who are members of the Minnesota bar.