**Exhibit B**



## COMMONWEALTH of VIRGINIA
*Department of Human Resource Management*

OFFICE OF EMPLOYMENT DISPUTE RESOLUTION

DECISION OF HEARING OFFICER

In re:

**Case Number: 11784**

Hearing Date:    May 11, 2022
Decision Issued:   May 31, 2022

## PROCEDURAL HISTORY

On November 15, 2021, Grievant was removed from employment for "Just Cause" because he refused to become vaccinated in accordance with the University's policy.

On December 13, 2021, Grievant timely filed a grievance to challenge the Agency's action. The matter advanced to hearing. On January 3, 2022, the Office of Employment Dispute Resolution assigned this appeal to the Hearing Officer. On May 11, 2022, a hearing was held by remote conference.

## APPEARANCES

Grievant
University Counsel
Witnesses

## ISSUES

1. Whether Grievant engaged in the behavior giving rise to his removal?

2. Whether there were mitigating circumstances justifying a reduction or removal of the University's action, and if so, whether aggravating circumstances existed that would overcome the mitigating circumstances?

3. Whether the University discriminated against Grievant by failing to provide him with a religious exemption to its vaccination mandate.

## BURDEN OF PROOF

The burden of proof is on the University to show by a preponderance of the evidence that its disciplinary action against the Grievant was warranted and appropriate under the circumstances. The employee has the burden of raising and establishing any affirmative defenses to discipline and any evidence of mitigating circumstances related to discipline. Grievance Procedure Manual ("GPM") § 5.8. A preponderance of the evidence is evidence which shows that what is sought to be proved is more probable than not. GPM § 9.

## FINDINGS OF FACT

After reviewing the evidence presented and observing the demeanor of each witness, the Hearing Officer makes the following findings of fact:

The University of Virginia Health System employed Grievant as an Assistant Nurse Manager.

The University created an electronic system called VaxTrax to allow employees to submit requests for exemption to the University's vaccination policy. The University refers to its employees as team members.

On August 25, 2021, the Executive Vice President sent an email to staff informing them that the University would "now require all team members without a religious or medical exemption to be vaccinated against COVID-19 by November 1, 2021. Any team member not meeting the vaccination requirement deadline will be subject to disciplinary action up to and including termination."[1]

The University assigned responsibility to a group of human resource employees to determining whether a request for exemption met the requirements of its vaccination policy. These employees received training on the University's policies and applicable laws. The Assistant Vice President described the employees as diverse in ethnicity and religion and having the ability to "function in the gray space."

---

[1] University Exhibit p. 23.

The University's objective was to distinguish between employees holding religious beliefs that precluded the taking of COVID-19 vaccines and employees using the color of religion to express personal objections to being vaccinated. Drawing this distinction was not a simple task.

The University identified all of the reasons an employee listed for refusing to take the vaccine. The University then looked at each reason to determine if it showed a religious belief precluding vaccination or reflected a personal preference. For example, if a reason reflected false information or misinformation, the University concluded the reason did not arise because of a religious belief. If the reason reflected a personal preference such as a political opinion, the University concluded that the reason was not based on a religious belief. Based on this analysis, the University determined whether the employee's application for religious exemption should be granted. The group did not document their reasoning or vote to grant or deny a request.

Over 400 employees requested religious exemptions. Employees were permitted to submit additional information after denial. Some employees submitted information three or four times. Each submission was to be reviewed by the committee. The group met daily.

On September 1, 2021, Grievant submitted a request for exemption to the COVID-19 vaccination:

> I am requesting an exemption from the requirement to receive the Covid 19 and the flu vaccines based on my sincerely held religious beliefs. First, I must provide an explanation of my faith to establish the foundation of my religious request for exemption from these vaccination requirements. My sincerely held belief is that that there is one omnipotent and omnipresent God who created all of humankind and all that we know to exist. ***
>
> As a believer saved by Jesus, God's Holy Spirit dwells within me and communicates with me. This may be difficult for some who does not believe to understand but the Bible has foretold this in 1 Corinthians 1:18 where it is stated, "For the message of the cross is foolishness to those who are perishing, but to us who are being saved it is the power of God." The Bible says in Genesis 1:27, "God created man in His own image, in the image of God he made him; male and female He created them." Further, the Bible says in Acts 17:25, "nor is He served by human hands, as though He needed anything, since He Himself gives to all people life and breath and all things". As for me, this explanation and so much more that is explained in God's Word, the Bible is my sincerely held belief. I firmly believe that God is my creator; he saved me by sending His Son Jesus to pay the price for my sin as he died on the cross, Jesus was raised from the dead three days later in victory over death and He exists now in Heaven with God the Father preparing a place for me. ***
>
> Further, God in the form of the Holy Spirit came to live within me when I accepted Jesus as my Savior. I believe that God has communicated with me that the human life begins at conception. Therefore, aborting an unborn child

