**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF VIRGINIA**
**Charlottesville Division**

| | |
|---|---|
| J. Dwayne PHILLIPS, Mark EHRLICH, Ryan MESZAROS, Rebecca TYSON, Rebecca LOFLIN, Janet RIPLEY, Christopher PARSNOW, Nicole BOKER, Joshua SEILER, Nadine McCARTHY, and Chelsea SHEPPARD, M.D., on behalf of themselves and all others similarly situated,<br><br>              Plaintiffs,<br><br>    v.<br><br>RECTOR AND VISITORS OF THE UNIVERSITY OF VIRGINIA, Whittington W. CLEMENT, in his official capacity as Rector; Robert D. HARDIE, in his official capacity as Vice Rector; Visitors Robert M. BLUE, Mark T. BOWLES, Carlos M. BROWN, Elizabeth M. CRANWELL, Thomas A. DEPASQUALE, U. Bertam ELLIS Jr., Louis S. HADDAD; Babur B. LATEEF, Stephen P. LONG, Angela Hucles MANGANO, James B. MURRAY Jr., L.F. PAYNE, Amanda L. PILLION, James V. REYES, Douglas D. WETMORE, Susan E. KIRK, and Lily A. ROBERTS, each in her or his official capacity; K. Craig KENT, CEO UVA Health and UVA Executive Vice President for Health Affairs, in his individual and official capacities; Wendy HORTON, CEO UVA Medical Center, in her individual and official capacities; Melissa FREDERICK, former Assistant Vice President, UVA Health System, in her individual capacity; Katy HOFFMAN, in her individual capacity and John DOES 1-14, senior Human Resources personnel of UVA Health, in their individual and official capacities.<br><br>              Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br><br>Case No.<br>3:22-cv-0075-NKM-JCH |

---

**AMENDED CLASS ACTION COMPLAINT**

1.      This is a religious-discrimination and civil-rights case under the Establishment and Free Exercises Clauses of the First Amendment and the Virginia Constitution, and the Equal Protection Clause of the Fourteenth Amendment. It arises out of the University of Virginia Health System's openly-expressed disdain for the religious objections that hundreds of its employees lodged regarding COVID-19 vaccines.

2.      When UVA Health mandated that employees receive a COVID vaccine, it knew that it was legally required to accommodate religious beliefs. But it wanted to minimize accommodations, and it believed that most objections were false political beliefs from members of the political right. As a result, UVA Health has cycled through a series of blatantly unconstitutional and unlawful attempts to exclude religious employees from its workplace *en masse*.

3.      UVA Health's first effort was an egregious violation of the Establishment and Free Exercise clauses: its Human Resources department drew up a (short) list of churches, and decided to exempt members of those churches from the vaccine requirement "automatically," while denying exemptions to employees who belong to any other church or religious body—without concern for the individual employees' beliefs about religion and vaccines.

4.      Plaintiff J. Dwayne Phillips, for instance, told UVA Health that he believed that "the Holy Spirit of God has told me that I should not receive this vaccine"—but UVA Health responded, with rather shocking candor, that it thought "God speaking to him" did not qualify as "religious belief." Similarly, Plaintiff Mark Ehrlich's Seventh-Day Adventist faith has caused him to refrain for more than 25 years from eating animal products, taking pain relievers, antihistamines, or cold medicines, and receiving certain vaccines—but UVA Health dismissed

his objection to the COVID vaccine as not "a *bona fide* sincerely held religious belief," but rather a secular concern "veiled in religious language."

5.     UVA Health also arrogated to itself the right to judge its employees' religious beliefs as incorrect, and therefore not worthy of consideration. It did this especially to employees who objected to COVID vaccines on the (accurate) grounds that all available versions of COVID vaccine had been developed or tested using cell lines that originated from aborted fetuses. When employees like Mr. Phillips objected on that basis, UVA Health rejected their exemption requests on the ground that their religious beliefs are simply wrong, and that the vaccines' connection with abortion is too remote to trigger any moral concern.

6.     Based on these policies and practices, in late 2021 UVA Health denied exemption requests *en masse*, in brief boilerplate rejection statements, and without individual consideration. The result was that dozens or even hundreds of UVA Health employees were fired simply because UVA Health thought they went to the wrong church or held wrong religious beliefs. Countless more job applicants were rejected for the same reasons—UVA Health denied them religious exemptions and therefore employment, sometimes even after it had offered them a job.

7.     By October 2022, UVA Health had realized that these policies were obviously unconstitutional and illegal and had to be changed. Therefore, UVA Health drew up a new policy that, if UVA had applied it fairly and honestly, would have entitled dozens or hundreds of former employees to return to their jobs. But, because UVA Health still harbored the same biased assumptions regarding religious objectors to the vaccine, it simply switched to other tactics for excluding them.

8.     UVA Health tried to keep its purported new policy a secret. UVA Health had a great need to hire more employees due to its longstanding staffing shortages and is offering hefty

bonuses to new hires. Yet, UVA Health did nothing to announce or advertise its new policy to unlawfully fired religious employees.

9.      In addition, when religious objectors to the vaccine did apply for a job, UVA Health has continued its ongoing violations of the law by finding ways to apply its new policy to exclude them.

10.      Plaintiff Nadine McCarthy was one of the lucky few employees who UVA Health originally granted a religious exemption from COVID vaccination in 2021. But when she re-applied to UVA Health in late 2022 after a hiatus working elsewhere, UVA Health rescinded Ms. McCarthy's job offer and told her that its new COVID policy would not allow Ms McCarthy to work in her previous unit even though she had safely worked there unvaccinated under her previous exemption.

11.      UVA Health knows that its rejections of religious workers are not necessary. For example, UVA Health fired Plaintiff Christopher Parsnow even though his job was fully remote and never required him to interact in person with other people. And when UVA Health fired Plaintiff Joshua Seiler, it stated that his religious objections to the vaccine made him "a serious safety risk"—but within a few months, UVA Health hired Mr. Seiler back as an independent contractor to do exactly the same job, in the same places, with the same co-workers, without being vaccinated for COVID.

12.      Through all of these actions, UVA Health has violated and continues to violate the Establishment, Free Exercise, and Equal Protection guarantees of the U.S. and Virginia Constitutions. Defendants therefore are liable for injunctive relief in their official capacities and money damages in their personal capacities.

**JURISDICTION AND VENUE**

13.     This Court has original subject matter jurisdiction over this case, as it raises claims pursuant to federal statute, pursuant to 28 U.S.C § 1331 and 42 U.S.C. § 1983. This Court further has supplemental jurisdiction over Plaintiff's state law claims pursuant to 29 U.S.C § 1367.

14.     This Court has general personal jurisdiction over the Rector and Visitors of the University of Virginia because they are incorporated in, and have their principal place of business in, this District.

15.     This Court has specific personal jurisdiction over all Defendants because their actions giving rise to the causes of action asserted herein either took place in or were deliberately and knowingly directed toward this District.

16.     Venue is proper in this District under 28 U.S.C § 1391(b), as events giving rise to the causes of action asserted herein took place primarily within this District.

**NAMED PLAINTIFFS**

17.     Plaintiff J. Dwayne Phillips is a former employee of UVA Health. From June 2019 until November 2021, he worked as an Assistant Nurse Manager at UVA Health's Kidney Center Clinic in Charlottesville, Virginia.

18.     At all relevant times, Mr. Phillips was and is a citizen of Virginia and a resident of Bremo Bluff, Virginia.

19.     Plaintiff Mark Ehrlich is a former employee of UVA Health. From November 2020 until November 2021, Mr. Ehrlich worked as a Manager Patient Friendly Access in UVA Health's digestive health department in Charlottesville, Virginia.

20.     At all relevant times. Mr. Ehrlich was and is a citizen of Virginia and a resident of Stanardsville, Virginia.

21.     Plaintiff Ryan Meszaros is a former employee of UVA Health. From 2000 until November 2021, he worked at the University of Virginia Medical Center Emergency Department in Charlottesville.

22.     Mr. Meszaros held multiple job titles that changed over time, but he worked primarily as an RN Clinician IV, an RN Clinical Supervisor, a Forensic Nurse Examiner, and as an instructor at UVA Health's Life Support Learning Center.

23.     At all relevant times, Mr. Meszaros was and is a citizen of Virginia and a resident of Madison, Virginia.

24.     Plaintiff Rebecca Tyson is a former employee of UVA Health. From August 2017 until November 2021, she worked as a Patient Access Associate, first at Northridge Clinic in Charlottesville and later at Zion Crossroads Primary Care and Specialty Clinic in Zion Crossroads.

25.     At all relevant times, Ms. Tyson was and is a citizen of Virginia and a resident of Louisa, Virginia.

26.     Plaintiff Rebecca Loflin is a former employee of UVA Health and a Registered Nurse. Until November 2021, she worked as an RN Care Coordinator in the Pediatric Endocrinology unit of UVA Health's Children's Hospital, helping care for diabetic children.

27.     At all relevant times, Ms. Loflin was and is a citizen of Virginia and a resident of Stuart's Draft, Virginia.

28.     Plaintiff Janet Ripley is a former employee of UVA Health. From 1987 until November 2021, she worked at the University of Virginia Medical Center in Charlottesville. Ms.

Ripley held multiple job titles that changed over time, but she worked primarily as a Staff CT Technologist.

29.     At all relevant times, Ms. Ripley was and is a citizen of Virginia and a resident of Greenville, Virginia.

30.     Plaintiff Christopher Parsnow is a former employee of UVA Health. From April 2018 until November 2021, he was a Business Intelligence Analyst in the Dean's Office of the UVA School of Medicine in Charlottesville.

31.     At all relevant times, Mr. Parsnow was and is a citizen of Virginia and a resident of Troy, Virginia.

32.     Plaintiff Nicole Boker is a registered nurse who applied to work as an intensive care nurse at UVA Health's Haymarket, Virginia facility in December 2021.

33.     At all relevant times, Ms. Boker was and is a citizen of Virginia and a resident of Gainesville, Virginia.

34.     Plaintiff Joshua Seiler is a former employee of the University of Virginia and UVA Health who was subject to UVA Health's human-resources policies. From 2007 until late 2021, he worked at UVA's Charlottesville campus, most recently as a Pipefitter.

35.     At all relevant times, Mr. Seiler was and is a citizen of Virginia and a resident of Schuyler, Virginia.

36.     Plaintiff Nadine McCarthy is a registered nurse who applied to work at UVA Health in November 2022.

37.     At all relevant times, Ms. McCarthy was and is a citizen of Virginia and a resident of Charlottesville, Virginia.

38.    Plaintiff Dr. Chelsea Sheppard is a former professor, medical doctor, and employee of UVA Health. From July 2019 until late 2021, she was an Associate Professor of Pathology at the University of Virginia and regularly worked in UVA Health facilities.

39.    At all relevant times, Dr. Sheppard was and is a citizen of Virginia and resident of Richmond, Virginia.

## DEFENDANTS

40.    Defendants, the Rector and Visitors of the University of Virginia, named in this Complaint make up the corporate board for the University of Virginia ("UVA"), which is a public corporation and an agency or instrumentality of the Commonwealth of Virginia. UVA is headquartered in Charlottesville, Virginia.

41.    University of Virginia Health System, also known as "UVA Health," is operated by, and is a division of, UVA. UVA Health is an academic health system that operates a medical center, trauma center, Comprehensive Cancer Center, UVA Children's Hospital, three community hospitals, and a network of primary and specialty care clinics throughout Virginia.

42.    UVA Health is headquartered in Charlottesville, Virginia, where its leaders establish human resources policies for its approximately 16,000 employees. UVA Health's employees work for its constituent organizations including, without limitation, UVA Medical Center, UVA School of Medicine, UVA School of Nursing, UVA Claude Moore Health Sciences Library, UVA Physicians Group, UVA Community Health Medical Group, the Transitional Care Hospital, the Health System Development Office/UVA Health Foundation, and UVA Physician Group (collectively, "UVA Health").

43.    Defendant Whittington W. Clement is the Rector of UVA. He is sued in his official capacity.

44.     Defendant Robert D. Hardie is the Vice Rector of UVA. He is sued in his official capacity.

45.     Defendants Robert M. Blue, Mark T. Bowles, Carlos M. Brown, Elizabeth M. Cranwell, Thomas A. DePasquale, U. Bertam Ellis Jr., Louis S. Haddad, Babur B. Lateef, Stephen P. Long, Angela Hucles Mangano, James B. Murray, Jr., L. F. Payne, Amanda L. Pillion, James V. Reyes, Douglas D. Wemore, Susan E. Kirk, and Lily A. Roberts are the Visitors of the University of Virginia. They are sued in their official capacities.