at any stage of development is murder of an unborn child. To support this act in any way whether in the past, present, or future would cause me to sin against God. Additionally, my sincere belief is that God has communicated to me through His Holy Spirit that I should not accept the Covid 19 vaccine. I sincerely believe that doing so would be a sin against God and disobedient to His command to me. ***

As stated in the explanation of my religious belief, I believe that God has communicated with me that the human life begins at conception. Therefore, aborting an unborn child at any stage of development is murder of an unborn child. To support this act in any way whether in the past, present, or future would cause me to sin against God. Additionally, my sincere belief is that God has communicated to me through His Holy Spirit that I should not accept the Covid 19 vaccine. I sincerely believe that doing so would be a sin against God and disobedient to His command to me. As we have progressed through the covid 19 pandemic, I have discovered new information that was previously unknown by me about the development of vaccines. I discovered that many vaccines, including the flu vaccine and Covid 19 vaccines have been researched, developed, tested and/or produced using fetal tissue that was derived from fetal cells harvested during previous abortions. I discovered that I have previously sinned against God by receiving vaccines that used fetal tissue at some point during their development. This was difficult for me to discover but I have confessed my sin to God and received forgiveness for these transgressions. I may not support or benefit from abortion in any way. To do so is sin for me against God. It is clearly documented that the Pfizer, Moderna and Johnson and Johnson Covid 19 vaccines that are being offered were developed or produced using fetal tissue that ultimately derived from an aborted fetus at some point. The Holy Spirit has communicated to me that I should not receive these vaccines and to do so is sinful for me. [2]

On September 9, 2021, Grievant submitted another request for religious exemption to the COVID-19 vaccination requirement. On September 10, 2021, Grievant updated his request for religious exemption.

Grievant's request was denied:

Dear Applicant Thank you for your request for a religious exemption under the OCH-002-Health Screening Policy. At this time your request is denied. To qualify for a religious exemption, you must briefly explain the religious principle, tenet or belief and how that religion's principles, tenets or beliefs conflict with or preclude you from receiving a vaccination. For information on becoming compliant with OCH-002, please visit Immunize UVA.[3]

---

[2] University Exhibits p. 95, 96.

[3] University Exhibits p. 76.

Case No. 11784                                                    4

On September 15, 2021, Grievant updated his request for religious exemption to the COVID-19 vaccination requirement. His request was denied. He updated his request on September 23, 2021. Grievant's request was denied:

> Dear Applicant, We have reviewed your additional information, our decision remains, your request is denied. Please be aware that failure to comply with the vaccination requirement by November 1, 2021, may result in disciplinary action. Immunize UVA.[4]

On September 28, 2021 and October 13, 2021, Grievant updated his request for religious exemption to the COVID-19 vaccination requirement. His requests were denied.

Grievant was not vaccinated for COVID-19 on November 1, 2021. On November 2, 2021, the University suspended Grievant with the hope that Grievant would change his mind and become vaccinated. Grievant did not become vaccinated. On November 15, 2021, the University terminated Grievant by Written Notice of Intended Action for "Just Cause" pursuant to Medical Center Human Resource Policy 105.

## CONCLUSIONS OF POLICY

Medical Center Policy 701, Employee Performance Standards and Conduct, provides:

> Administrative Actions:
>
> Without regard to the Progressive Counseling Process described in this policy, employees who fail to complete the following as directed shall be suspended without pay until the requirement is successfully completed and Medical Center management is provided with documentation thereof:
>
> Failure to complete medical screenings, vaccinations and/or tests required in Health System Policy OCH-002 "Occupational Health Screening and Maintenance."
>
> Failure to complete all assigned and/or required testing or training modules.
>
> Failure to renew license, certification, registration, or other credential prior to the date of expiration as required by Medical Center Human Resources Policy No. 905 "Healthcare Provider Licensure and Certification."
>
> Any employee failing to complete the above requirements within five (5) scheduled workdays following suspension shall be terminated.