46.     Defendants Babur B. Lateef, Robert M. Blue, Whittington W. Clement, Stephen P. Long, James B. Murray, James V. Reyes, Douglas D. Wetmore, are the Visitor members of the UVA Health System Board. They are sued in their official capacities.

47.     K. Craig Kent, MD is Chief Executive Officer of UVA Health and UVA's Executive Vice President for Health Affairs. He had and has authority over and responsibility for UVA Health's unlawful actions described herein. He is sued in his individual and official capacities.

48.     Wendy Horton is the Chief Executive Officer of UVA Medical Center. She had and has authority over and responsibility for UVA Health's unlawful actions described herein. She is sued in her individual and official capacities.

49.     Defendants named in paragraphs 40-48 (collectively, "UVA Health's Leaders") are responsible for management, oversight, policies, and practices of UVA Health.

50.     Defendants John Does 1-14 (collectively, the "Religious Accommodation Committee") are senior Human Resources personal of UVA Health who were or are the voting members of a committee established by UVA Health's Leaders to evaluate employees' religious beliefs and decide whether to grant employee requests for religious accommodations related to

COVID vaccination. At various times, this committee has been called the "Religious Accommodation Committee," the "Vaccine Religious Exemption Committee," and possibly other names. Does 1-14 are sued in their individual and official capacities.

51.     Defendant Katy Hoffman is the UVA Health "Exemption Coordinator" who. following October 2022, apparently had (and may still have) near exclusive authority to grant or deny religious accommodation requests. Ms. Hoffman is sued in his or her individual and official capacities.

52.     Defendant Melissa Frederick is a former Assistant Vice President of UVA Health System, and was the chairperson of UVA Health's Religious Accommodation Committee at the time many of the Named Plaintiffs were denied religious exemptions and fired. She is sued in her individual capacity.

53.     The Religious Accommodation Committee carried and carries out directives, policies, and/or practices established or as directed by UVA Health's Leaders.

54.     UVA Health has never disclosed the names of the Religious Accommodation Committee members to Plaintiffs. When Plaintiffs learn the identities of these individuals, they intend to amend their Complaint to name each of them specifically in their individual and official capacities.

55.     UVA Health's Leaders and members of the Religious Accommodation Committee are referred to collectively, hereinafter, as "Defendants" or as "UVA Health."

## DEFENDANTS MANDATE EMPLOYEE COVID VACCINATION AND CREATE AN UNCONSTITUTIONAL ACCOMMODATION PROCESS

56.     On August 25, 2021, UVA Health's Leaders announced that all UVA Health employees were required to be vaccinated against COVID or be terminated on November 1, 2021. Pursuant to policy OCH-002, UVA Health's Occupational Health Screening and

Maintenance Policy, all employees were required to receive two doses of the **Moderna or Pfizer** COVID vaccines, or one dose of the Johnson & Johnson COVID vaccine.

57.    UVA Health's Leaders anticipated that a number of employees would request religious accommodations seeking exemption from mandatory COVID vaccination.

58.    Without reviewing any of these exemption requests and indeed before they were even filed, UVA Health's Leaders decided that most of the requests would be insincere and a pretext for political or other personal objections to COVID vaccines.

59.    UVA Health's Leaders established a new process to consider religious accommodations related to COVID vaccination. This new process was more restrictive than UVA Health's previous processes for considering religious accommodations.

60.    UVA Health's Leaders assembled the Religious Accommodation Committee, whose voting members were five Human Resources employees, Defendants John Does 1-5. This committee would review accommodation requests submitted by employees and evaluate employees' religious beliefs and practices.

61.    UVA Health has not disclosed the procedures by which the Religious Accommodation Committee operated. According to testimony under oath by a UVA human resources leader, the committee "didn't have a record keeping system."

62.    It is not known whether the Religious Accommodation Committee members voted on individual exemption requests, or—if they did vote—how many committee members participated in each vote, or how many votes were required to grant or reject an exemption.

63.    UVA Health did know that, in processing and reviewing requests for religious exemptions, it was bound to comply with the U.S. Constitution and nondiscrimination laws, including laws prohibiting discrimination based on and requiring accommodation of employees'

religious beliefs and practices. UVA Health and one or more of its attorneys informed the Religious Accommodation Committee about nondiscrimination laws and purported to provide training in how to comply with them. Exhibit ("Ex.") A (PowerPoint presentation created by UVA attorney).

64.   This training noted that UVA Health must grant religious accommodations "[u]nless it would be an undue hardship on the . . . operation of its business…" Ex. A slide 13.

65.   Religious Accommodation Committee members were informed that an employee's

> belief is "religious" if it is "religious" in a person's "own scheme of things," i.e. it is a "sincere and meaningful" belief that "occupies a place in the life of its possessor parallel to that filled by…God."
>
> This includes theistic as well as non-theistic moral or ethical beliefs as to what is right and wrong which are sincerely held with the strength of traditional religious views.

Ex. A slide 5 (ellipsis in original).

66.   However, UVA Health leaders, human-resources staff, and attorneys formulated and applied extraordinarily narrow and biased criteria designed to minimize the number of religious exemptions granted.

## UVA HEALTH CREATES A LIST OF FAVORED CHURCHES

67.   UVA Health decided that essentially the only employees it would exempt from the COVID vaccine mandate were those who belonged to churches or other religious bodies that had official doctrines forbidding all vaccines.

68.   As part of its process for training its human-resources personnel to review religious exemption requests, UVA Health established a written list of "religions that prohibited vaccination." The list included specific approved churches with "a known theological objection

to vaccines" including Dutch Reformed Congregations, Faith Tabernacle, Church of the First Born, Faith Assembly, End Time Ministries, and Church of Christ, Scientist. *See* Ex. A slide 13.

69.     UVA Health instructed human resources personnel in writing that they should routinely grant exemption requests from employees who practiced these approved faiths. *See* Ex. A slide 15.

70.     The UVA Health Executive Vice President who oversaw the exemption process has repeatedly testified under oath that employees who stated they were members of these approved faiths had their exemption requests approved "automatically."

71.     UVA Health also exempted from the COVID vaccine mandate any individual who had previously been granted a religious exemption from receiving annual flu vaccines. UVA Health did not require such individuals to apply for a COVID vaccine exemption at all.

72.     However, UVA Health had first implemented a flu-vaccine mandate for employees only shortly before COVID began spreading, so this automatic exemption had a limited scope.

73.     According to UVA Health's written instructions, if an employee's religious exemption request cited religious grounds but the employee was not a member of one of the approved faiths or religious groups, the request "should be forwarded to the Committee for discussion/consideration."

74.     In reality, if a UVA Health employee did not identify as a member of an approved faith on UVA's established list, but still had individual religious beliefs precluding vaccination in general or the COVID vaccines in particular, it did not matter to UVA Health what the employee's religious beliefs were, how sincere they were, or how long or how faithfully the employee had adhered to them.

75.     UVA Health determined that it would deny religious exemption requests by such employees as pretextual, as insincere, as simply wrong on the moral question involved, or as misinterpretations of the employee's own religious beliefs.

76.     In short, UVA Health granted religious exemptions to members of religious denominations that it favored, while denying religious exemptions to employees who held exactly the same religious beliefs about the COVID vaccine, but who did not belong to one of the religious bodies on UVA Health's established list.

**UVA CATEGORICALLY DISMISSES RELIGIOUS OBJECTIONS REGARDING VACCINES AND FETAL CELL LINES AS "MISINFORMATION"**

77.     The development or testing history of all COVID vaccines available in the United States included the use of cell lines that originated from aborted fetuses. That is, at some point in the development or testing of each available COVID vaccine, the company developing or testing the vaccine used human cells that had been growing and reproducing themselves in a lab for years, but that had originated with cells taken from an aborted fetus.[1]

78.     UVA Health was aware of this when it considered religious COVID vaccine exemption requests.

79.     UVA Health also was aware of false claims circulating on the Internet that doses of the vaccine given to patients actually contained aborted fetal cells.

80.     UVA Health formed its own religious/moral view that the vaccines' connections with abortion are so remote that no one could harbor any sincere religious objection to them.

---

[1] *See, e.g.*, Prentice, David, Charlotte Lozier Inst., *Update: COVID-19 Vaccine Candidates and Abortion-Derived Cell Lines* (Sept. 30, 2020, Updated June 2, 2021), https://lozierinstitute.org/update-covid-19-vaccine-candidates-and-abortion-derived-cell-lines/ (accessed Dec. 12, 2022.)

81.     Because of UVA Health's own moral position, it disapproved of and disagreed with the religious beliefs of employees who requested exemptions from its COVID mandate based on the vaccines' connection to abortion, and it therefore decided not to grant such exemptions.

82.     Even if a UVA Health employee's information was perfectly accurate—even if the employee specifically objected on religious grounds to the use of fetal cell lines in the development or testing of the vaccines—that did not matter to UVA Health. UVA Health determined that, when a religious exemption request mentioned abortion, it would deny the request as based on "misinformation" or as not raising any serious moral concern.

*       *       *

83.     As a result of the policies and actions described in paragraphs 56-82, in late 2021 UVA Health fired many dozens, or even hundreds, of unvaccinated employees simply because they went to the wrong church, or held religious beliefs that UVA Health viewed as wrong.

84.     UVA Health acted very differently toward the relatively few employees who stated they belonged to what UVA Health viewed as the "right" churches (or who had previously managed to get a religious exemption to the flu-vaccine mandate during the short time it had been in place). UVA Health granted exemptions to these employees "automatically," and allowed them to remain at their jobs, unvaccinated, with few or no additional mitigation measures beyond what they had been doing before.

## UVA HEALTH SECRETLY REVISES ITS POLICY

85.     At some point between August 2021 and October 2022 (if not before), UVA Health realized that the policies described above were obviously illegal and unconstitutional.

86.   In October 2022—after operating for more than a year under the policies described above—UVA Health internally released a new religious accommodations policy that purported to be entirely different.

87.   The new policy gave several examples of religious beliefs, observances, or practices that UVA Health personnel were now instructed to treat as sincere and eligible for exemption. Two of these examples were:

- "*I believe my body is a temple as stated in the bible, and therefore I should not put impure substances into my body. I believe the influenza vaccine is an impure substance.*"

- "*I am a Christian and I am opposed to abortion, and I will not use a product that contains, or is derived from or developed using, the cells of an aborted fetus. As a result, I am opposed to receiving the vaccine and request a religious exemption.*"

88.   UVA Health copied all of the substance, and much of the wording, of these examples from actual exemption requests submitted the previous year by UVA Health employees, including Named Plaintiffs in this case.

89.   UVA Health had previously found that those religious exemption requests did not express sincere religious objections to vaccination, and thus had denied them.

90.   The year before promulgating its purported new policy, UVA had fired dozens, if not hundreds, of religious employees after finding that their objections to COVID vaccination were not "sincere" or not "religious" in nature. Under the revised policy, almost every single one of those findings was improper and wrong.

91.   UVA Health sought to keep its new policy a secret. It initially designated the document as "Confidential" and instructed that it not be shared outside the UVA Health organization.

92.     UVA was still facing a staffing crisis, with many hundreds of open positions. In order to fill those positions, it was offering to pay bonuses of many thousands of dollars to new hires in high-demand positions.

93.     Despite that fact, UVA Health made no effort to communicate about its new policy with the dozens or hundreds of its former employees who had been refused exemptions and fired.

94.     At the time this lawsuit was filed in December 2022, none of these former employees had been informed that UVA Health had implemented a new policy, or that UVA Health had purportedly reversed its position on the very issue that had led to the denial of their exemption requests in the first place.

95.     UVA Health's response to this lawsuit has only confirmed and continued its discrimination against religious vaccine objectors. Faced with an indefensible legal position, UVA Health purported to offer "reinstatement" to Named Plaintiffs and many class members— but it made its offers so confusing and short-lived that it is likely that few religious employees will be able to accept them and return to work.

96.     In January 2023, as UVA Health's first briefs in this case came due, it rushed out a mass mailing of one-to-two-page "offers of reinstatement" to a large number of members of the proposed classes and Named Plaintiffs.

97.     These "offers" told the recipients virtually nothing about the job they supposedly were being offered beyond its title—which typically did not match the job that the recipient had previously held at UVA Health. The "offers" provided no description of the new job and typically did not tell the recipients how much UVA Health was offering to pay them, what city the job was located in, who the recipient's supervisor would be, or what hours or time of day the

job would be scheduled for. Nor did the "offers" explain that UVA Health had changed its policy on religious accommodations, or state any other reason why UVA Health would allow recipients to come back to work despite having previously fired them.