---

[4] University Exhibits p. 58.

Case No. 11784                                             5

Health System Policy OCH-002 governs Occupational Health Screening and Maintenance. This policy provides:

Tier 1. Team Members whose job-related activities require them to be present in Health System Facilities at any time in a given calendar year. ***

Team Members may apply for a medical or religious exemption from any requirement specified in this Policy including any additional requirements imposed by the Medical Center Hospital Epidemiologist from time to time. ***

The Team Member seeking an Exemption Request shall be provided with a written response to such request, and shall be afforded an opportunity to present additional information, if needed, in order to properly assess the request. ***

Team Members are responsible for ensuring their compliance with the requirements of this policy, and failure to comply may result in disciplinary action up to and including termination in accordance with applicable policies and procedures. ***

Tier 1: All current Tier 1 Team Members must have completed primary vaccination against COVID 19 by November 1, 2021. ***

REQUESTS FOR EXEMPTION BASED ON SINCERELY HELD RELIGIOUS BELIEF: Tier 1 and Tier 2 Team Member applications for exemption from required vaccination or booster based on a sincerely held religious belief require the submission to Employee Health/WorkMed via VaxTrax of an Exemption Request consistent with this Policy. ***

Tier 1 Team Members granted an exemption for any reason must undergo weekly testing, must mask in accordance with current guidelines, and must follow all other requirements established by the Hospital Epidemiologist.

Medical Center Human Resource Policy 104 governs Conditions of Employment. This policy provides:

Employees of the Medical Center may also be required to undergo any other screening, vaccinations, or tests determined by the Medical Center Hospital Epidemiologist to be necessary for infection control and patient safety. An employee failing to complete required screenings, vaccinations and/or any other immunizations are subject to disciplinary action in accordance with Medical Center Human Resources Policy No. 701 "Employee Standards of Performance and Conduct").

Medical Center Human Resource Policy 105 governs Management Conditions of Appointment and provides:

Individuals who are appointed to a management position with the University of Virginia Medical Center are employed under the conditions described in Medical Center Human Resources Policy No.104 "Conditions of Employment" and the conditions that are described in this policy.

Members of Management serve without the expectation of continued employment, are employed without contract or term and may be given Notice of Appointment Cessation at any time. The length of the Notice Period will be based on years of continuous service with the Medical Center as follows: ***

MANAGERS/ASSISTANT MANAGERS
< 3 years, 3 Months
3 – 5 years, 4 Months
More than 5 years, 6 Months

***

Members of Management may be removed for Just Cause. Just Cause may include, but is not limited to, professional incompetence, multiple instances of unacceptable performance, unethical conduct, misconduct that interferes with the capacity of the Member of Management to perform effectively the requirements of his/her position, being listed on the Department of Health and Human Services Office of the Inspector General's List of Excluded Individuals/Entities or the General Services Administration List of Parties Excluded from Federal Procurement and Non-Procurement Programs, or the falsification of credentials, education, qualifications or experience.

Members of Management removed for Just Cause are ineligible for severance payments made pursuant to the Notice of Appointment Cessation or otherwise.

The University required employees to become vaccinated for COVID-19 by November 1, 2021. Grievant did not become vaccinated. After being suspended Grievant did not indicate to the University that he had or intended to become vaccinated for COVID-19. The University has presented sufficient evidence to support its decision to remove Grievant from employment by administrative action.

To reverse the University's action, Grievant may show that the University failed to comply with or unfairly applied its vaccination policy. Grievant may also show that despite the University's policy, the Grievant holds a sincerely held religious belief precluding him from being vaccinated with the COVID-19 vaccine.

Grievant argued that the University incorrectly failed to grant him a religious exception to its COVID-19 vaccination requirement.

Title VII of the Civil Rights Act of 1964, as amended by the Equal Employment Opportunity Act of 1972, prohibits the University from discriminating against its employees on the basis of religion. See, 42 U.S.C. § 2000e et seq.

Title VII requires employers to accommodate religious beliefs, practices and observances if the beliefs are "sincerely held" and the reasonable accommodation poses no undue hardship on the employer.