98.    Despite these glaring omissions, each "offer" stated that it expired on a specified date that fell, for many, just seven days after the letter was likely to be delivered.

99.    A seven-day response time was far shorter than UVA Health's normal hiring process, which typically takes several weeks or even months.

100.    On information and belief, the total number of class members and Named Plaintiffs who accepted one of these "offers" within the originally stated deadline was zero.

101.    On information and belief, the total number of class members and Named Plaintiffs who had accepted one of these "offers" at the time this Amended Complaint was filed was also zero.

102.    If a class member or Named Plaintiff contacted UVA Health about the "offer," UVA Health sometimes granted an additional week or so of response time and clarified certain terms. While this may eventually result in some Named Plaintiffs or class members returning to work at UVA Health, the number who are able to do so is likely to be small.

103.    Before UVA Health had even mailed these purported "offers," it filed briefs in this case arguing that its offers of reinstatement had made major parts of this case moot.

104.    UVA Health's apparent purpose in "offering reinstatement" was to prejudice class members in this litigation while ensuring that few returned to the work for UVA Health.

## UVA HEALTH APPLIES ITS NEW POLICY TO CONTINUE ITS DISCRIMINATION

105.    During the year-plus that UVA Health had applied its previous religious-accommodation policy, it had purged the great majority of religious vaccine objectors from the

ranks of its employees. Therefore, the October 2022 policy has operated mostly with respect to new applicants for jobs at UVA Health.

106.   Under the October 2022 policy, a determination that an employee has a sincere religious objection to vaccination does not end the inquiry. Instead, the policy directs that an accommodation for such an employee will still be denied if it would create an undue hardship or a more than a *de minimis* cost or burden to UVA Health.

107.   In contrast to the new policy's detailed instructions and examples as to how to recognize a sincere religious objection to vaccination, the new policy contains very little guidance about what qualifies as an undue hardship.

108.   Under its previous policy, UVA Health had rejected the great majority of accommodation applications as "insincere." Under that old policy, on the relatively rare occasions when UVA Health found an employee to have a sincere religious objection to vaccination, it granted an exemption "automatically" and rarely, if ever, found an exemption would cause an undue hardship.

109.   Upon information and belief, with its new policy, UVA Health reversed the situation: it began rejecting few if any religious-accommodation requests as "insincere," but instead rejected a large portion of requests as "unduly burdensome."

110.   To that end, UVA Health adopted new, undisclosed standards, not included in its written policy, that it rigidly applies to bar many unvaccinated religious employees it claims to constitute an undue hardship to its business.

111.   UVA Health has long experience showing that these rejected job applicants would not really be a "hardship." Its previous grants of "automatic" exemptions to certain employees, although small in number, resulted in no significant problems.

112.   UVA Health is aware that fully vaccinated individuals can become infected with COVID and can transmit COVID to others, just like unvaccinated individuals. The peak viral loads of vaccinated individuals are the same as or similar to those of unvaccinated individuals. Vaccinated employees can transmit infection to others in the same manner as unvaccinated individuals.

113.   Regardless of the precise difference in potential transmission or risk of transmission between unvaccinated individuals and vaccinated individuals, UVA Health knows that unvaccinated individuals could mitigate the risk of transmission (such as by performing self-testing at their own expense).

114.   Both self-tests and laboratory testing are available in Virginia and other states, free of charge.

115.   If unvaccinated individuals engaged in regular testing, along with other common sense precautions, their likelihood of transmission is ***lower*** than vaccinated individuals.

116.   Numerous employees have missed work at UVA Health as a result of receiving COVID vaccines and boosters.

117.   UVA Health patients are less safe because of the health system's significant staffing shortages.

118.   UVA Health is required to incur significant additional costs to hire temporary and traveling nurses and other workers as a result of staffing shortages.

119.   Upon information and belief, UVA Health did not and does not consider staffing and recruiting costs and shortages in its "undue hardship" analysis.

120.    Nevertheless, UVA Health is applying its "undue hardship" standards in a way that can have even stricter results than its previous policy. In fact, when employees with religious exemptions leave, UVA Health is (on at least some occasions) using its "undue hardship" rules to deny religious exemptions to new applicants who would fill the same role.

## UVA'S UNCONSTITUTIONAL DISCRIMINATION AGAINST
## PLAINTIFFS/CLASS REPRESENTATIVES

121.    While each of the Named Plaintiffs had different job duties, worked in different divisions of the health system, and had different beliefs, UVA Health applied the same unconstitutional policy and practices to all Plaintiffs.

### Plaintiff J. Dwayne Phillips' Employment with UVA Health and
### Request for Exemption From COVID Vaccination

122.    Mr. Phillips has a bachelor's degree in nursing and a master's degree in business administration. He has been a Registered Nurse since 1997.

123.    After working for several other health care organizations, Mr. Phillips was hired as Assistant Nurse Manager for UVA Health's Kidney Center Clinic in June 2019.

124.    In this role, Mr. Phillips supervised nursing and patient care delivery, including human resources management. Mr. Phillips had oversight of the complete comprehensive program.

125.    Mr. Phillips is also a Christian. He endeavors, with God's help, to follow God's commands in all areas of his life. When faced with important decisions, he attempts to pray and read the Bible to determine God's will. Mr. Phillips believes God's Holy Spirit provides guidance to Christians today, including him.

126.    As a Christian, Mr. Phillips believes in the sanctity of human life and believes that abortion is morally wrong. His faith dictates that he may not support or benefit from abortion in any way and that to do so would be a sin against God.

127.    When Mr. Phillips learned of UVA Health's mandated vaccination for COVID, he promptly requested a religious exemption from the vaccine mandate, submitting three separate documents in support of his request. As relevant here, Mr. Phillips's exemption request explained two different ways in which receiving a COVID vaccine would violate his religious beliefs.

128.    First, Mr. Phillips explained that he believes that God's "Holy Spirit … reside[s] within everyone who confesses that they are a sinner and accepts Jesus as our Savior…. His Holy Spirit communicates with us and guides us in this world." Therefore, Mr. Phillips believes that "God's Holy Spirit dwells within me and communicates with me."

129.    Although he acknowledged that "[t]his may be difficult for some[one] who does not believe to understand," Mr. Phillips's exemption request explained that "God has communicated to me through His Holy Spirit that I should not accept the COVID 19 vaccine," and that "[t]he Holy Spirit has communicated to me that I should not receive these vaccines and to do so is sinful for me."

130.    Second, Mr. Phillips's exemption request explained that the available "COVID 19 vaccines have been researched, developed, tested and/or produced using … tissue … derived from fetal cells harvested in previous abortions." He believes that he must not associate himself with or benefit from abortion "in any way whether in the past, present, or future," and that this includes receiving a vaccine with this level of connection to abortion.

131.    In his exemption request, Mr. Phillips acknowledged that, in the past, he had unwittingly received other vaccines or used medicines that have a similar connection to abortion. Mr. Phillips explained that he had not known of this connection to abortion until he learned about it during the controversy over COVID vaccines—and once he learned that he had previously received vaccines and used medicines like those, he had felt it necessary to "confess[] my sin to God and receive[] forgiveness for these transgressions."

132.    Having learned about the connection between COVID vaccines and abortion, Mr. Phillips sincerely believed that receiving the vaccines would violate God's will for him.

**UVA Health Denies Mr. Phillips's Requested Exemption on Unconstitutional Grounds**

133.    In a series of short electronic communications in September and October 2021, UVA Health denied Mr. Phillips's religious exemption request. The only explanation contained in any of the letters was a cursory statement that "none of the currently authorized/approved vaccines have fetal cells or tissues."

134.    On information and belief, other than these denial letters, UVA Health created no records of any kind to memorialize its consideration of Mr. Phillips's exemption request.

135.    After UVA Health denied Mr. Phillips's exemption request, on November 15, UVA Health gave Mr. Phillips written notice that it intended to fire him for not receiving the vaccine. UVA Health fired Mr. Phillips two days later, on November 17.

136.    Mr. Phillips filed a grievance with the Commonwealth of Virginia's Office of Employment Dispute Resolution. At the hearing, Melissa Frederick, who was the UVA Health Assistant Vice President for Human Resources who oversaw UVA Health's consideration of exemption requests, testified under oath that UVA Health denied Mr. Phillips's exemption request because it refused to recognize that Mr. Phillips's convictions about "God speaking to

him" or "the … Holy Spirit speaking to him" qualified as "religious belief." As UVA's own lawyer summarized her testimony, "a direct instruction … from God is not … something that … would qualify [for] a religious accommodation here."

137.    Ms. Frederick also testified that Mr. Phillips's exemption request was based on "misinformation" that "this vaccine … contains fetal cells from aborted fetuses."

138.    Mr. Phillips's actual exemption request, however, stated exactly the opposite: "that there are not fetal cells in the vaccine itself." His real objection was that the vaccines are produced or were tested using fetal cell lines that *originated* from aborted fetal cells.

139.    Ms. Frederick testified on behalf of UVA Health that she did not know whether fetal cell lines were used in the production of any of the mandated COVID vaccines.

140.    The Commonwealth's hearing officer agreed that UVA Health could disregard Mr. Phillips' beliefs and that UVA Health had the right to establish what was actually required by Mr. Phillips' religious faith.

141.    The hearing officer's decision noted Mr. Phillips' statement, in his exemption request, that "my sincere belief is that God has communicated to me through His Holy Spirit that I should not accept the COVID 19 vaccine. I sincerely believe that doing so would be a sin against God and disobedient to His command to me." Ex. B. p. 4. Regarding this aspect of Mr. Phillips request, the hearing officer endorsed UVA Health's findings:

> There is little doubt that Grievant has sincerely held religious beliefs. Grievant must show that those sincerely held religious beliefs preclude him being vaccinated. Simply because an employee says his or her religion precludes vaccination does not make it true. ***
>
> [T]he nature of Grievant's communication [with the Holy Spirit] would not in itself represent a tenet of his religion.

*Id*. p. 9.

142.    The hearing officer also noted Mr. Phillips' belief that he could not be vaccinated because cell lines originating from fetuses aborted in the past were used in the manufacturing or testing of COVID vaccines. The officer found that Mr. Phillips was factually correct: that the three available COVID vaccines were either "manufactured using human fetal cells from an abortion," or had "fetal cell lines … used to test [their] efficacy … while they were being researched and developed." *Id*. p. 11.

143.    Nonetheless, the hearing officer agreed that UVA Health could decide what Mr. Phillips' religious beliefs required. The decision affirmed that UVA could decide whether there was "a sufficient nexus between receiving a dose of the Moderna or Pfizer vaccine and [Mr. Phillip']s religious beliefs. A mere association with abortion is not sufficient to establish that Grievant's religious beliefs precluded vaccination." *Id*.

144.    Since being fired by UVA Health, Mr. Philips has been unable to find other work in the health care field. This has apparently brought to an end Mr. Phillips's lengthy and successful career in the health-care field.

145.    Mr. Phillips has been forced to take a different job that pays less than half the salary he earned at UVA Health, causing severe financial stress on his family.

146.    Although UVA Health purported to change its policy in October 2022 to permit religious exemptions on grounds similar or identical to the ones that Mr. Phillips identified in his application, UVA Health did not inform Mr. Phillips of the change or otherwise invite him to return to work until after UVA Health was forced to respond to this lawsuit.

**Plaintiff Mark Ehrlich's Employment with UVA Health and
Request for Exemption from COVID Vaccination**

147.    Mr. Ehrlich has a bachelor's degree in business administration. He has been working in health-care management for nearly 20 years.

148.    In November of 2020, UVA Health hired Mr. Ehrlich as a "Manager Patient Friendly Access" for its digestive health department in Charlottesville.

149.    In that capacity, Mr. Ehrlich managed the scheduling team for the digestive health department.

150.    Mr. Ehrlich's primary workplace was a private office, in which he had only occasional interaction with coworkers.

151.    When Mr. Ehrlich attended work meetings, he normally attended by WebEx.

152.    Whenever Mr. Ehrlich entered common spaces at work, he consistently observed masking and social distancing practices.

153.    Mr. Ehrlich willingly participated in UVA Health's regimen for unvaccinated workers, including daily health attestations and weekly COVID testing.

154.    Mr. Ehrlich is a Christian and a member of the Seventh Day Adventist Church.

155.    Mr. Ehrlich's sincere religious beliefs compel him to abstain from eating animal products, so he and his wife are practicing vegans. Mr. Ehrlich's beliefs similarly compel him to avoid the use of painkillers, such as acetaminophen or aspirin, as well other medications, such as antihistamines and pharmaceutical cold and flu treatments.