The EEOC stated:

Religious beliefs include theistic beliefs as well as non-theistic "moral or ethical beliefs as to what is right and wrong which are sincerely held with the strength of traditional religious views." Although courts generally resolve doubts about particular beliefs in favor of finding that they are religious, beliefs are not protected merely because they are strongly held. Rather, religion typically concerns "ultimate ideas" about "life, purpose, and death."

Social, political, or economic philosophies, as well as mere personal preferences, are not religious beliefs protected by Title VII. (Citations omitted).[5]

Title VII does not protect social, political, or economic views or personal preferences. Thus, objections to a COVID-19 vaccination requirement that are purely based on social, political, or economic views or personal preferences, or any other nonreligious concerns (including about the possible effects of the vaccine), do not qualify as religious beliefs, practices, or observances under Title VII. However, overlap between a religious and political view does not place it outside the scope of Title VII's religious protections, as long as the view is part of a comprehensive religious belief system and is not simply an isolated teaching.[6]

If an employee's objection to a COVID-19 vaccination requirement is not religious in nature, or is not sincerely held, Title VII does not require the employer to provide an exception to the vaccination requirement as a religious accommodation.[7]

---

[5] https://www.eeoc.gov/laws/guidance/section-12-religious-discrimination

[6] https://www.eeoc.gov/wysk/what-you-should-know-about-covid-19-and-ada-rehabilitation-act-and-other-eeo-laws#L

[7] https://www.eeoc.gov/wysk/what-you-should-know-about-covid-19-and-ada-rehabilitation-act-and-other-eeo-laws#L

Case No. 11784                                8

A religious practice includes, "moral or ethical beliefs as to what is right and wrong which are sincerely held with the strength of traditional religious views." 29 CFR 1605.1.

In Dachman v. Shala, 9 F. App'x 186, 193 (4th Cir. 2001), the Court held:

While an employer has a duty to accommodate an employee's religious beliefs, the employer does not have a duty to accommodate an employee's preferences.

There is little doubt that Grievant has sincerely held religious beliefs. Grievant must show that those sincerely held religious beliefs preclude him being vaccinated. Simply because an employee says his or her religion precludes vaccination does not make it true. There must be some rational, reasonable, and explicit connection between the employee's religious views and the employee's refusal to become vaccinated. In other words, Grievant's claim that he has religious beliefs is subject to a subjective test. Grievant's claim that his religious beliefs preclude him from being vaccinated is subject to both a subjective and objective reasonableness test.

Grievant has not presented sufficient evidence to show that his religious beliefs preclude vaccination.

Grievant asserted, "God has communicated to me through His Holy Spirit that I should not accept the Flu vaccine."

Grievant did not testify. He did not express the nature of his communication and afford the University an opportunity to examine the nature of his communication. In any event, the nature of Grievant's communication would not in itself represent a tenet of his religion.

Grievant submitted a letter from his Pastor who wrote that the official position of the church was not against the influenza and COVID-19 vaccinations but many members like Grievant strictly followed the church's counsels on healthy living and the biblical teaching found in 1 Corinthians 6:19 that our bodies are the temple of the Holy Spirit.

In *Geerlings v. Tredyffrin/Easttown Sch. Dist.*, Civil action 21-cv-4024, 13 (E.D. Pa. Sep. 27, 2021) the court held:

The notion that we should not harm our bodies is ubiquitous in religious teaching, but a "concern that [a treatment] may do more harm than good is a medical belief, not a religious one." *Fallon v. Mercy Cath. Med. Ctr. of Se. Pennsylvania,* 877 F.3d 487, 492 (3d Cir. 2017). Even though the two may sometimes overlap, such as where a prohibition on eating pork serves both sanitary and spiritual ends, it takes more than a generalized aversion to harming the body to nudge a practice over the line from medical to religious.

Grievant asserted, "[a]s we have progressed through the covid 19 pandemic, I have discovered new information that was previously unknown by me about the development of vaccines. I discovered that many vaccines, including the flu vaccine and

Case No. 11784                                  9

Covid 19 vaccines have been researched, developed, tested and/or produced using fetal tissue that was derived from fetal cells harvested during previous abortions."