**UVA Health Denies Mr. Ehrlich's Requested Exemption On Unconstitutional Grounds**

156.    Mr. Ehrlich's sincere religious beliefs are that it would be dishonoring to God for him to take certain medications, including the Influenza and COVID vaccines. Accordingly, Mr. Ehrlich has never received these vaccines during his almost 20 years working in healthcare.

157.    Before Mr. Ehrlich joined UVA health, his two previous employers—both healthcare providers—granted him religious exemptions from receiving the flu vaccine.

158.    Well-known official Seventh Day Adventist teachings emphasize the relationship between physical welfare and spiritual health or holiness. Thus, Adventists eat a kosher diet and abstain from using tobacco, caffeine, or alcohol.

159.    Many Adventists apply the principles of their faith even more strictly to their own lives. Thus, although it is not absolutely required by official church teaching, many Adventists—in some places, a majority of them—feel compelled on religious grounds to adopt a vegetarian or vegan diet.

160.    Similarly, many Adventists have concluded that their faith requires them to refrain from receiving some or all vaccines. Although the institutional Seventh-Day Adventist Church does not condemn vaccines generally or the COVID vaccines in particular, it does officially recognize that "the decision to be immunized [against COVID] or not is the choice of each individual," which must be made "following God's leading in our lives."[2]

161.    After considering the general biblical principles articulated by his church and seeking God's guidance through prayer and study of the Bible, Mr. Ehrlich sincerely believed that God was leading him to avoid vaccines. He believes that to disobey this conviction would be immoral and sinful.

162.    Pursuant to his religious belief, shortly after Mr. Ehrlich started work at UVA Health in November 2020, he requested a religious exemption from annual flu vaccination.

---

[2] Seventh Day Adventist General Conference Health Ministries Department et al., *COVID-19 Vaccines: Addressing Concerns, Offering Counsel* (Dec. 22, 2020), https://www.healthministries.com/covid-19-vaccines-addressing-concerns-offering-counsel/?_ga =2.171863014.792021378.1668469269-1018213093.1668469269 (accessed Dec. 12, 2022.)

163.    UVA Health promptly changed Mr. Ehrlich's online flu-vaccine status to "compliant."

164.    When UVA Health announced its COVID vaccine mandate in August 2021, it stated that previously-granted exemptions to the flu vaccine would be applied to exempt the same employees from COVID vaccination. However, UVA Health human resources personnel later informed Mr. Ehrlich that his flu exemption somehow had never been approved.

165.    After UVA Health fired Mr. Ehrlich, it took the position that it had never actually granted him a flu-vaccine exemption, but that he had been marked "compliant" due to a mistake or technical glitch.

166.    Mr. Ehrlich tried in vain for more than six weeks to determine why his flu-vaccine exemption had not carried over, but when the deadline for COVID vaccines arrived, he was forced to submit another religious exemption request.

167.    Mr. Ehrlich's exemption request explained his religious beliefs that he must not receive the flu or COVID vaccines. Seventh-Day Adventist beliefs limiting believers' ingestion of food and medicines are well known and have been routinely recognized by federal courts.

168.    In a series of short electronic communications, UVA Health denied Mr. Ehrlich's exemption request.

169.    The letters gave no indication that UVA Health had given any individual consideration to Mr. Ehrlich's request. The only stated reason for denying the request was that "[t]he Medical Center cannot risk subjecting its patients or employees to unvaccinated employees providing medical care . . ."

170.    This reason is plainly false and pretextual, for at least two reasons. First, Mr. Ehrlich's job duties did not include providing medical care. Second, for other employees

who *did* provide medical care, UVA Health granted vaccine exemptions if they belonged to churches on UVA Health's list of favored faiths.

171.    After UVA Health fired Mr. Ehrlich, he filed a grievance with the Commonwealth's Office of Employee Dispute Resolution. In response to Mr. Ehrlich's grievance, UVA Health took the position in writing that "Mr. Ehrlich's professed 'religious belief' was not sincere," but was merely a secular interest "veiled in religious language."

172.    The Commonwealth's hearing officer agreed—caricaturizing Mr. Ehrlich's religious conviction as a mere "aversion to harming his body," concluding as a matter of fact that COVID vaccines do not harm the body, and therefore concluding that Mr. Ehrlich's refusal to be vaccinated is a misinterpretation of his own religion.

173.    After being fired by UVA Health, Mr. Ehrlich was unable to find other suitable work for approximately 10 months. He eventually was forced to take a job paying substantially less than he had earned at UVA Health.

174.    Mr. Ehrlich's new employer granted him religious exemptions from both influenza and COVID vaccination.

175.    Although UVA Health purported to change its policy in October 2022 to permit religious exemptions on grounds like the ones that Mr. Ehrlich identified in his application, UVA Health did not inform Mr. Ehrlich of the change or otherwise invite him to return to work until after UVA Health was forced to respond to this lawsuit.

### Plaintiff Ryan Meszaros' Employment with UVA Health and <u>Request for Exemption from COVID Vaccination</u>

176.    Mr. Meszaros is a registered nurse and worked at the University of Virginia Medical Center Emergency Department, in Charlottesville, from 2000 until November 2021.

177.    At the time UVA Health imposed its COVID vaccine mandate, Mr. Meszaros worked as an RN Clinician IV. In that capacity, he oversaw the day-to-day operations of the emergency department—overseeing the flow of hundreds of patients, supervising a team of around 20 nurses, and handling patient complaints.

178.    When Mr. Meszaros was not on-duty supervising the emergency department, he also served as a Forensic Nurse Examiner in the Emergency Department. This role required Mr. Meszaros to be on call in case a sexual-assault patient presented to the Emergency Department. When that happened, Mr. Meszaros would report to the hospital and provide emergency care to the patient.

179.    Mr. Meszaros worked as a Forensic Nurse Examiner at UVA Health for 18 years, and was compensated for this separately from, and in addition to, his regular salary.

180.    On days when Mr. Meszaros was not scheduled to work supervising the emergency department, he also taught courses in trauma nursing and emergency pediatric nursing through UVA Health's Life Support Learning Center. UVA Health compensated Mr. Meszaros for this teaching work separately from, and in addition to, his regular salary.

181.    Mr. Meszaros is a Catholic Christian who believes that his body is a temple of the Holy Spirit, and that God requires him to refrain from the use of ritually unclean food or injections.

182.    For this reason, Mr. Meszaros regards all vaccines as ritually impure.

183.    Mr. Meszaros' religious conviction regarding vaccines predated the COVID vaccine and is not limited to it. In 2019, when UVA Health began mandating flu vaccines for its employees, Mr. Meszaros and his wife both applied to UVA Health for religious exemptions from receiving the flu vaccine.

184.    Although their stated reasons for objecting to vaccines were identical, word for word, UVA Health granted a flu-vaccine exemption to Mr. Meszaros' wife but denied one to him. UVA Health did not explain the reasons for the denial.

185.    Faced with mere days to choose between receiving a flu vaccine and being fired from UVA Health, Mr. Meszaros violated his religious beliefs and received the flu vaccine. This decision has deeply troubled his conscience ever since.

186.    In the 2020-2021 flu season, Mr. Meszaros complied with the dictates of his conscience and did not receive the flu vaccine. Although UVA Health had not granted him a formal exemption, it never disciplined him for not receiving the vaccine, and indeed never raised the issue with him at all.

187.    In 2021, when UVA Health mandated the COVID vaccine, Mr. Meszaros was again determined that he would not violate his conscience. He promptly submitted an exemption application, explaining that the ingredients used in the available COVID vaccines make them, to him, "the equivalent of a prohibited 'unclean food," which is "analogous to what non-kosher food is to orthodox Jews." He further explained that although the vaccines may be "completely healthy" from the point of view of "[m]edical experts," ritual purity rules may still mean that "religious faith compels certain individuals"—including Mr. Meszaros—"to decline their consumption."

### UVA Denies Mr. Meszaros' Requested Exemption without Explanation

188.    UVA Health denied Mr. Meszaros' exemption application without explanation.

189.    On November 1, UVA Health suspended Mr. Meszaros from work for his failure to be vaccinated. Days later, UVA Health fired him.

190.    Mr. Meszaros has been forced to take lower-paying work as a nurse in another hospital's emergency department. Notably, this hospital readily granted Mr. Meszaros a religious exemption from all vaccine requirements.

191.    Mr. Meszaros's new position does not permit him to serve as a Forensic Nurse Examiner or to teach nursing courses, as he did at UVA Health. Mr. Meszaros has simply lost the income and experience that he derived from that work.

192.    Although UVA Health purported to change its policy in October 2022 to permit religious exemptions on grounds similar or identical to the ones that Mr. Meszaros identified in his application, UVA Health did not inform Mr. Meszaros of the change or otherwise invite him to return to work until after UVA Health was forced to respond to this lawsuit.

### Plaintiff Rebecca Tyson's Employment with UVA Health and Request for Exemption from COVID Vaccination

193.    Rebecca Tyson began work for UVA Health at Northridge Clinic in Charlottesville in August 2017.

194.    In 2020, Ms. Tyson made a lateral transfer to UVA Health's Zion Crossroads Primary Care and Specialty Clinic in Zion Crossroads, Virginia.

195.    As a Patient Access Associate, Ms. Tyson checked patients in and out for appointments.

196.    At the Zion Crossroads clinic, after a few months working at the front desk, Ms. Tyson's main job responsibility was answering telephone calls. She did this from an enclosed office that she shared with one other employee.

197.    Ms. Tyson is a Christian. She believes as a matter of faith that life begins at conception, that abortion is murder, and that cooperating with it in any manner is a grave sin.

198.    When UVA Health mandated that employees receive a COVID vaccine, Ms. Tyson requested a religious exemption and explained these beliefs of hers.

199.    Specifically, Ms. Tyson explained that "the COVID-19 vaccines were developed, tested and/or manufactured … using human cell lines that were generated or derived from tissues of aborted fetuses," and that "it would violate my … religious beliefs to cooperate with, or otherwise be complicit in, abortion in any manner."

200.    Ms. Tyson has developed these religious beliefs over time, through prayer, study, and thought. In requesting a religious exemption from UVA Health, she acknowledged that her beliefs have "evolved" over time.

### UVA Health Denies Ms. Tyson's Requested Exemption On Unconstitutional Grounds

201.    In a short email on September 13, 2021, UVA Health denied Ms. Tyson's exemption request without giving any explanation.

202.    When Ms. Tyson inquired about what was wrong with her application, her supervisor told her that it appeared the only employees who were receiving exemptions were Christian Scientists.

203.    In early November 2021, UVA Health suspended and then fired Ms. Tyson because she was not vaccinated against COVID.

204.    After her firing, Ms. Tyson filed a grievance with the Commonwealth's Office of Employment Dispute Resolution. In response to her grievance, UVA Health took the position in writing "that her professed 'religious belief' was not sincere," but instead was mere "personal beliefs … fueled by misinformation and simply veiled in religious language."

205.    UVA Health's grievance response did not corroborate its accusation about "misinformation." In fact, UVA Health conceded the "remote use of immortal fetal cell lines in [the vaccines'] testing and development."

206.    Instead, UVA Health simply declared its own religious and moral view that this "remote use" does not create any ethical problem. Specifically, UVA Health stated in writing that the connection between abortion and COVID vaccines "is insufficient to establish a sincerely held belief that prohibits vaccination," and "was so remote that people of faith … have uniformly deemed vaccination morally and ethically responsible."

207.    In other words, UVA Health dismissed Ms. Tyson's religious beliefs about the acceptable connection between abortion and vaccines simply because UVA Health disagrees with them and disapproves of them, and prefers other conflicting moral or religious beliefs.

208.    The Commonwealth's hearing officer upheld Ms. Tyson's termination, agreed with UVA Health's preferred moral belief regarding abortion and vaccines, and held that Ms. Tyson had misinterpreted her own religion. The hearing officer concluded that, even if fetal cell lines were used in the production or development history of the vaccines, "[g]iving an employee the Moderna or Pfizer vaccines is not in furtherance of abortion" because "the vaccine dose Grievant would receive would not itself have been tested using fetal cells." The hearing officer concluded that the vaccines' "mere association with abortion is not sufficient to establish that Grievant's religion precluded vaccination," and that Ms. Tyson's conviction to the contrary was a misunderstanding of her own faith.

209.    Since being fired by UVA Health, Ms. Tyson has been unable to find other work in the health care field. She has been forced to take a different job with lower pay.

210.    Although UVA Health purported to change its policy in October 2022 to permit religious exemptions on grounds similar or identical to the ones that Ms. Tyson identified in his application, UVA Health did not inform Ms. Tyson of the change or otherwise invite her to return to work until after UVA Health was forced to respond to this lawsuit.