The ingredients of the Johnson and Johnson/Janssen vaccine are:

The Janssen COVID-19 Vaccine includes the following ingredients: recombinant, replication-incompetent adenovirus type 26 expressing the SARS-CoV-2 spike protein, citric acid monohydrate, trisodium citrate dihydrate, ethanol, 2-hydroxypropyl-β-cyclodextrin (HBCD), polysorbate-80, sodium chloride.[8]

The ingredients to the Moderna vaccine are:

WHAT ARE THE INGREDIENTS IN THE VACCINE? The Moderna COVID-19 Vaccine and SPIKEVAX (COVID-19 Vaccine, mRNA) contain the following ingredients: messenger ribonucleic acid (mRNA), lipids (SM-102, polyethylene glycol [PEG] 2000 dimyristoyl glycerol [DMG], cholesterol, and 1,2-distearoyl-sn-glycero-3- phosphocholine [DSPC]), tromethamine, tromethamine hydrochloride, acetic acid, sodium acetate trihydrate, and sucrose.[9]

The ingredients to the Pfizer vaccine are:

The Pfizer-BioNTech COVID-19 Vaccine is supplied as a frozen suspension in multiple dose vials with purple caps; each vial must be diluted with 1.8 mL of sterile 0.9% Sodium Chloride Injection, USP prior to use to form the vaccine. Each 0.3 mL dose of the Pfizer-BioNTech COVID-19 Vaccine supplied in multiple dose vials with purple caps contains 30 mcg of a nucleoside-modified messenger RNA (modRNA) encoding the viral spike (S) glycoprotein of SARS-CoV-2. Each 0.3 mL dose of the Pfizer-BioNTech COVID-19 Vaccine supplied in multiple dose vials with purple caps also includes the following ingredients: lipids (0.43 mg (4-hydroxybutyl)azanediyl)bis(hexane-6,1-diyl)bis(2- hexyldecanoate), 0.05 mg 2[(polyethylene glycol)-2000]-N,N-ditetradecylacetamide, 0.09 mg 1,2-distearoyl-snglycero-3-phosphocholine, and 0.2 mg cholesterol), 0.01 mg potassium chloride, 0.01 mg monobasic potassium phosphate, 0.36 mg sodium chloride, 0.07 mg dibasic sodium phosphate dihydrate, and 6 mg sucrose. The diluent (sterile 0.9% Sodium Chloride Injection, USP) contributes an additional 2.16 mg sodium chloride per dose.[10]

---

[8] https://www.fda.gov/media/146305/download#page=2

[9] https://www.fda.gov/media/144638/download#page=3

[10] https://www.fda.gov/media/153713/download

Case No. 11784                              10

The Moderna, Pfizer, and Johnson and Johnson vaccines are liquids injected into a person's body. If a vaccine contained human tissue or fetal cells from an abortion, the connection between a religious objection to abortion and a vaccine containing human tissue or fetal cells would be clear. A University employee who takes the Johnson and Johnson, Moderna, or Pfizer vaccines, however, is not injected with human tissue or fetal cells from an abortion.

If a vaccine was manufactured using (but not containing) human tissue or fetal cells from an abortion, the connection between a religious objection to abortion and the vaccine would be clear. None of the three vaccines were manufactured using human tissue. Only the Johnson and Johnson vaccine was manufactured using human fetal cells from an abortion. Grievant was free to choose the Moderna and Pfizer vaccines to avoid receiving a vaccine manufactured with human fetal cells.

> To be clear, none of the vaccines uses actual fetal tissues or cells that were acquired from aborted children. Rather, they use cell lines that were generated or derived from tissues of fetuses that were aborted decades ago. And no vaccines require ongoing abortions in their productions. However, these vaccines—and the cell lines that were used to develop these vaccines—can be traced to two abortions.[11]

Grievant asserts that aborted fetal cell lines were used during the development stage of the Moderna and Pfizer vaccines. Grievant does not assert that after the vaccines were developed that individual doses of the vaccines were retested using fetal cell lines prior to injecting the vaccines into people.

When these two vaccines were being developed, fetal cell lines were used to test their effectiveness. There is a difference between testing done at the time of vaccine research and development and testing done at the time a vaccine is administered to an individual. Grievant has established that fetal cell lines were used to test the efficacy of the Moderna and Pfizer vaccines while they were being researched and developed. He has not established that any additional testing was done as part of the process to administer the vaccines to people including University employees. An individual dose of the Moderna or Pfizer vaccine is not tested with fetal cells prior to its injection into a person. Thus, the administration of the Moderna and Pfizer vaccines does not involve fetal cell testing. Giving an employee the Moderna or Pfizer vaccines is not in furtherance of abortion. In other words, the vaccine dose Grievant would receive would not itself have been tested using fetal cells.