### Plaintiff Rebecca Loflin's Employment with UVA Health and Request for Exemption from COVID Vaccination

211.    Rebecca Loflin is a Registered Nurse and holds a bachelor's degree in nursing.

212.    In January 2020, UVA Health hired Ms. Loflin as the RN Coordinator of Pediatric Endocrinology in UVA Health's Children's Hospital.

213.    In that role, Ms. Loflin met with all patients diagnosed with diabetes and oriented them to the first steps of their hospital stay. She also helped teach patient classes and met with patients on an ongoing basis to ensure they were achieving their desired outcomes.

214.    Ms. Loflin is a born-again Christian who believes that her body is a temple of the Holy Spirit.

215.    After much prayer, she has concluded that this belief means that receiving any vaccine—not just a COVID vaccine—would jeopardize her relationship with God.

216.    Ms. Loflin also believes as a matter of religious faith that all life is sacred, including the life of a child in the womb.

217.    When UVA Health announced that its employees were required to receive COVID vaccinations, Ms. Loflin requested a religious exemption. Her application explained that receiving a COVID vaccine would conflict with her belief that her body is a temple of the Holy Spirit.

218.    In addition, Ms. Loflin explained that "the companies that created the vaccines have used fetal cells in some capacity whether it be in the research, testing or developmental

phase," and that therefore "accepting that vaccine goes against what God has asked of me and would be a sin."

219.    As part of her exemption request, Ms. Loflin additionally submitted a letter from her pastor specifying that "Rebecca beliefs that the Holy Spirit is forbidding her to accept the COVID shot" and "that to do so … would [be] sinning against our living God."

**UVA Health Denies Ms. Loflin's Requested Exemption Without Explanation**

220.    UVA Health denied Ms. Loflin's exemption request without giving any reason or explanation why.

221.    On November 7, 2021, UVA Health fired Ms. Loflin because she had not received a COVID vaccine.

222.    Although Ms. Loflin has found other nursing work, the pay is substantially less than she received at UVA Health, placing a strain on her household finances.

223.    Although UVA Health purported to change its policy in October 2022 to permit religious exemptions on grounds similar or identical to the ones that Ms. Loflin identified in her application, UVA Health did not inform Ms. Loflin of the change or otherwise invite her to return to work until after UVA Health was forced to respond to this lawsuit.

**Plaintiff Janet Ripley's Employment with UVA Health and
Request for Exemption from COVID Vaccination**

224.    Janet Ripley is a Registered Radiologic Technologist who holds or has held certifications in Radiography, Nuclear Medicine, and Computed Tomography. She also holds a Virginia State License in Radiologic Technology.

225.    Ms. Ripley worked at UVA for 34 years, starting in 1987 while she was a student in UVA's Programs of Radiologic Technology.

226.    Over the decades, she worked her way to become the longest-tenured employee in the CT Department, in Radiology, at UVA Health's main Charlottesville hospital.

227.    Her job there, as a Staff CT Technologist, was to obtain high-quality scans of trauma, ICU, and ER patients.

228.    Ms. Ripley willingly participated in UVA Health's regimen for unvaccinated workers, including daily health attestations and weekly COVID-testing.

229.    Ms. Ripley is a Christian who believes in the Bible. She also believes that innocent life is sacred to God, including the life of a child in the womb.

230.    When UVA mandated COVID vaccines for its employees, Ms. Ripley requested a religious exemption. Her submissions explained that the ingredients used in the available COVID vaccines make them, to her, "the equivalent of a prohibited 'unclean food," which is "analogous to what non-kosher food is to orthodox Jews." She further explained that although the vaccines may be "completely healthy" from the point of view of "[m]edical experts," ritual purity rules may still mean that "religious faith compels certain individuals"—including Ms. Ripley—"to decline their consumption."

231.    In addition, Ms. Ripley explained that "the manufacturers of the COVID vaccines have used aborted fetal cell lines as part of their research, development and testing," and that "[m]y faith prohibits me from participating in or benefitting from an abortion, no matter how far back in time that abortion occurred."

232.    Ms. Ripley's application acknowledged that "[i]n the past, I have received vaccines" with similar connections to abortion, because she was not aware of the connection.

233.    For these reasons, Ms. Ripley stated, "[i]t is my firm belief that receiving the COVID vaccine would be to sin against God, violate my conscience and jeopardize my relationship with God."

234.    UVA Health denied Ms. Ripley's exemption request with no explanation.

235.    In fact, when Ms. Ripley submitted requests for further review, she often received an electronic rejection notice within a few minutes after submission.

236.    In early November 2021, UVA Health fired Ms. Ripley for being unvaccinated.

237.    Ms. Ripley has been unable to find other work in the medical field that would allow her to continue caring for her aging father. Since leaving UVA Health, she has been attempting to start her own business and has had no source of income.

238.    Ms. Ripley's inability to work in the medical field has also complicated her ability to maintain her professional certifications.

**Ms. Ripley Is Invited to Re-Apply but Is Again Denied a Religious Exemption.**

239.    In February of 2021, the supervisor of Ms. Ripley's former department at UVA Health sent her a text message. The message stated that UVA Health had been unable to hire anyone to do Ms. Ripley's former job, and invited her to re-apply for the job and for a religious exemption from the vaccine mandate.

240.    Ms. Ripley submitted an application, and shortly thereafter was told by the supervisor that she would be hired if the religious exemption could be granted.

241.    Ms. Ripley applied for a religious exemption using a process similar to the one she had experienced before.

242.    After several weeks of waiting, Ms. Ripley was told that she still would not be allowed a religious exemption, and so would not be re-hired.

243.     On September 5, 2022, ten months after UVA Health terminated her, Ms. Ripley checked with the manager and was told that her old position was still available.

244.     Although UVA Health purported to change its policy in October 2022 to permit religious exemptions on grounds similar or identical to the ones that Ms. Ripley identified in her application, UVA Health did not inform Ms. Ripley of the change or otherwise invite her to return to work until January 2023, after UVA Health was forced to respond to this lawsuit.

245.     In early December 2022, Ms. Ripley was again in contact with the manager of her former department at UVA Health. Although the manager reiterated that that her old position remains open and that she would be welcome back, Ms. Ripley was not informed of any policy change that might affect her ability to receive a religious accommodation in order to return.

**Plaintiff Christopher Parsnow's Employment with UVA Health and**
**Request for Exemption From COVID Vaccination**

246.     Mr. Parsnow has had a successful career in business analytics. In 2018, he joined the Dean's Office of the UVA School of Medicine as a Business Intelligence Analyst.

247.     In this role, Mr. Parsnow analyzed data regarding enrollment and operations, in order to prepare reports that would help administrators and professors make decisions.

248.     Starting in April 2020, Mr. Parsnow's UVA Health position became fully remote. His job duties never required him to physically enter any UVA or UVA Health facility, or to interact with anyone else in person.

249.     From April 2020 until the time UVA Health fired Mr. Parsnow, the only time he physically entered any UVA or UVA Health facility for work was to take COVID tests.

250.     Mr. Parsnow is a Christian who believes it is immoral to use artificial messenger RNA to modify the processes of the human body, which most of the available COVID vaccines

do. Mr. Parsnow also believes it is immoral to support development practices that use cells derived from aborted fetal tissue, which were used for all available COVID vaccines.

251.    When Mr. Parsnow learned of UVA Health's mandated vaccination for COVID, he promptly requested a religious exemption from the vaccine mandate, explaining that these beliefs prevent him from receiving the vaccination.

**UVA Health Denies Mr. Parsnow's Requested Exemption on Unconstitutional Grounds**

252.    In a series of short electronic communications between September and November 2021, UVA Health denied Mr. Parsnow's religious exemption request. None of the communications gave any reason why UVA Health was denying the request.

253.    On information and belief, other than these denial letters, UVA Health created no records of any kind to memorialize its consideration of Mr. Parsnow's exemption request.

254.    After UVA Health denied Mr. Parsnow's exemption request, in November 2021, UVA Health suspended Mr. Parsnow for being unvaccinated. In late November, it fired him for the same reason.

255.    As a result of being fired, Mr. Parsnow was unemployed for multiple months, and suffering a resulting loss of income.

256.    Although UVA Health purported to change its policy in October 2022 to permit religious exemptions on grounds similar or identical to the ones that Mr. Parsnow identified in his application, UVA Health has never informed Mr. Parsnow of this change in policy or suggested that he might be eligible to return to UVA Health.

**UVA Health Offers Plaintiff Nicole Boker a Job,
Then Rejects Her for on Unconstitutional Grounds**

257.    Ms. Boker has been a Registered Nurse for over 20 years, working principally in critical care.

258.    Ms. Boker is a Christian who believes she is required to submit all significant life decisions to God, and especially the Holy Spirit, in prayer. When COVID vaccines became available, Ms. Boker prayed frequently and at length about whether she should receive one. She believes that God directed her not to do so.

259.    As of December 2021, Ms. Boker was working as a nurse in another area hospital (not UVA Health), which did not require her to be vaccinated against COVID, and allowed her to test weekly for the virus instead.

260.    In December 2021, Ms. Boker applied for a position as an intensive care nurse at UVA Health's hospital in Haymarket, Virginia.

261.    Ms. Boker was eager to work at this UVA Health facility because it was much closer to her home than her then-current workplace, and because she previously had a positive experience as a patient there.

262.    Based on Ms. Boker's previous experience with hospital work and vaccine exemptions, she did not expect difficulty in satisfying UVA Health's COVID policies.

263.    Within a few weeks of her application, Ms. Boker successfully completed UVA Health's hiring process. UVA Health offered her the job she had applied for, and Ms. Boker accepted it.

264.    As part of the on-boarding process, UVA Health requested proof of Ms. Boker's vaccination against COVID. On December 30, 2021 Ms. Boker requested a religious exemption, explaining that "God has directed me not to receive" the vaccine and that doing so would "be displeasing to God."

265.    Three days later—on January 2, 2022—UVA Health replied that Ms. Boker's accommodation request was denied, and that she could not be employed at UVA Health without receiving a COVID vaccine.

266.    On information and belief, other than this denial, UVA Health created no records of any kind to memorialize its consideration of Ms. Boker's exemption request.

267.    UVA Health held Ms. Boker's job offer open for several weeks to allow her to consider whether to be vaccinated.

268.    During this period, because Ms. Boker was interested in the job, she engaged in further intense prayer in order to determine whether there was any way she could in good conscience receive a COVID vaccine. Ultimately, Ms. Boker concluded that her religious beliefs remained unchanged and prevented her from being vaccinated.

269.    In late January 2022, Ms. Boker informed UVA Health that she could not violate her religious convictions and so could not accept the job.

270.    Although UVA Health purported to change its policy in October 2022 to permit religious exemptions on grounds similar or identical to the ones that Ms. Boker identified in her application, UVA Health has never informed Ms. Boker of the change or otherwise invite her to renew her application to work at UVA Health.

### Plaintiff Joshua Seiler's Employment with UVA Health and
### Request for Exemption From COVID Vaccination

271.    Mr. Seiler worked for the University of Virginia for approximately 15 years. He began as a Grounds Worker, and over the years worked his way to being a Pipefitter in UVA's Facilities Management Utilities department.

272.    Mr. Seiler performed job duties as a Pipefitter in UVA Health hospitals and facilities, and consequently was subject to certain UVA Health human-resources requirements, including its COVID vaccine requirement.

273.    Mr. Seiler is an Evangelical Christian who believes that abortion is against God's will and that for him to knowingly benefit from the results of an abortion, no matter how remotely, would be immoral.

274.    When UVA Health mandated vaccination against COVID, Mr. Seiler promptly requested a religious exemption. He explained that the use of "fetal cell lines in development, confirmation and production" of the various COVID vaccines would mean that, in his belief, receiving a vaccine would be "morally compromising" because it would be "indirect engagement and participation in abortion."

### UVA Health Denies Mr. Seiler's Requested Exemption on Unconstitutional Grounds, Then Hires Him Back as an Independent Contractor

275.    In a series of short electronic communications between September and November 2021, UVA Health denied Mr. Seiler's religious exemption request. None of the communications contained any explanation of why his request was denied.

276.    On information and belief, other than these denial letters, UVA Health created no records of any kind to memorialize its consideration of Mr. Seiler's exemption request.

277.    After UVA Health denied Mr. Seiler's exemption request, in November 2021, UVA Health and UVA suspended him for being unvaccinated.

278.    Finally, in November 2021, UVA Health and UVA fired Mr. Seiler for being unvaccinated. His termination letter stated that Mr. Seiler "presents a serious safety risk to self, co-workers, and patients."