Because administering a dose of the Moderna or Pfizer vaccine is not in furtherance of abortion, Grievant has not established a sufficient nexus between receiving a dose of the Moderna or Pfizer vaccine and his religious beliefs. A mere association with

---

[11] https://www.flfamily.org/wp-content/uploads/COVID-Vaccination-Religious-Accommodation-Primer-for-Allied-Attorneys.pdf

abortion is not sufficient to establish that Grievant's religious beliefs precluded vaccination.

Grievant argued employees of other religious beliefs were granted exemption while he was denied an exemption. Grievant did not establish this allegation.

Grievant argued that the University promised its employees a "back and forth" dialog regarding each employee's religious exemption request. Instead the University merely created an electronic system to allow employees to submit their requests and the University then approved or denied the request without much explanation.

Grievant has established that the University's system to receive and process requests for religious accommodation was poorly designed and implemented. The University did not retain records regarding how committee members voted on requests they received. The University provided only cryptic responses as to why it denied a request. The University's failure to provide a robust and comprehensive system to review requests for religious exemption, however, does not affect the outcome of this case. Grievant has not presented a policy prohibiting the University from removing him despite using a poorly designed system. Grievant received procedural due process because the University's system allowed his input and informed him of its decision. To the extent the University failed to consider all of Grievant's evidence, Grievant had the opportunity to present such evidence during the hearing.

The University erred in the application of its policies by removing Grievant for "Just Cause." The University's definition of Just Cause under Policy 105 lists behaviors that are disciplinary in nature. Grievant was obligated to be vaccinated with the COVID-19 as a condition of employment. His failure to do so was not disciplinary in nature. Policy 104 provides, "[a]n employee failing to complete required screenings, vaccinations and/or any other immunizations are subject to disciplinary action in accordance with Medical Center Human Resources Policy No. 701 "Employee Standards of Performance and Conduct". However, an employee failing to be vaccination is removed by "administrative action" not disciplinary action under Policy 701. The University should have removed Grievant by administrative action and not by Written Notice of Intended Action.

Because Grievant should not have been removed for Just Cause, he should have been given a Notice Period based on his length of employment and paid severance in accordance with Policy 1.05.

## DECISION

For the reasons stated herein, the University's decision to remove Grievant from employment is **upheld**. The basis for that removal is administrative action. The University is **ordered** to provide Grievant with a Notice Period and severance payment as required by Medical Center Human Resource Policy 1.05.

## APPEAL RIGHTS

You may request an administrative review by EDR within **15 calendar** days from the date the decision was issued. Your request must be in writing and must be **received** by EDR within 15 calendar days of the date the decision was issued.

Please address your request to:

> Office of Employment Dispute Resolution
> Department of Human Resource Management
> 101 North 14th St., 12th Floor
> Richmond, VA 23219

or, send by e-mail to EDR@dhrm.virginia.gov, or by fax to (804) 786-1606.

You must also provide a copy of your appeal to the other party and the hearing officer. The hearing officer's **decision becomes final** when the 15-calendar day period has expired, or when requests for administrative review have been decided.

A challenge that the hearing decision is inconsistent with state or agency policy must refer to a particular mandate in state or agency policy with which the hearing decision is not in compliance. A challenge that the hearing decision is not in compliance with the grievance procedure, or a request to present newly discovered evidence, must refer to a specific requirement of the grievance procedure with which the hearing decision is not in compliance.

You may request a judicial review if you believe the decision is contradictory to law. You must file a notice of appeal with the clerk of the circuit court in the jurisdiction in which the grievance arose within **30 days** of the date when the decision becomes final.[1]

[See Sections 7.1 through 7.3 of the Grievance Procedure Manual for a more detailed explanation, or call EDR's toll-free Advice Line at 888-232-3842 to learn more about appeal rights from an EDR Consultant].

*/s/ Carl Wilson Schmidt*
_____
Carl Wilson Schmidt, Esq.
Hearing Officer

---

[1] Agencies must request and receive prior approval from EDR before filing a notice of appeal.