279.    Mr. Seiler was forced to find other work at lower pay. Over the next few months, he switched jobs several times in an attempt to find a suitable position. Eventually, in March 2022, Mr. Seiler accepted work with a company that (among other things) provided facilities-management services as an independent contractor to various businesses and entities, including the University of Virginia.

280.    Mr. Seiler's exclusive duties at his new employer were to do exactly the same pipefitting work at UVA and UVA Health that he had been fired from four months before.

281.    As a result, UVA and UVA Health accepted Mr. Seiler back, unvaccinated, to do the same work in the same facilities with the same co-workers that he had been doing before.

282.    Although Mr. Seiler was still unvaccinated, no UVA or UVA Health personnel even mentioned or asked about it, let alone objected to it.

283.    Mr. Seiler performed this work for multiple months at UVA and UVA Health before voluntarily moving on to another employer.

284.    Although UVA Health purported to change its policy in October 2022 to permit religious exemptions on grounds similar or identical to the ones that Mr. Seiler identified in his application, UVA Health did not inform Mr. Seiler of the change or otherwise invite him to return to work until after UVA Health was forced to respond to this lawsuit.

**Plaintiff Nadine McCarthy's Background with UVA Health**

285.    Ms. McCarthy is a Registered Nurse who started working at UVA Health in 1980.

286.    Although Ms. McCarthy worked elsewhere for certain periods, most of her career from 1980 until now has been at UVA Health, most recently as a Labor and Delivery nurse at UVA Medical Center in Charlottesville.

287.   As of 2021, Ms. McCarthy had 20 years of experience in maternity nursing and was one of UVA Health's most experienced nurses in that field.

288.   Ms. McCarthy is a Christian who believes that her body is a temple and she must avoid the use of substances that she believes to be impure, including various kinds of vaccines.

289.   Ms. McCarthy also believes that abortion is immoral and that it is sinful to use a vaccine that was developed or produced using cell lines that originated from an abortion.

290.   When UVA Health first imposed a requirement for flu vaccines shortly before the COVID pandemic began, Ms. McCarthy requested and received a religious exemption.

291.   When UVA Health mandated vaccination against COVID vaccines approximately one year later, its policy was to automatically carry over flu-vaccine exemptions to the COVID vaccine. Therefore, Ms. McCarthy was one of the few employees who UVA Health initially granted a religious exemption from the COVID vaccine.

292.   Although UVA Health required Ms. McCarthy to be tested for COVID on a weekly basis, it imposed no other extra restrictions on her practice as a labor and delivery nurse.

293.   Ms. McCarthy successfully worked under this accommodation for several months.

294.   In March 2022, Ms. McCarthy resigned her position at UVA Health and accepted employment as a different health-care facility.

295.   As part of the departure process, UVA Health personnel told Ms. McCarthy that she was eligible for re-hire if she decided in the future to come back.

296.   Ms. McCarthy's new employer, a surgical center, also gave her a religious exemption from COVID vaccination.

**UVA Health Denies Ms. McCarthy's Requested Exemption on Unconstitutional Grounds**

297.    During 2022, while Ms. McCarthy was working elsewhere, her former manager at UVA Health contacted her to invite her to return to her former position. Ms. McCarthy initially declined the invitation.

298.    In November 2022, however, Ms. McCarthy reconsidered the invitation and applied for a position at UVA Health as a Staffing Resource Office nurse, at the same Charlottesville Medical Center where she had worked before.

299.    A nurse in this position provides nursing services in different departments as needed, including in Ms. McCarthy's previous capacities in the Labor and Delivery Unit and other maternity nursing.

300.    Because UVA Health had previously exempted Ms. McCarthy from its COVID vaccine requirement, she did not expect any difficulty in satisfying UVA Health's COVID policies.

301.    Ms. McCarthy successfully completed the application process. In late November 2022 UVA Health offered her the position, and in early December she accepted.

302.    As part of the on-boarding process, UVA Health requested proof of Ms. McCarthy's vaccination against COVID. She responded by requesting a religious exemption, referring UVA Health to the exemption it had previously granted her.

303.    In mid-January 2023, UVA Health informed Ms. McCarthy that her exemption request was denied "due to undue hardship concerns."

304.    Although UVA Health initially stated that it might have other jobs where it could accommodate Ms. McCarthy, it did not offer her one of those jobs, identify those jobs, or even suggest which jobs those might be. Instead, it simply "encourage[d]" her to try applying for a

different job, but said she could "reapply for an exemption" only after she was "given a condition offer for a different position."

305.    When Ms. McCarthy asked why she was being denied the exemption that UVA Health had previously granted her, a UVA Health human resources executive told her that UVA Health's vaccination policy had changed, and that unvaccinated personnel now were not allowed to provide treatment to children or babies.

306.    On February 1, 2023, UVA Health sent a short message to Ms. McCarthy in which "rescinded" Ms. McCarthy's job offer and barred her from re-applying for one year. UVA Health offered no explanation of why it was reversing course from its previous statements to Ms. McCarthy.

### Plaintiff Dr. Chelsea Sheppard's Employment with UVA Health and <u>Request for Exemption From COVID Vaccination</u>

307.    Dr. Sheppard has practiced medicine for 20 years and holds board certifications in Clinical Pathology and Blood Banking and Transfusion Medicine. She earned her M.D. degree from the St. Louis University School of Medicine, served residencies and a fellowship at the Emory University School of Medicine, and is licensed to practice medicine in Virginia and Louisiana.

308.    Dr. Sheppard started at UVA and UVA Health in July 2019, serving as an Associate Professor of Pathology and the Facility Director of the apheresis stem cell collection facility.

309.    As soon as she joined UVA Health, Dr. Sheppard started helping with the response to the ongoing COVID pandemic. She regularly worked extra shifts to care for COVID patients and for others. She received bonuses for this from UVA Health and was singled out for praise from the Chairman of UVA Health's Pathology Department.

310.    Dr. Sheppard's work with COVID patients resulted in her being a co-investigator in a clinical study that was funded by the National Institutes of Health. *See* J. Sturek *et al.*, *Convalescent Plasma for Preventing Critical Illness in COVID-19: a Phase 2 Trial and Immune Profile*, 10 Microbiology Spectrum J. 6 (Feb. 23, 2022), *available at* https://pubmed.ncbi.nlm.nih.gov/35196802/.

311.    Dr. Sheppard also is a Christian whose faith prohibits her from participating in or benefiting from an abortion, no matter how remotely. This conviction has profoundly affected Dr. Sheppard's life as she is the mother of a child with Down Syndrome, most of whom are aborted before being born.

312.    When UVA Health announced in 2021 that employees were required to be vaccinated against COVID, Dr. Sheppard promptly requested a religious exemption. She explained that "[e]ach of the manufacturers of the Covid vaccines currently available developed and/or confirmed the vaccines efficacy using fetal cell lines, which originated from aborted fetuses," and that she could not receive such vaccines because of her "religious belief that I cannot participate in or benefit from an abortion, no matter how remote in time the abortion occurred." Dr. Sheppard specifically promised "to meet all [other] requests from the hospital epidemiology team to mitigate the spread of the virus including, but not limited to, weekly testing."

**UVA Health Denies Dr. Sheppard's Requested Exemption on Unconstitutional Grounds**

313.    In short electronic communications in September and October 2021, UVA Health denied Dr. Sheppard's religious exemption request. The communications gave no explanation of why UVA Health denied her request.

314.     On information and belief, other than these denial letters, UVA Health created no records of any kind to memorialize its consideration of Dr. Sheppard's exemption request.

315.     Dr. Sheppard asked by email why her request had been denied. About a week later, UVA Health replied that "we are unable to provide reasons for individual decisions."

316.     In November 2021, UVA Health suspended Dr. Sheppard for being unvaccinated. In later November, it fired her for the same reason.

317.     As a result, Dr. Sheppard was unemployed until early 2022.

318.     Although UVA Health purported to change its policy in October 2022 to permit religious exemptions on grounds similar or identical to the ones that Dr. Sheppard identified in her application, UVA Health has never informed Dr. Sheppard of the change or otherwise invited her to return to work at UVA Health.

## CLASS ALLEGATIONS

319.     Plaintiffs seek to represent and have certified two classes of plaintiffs.

### The Disfavored Religions Class

320.     The Disfavored Religions Class, represented by all Named Plaintiffs, consists of all persons who, before the entry of judgment in this case:

(1) Were employed by or applied for employment with UVA Health, or with a UVA Heath-affiliated organization or entity that applied UVA Health's religious accommodation policies and practices.

(2) Submitted a request to UVA Health for a religious exemption from receiving a COVID vaccine;

(3) Were not members of the Dutch Reformed Church; the Church of the First Born; the Church of Christ, Scientist; or any other church or religious organization appearing on the written list or lists established by UVA Health as churches, denominations, or religious bodies whose members would be exempted from the COVID vaccine (collectively, "UVA's Favored Religions");

(4) After requesting a religious exemption, either

(a) were fired, suspended, disciplined, not hired, or subjected to any other adverse employment action by UVA Health as a result of not receiving a COVID vaccine; or

(b) were given notice by UVA Health that they would be fired, suspended, disciplined, or subjected to any adverse employment action, but stopped working for UVA Health before the date that UVA Health identified for such adverse employment action; or

(c) were not granted an exemption by UVA Health and have not been hired by UVA Health to a position for which they applied.

321.   The Disfavored Religions Class includes hundreds of former employees of UVA Health, rendering the class so numerous that joinder of all members is impracticable.

322.   There are many questions of law and fact common to the Disfavored Religions Class, including:

- Whether UVA Health compiled a list of Favored Religions for which individuals who identified as affiliated would routinely be exempted from COVID-19 vaccination upon request, while denying identical exemption applications from class members who belonged to other religious traditions;

- Whether UVA Health otherwise favored—such as by applying more favorable accommodation standards or automatic exemptions—employees and applicants who identified as affiliated with one of UVA's Favored Religions, while denying identical exemption applications from class members who belonged to other faiths or religious traditions;

- Whether UVA Health continued its discriminatory practice by revising its policy on paper but refusing to inform wrongfully-fired plaintiffs of that fact, and by continuing to reject religious objectors to the vaccine on pretextual "undue hardship" grounds;

- Whether UVA Health's actions, policies, or practices violated the Free Exercise rights of class members;

- Whether UVA Health's actions, policies, or practices violated the Establishment Clause;

- Whether UVA Health's actions, policies, or practices violated the Equal Protection Clause; and

- Whether UVA Health's actions, policies, or practices violated the establishment or free-exercise provisions of the Virginia Constitution.

323.   The Named Plaintiffs' claims are typical of the claims of the other class members. Like the rest of the class, the Named Plaintiffs requested a religious exemption from

50

UVA Health's COVID vaccine mandate, and UVA Health would have granted it (at least until October 2022) if the named Plaintiff had stated the request was because of her or his belief or membership in one of UVA's Favored Religions. After October 2022, UVA Health perpetuated its unlawful discrimination by continuing to refuse to hire or re-hire each Named Plaintiff.

324.    Each of the Named Plaintiffs will fairly and adequately protect the interests of the class. Their interests in this matter are the same as those of the class, and they have no conflict of interest with the class.

325.    Defendants have acted on grounds that apply generally to the class because, as against each class member, Defendants took adverse employment actions that they would not have taken (at least until October 2022) if only the class member belonged to one of UVA's Favored Religions. After October 2022, UVA Health perpetuated its unlawful discrimination by continuing to refuse to hire or re-hire each Named Plaintiff. As a result, final injunctive relief or corresponding declaratory relief is appropriate respecting the Disfavored Religions Class as a whole.

326.    Questions of law or fact common to members of the Disfavored Religions Class predominate over any questions affecting only class members. Because UVA Health granted religious exemptions to members of its favored religious groups "automatically," with little or no individualized consideration of their applications, whether it unlawfully discriminated against class members can be determined without examining their individual circumstances. In addition, a large portion of the damages due to class members consists of back pay or other lost wages, which can be calculated mechanically based on records maintained by UVA Health.

327.    A class action is superior to other available methods for fairly and efficiently adjudicating the claims of members of the Disfavored Religions Class. UVA Health

discriminated against all class members in exactly the same way, and through the application of a uniform policy. Therefore, individual litigation of class members' claims would involve repeated re-litigation of exactly the same questions.

### The Abortion Objectors Class

328.   The Abortion Objectors Class, represented by Mr. Phillips, Ms. Tyson, Ms. Loflin, Ms. Ripley, Mr. Parsnow, Mr. Seiler, Ms. McCarthy, and Dr. Sheppard (hereinafter "the class representatives"), consists of all persons who, before the entry of judgment in this case:

(1) Were employed by or applied for employment with UVA Health, or with a UVA Heath-affiliated organization or entity that applied UVA Health's religious accommodation policies and practices; and

(2) Submitted a written request to UVA Health for a religious exemption from receiving a COVID vaccine, based on the available vaccines' association with abortion or cell lines or tissue from aborted fetuses;

(3) After requesting a religious exemption, either

(a) were fired, suspended, disciplined, not hired, or subjected to any other adverse employment action by UVA Health as a result of not receiving a COVID vaccine; or

(b) were given notice by UVA Health that they would be fired, suspended, disciplined, or subjected to any adverse employment action, but stopped working for UVA Health before the date that UVA Health identified for such adverse employment action; or

(c) were not granted an exemption by UVA Health and have not been hired by UVA Health to a position for which they applied.

329.   Plaintiffs cannot determine the exact number of members of the Abortion Objectors Class at this time, since doing so would require access to UVA Health's records of class members' exemption requests. However, on information and belief, Plaintiffs estimate that the class consists of well over 100 individuals, rendering it so numerous that joinder of all members is impracticable.

330.    There are numerous questions of law and fact common to the Abortion Objectors Class, including:

- Whether Defendants took any adverse employment action—such as rejecting a request for religious exemption—on the basis of Defendants' moral or religious belief that COVID vaccines' connection with abortion or fetal cell tissue is too remote or outdated to pose any moral or religious problem;
- Whether Defendants took any adverse employment action because Defendants disfavored the religious beliefs or viewpoints expressed by class members related to COVID vaccines and abortion, fetal cell research, or similar issues;
- Whether Defendants
- Whether such adverse employment actions violated the Free Exercise rights of class members;
- Whether such adverse employment actions violated the Establishment Clause;
- Whether such adverse employment actions violated the Virginia Constitution.

331.    The claims of the class representatives are typical of the claims of the other class members. Like the rest of the class, these representatives each requested a religious exemption from the COVID mandate based on the available vaccines' connection with abortion, and UVA Health denied those exemptions solely because it disagrees with or disapproves of their religious beliefs in this regard.

332.    The class representatives have no conflicts of interest with the class.

333.    Defendants have acted on grounds that apply generally to the class because, as against each class member, they have taken adverse employment actions based on UVA Health's own preferred moral and religious beliefs and viewpoints about abortion and COVID vaccines. As a result, final injunctive relief or corresponding declaratory relief is appropriate respecting the Abortion Objectors Class as a whole.

334.    Questions of law or fact common to class members predominate over any questions affecting only class members. Because UVA Health denied abortion-related applications for religious exemptions based on its own moral and religious beliefs, rather than

based on the circumstances or beliefs of individual class members, the lawfulness of those denials can be determined in common for the entire class. In addition, a large portion of the damages due to class members consists of back pay or other lost wages, which can be calculated mechanically based on records maintained by UVA Health.

335.    A class action is superior to other available methods for fairly and efficiently adjudicating the claims of members of the Abortion Objectors Class. UVA Health discriminated against all class members in exactly the same way, and through the application of a uniform policy. Therefore, individual litigation of class members' claims would involve repeated re-litigation of exactly the same questions.

## DEFENDANTS' UNLAWFUL ACTIONS AND OMISSIONS

336.    Each and every act of Defendants alleged herein was committed by Defendants named herein, and each and every act was committed under the color and authority of state law.

337.    The Named Plaintiffs and class members did not create risk for coworkers or patients. Because each participated in weekly COVID testing that UVA Health did not require for vaccinated employees, they presented a lower risk of transmission than their vaccinated coworkers.

338.    Other local hospitals and healthcare facilities have hired employees terminated by UVA Health. Those that mandate vaccination have routinely granted religious exemptions that were denied by UVA Health.

339.    Defendants' unlawful actions, policies, and practices were not compelled by any federal law or regulation. In fact, federal agencies seeking to mandate vaccination for COVID expressly recognize that exemptions from vaccination are consistent with safety and may be

required by applicable law because of employees' religious beliefs, practices, or observances that conflict with the vaccination.

340.     For a period of time, it was believed that UVA Health would be required to follow the Occupational Safety and Health Administration's ("OSHA") Emergency Temporary Standard on COVID Vaccination and Testing published on November 5, 2021. See 86 Fed. Reg. 61402 (2021) ("ETS"). But the ETS never required or even allowed UVA Health's draconian approach to religious exemptions, for multiple reasons.

341.     Ultimately, the U.S. Supreme Court held that OSHA lacked authority to issue the ETS. But even before the Court's decision, the ETS never actually mandated vaccination— instead it expressly authorized testing as a safe alternative to vaccination. And regardless of an employer's policy, the ETS explicitly confirmed that employers must exempt employees from vaccination by providing "reasonable accommodation[s] under federal civil rights laws [if employees] have . . . sincerely-held religious beliefs, practices, or observances that conflict with the vaccination requirement."

342.     Similarly, in November 2021, the U.S. Department of Health and Human Services, Centers for Medicare & Medicaid Services issued an interim final rule that required certain providers and suppliers participating in Medicare and Medicaid programs to be vaccinated for COVID, 86 Fed. Reg. 61555 (2021) (the "CMS Rule"). The CMS Rule expressly recognized that there would be "workers who cannot be vaccinated or tested because of . . . religious beliefs, practice, or observance" who may require "an exemption from their employer."

343.     CMS's final regulations mandated that the "policies and procedures" of covered healthcare facilities

must include, at a minimum, the following components:***

(vi) A process by which staff may request an exemption from the staff COVID-19 vaccination requirements based on an applicable Federal law [including accommodations of employee's religious beliefs, observances, or practices that prevented vaccination; and]

(vii) A process for tracking and securely documenting information provided by those staff who have requested, and for whom the facility has granted, an exemption from the staff COVID-19 vaccination requirements ….

42 C.F.R. §§ 483.80(i)(3)(vi)-(vii).

344.    Defendants' actions, policies, and practices described herein, including the actions, policies, and practices of Defendants' subordinates at the direction or with the knowledge and approval of Defendants, deprived the Named Plaintiffs and class members of their rights under the United States Constitution and federal statutes.

345.    Defendants directed their subordinates to take actions that deprived the Named Plaintiffs and class members of their rights.

346.    Defendants set in motion a series of acts by their subordinates, or knowingly refused to terminate a series of acts by their subordinates, that they knew or reasonably should have known would cause the subordinates to deprive the Named Plaintiffs and class members of their rights.

347.    Defendants knew that their subordinates were engaging in these acts and knew or reasonably should have known that the subordinates' conduct would deprive the Named Plaintiffs and class members of their rights.

348.    Defendants failed to act to prevent their subordinates from engaging in such unlawful conduct.

349.    Defendants disregarded the known or obvious consequence that a particular deficiency of supervision, failure to supervise, omission of policy correction, omission of

practice correction, or similar omission or inaction would cause their subordinates to violate the Named Plaintiffs' and class members' rights.

350.    Defendants' deficiency of supervision, failure to supervise, omission of policy correction, omission of practice correction, or similar omission or inaction actually caused their subordinates to deprive the Named Plaintiffs and class members of their rights.

351.    Defendants engaged in conduct that showed a reckless or callous indifference to the deprivation by their subordinates of the rights of others.

352.    Defendants' conduct was so closely related to the deprivation of the Named Plaintiffs' and class members' rights as to be the moving force that caused the ultimate injury.

353.    As a result of Defendants' and their subordinates' unlawful acts, the Named Plaintiffs and class members have suffered and continue to suffer economic and other damages in amounts to be proven at trial, including front pay, back pay, emotional distress damages, compensatory damages, punitive damages, and attorney fees in amounts to be determined at trial.

354.    The Named Plaintiffs and/or other class representatives intend to amend this Complaint to add claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C § 2000e, *et seq.*, once they have exhausted their administrative remedies.

*          *          *          *          *

**FIRST CAUSE OF ACTION**
**Violation of the Free Exercise Clause under 42 U.S.C. § 1983**
**(By both classes)**

355.    Named Plaintiffs and the classes restate and reallege each of the previous paragraphs.

356.    Class members have sincere religious beliefs that prevent them from receiving the COVID vaccines.

357.    Defendants' mandate that class members receive the vaccines, or else lose their jobs, not be hired, or face other adverse employment actions, was a severe burden on this religious belief and practice.

358.    This mandate was not a neutral rule of general applicability, because Defendants made exceptions to this rule for other employees and job applicants—including employees and applicants who had certain medical needs, or who belonged to certain faiths or faith groups approved by Defendants, or who Defendants had previously exempted from receiving the flu vaccine.

359.    Defendants offered no such accommodations to class members, but instead required them to choose between honoring their religious beliefs and losing their jobs, not being hired, or otherwise facing adverse employment action.

360.    After UVA Health purported to change its policy in October 2022, Defendants continued this discrimination by refusing to inform the religious employees whom they had fired about the policy change.

361.    After UVA Health purported to change its policy in October 2022, Defendants further continued this discrimination by denying religious-exemption applications on "undue hardship" grounds—in stark contrast to the "automatic" religious exemptions they have handed out to members of their favored churches.

362.    After UVA Health purported to change its policy in October 2022, it has further continued this discrimination by denying many religious-exemption applications on "undue hardship" grounds—in stark contrast to the "automatic" religious exemptions it has handed out to members of their favored churches.

363.    None of this discrimination was adequately tailored to achieve any government interest. Although government has an interest in limiting the occurrence and symptoms of COVID, it may not pursue that interest by arbitrarily granting religious exemptions to members of some favored faiths or faith bodies, while denying exemptions to other believers who want to engage in exactly the same religiously-motivated conduct.

364.    The lack of proper tailoring is further demonstrated by the fact that other hospital systems in Virginia and neighboring states, with similar operations to UVA Health, have managed to avoid the kind of mass firings of religious objectors that UVA Health perpetrated.

365.    Defendants engaged in this activity under color of state law.

366.    This discrimination violated well-established principles under the Free Exercise Clause of the U.S. Constitution.

367.    Because of Defendants' unlawful actions, the members of the Disfavored Religions Class suffered and continue to suffer economic and other damages in amounts to be proven at trial, including front pay, back pay, emotional distress damages, compensatory damages, punitive damages, and attorney fees in amounts to be determined at trial.

368.    In addition, Defendants' unlawful actions have caused members of the class to suffer and continue to suffer other harm not remediable by money damages.

**SECOND CAUSE OF ACTION**
**Violation of the Establishment Clause under 42 U.S.C. § 1983**
**(By the Disfavored Religions Class)**

369.    Named Plaintiffs and the Disfavored Religions Class restate and reallege each of the previous paragraphs.

370.   In implementing UVA Health's COVID vaccine mandate, Defendants compiled and/or enforced a list of religious bodies and communities whose members would routinely receive exemptions from the mandate.

371.   If the members of the Disfavored Religions Class had belonged to any of those favored religious bodies or communities and had applied for a religious exemption between August 2021 and at least October 2022, Defendants would have exempted them from UVA Health's COVID vaccine mandate.

372.   Because the members of the Disfavored Religions Class belonged to other faith communities, and not the favored ones, Defendants refused to grant their exemption requests and fired them from their jobs, refused to hire them, or subjected them to other adverse employment actions.

373.   After UVA Health purported to change its policy in October 2022, Defendants continued this discrimination by refusing to inform the religious employees who they had fired about the policy change.

374.   After UVA Health purported to change its policy in October 2022, Defendants further continued this discrimination by denying many religious-exemption applications on "undue hardship" grounds—in stark contrast to the "automatic" religious exemptions they have handed out to members of their favored churches.

375.   Defendants engaged in this activity under color of state law.

376.   This violated well-established principles under the Establishment Clause of the United States Constitution.

377.   Because of Defendants' unlawful actions, the members of the Disfavored Religions Class suffered and continue to suffer economic and other damages in amounts to be

proven at trial, including front pay, back pay, emotional distress damages, compensatory damages, punitive damages, and attorney fees in amounts to be determined at trial.

378.    In addition, Defendants' unlawful actions have caused members of the class to suffer and continue to suffer other harm not remediable by money damages.

### THIRD CAUSE OF ACTION
### Violation of the Establishment Clause under 42 U.S.C. § 1983
### (By the Abortion Objectors Class)

379.    The class representatives and the Abortion Objectors Class restate and reallege each of the previous paragraphs.

380.    Throughout history, scientists have had to grapple with ethical questions regarding the use of data or materials that were derived through immoral conduct. This has given rise to a significant religious and moral debate among bioethicists and theologians of various faiths: under what circumstances is it morally acceptable to use or benefit from products whose research-and-development histories implicate moral questions like these—and by contrast, when is it wrong or sinful to use or benefit from such products.

381.    This debate extends to and includes the moral status of medical products that were made from, or developed with the use of, tissue or cell lines that originated from aborted fetuses.

382.    At the time that each member of the Abortion Objectors Class sought religious exemptions to the COVID vaccine, all varieties of COVID vaccine available to them had been either produced or developed using cell lines that originated from aborted fetal tissue.

383.    The class representatives and the members of the Abortion Objectors Class hold the sincere religious belief that this connection with abortion made it immoral for them to receive any of those vaccines.

384.    Defendants disagreed with this religious belief, and instead expressed their own preferred moral and religious view that the connection between COVID vaccines and abortion is too remote to give rise to any ethical or religious concerns.

385.    Defendants fired, otherwise disciplined, or refused to hire each Class member because he or she refused to agree with, or conform his or her conduct to, Defendants' preferred moral and religious beliefs on this matter.

386.    After UVA Health purported to change its policy in October 2022, Defendants continued this discrimination by refusing to inform the religious employees—whom they had previously fired—about the policy change.

387.    After UVA Health purported to change its policy in October 2022, Defendants further continued this discrimination by denying many religious-exemption applications on "undue hardship" grounds—in stark contrast to the "automatic" religious exemptions they have handed out to members of their favored churches.

388.    Defendants engaged in this activity under color of state law.

389.    These actions violated well-established principles under the Establishment Clause of the First Amendment to the U.S. Constitution.

390.    Because of Defendants' unlawful actions, the class representatives and the members of the Abortion Objectors Class suffered and continue to suffer economic and other damages in amounts to be proven at trial, including front pay, back pay, emotional distress damages, compensatory damages, punitive damages, and attorney fees in amounts to be determined at trial.

391.    In addition, Defendants' unlawful actions have caused members of the class to suffer and continue to suffer other harm not remediable by money damages.

**FOURTH CAUSE OF ACTION**
**Violation of the Equal Protection Clause under 42 U.S.C. § 1983**
**(By the Disfavored Religions Class)**

392.    Named Plaintiffs and the Disfavored Religions Class restate and reallege each of the previous paragraphs.

393.    From August 2021 until at least October 2022, each member of the Disfavored Religions Class could have submitted exactly the same exemption request that he or she did— and Defendants would have granted the request—had he or she belonged to the Dutch Reformed Church; the Church of the First Born; the Church of Christ, Scientist; or any other of numerous religious organizations or denominations on the written list prepared by UVA Health for that purpose.

394.    Defendants refused to grant each class member's exemption request because he or she did not belong to any of those favored religious groups, but instead adhered to a different faith.

395.    After UVA Health purported to change its policy in October 2022, Defendants continued this discrimination by refusing to inform the religious employees who they had fired about the policy change.

396.    After UVA Health purported to change its policy in October 2022, Defendants further continued this discrimination by denying many religious-exemption applications on "undue hardship" grounds—in stark contrast to the "automatic" religious exemptions they have handed out to members of their favored churches.

397.    This placed a severe burden on class members' fundamental right to practice their religious faith.

398.     This religious discrimination was not adequately tailored to achieve any government interest. Although the government has legitimate and important interests both in limiting the occurrence and symptoms of COVID and in accommodating the sincere religious objections of its employees, it may not balance between those interests by arbitrarily discriminating between religious objectors, accommodating members of some faiths while firing those of other faiths who want to engage in exactly the same religiously-motivated conduct.

399.     Defendants engaged in this activity under color of state law.

400.     Defendants' discrimination based on religion violated well-established principles under the Equal Protection Clause of the U.S. Constitution.

401.     Because of Defendants' unlawful actions, Named Plaintiffs and each member of the Disfavored Religions Class suffered and continue to suffer economic and other damages in amounts to be proven at trial, including front pay, back pay, emotional distress damages, compensatory damages, punitive damages, and attorney fees in amounts to be determined at trial.

402.     In addition, Defendants' unlawful actions have caused members of the class to suffer and continue to suffer other harm not remediable by money damages.

### FIFTH CAUSE OF ACTION
### Violation of the Virginia Constitution's Free Exercise guarantee
### (By both classes)

403.     Named Plaintiffs and the classes restate and reallege each of the previous paragraphs.

404.     The class members have sincere religious beliefs that prevent them from receiving the COVID vaccines.

405.    Defendants' mandate that class members receive the vaccines, or else lose their jobs, not be hired, or face other adverse employment actions, was a severe burden on this religious belief and practice.

406.    This mandate was not a neutral rule of general applicability, because Defendants made exceptions to this rule for other employees and job applicants—including employees and applicants who had certain medical needs, or who belonged to certain faiths or faith groups approved by Defendants, or who Defendants had previously exempted from receiving the flu vaccine.

407.    Defendants offered no such accommodations to class members, but instead required them to choose between honoring their religious beliefs and losing their jobs, not being hired, or otherwise facing adverse employment action.

408.    The lack of proper tailoring is further demonstrated by the fact that other hospital systems in Virginia and neighboring states, with similar operations to UVA Health, have managed to avoid the kind of mass firings of religious objectors that UVA Health perpetrated.

409.    After UVA Health purported to change its policy in October 2022, Defendants continued this discrimination by refusing to inform the religious employees who they had fired about the policy change.

410.    After UVA Health purported to change its policy in October 2022, Defendants further continued this discrimination by denying many religious-exemption applications on "undue hardship" grounds—in stark contrast to the "automatic" religious exemptions they have handed out to members of their favored churches.

411.    This discrimination violated the Free Exercise Clause of the Virginia Constitution.

412.    Because of Defendants' unlawful actions, Named Plaintiffs and each class member suffered and continue to suffer economic and other damages in amounts to be proven at trial, including front pay, back pay, emotional distress damages, compensatory damages, punitive damages, and attorney fees in amounts to be determined at trial.

413.    In addition, Defendants' unlawful actions have caused members of the class to suffer and continue to suffer other harm not remediable by money damages.

**SIXTH CAUSE OF ACTION**
**Violation of the Virginia Constitution's Establishment Clause**
**(By the Disfavored Religions Class)**

414.    Named Plaintiffs and the Disfavored Religions Class restate and reallege each of the previous paragraphs.

415.    In implementing UVA Health's COVID vaccine mandate, Defendants compiled and/or enforced a list of religious bodies and communities whose members would routinely receive exemptions from the mandate.

416.    If the members of the Disfavored Religions Class had belonged to any of those favored religious bodies or communities, Defendants would have exempted them from UVA Health's COVID vaccine mandate.

417.    Because the members of the Disfavored Religions Class belonged to other faith communities, and not the favored ones, Defendants denied their exemption requests and fired them from their jobs, refused to hire them, or subjected them to other adverse employment actions.

418.    After UVA Health purported to change its policy in October 2022, Defendants continued this discrimination by refusing to inform the religious employees who they had fired about the policy change.

419.   After UVA Health purported to change its policy in October 2022, Defendants further continued this discrimination by denying many religious-exemption applications on "undue hardship" grounds—in stark contrast to the "automatic" religious exemptions they have handed out to members of their favored churches.

420.   Through this conduct, Defendants conferred peculiar privileges or advantages upon certain specific sects or denominations, in violation of Article I, Section 6 of the Virginia Constitution.

421.   Because of Defendants' unlawful actions, each member of the Disfavored Religions Class suffered and continue to suffer economic and other damages in amounts to be proven at trial, including front pay, back pay, emotional distress damages, compensatory damages, punitive damages, and attorney fees in amounts to be determined at trial.

422.   In addition, Defendants' unlawful actions have caused members of the class to suffer and continue to suffer other harm not remediable by money damages.

### SEVENTH CAUSE OF ACTION
### Violation of the Virginia Constitution's Establishment Clause
### (By the Abortion Objectors Class)

423.   The class representatives and the Abortion Objectors Class restate and reallege each of the previous paragraphs.

424.   Throughout history, scientists have had to grapple with ethical questions regarding the use of data or materials that were derived through immoral conduct. This has given rise to a significant religious and moral debate among bioethicists and theologians of various faiths: under what circumstances is it morally acceptable to use or benefit from products whose research-and-development histories implicate moral questions like these—and by contrast, when is it wrong or sinful to use or benefit from such products?

425. This debate extends to and includes the moral status of medical products that were made from, or developed with the use of, tissue or cell lines that originated from aborted fetuses.

426. At the time that each member of the Abortion Objectors Class sought a religious exemption to the COVID vaccine, all available vaccines had been either produced or developed using cell lines that originated from aborted fetal tissue.

427. Each member of the Abortion Objectors Class holds the sincere religious belief that this connection with abortion made it immoral for him or her to receive any of those vaccines.

428. Defendants disagreed with this religious belief, and instead expressed their own preferred moral and religious view that the connection between COVID vaccines and abortion is too remote to give rise to any ethical or religious concerns.

429. Defendants fired, refused to hire, or otherwise disciplined each class member because he or she refused to agree with, or conform his or her conduct to, Defendants' preferred moral and religious beliefs on this matter.

430. After UVA Health purported to change its policy in October 2022, Defendants continued this discrimination by refusing to inform the religious employees who they had fired about the policy change.

431. After UVA Health purported to change its policy in October 2022, Defendants further continued this discrimination by denying many religious-exemption applications on "undue hardship" grounds—in stark contrast to the "automatic" religious exemptions they have handed out to members of their favored churches.

432. Through these actions, Defendants diminished class members' civil capacities, and/or imposed a religious test, in violation of Article I, Section 6 of the Virginia Constitution.

433.    Because of Defendants' unlawful actions, the class representatives and each member of the Abortion Objectors Class suffered and continue to suffer economic and other damages in amounts to be proven at trial, including front pay, back pay, emotional distress damages, compensatory damages, punitive damages, and attorney fees in amounts to be determined at trial.

434.    In addition, Defendants' unlawful actions have caused members of the class to suffer and continue to suffer other harm not remediable by money damages.

## JURY DEMAND

Named Plaintiffs and the classes demand a trial by jury on all claims and issues for which they have a right to trial by jury.

## PRAYER FOR RELIEF

WHEREFORE, Named Plaintiffs and the classes pray for judgment against Defendants and that this Court:

A.  Adjudge, decree, and declare that the Defendants sued in their individual capacity are liable to all class members for their actual damages, including front pay and back pay, interest, emotional distress and pain and suffering, compensatory damages, punitive damages, nominal damages, and any damages or penalties available at law; and

B.  Enter preliminary and permanent injunctions directing that Defendants discontinue the operation of their Religious Accommodations Committee, grant religious exemptions from COVID vaccination to all class members, reinstate the employment status of any class member who requests it, and consider or reconsider all pending or future job applications by class members without attaching any negative weight to their COVID vaccination status;

C.  Award class members their costs, reasonable attorneys' fees, prejudgment interest, and any other relief permitted by statute or otherwise; and

D.  Award such other or further relief as the Court may deem necessary, proper, just, or equitable.

Dated: February 13, 2023                    Respectfully submitted,

**J. DWAYNE PHILLIPS, MARK EHRLICH, RYAN MESZAROS, REBECCA TYSON, REBECCA LOFLIN, JANET RIPLEY, CHRISTOPHER PARSNOW, NICOLE BOKER, JOSHUA SEILER, NADINE MCCARHTY, AND CHELSEA SHEPPARD, M.D.**

By their Counsel:

 s/Charles B. Molster, III
Charles B. Molster, III (VSB#23613)
Law Offices of Charles B. Molster, III PLLC
129 East Davis Street, Suite 250
Culpeper, Virginia 22701
Tel. (703) 346-1505
Email: cmolster@molsterlaw.com

Samuel W. Diehl (MN#0388371)[3]
Nicholas J. Nelson (MN#0388371)[3]
Nathan Hopkins (PA#328162)[3*]
CROSSCASTLE PLLC
333 Washington Avenue N.
Ste 300-9078
Minneapolis, MN 55401
Tel: (612) 429-8100
Fax: (612) 234-4766
Email: sam.diehl@crosscastle.com
          nicholas.nelson@crosscastle.com
          nathan.hopkins@crosscastle.com

Joshua A. Hetzler, Esq. (VSB #89247)
Founding Freedoms Law Center
707 E. Franklin St.
Richmond, VA 23219
Tel: (804) 801-6707
Email: josh@foundingfreedomslaw.org

4856-6447-4171, v. 14

---

[3] Admitted *pro hac vice*.

* Mr. Hopkins is supervised by principals of the firm who are members of the Minnesota bar.