**Exhibit 6**



# Transcript of █████████████

**Date:** August 28, 2024
**Case:** Phillips, et al. -v- Rector and Visitors of the University of Virginia, et al.

**Planet Depos**
**Phone:** 888.433.3767 **| Email:** transcripts@planetdepos.com
**www.planetdepos.com**
**Michigan #8598 | Nevada #089F | New Mexico #566**

**WORLDWIDE COURT REPORTING & LITIGATION TECHNOLOGY**

**Page 1**

```
1        UNITED STATES DISTRICT COURT
2        WESTERN DISTRICT OF VIRGINIA
3           Charlottesville Division
4        Case No. 3:22cv0075-RSB-JCH
5
6    Dwayne PHILLIPS, et al.,        )
7           Plaintiffs,             )
8           v.                      )
9    RECTOR AND VISITORS OF THE      )
10   UNIVERSITY OF VIRGINIA, et al., )
11          Defendants.             )
12
13   AUDIO TRANSCRIPTION OF RECORDED DEPOSITION
14       TESTIMONY OF ▮▮▮▮▮▮▮
15
16
17   August 28, 2024, 9:36 a.m.
18   Job No. 551153
19   Pages: 1-217
20   Transcribed by: Cynthia Bauerle, CSR
21   Notary Public/Court Reporter: Danny Terry
22
```

**Page 2**

```
1
2    Deposition testimony of ▮▮▮▮▮▮▮,
3    held at:
4        323 2nd St SE
5        Suite 900
6        Charlottesville, VA 22902
7        Phone: 434.951.5700
8
9    Pursuant to agreement, before Danny Terry,
10   Notary Public in and for Commonwealth of
11   Virginia.
12
```

**Page 3**

```
1    APPEARANCES:
2
3    ON BEHALF OF THE PLAINTIFF:
4        SAMUEL W. DIEHL, ESQUIRE
         Crosscastle PLLC
5        14525 Highway 7
         Suite 345
         Minnetonka, MN 55345
6        Phone: 612-429-8100
         Fax: 612-234-4766
7        Sam.diehl@crosscastle.com
8
9    ON BEHALF OF THE DEFENDANT: The Rector and
10   Visitors of the University of Virginia
         WENDY C. MCGRAW, ESQUIRE
11       Hunton Andrews Kurth LLP
         Riverfront Plaza, East Tower
12       951 East Byrd Street
         Richmond, VA 23219
13       Phone: 804-788-7221
         Fax: 804-788-8218
14       Wmcgraw@HuntonAK.com
15
16   ON BEHALF OF THE DOE DEFENDANT 1
17       MATTHEW B. KIRSNER, ESQUIRE
         Williams Mullen
18       200 South 10th Street
         Suite 1600
19       Richmond, VA 23219
         Phone: 804-420-6074
20       Fax: 804-420-6507
         Mkirsner@williamsmullen.com
21
22
```

**Page 4**

```
1                  INDEX
2    WITNESS                          PAGE
3    ▮▮▮▮▮▮▮
4    EXAMINATION ON BEHALF OF PLAINTIFF
5       By Mr. Diehl                7
6    EXAMINATION ON BEHALF OF DEFENDANT
7       By Ms. McGraw               211
8          E X H I B I T S
9    EXHIBIT    DESCRIPTION           PAGE
10       (Previously Marked)
11    ▮▮▮ 1 Exhibit A-Print-out of PowerPoint-UVA
12    Vaccine Religious Acommodation
13    Requests                       32
14    ▮▮▮ 2 Defendant UVA's Objections and
15    Answers to Plaintiffs' First Set of
16    Interrogatories                32
17    ▮▮▮ 3 LinkedIn Profile of ▮▮▮▮▮▮
18    ▮▮▮ 4 Print-out of web page-UVA HR
19    Business Partners
20    ▮▮▮ 5 University of Virginia Health
21    System-Diagram for Department
22    Structure
```

Transcript of ████████████████████          2 (5 to 8)
Conducted on August 28, 2024

| | 5 |
|---|---|
| 1 | EXHIBIT    DESCRIPTION    PAGE |
| 2 | (Previously Marked) |
| 3 | ████ 6 (Highly Confidential) |
| 4 | UVA_0002368-Print-out of Information |
| 5 | from the Vax Trax system        50 |
| 6 | ████ 7 (Highly Confidential) |
| 7 | UVA_0002235-Print-out of Information |
| 8 | from the Vax Trax system |
| 9 | ████ 8 Declaration of Karmen Fittes |
| 10 | ████ 9 Exhibit B-UVA Health Required |
| 11 | COVID-19 Vaccination for Team |
| 12 | Members-dated 8.25.2021 |
| 13 | ████ 10 (Highly Confidential) |
| 14 | UVA_0002421-Print-out of Information |
| 15 | from the Vax Trax system |
| 16 | ████ 11 Email-RE-Vax Trax Request |
| 17 | ████ 12 (Highly Confidential)-Print-out of |
| 18 | Information from the Vax Trax system |
| 19 | ████ 13 UVA_0006795-Email-dated |
| 20 | 10.23.2020-Vax Trax request-religious |
| 21 | Exemption request |
| 22 | |

| | 6 |
|---|---|
| 1 | ████ 14 (Highly Confidential) |
| 2 | UVA_0002396-Print-out of Information |
| 3 | from the Vax Trax system |
| 4 | ████ 15 (Highly Confidential) |
| 5 | UVA_0002672-Print-out of Information |
| 6 | from the Vax Trax system |
| 7 | ████ 16 (Highly Confidential)-Preliminary |
| 8 | Analysis-Produced Subject to |
| 9 | Objections and Response to |
| 10 | Plaintiffs' First Set of |
| 11 | Interrogatories |
| 12 | ████ 17 (Highly Confidential) |
| 13 | UVA_0003035-Print-out of Information |
| 14 | from the Vax Trax system        67 |
| 15 | ████ 18 (Highly Confidential) Email sent |
| 16 | on 9.3.2021-from Qualtrics Religious |
| 17 | Exemption to UVA HR Health Screenings |
| 18 | Pre-Hire Religious Request        125 |
| 19 | ████ 19 UVA Office for Equal Opportunity |
| 20 | and Civil Rights-Religious Workplace |
| 21 | Accommodation Request Procedures  198 |
| 22 | |

| | 7 |
|---|---|
| 1 | THE REPORTER: ████████████ |
| 2 | please raise your right hand. |
| 3 | Do you solemnly swear or affirm under |
| 4 | the penalty of perjury that the testimony you |
| 5 | shall give will be the truth, the whole truth, |
| 6 | and nothing but the truth? |
| 7 | ████████████████, |
| 8 | after having been first duly sworn, was |
| 9 | examined and testified as follows: |
| 10 | THE WITNESS: I do. |
| 11 | EXAMINATION |
| 12 | BY MR. DIEHL: |
| 13 | Q.    Good morning, ████████. I |
| 14 | introduced myself before we got started, but |
| 15 | I'll do it again on the record. My name is |
| 16 | Sam Diehl. I'm one of the attorneys |
| 17 | representing the plaintiffs in a lawsuit |
| 18 | against the University of Virginia. And have |
| 19 | you ever had your deposition taken before? |
| **20** | **A.    No.** |
| 21 | Q.    Well, I'll provide some intro -- |
| 22 | introduction about depositions. In some ways, |

| | 8 |
|---|---|
| 1 | it's just a conversation, you know, where I |
| 2 | ask questions, you answer, but it's a little |
| 3 | different. It's a little more formal, |
| 4 | obviously, and -- and then we have a court |
| 5 | reporter of sorts taking down what is said |
| 6 | today. And so there's just a few things that |
| 7 | are helpful and I'll just cover those now, but |
| 8 | before I do, we -- we have a different court |
| 9 | reporter here than -- than I'm used to and -- |
| 10 | but I believe, Counsel, we've spoken off the |
| 11 | record about that and -- and neither party |
| 12 | objects to the court reporter that is here |
| 13 | today and the means of -- of stenography |
| 14 | that's occurring. |
| 15 | MS. McGRAW: That's correct. |
| 16 | For purposes of this deposition, we do not |
| 17 | object to the digital court reporter. We do |
| 18 | reserve all objections to the informal video. |
| 19 | MR. KIRSNER: I concur with |
| 20 | Wendy on behalf of ████████. |
| 21 | MR. DIEHL: Thank you. |
| 22 | MS. McGRAW: And Sam, also just |

**9**

1  while we're going over these housekeeping
2  matters, I think we agreed in the prior
3  deposition that if I make an objection, it's
4  not necessarily -- necessary for Mr. Kirsner
5  to join in and vice versa.  That the
6  objections will be for both.  For both for ██
7  ███████ in ██ individual capacity and for
8  UBA, regardless of which counsel makes the
9  objection.
10           MR. DIEHL:  That is correct.
11  And we appreciate that.
12  BY MR. DIEHL:
13      Q.    So obviously there's some things
14  we need to say for the record today and -- and
15  one thing that's helpful in that is if we try
16  not to speak over each other.  So when I ask a
17  question, will you try to wait till I finish
18  my answer, my -- I'll see that then I object
19  to my introductory remarks.  When I ask a
20  question, will you wait till I finish the
21  question before you start your answer?
22      A.    Yes.

**10**

1      Q.    And I'll do the same for you to
2  the extent possible, but if -- if I speak over
3  you or you have more to say in a particular
4  answer, will you let me know?
5      A.    Yes.
6      Q.    And is there any reason you will
7  have -- have any physical or mental issue with
8  your memory today?
9      A.    No.
10      Q.     Is there any other reason why
11  you might not be able to testify truthfully
12  about matters that might be relevant to this
13  lawsuit?
14      A.    No.
15      Q.    And you're doing a great job so
16  far, but one of the things that's helpful for
17  the record is because we're going to have a
18  written transcript, if the -- if it's a yes or
19  no question, to speak audibly and say yes or
20  no rather than uh-ugh or uh-huh, just because
21  it doesn't come across clearly.  Does that
22  make sense?

**11**

1      A.    Yes.
2      Q.    And, again, you're doing a good
3  job.  If -- if I remind you of that during the
4  day, just understand that I'm not -- it's --
5  it's not personal and I'm -- I'm a normal
6  person and would normally be just fine with
7  someone saying, uh-huh, you know, to a simple
8  question, but -- but if I remind you, it's
9  just -- it's just to remind you for the record
10  and this formality that we have here.  If --
11  if you don't understand a question, will you
12  let me know?
13      A.    Yes.
14      Q.    And if you answer a question, is
15  it fair to assume you understood the question?
16      A.    Yes.
17      Q.    How long -- what -- what is your
18  -- can you.  Let's just start back.  Can you
19  say and spell your name for the record?
20      A.    ████████████████
21  ██████████████████████████████
22      Q.    And I understand you work for

**12**

1  the University of Virginia?
2      **A.    I do, yes.**
3      Q.    And what is your position?
4      **A.    Senior Human Resources Business**
5  **Partner.**
6      Q.    And how long have you held that
7  position?
8      **A.    For three-and-a-half years.**
9      Q.    And what did you do before you
10  held the senior HR business position for UVA?
11      **A.    Manager of employee relations.**
12      Q.    At -- at UVA?
13      **A.    At UVA.**
14      Q.    And then when did you start that
15  job?
16      **A.    June of 2019.**
17      Q.    And what did you do before for
18  work before that?
19      **A.    Human resources consultant for**
20  **the University of Missouri.**
21      Q.    As a consultant, were you an
22  employee or -- or --

Transcript of ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮                    4 (13 to 16)
Conducted on August 28, 2024

13

1      A.    Yeah.
2      Q.    -- some other type of worker?
3  Sorry.
4      A.    Yes.  A university employee as a
5  Senior Human Resources Consultant for the
6  School of Medicine.  So, yes, an employee.
7  Not an independent contractor.
8      Q.    So the -- the idea is that you
9  consult the managers at the -- at the
10 university hospital.  Is that the -- that's
11 the consulting part.  Not as an independent
12 consultant obviously?
13     A.    Correct.
14     Q.    And how long did you work in
15 that position?
16     A.    For three years.
17     Q.    What did you do before that?
18     A.    Prior to that, I was at the
19 University of Rochester.
20     Q.    That's Rochester, New York?
21     A.    Rochester, New York, yes.
22     Q.    I don't think there's a

14

1  University of Rochester, Minnesota, but there
2  is, I guess, Mayo has the university.  And
3  what did you do at the University of
4  Rochester?
5      A.    Human Resources Business
6  Partner.
7      Q.    And how long -- what time period
8  did you work for the University of Rochester?
9      A.    So 20 -- June 2016 through June
10 2019.
11     Q.    Do you have a degree in human
12 resources?
13     A.    I have a degree in
14 organizational development.
15     Q.    And -- and when did you receive
16 that degree?
17     A.    I received my master's degree in
18 2013 from University of Rochester.
19     Q.    And then what was your
20 undergraduate degree?
21     A.    Organizational management.
22     Q.    And where did -- where did you

15

1  go or where did you obtain that degree?
2      A.    Washington Adventist University.
3      Q.    Is that Seventh-day Adventist as
4  in Adventist?
5      A.    Yes.
6      Q.    Are you personally a Seventh-day
7  Adventist?
8      A.    Yes.
9      Q.    Do you -- do you attend a
10 Seventh-day Adventist church?
11     A.    Yes.
12     Q.    What is -- what church is that?
13     A.    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
14 ▮▮▮▮▮▮▮▮▮
15     Q.    Are you married?
16     A.    Yes.
17     Q.    What -- what's the name?  What
18 is your ▮▮▮▮▮▮▮ name?
19     A.    ▮▮▮▮▮▮▮▮
20     Q.    What does your husband do?
21     A.    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ for UVA.
22     Q.    What -- what does that -- do you

16

1  know what that job entails?
2          MS. McGRAW:  Object to the form.
3  You can answer.
4          THE WITNESS:  To ensure -- well,
5  to ensure diversity, equity and inclusion
6  within UVA in regards to hiring, in regards to
7  student success.
8  BY MR. DIEHL:
9      Q.    Do -- do you personally have any
10 duties related to diversity, equity and
11 inclusion?
12     A.    So define duties.
13     Q.    Job duties?
14     A.    Yes.
15     Q.    What are those or how would
16 that -- I guess, what would the duties be?
17     A.    Serve on a diversity, equity and
18 inclusion committee for human resources.
19     Q.    And who -- well, I guess, not
20 the names, but what -- what people are the --
21 are HR people on that committee?
22     A.    Yes.  It's an HR focus

17

1  committee.
2      Q.     Is it HR business partners or
3  any different roles?
4      **A.     A variety of roles.**
5      Q.     what -- what does that committee
6  do?
7      **A.     Provides trainings, monthly**
8  **trainings, education, awareness of diversity,**
9  **equity and inclusion matters.**
10     Q.     What have you provided or do
11 members of the committee provide training
12 through that, or is it outside?
13     **A.     It's through organizational**
14 **development within UVA or it could be various**
15 **speakers within UVA. So in terms of**
16 **trainings, UVA provides LinkedIn training. So**
17 **it could be training on LinkedIn. However,**
18 **these are not mandatory trainings.**
19     Q.     So are they trainings for human
20 resources personnel or are they for everyone?
21     **A.     For everyone.**
22     Q.     What -- I'm -- I'm going to come

18

1  back to that, but I -- I want to ask about
2  your -- your job, your other job duties as a
3  senior HR business partner in your current
4  job. What are -- what -- what do you do?
5      **A.     I support the Department of**
6  **Medicine within the School of Medicine and The**
7  **Center for Diabetes.**
8      Q.     And what -- what -- what's the
9  difference between the School of Medicine and
10 the Department of Medicine?
11     **A.     Well, the School of Medicine is**
12 **comprised of several departments, research**
13 **centers and institutes. The Department of**
14 **Medicine is just what it is. It's the**
15 **Department of Medicine, and it has nine**
16 **divisions under the Department of Medicine.**
17     Q.     And -- and what -- what do you
18 functionally do for -- for those areas?
19     **A.     Yeah. So I provide constant**
20 **consultation in regards to compensation,**
21 **resolve employee relation matters. I ensure**
22 **performance evaluations are completed. Any --**

19

1  any HR related matters in general would come
2  to a HR business partner.
3      Q.     And who do you report to?
4      **A.     I report to Jenny Babcock.**
5      Q.     What -- what is Ms. Babcock's --
6  Ms. Babcock's title?
7      **A.     HR Director.**
8      Q.     And then who does Ms. Babcock --
9  Babcock report to?
10     **A.     Katy Hoffman.**
11     Q.     Are those duties same -- your --
12 your -- your current duties, are those the
13 same general duties that you had in 2020 and
14 2021?
15     **A.     So and -- so I started at --**
16 **so --**
17     Q.     Oh, yeah. Okay. So I should
18 clarify. So you started as -- what -- what
19 did you do as an -- I'm going to jump back.
20 You started as an manager of employee
21 relations. What -- what did you do in that
22 job?

20

1      **A.     Yeah. So I supervised eight**
2  **employee relation consultants, and the**
3  **consultants were responsible for gathering**
4  **information in terms of employee and manager**
5  **conflict incidents. So I was responsible for**
6  **leading the team, coaching the team, their**
7  **performance evaluations.**
8      Q.     How would the -- how would
9  conflict -- resolving conflict incidents, how
10 did that occur or was it supposed to?
11     **A.     Employees or managers would call**
12 **an ER consultant to discuss the matter. The**
13 **ER consultant would gather the information**
14 **from the employee and manager and then discuss**
15 **ways to resolve the conflict, or if additional**
16 **-- if -- if additional assistance was needed,**
17 **then they would reach out to EOCR.**
18     Q.     And that's --
19     **A.     Equal Opportunity and Civil**
20 **Rights.**
21     Q.     That's an office?
22     **A.     Yes.**

---

21

1    Q.    That's in Virginia?
2    **A.    Yes.**
3    Q.    And when -- when there was a
4 conflict, was part of your -- what -- did --
5 did you actually -- let me step back.
6        With respect to resolving conflicts,
7 did you actually participate in that process
8 yourself, or did you supervise employees that
9 helped resolve conflicts?
10    **A.    It -- it depended on the**
11 **complexity of the issue.**
12    Q.    So you might get involved if
13 something more complex?
14    **A.    Yes.**
15    Q.    And was it -- was part of the
16 process to get to -- to have -- get people to
17 talk to each other and understand each other?
18 Is that part of the conflict resolution
19 process?
20    **A.    Yes.**
21    Q.    Did -- did some of the conflicts
22 often result or did conflicts result from --

---

22

1 let me just start over.
2        In your experience there, did you see
3 that conflicts might result from a
4 misunderstanding in communication?
5        MS. McGRAW:  Object to the form.
6        THE WITNESS:  Yes.
7 BY MR. DIEHL:
8    Q.    You understand what I mean by a
9 misunderstanding in communication?
10    **A.    Yes.**
11    Q.    And when did you move to the --
12 again -- again, sorry for asking, but when did
13 you move to the senior HR business partner
14 role?
15    **A.    November of 2020.**
16    Q.    So we talked about your duties
17 as a senior HR business partner.  Have those
18 duties been the same from November 2020 until
19 the -- until the present?
20    **A.    Yes.**
21    Q.    And have you supported the same
22 areas of -- of the university, for lack of a

---

23

1 better term?
2    **A.    Repeat your question.**
3    Q.    Well, let -- let me maybe ask or
4 define a term or the -- if I use the term UVA
5 Health, what -- what does that term mean to
6 you?
7        MS. McGRAW:  Object to the form.
8        THE WITNESS:  Well, I -- I
9 supported the School of Medicine.  The school
10 of Medicine reports up to UVA Health.  So the
11 dean reports to President Kent of UVA Health.
12 BY MR. DIEHL:
13    Q.    Is UVA Health sort of a
14 shorthand for the UVA Health System?
15        MS. McGRAW:  Object to the form.
16        THE WITNESS:  Yes.
17    Q.    Now, I understand, are you
18 technically on the academic side personally?
19 Your -- your job is personally on the academic
20 side?
21    **A.    School of Medicine is academic.**
22 **So, yes, I am an academic employee.**

---

24

1    Q.    And -- and but the School of
2 Medicine is also part of UVA Health?
3    **A.    Yes.**
4    Q.    So if I use the term UVA Health
5 today, just know that I'm referring to the UVA
6 Health System.
7    **A.    The hospital.**
8    Q.    Well, what -- what is the hos--
9 the -- the medical center.  What do you mean
10 by hospital?
11    **A.    Well, I'm needing clarification**
12 **from -- how do you define it?**
13    Q.    Well, I want to define it
14 correctly.  So -- and I don't work for UVA, so
15 what -- what do you understand, again, UVA
16 Health to be?
17        MS. McGRAW:  Object to the form.
18        THE WITNESS:  UVA Health is the
19 hospital.
20 BY MR. DIEHL:
21    Q.    Which -- which hospital?
22    **A.    What do you -- I don't**

---

25

1  understand your question.
2      Q.    Well, I guess what --
3      **A.    In Charlottesville, Virginia.**
4      Q.    But it's not -- well, would it
5  include clinics that may not be part of the
6  hospital proper?
7          MS. McGRAW:  Object to the form.
8          THE WITNESS:  Yes.
9  BY MR. DIEHL:
10     Q.    So UVA Health would include the
11 hospital and any clinics or entities that are
12 part of the UVA Health System.
13         MS. McGRAW:  Object to the form.
14     Q.    Is that fair?
15     **A.    Yes.**
16     Q.    Were your duties at -- was it
17 University of Missouri?
18     **A.    Yes.**
19     Q.    Were your duties at University
20 of Missouri or University of Rochester
21 substantially different than -- than what you
22 do at -- have done at UVA?

26

1      **A.    No.  You know, each -- each**
2  **organization defines the titles differently in**
3  **the scope of the position differently.**
4      Q.    Did -- do the HR departments
5  that you worked in, are they substantially
6  different at the different universities you've
7  worked at?
8          MS. McGRAW:  Object to the form.
9          THE WITNESS:  Yes.
10 BY MR. DIEHL:
11     Q.    What -- what's -- what are the
12 biggest differences between UVA's HR
13 department and University of Missouri?
14         MS. McGRAW:  Object to the form.
15         THE WITNESS:  In terms of size,
16 in terms of scope, in terms of reporting
17 structure?
18     Q.    So --
19     **A.    Or decentralized versus**
20 **centralized?**
21     Q.    Yeah.  So -- so what -- what --
22 what is different about those issues that you

27

1  just referenced between the University of
2  Virginia and the University of Missouri?
3      **A.    So my role at University of**
4  **Missouri as the senior HR consultant reported**
5  **to an associate dean and the dean of the**
6  **School of Medicine.  My position here at UVA,**
7  **I report to a director of human resources for**
8  **the School of Medicine.  So the reporting**
9  **structure is different.**
10     Q.    Are there more layers of
11 reporting structure at UVA?
12         MS. McGRAW:  Object to the form.
13         THE WITNESS:  Yes.
14 BY MR. DIEHL:
15     Q.    Did any of the universities you
16 worked for previously require employees to be
17 vaccinated?
18     **A.    I don't remember.**
19     Q.    And before 2021, did you have
20 any duties related to vaccination or excuse
21 me.  Request.  Did you have any -- let me
22 start over.

28

1          Before 2021, did you have any duties
2  related to exemptions from any vaccination
3  requirements at -- as part of your job at UVA?
4      **A.    No.**
5      Q.    But -- but you did, I
6  understand, have duties related to vaccination
7  exemptions beginning in 2021?
8      **A.    Yes.**
9      Q.    What was that?
10     **A.    I was part of a committee.  I**
11 **was a part of a committee, a team committee**
12 **that reviewed religious exemptions.**
13     Q.    So reviewed requests for
14 religious exemptions submitted by UVA
15 employees?
16     **A.    Yes.**
17     Q.    Did the committee review request
18 for exemptions from -- from employees that
19 didn't -- did not work for UVA?
20         MS. McGRAW:  Object to the form.
21         THE WITNESS:  No.
22 BY MR. DIEHL:

Transcript of ▓▓▓▓▓▓▓▓

8 (29 to 32)

Conducted on August 28, 2024

---

**29**

1    Q.    And if -- if there's -- if I use
2  the term team member, is -- what does that
3  term mean at UVA?
4    **A.    For UVA Health, that means an**
5  **employee at the hospital that works in the**
6  **medical center.**
7    Q.    When did you first learn that
8  you would be part of the -- the committee that
9  reviewed religious exemption requests?
10    **A.    I don't remember.**
11    Q.    If I say -- if I refer to that
12  committee as the religious exemption committee
13  just to make it shorter, is that -- does that
14  make sense to you?
15    **A.    Yes.**
16    Q.    Do you recall who talked to you
17  about being on that committee?
18    **A.    Melissa Fredrick.**
19    Q.    And what do you recall about
20  that conversation?
21    **A.    I don't remember.**
22    Q.    Do you recall anything other

---

**30**

1  than asking you to be a part of this
2  committee?
3    **A.    No, I don't.**
4    Q.    After -- and was that a
5  in-person conversation?
6    **A.    I don't remember.**
7    Q.    Was it -- was it were you
8  speaking to each other, whether by video or
9  phone or in-person, or was it an email?
10    **A.    I don't remember.  I don't**
11  **remember.**
12    Q.    Does -- does the University of
13  Virginia provide you with a -- with a cell
14  phone?
15    **A.    No.**
16    Q.    Do you -- do you use your own
17  cell phone if you have to text somebody for
18  work?
19        MS. McGRAW:  Object to the form.
20  Calls for speculation.
21        THE WITNESS:  Repeat the
22  question.

---

**31**

1  BY MR. DIEHL:
2    Q.    Yeah.  If you have to -- if you
3  send a text related to work, do you use your
4  own phone?
5        MS. McGRAW:  Object to the form.
6  Lack of foundation.
7        THE WITNESS:  Yes.
8    Q.    And after you met with Ms.
9  Fredrick for -- well, I don't know if it's a
10  meeting or not, but after you somehow
11  communicated with Ms. Fredrick about being a
12  part of the committee, what -- what do you
13  recall happened next with respect to your
14  participation in that committee?
15    **A.    That we had a meeting with**
16  **others that were also a part of the committee.**
17    Q.    And when was that?  Do you
18  recall?
19    **A.    I don't.  I don't remember.**
20    Q.    Was it in the summer of -- of
21  2021?
22    **A.    I don't remember.**

---

**32**

1        (▓▓▓ 1, Exhibit A, Print-out of
2  PowerPoint-UVA Vaccine Religious Accommodation
3  Requests, marked for identification.)
4        (▓▓▓ 2, Defendant UVA's
5  Objections and Answers to Plaintiffs' First
6  Set of Interrogatories, marked for
7  identification.)
8  BY MR. DIEHL:
9    Q.    I'm handing you a document
10  that's been previously marked as Exhibit 1.
11  And I -- I said this on the record just
12  yesterday, but the -- the -- the first page is
13  -- is something that was submitted in the
14  lawsuit.  So you can kind of ignore it and
15  that type at the top of this page and then the
16  subsequent pages.  That -- that's from the
17  lawsuit.  So you -- just -- just understand
18  that that wasn't originally there.  So the
19  document originally started -- you're --
20  you're looking at the first page there where
21  it says, Melissa Wolf Riley, and then I'm
22  going to -- I'll -- if you could keep that

---

33

1  exhibit there, and then I'm going to hand you
2  what's been marked as Exhibit 2 previously.
3  And I'd ask you to turn to Exhibit 2.
4      If you look at Exhibit 2, does that
5  look like a document that you've seen before?
6      **A.   Yes.**
7      Q.    When have you seen that
8  document?
9      **A.   When I was notified of the class**
10 **action lawsuit.**
11     Q.    Okay.  So you've seen something
12 related to the lawsuit about this.  When were
13 you notified about the -- the lawsuit?
14     **A.   I don't remember.**
15     Q.    Likely, when around the time it
16 was filed?
17     **A.   I -- I don't remember.**
18     Q.    So if you take Exhibit 2,
19 counsel can confirm this, but this is a
20 document that was provided to us by UVA's
21 lawyers and what -- what's listed as the
22 interrogatories, those are questions that we,

34

1  the plaintiffs, posed to UVA.  So I just want
2  to point you to Interrogatory No. 3, which is
3  on page six.  So if you take a minute and just
4  read Interrogatory No. 3 at the -- the bottom
5  of page six, and it's asking about training
6  related to vaccine exemptions.  And obviously
7  you can read the specific words and tell me,
8  are you done reading the interrogatory itself?
9      **A.   I am.  Yes.**
10     Q.    And then just -- I just want to
11 ask you in the -- in the answer, there's the
12 objections.  Those are from the lawyers, but
13 just -- I want to point you to the first
14 sentence of the answer to Interrogatory No. 3
15 in the middle of the page there where it says,
16 subject to and without waiving its objections,
17 UVA states that a training was held on July
18 1st, 2021 at McKim Hall, and then it continues
19 and two sentences later it says, the attendees
20 were -- and there's a list of people,
21 including you.  Do you recall attending that
22 July 1st training?

35

1      **A.   Yes.**
2      Q.    And it's my understanding that
3  the PowerPoint that is -- that is -- that is
4  Exhibit 1, that PowerPoint was -- was
5  discussed at that training?
6      **A.   Yes.**
7      Q.    Was that July 1st, 2021 training
8  the first step after -- excuse me.  Let me
9  start that over.
10     Was the July 1st, 2021 training the
11 first meeting that occurred after Melissa
12 Fredrick asked you to participate on the
13 committee?
14     MS. McGRAW:  Object to the form.
15     THE WITNESS:  I don't remember.
16 I -- I don't remember.
17 BY MR. DIEHL:
18     Q.    Was there -- do you remember any
19 other meetings related to the religious
20 exemption committee before the committee
21 started to meet and review exemptions?
22     **A.   I don't remember.**

36

1      Q.    Do you -- do you remember that
2  training?
3      **A.   Yes.**
4      Q.    And do you recall the -- the
5  information provided related to the PowerPoint
6  that is Exhibit 1?
7      **A.   Yes.**
8      Q.    Did you receive any other
9  training related to reviewing religious
10 exemptions, other than the July 1st training
11 where Exhibit 1 was discussed?
12     **A.   No.**
13     Q.    And was the process that's
14 outlined in Exhibit 1 the process that the
15 religious exemption committee used?
16     **A.   Yes.  The process on page 14.  I**
17 **just want to make sure that we're referring to**
18 **the right -- the same process.**
19     Q.    Sure.  That's -- that -- that's
20 very helpful.  So you're referring to page 14
21 of Exhibit 1?
22     **A.   Yes.**

---

**37**

1    Q.    So could you walk me through
2  that process?
3         MS. McGRAW:  Object to the form.
4    Q.    Using -- using Exhibit 1, if
5  it's helpful.
6    **A.    Yes.  So the team member would**
7  **log into Vax Trax and enter in the -- enter**
8  **employee name, enter employee title, enter**
9  **department, and then the Vax Trax.  So they**
10 **would enter that in Vax Trax, and they would**
11 **upload any relevant information related to**
12 **their request, and then as an HR senior, HR**
13 **business partner, I could review or the**
14 **committee could review the request.  So that**
15 **was the process.**
16   Q.    On page 14 of Exhibit 1 where --
17 where it says HRBP, that's HR business
18 partner?
19   **A.    Correct.**
20   Q.    And -- and HRBP panelist, that's
21 -- is that referring to the members of the
22 committee?

**38**

1    **A.    Yes.**
2    Q.    Did you review exemptions
3  individually and -- well, yeah.  Did you
4  review exemptions individually or as a group?
5    **A.    I reviewed -- I reviewed**
6  **exemptions individually and also with the**
7  **team.  With the committee.**
8    Q.    What was -- was there a reason
9  some would be reviewed by you and some would
10 be reviewed by the committee?
11   **A.    Yes.**
12   Q.    What was that?
13   **A.    Individually, if I felt as --**
14 **individually if the request was incomplete or**
15 **needed additional information or**
16 **understanding, then we would have an**
17 **opportunity to meet as a committee to discuss.**
18   Q.    So if the request was complete
19 and -- and could either be reviewed or denied,
20 then you would do that on your own?
21   **A.    Yes.**
22   Q.    Do you recall any -- any common

**39**

1  issues that were discussed with the group with
2  respect to exemption requests?
3         MS. McGRAW:  Object to the form.
4         THE WITNESS:  Common, but --
5  BY MR. DIEHL:
6    Q.    So it -- it sounded like that --
7  that if a request was incomplete or you didn't
8  understand it, that that's what we discussed
9  with the group; is that fair?
10   **A.    Yes.**
11   Q.    So with respect to those issues,
12 either incompleteness or not understanding it,
13 were there similar issues among the different
14 requests that you would then discuss with the
15 committee?
16   **A.    I don't remember.**
17   Q.    You -- you don't remember if
18 there were -- were there issues that were
19 repeated among many requests that were then
20 discussed with the committee?
21   **A.    I don't remember.**
22   Q.    On page eight of Exhibit 1,

**40**

1  there's -- sorry.  I think that's Exhibit 2.
2  Exhibit 1 is the PowerPoint.  Sorry.  Do you
3  -- do you have page eight of the PowerPoint in
4  front of you?
5    **A.    Yes.**
6    Q.    And what do you know about --
7  this page talks about undo hardship, correct?
8    **A.    Yes.**
9    Q.    What do you know about undue
10 hardship as it relates to the religious
11 exemption process in 2021?
12   **A.    So undue -- undue hardship,**
13 **undue hardship -- let's see.  Employer can**
14 **demonstrate undue hardship by showing**
15 **proposal.  Yeah.  So if an employee -- if an**
16 **employee's job was assigned to working with**
17 **patients and the employee decided not to get**
18 **the -- the vaccine, given that would pose a**
19 **burden on the -- on the department.**
20        MS. McGRAW:  I'm going to --
21        THE WITNESS:  Or --
22        MS. McGRAW:  I'm sorry.

41

1          THE WITNESS:  Yeah.
2          MS. McGRAW:  I'm just saying
3    interposing a belated objection to the extent
4    we're asking for a legal conclusion here.
5    BY MR. DIEHL:
6        Q.    Just -- you're not an attorney,
7    are you?
8        A.    I am not, no.
9        Q.    So just know that any questions
10   I ask today, I'm not asking for your legal
11   opinion.  I'm just asking for your personal
12   opinion.  Either your personal opinion or
13   professional opinion as an HR person.  Does
14   that make sense?
15       A.    Yes.
16       Q.    With respect to the issue of
17   undue hardship that you were just discussing,
18   was that a part of -- how did that issue fit
19   into the committee's work that you're -- the
20   -- the religious exemption committee?
21       A.    I don't remember.
22       Q.    Do you not remember that --

42

1    well, let me -- let me rephrase that
2    differently.
3          When you say you don't remember, was
4    that you don't remember that the committee had
5    any work or duties related to undue hardship?
6          MS. McGRAW:  Object to the form.
7        Q.    Or there were, but you don't
8    remember the specifics?
9          MS. McGRAW:  Object to the form.
10         THE WITNESS:  I don't remember
11   the specifics.
12   BY MR. DIEHL:
13       Q.    So you -- so you the committee
14   did have, to your knowledge, did the committee
15   have duties related to undue hardship?  The
16   issue of undue hardship?
17       A.    I don't remember the specifics.
18       Q.    Whether or not you remember the
19   specifics, you generally remember that the
20   committee had some duties related to undue
21   hardship?
22       A.    Yes.

43

1          MS. McGRAW:  Object to the form.
2          MR. KIRSNER:  Mischaracterizes.
3    BY MR. DIEHL:
4        Q.    Yeah.  I'm sorry.  Just -- can
5    you explain what you mean as far as what you
6    remember about the issue of undue hardship in
7    the religious exemption committee?
8        A.    So as it relates to the training
9    and as it relates to reviewing the religious
10   exemptions, if -- if the request demonstrated
11   undue hardship, all of those it was taken into
12   consideration and reviewed thoroughly.
13       Q.    By you and members of the
14   committee?
15       A.    Yes.
16       Q.    What did -- what did you use to
17   -- what information did you use to judge that
18   issue?
19       A.    There were two questions that
20   were asked and so reviewing -- reviewing the
21   request for completeness.  So there were two
22   questions that were asked in ensuring that the

44

1    -- the team member answered the two questions
2    that were asked.
3        Q.    What -- what about those
4    questions related to the issue of undue
5    hardship?
6          MS. McGRAW:  I'm going to object
7    to the use of the phrase undue hardship,
8    including whether you're talking about an
9    undue hardship to an employee who's making the
10   request or undue hardship to an employer.
11   BY MR. DIEHL:
12       Q.    Well, as we've been talking
13   about undue hardship, you understand that I've
14   been talking about it as that term is used on
15   page eight of Exhibit 1, correct?
16         MS. McGRAW:  I've asked the
17   witness to read page eight of Exhibit 1.
18         MR. DIEHL:  Counsel, let's -- I
19   don't want your testimony today.  I want the
20   witness' testimony.  If you could have proper
21   objections and stick to those, that would be
22   helpful.

Transcript of █████████████

12 (45 to 48)

Conducted on August 28, 2024

45

1          MS. McGRAW:  You're referring to
2  the exhibit.
3          MR. DIEHL:  I'm asking the
4  witness about the exhibit.  Don't tell the
5  witness what to do.
6          MS. McGRAW:  I'm asking the
7  witness to read the document before █
8  responds to your request.
9  BY MR. DIEHL:
10     Q.    You -- you've -- you've read
11 page eight of Exhibit 1, correct?
12     **A.    Yes.**
13     Q.    And -- and when we were talking
14 about undo hardship over the past several
15 questions, you understood that's what we've
16 been referring to what's written on Exhibit 8?
17         MS. McGRAW:  Objection.
18     Q.    Excuse me.  Page eight of
19 Exhibit 1?
20         MS. McGRAW:  Object to the form.
21         THE WITNESS:  Yes.
22 BY MR. DIEHL:

46

1      Q.    So, I'm going to ask the same
2  questions again, unfortunately, just because
3  lawyers have to make objections to record and
4  I want to make sure the record's clear, so
5  I'll -- I'll go back through it.
6          Based on as a result of the objections,
7  we talked about the issue of undue hardship
8  and, again, we're referring to as that is
9  discussed on page eight of Exhibit 1.  Do you
10 understand that?
11     **A.    Yes.**
12     Q.    And you talked about the issue
13 of undue hardship with respect to the
14 committee's work and reviewing exemption
15 requests.  Can you tell me what that -- what
16 the committee did with respect to that issue
17 again?
18     **A.    I don't remember.**
19     Q.    As I look back through -- as I
20 recall your testimony, I believe you had
21 mentioned that -- that as the committee
22 reviewed exemptions requests, the issue of

47

1  undue hardship was taken into consideration?
2          MS. McGRAW:  Same objection as
3  made previously.
4          THE WITNESS:  What I remember is
5  undue hardship being a part of the training
6  document, but also it being separate and apart
7  from granting or denying.  So it -- it -- it
8  was not the committee's responsibility to
9  determine if it was undue hardship or not.  It
10 was the committee's responsibility to review,
11 to review the religious exemption request.
12 BY MR. DIEHL:
13     Q.    So the -- the committee did not
14 take undue hardship into consideration when --
15 when it was discussing requests?
16         MR. KIRSNER:  Objection.  Asked
17 and answered.
18         THE WITNESS:  I don't remember.
19     Q.    If you go back to page 14 of
20 Exhibit 8, the Vax Trax.  When we say Vax
21 Trax, what -- what is Vax Trax?
22     **A.    Vax Trax is a system that was**

48

1  **used to -- to indicate if a team member has**
2  **been vaccinated or not.**
3      Q.    And so the team member that --
4  that shows if they're vaccinated, but that's
5  also where employees would make requests for
6  exemption?
7      **A.    Yes.**
8      Q.    And did the religious exemption
9  committee have anything to do with medical --
10 request for exemption related to medical
11 issues?
12     **A.    No.**
13     Q.    Did you have any knowledge of
14 the process for -- that employees would use to
15 request a medical exemption from the COVID
16 vaccine requirement?
17     **A.    No.**
18     Q.    So back to page 14 of Exhibit 1.
19 The team member would submit an exemption
20 request in Vax Trax, and then that request
21 would be -- was -- was pulled by the
22 designated HRBP panelist.  What does it mean

Transcript of [REDACTED]

13 (49 to 52)

Conducted on August 28, 2024

---

**49**

1  to pull -- what does -- what does request as
2  pulled mean?
3      A.    To retrieve the religious
4  exemption request to review.
5      Q.    So you would receive notice that
6  there's requests to review.  How -- how would
7  you know which ones to review or pull?
8      A.    Login and check Vax Trax.
9      Q.    Do you know how -- how some were
10 assigned to you or some were assigned to other
11 members of the committee?
12     A.    How what?
13     Q.    Do you know how some requests
14 were assigned to you versus other members of
15 the committee?
16     A.    It was assigned by volume.  For
17 example, if 50 came in one day, then they were
18 divided among the team.  The committee
19 members.
20     Q.    Would -- was it -- was it, to
21 your knowledge, random in terms of which of
22 the -- other than the number which, for

---

**50**

1  example, area of UVA Health the employee
2  worked in?
3      A.    It was random.
4      Q.    And when you received requests,
5  did you receive information about where this
6  employee worked?
7      A.    Where the employee worked was on
8  the form.  It has department and title.
9             ([REDACTED] 6, (Highly
10 Confidential)-UVA_0002368-Print-out of
11 Information from the Vax Trax system, marked
12 for identification.)
13     Q.    I'm going to hand you a document
14 that was previously marked as Exhibit 6.  And
15 I understand this is a printout of information
16 from the Vax Trax system.  That's my
17 understanding.
18             MS. McGRAW:  It's just -- it's a
19 printout of tables from Vax Trax.  Vax Trax
20 database.  I just want to make sure that's
21 clear.  It's not like these are documents that
22 are just sitting in Vax Trax.

---

**51**

1             MR. DIEHL:  Yeah, I understand
2  that.
3             MS. McGRAW:  You have to select
4  tables.
5  BY MR. DIEHL:
6      Q.    It's my understanding that this
7  is information taken from the Vax Trax system.
8  Does -- does this -- does the information or
9  format -- well, does the information -- let me
10 break it apart.
11     Does the information on Exhibit 6 look
12 familiar to you?
13     A.    Yes.
14     Q.    It's my understanding that the
15 ID there is a -- is a new ID that was provided
16 in this lawsuit to anonymized the individuals,
17 and then the change by ID where it says
18 requester is -- it was added by the lawyers in
19 this lawsuit.  That's my understanding.  The
20 rest of the information is -- is what was in
21 the Vax Trax system or what is in the Vax Trax
22 system.  I don't see any information in this

---

**52**

1  document, Exhibit 6, that shows what
2  department the employee worked in.  Do you see
3  that anywhere?
4      A.    I do not.
5      Q.    Where -- and there -- but there
6  was that information there or, yeah, there
7  was.  Let me -- let me ask that again.
8             When you used the Vax Trax system in
9  2021 to review exemption requests, there was
10 information about where the employee worked in
11 the system?
12     A.    Department.
13     Q.    And then was there titles in the
14 -- in the Vax Trax system for employees who
15 made requests for exemption?
16     A.    Yes.
17     Q.    How would that -- where was that
18 shown, I guess.  Do you -- if you recall?
19     A.    On the requested form.  So this
20 -- on the requested form.  So an employee
21 would login -- well, actually, I don't know
22 what it looks like from an employee logging

---

Case 3:22-cv-00075-RSB-JCH    Document 265-5    Filed 02/14/25    Page 16 of 93
Pageid#: 11079
Transcript of ▮▮▮▮▮▮▮▮▮▮    14 (53 to 56)
Conducted on August 28, 2024

53

1  in, but to review, it would have name,
2  department, title.  This form only indicates
3  employee infor -- employee information, so.
4          MR. DIEHL: I don't think we
5  received that information.
6          MS. McGRAW: You have received
7  it.  It's in a spreadsheet from Workday.  What
8  I'm trying to explain to you is what ▮ sees
9  in Vax Trax is different than printing tables.
10         MR. DIEHL: I understand that.
11         MS. McGRAW: So the form itself
12  had that information on it.  It's been
13  produced to you on a spreadsheet that
14  corresponds to each one of these numbers.
15  BY MR. DIEHL:
16     Q.    I'll come back to that.  And I
17  didn't say this earlier, but if at any point
18  you need a break or want to take a break, just
19  let me know, and I'll try to take it as soon
20  as possible or might finish a question or two
21  if were finishing a topic.  So I'll come back
22  to the issues of -- of department and titles,

54

1  but I guess when you reviewed an exemption
2  request in 2021, as part of the religious
3  exemption committee, was the department and
4  title of the employee relevant to your review?
5      A.    No.
6      Q.    And if we go back to page 14 of
7  Exhibit 1, sorry to jump around, but that's
8  the PowerPoint there.  Do you have page 14 in
9  front of you?
10     A.    Yes.
11     Q.    And the panelists that -- that
12  -- that would be you for some, correct?
13     A.    Yes.
14     Q.    You review the request and then
15  -- and then what happens?
16     A.    Review the request for
17  completeness and -- and indicate approve or
18  deny, or hold to be further discussed with the
19  committee.
20     Q.    And if you, based on that review
21  without the committee, if you approved or
22  denied a request, then what would happen?

55

1      A.    Then the employee would be
2  notified.  The employee received notification
3  of the answer.
4      Q.    Would -- would anyone else, to
5  your knowledge, review the decision to approve
6  or deny it other than if you had made that
7  decision by yourself without the committee?
8          MS. McGRAW: Object to the form.
9          MR. DIEHL: Let me -- let me
10  break it apart.
11         MS. McGRAW: Okay.
12  BY MR. DIEHL:
13     Q.    So, for example, you -- for some
14  requests, you would review the request
15  yourself, and then based on your review, you
16  would approve the request; is that fair?
17     A.    Yes.
18     Q.    And so for that request, to your
19  knowledge, would someone else at UVA review
20  the decision before that decision was
21  communicated to the employee who made the
22  request?

56

1      A.    I don't remember.
2      Q.    Do you not remember that whether
3  that -- whether that occurred or whether it
4  didn't occur?
5          MS. McGRAW: Object to the form.
6  Asked and answered.
7  BY MR. DIEHL:
8      Q.    Well, do you understand that --
9  so the difference is -- is do you -- you don't
10  believe that occurred because you don't recall
11  that occurring or you're not sure whether it
12  occurred or not?  Do you understand that
13  difference?
14     A.    I do understand the difference.
15     Q.    So what -- what's -- what --
16  when you say you don't -- you don't remember,
17  you don't recall what was -- what does that
18  mean in this -- with respect to whether
19  another person reviewed the approval before it
20  was communicated to the employee?
21     A.    Well, if there was an approval
22  after I approve, I don't believe so.

---

**57**

1      Q.     Did anyone at any point tell you
2  that there was a certain number of approved
3  exemptions that -- that UVA could grant, but
4  -- but that there was a limit on the number of
5  -- of approvals that could be granted?
6      A.     No.
7      Q.     Did anyone tell you that if we
8  grant too many of these, that would be unsafe
9  for others at the -- at -- in the health
10 system or our patients?
11     A.     No.
12            MS. McGRAW:  Object to the form.
13            THE WITNESS:  No.
14 BY MR. DIEHL:
15     Q.     With respect to requests that
16 were granted, do you recall any themes or --
17 or common reasons why they were approved?
18     A.     No.
19     Q.     Were you aware of the issue of
20 if -- let me back up.
21     It's my understanding that for
22 employees that had received a religious

**58**

1  exemption that was approved in 2019 or 2020
2  with respect to the flu vaccine requirement,
3  those employees would automatically be
4  approved for an exemption from the COVID
5  vaccine requirement.  Is that your
6  understanding?
7      A.     I didn't work on -- I only
8  participated in the religious exemptions.
9      Q.     And do you know [REDACTED]?
10     A.     Yes.
11     Q.     And it's my understanding that
12 [REDACTED] reviewed requests for religious exemption
13 from the flu vaccine in 2019 and 2020.  Are
14 you aware of that?
15     A.     No.  I was not on that team
16 during that time.
17     Q.     Did do you recall [REDACTED]
18 discussing the issue of whether an employee
19 had requested and been approved for a
20 religious exemption in 2019 or 2020 that might
21 affect a request for religious exemption in
22 2021?

**59**

1      A.     I don't --
2             MS. McGRAW:  Object to the form.
3             THE WITNESS:  I don't remember.
4  BY MR. DIEHL:
5      Q.     In your -- when you reviewed
6  requests for religious exemption, did you
7  consider whether an employee had requested a
8  religious exemption from any other vaccine as
9  part of your review of a request in 2021?
10     A.     That information is on this form
11 on Exhibit 2.
12     Q.     Six?
13     A.     Six.
14     Q.     That's what you're referring to?
15     A.     Well, what I'm saying is the
16 question, vaccine information is located on
17 the -- on this form.  So in reviewing for
18 completeness, the team member or when
19 requesting the team member had to indicate if
20 they received vaccine before.
21     Q.     And then was that -- whatever
22 information was provided with respect to

**60**

1  receiving a previous vaccine, was that
2  considered by you as part of your review of
3  their new request in 2021 related to the COVID
4  vaccine?
5      A.     I don't remember.
6      Q.     Do you remember criteria that
7  you used for considering whether to approve or
8  deny a request in -- in 2021 as part of your
9  work for the committee?
10     A.     Reviewing the form for
11 completeness, there were two questions that
12 the team member had to answer.
13     Q.     Do you -- do you recall what
14 those questions were?
15     A.     I don't remember.
16     Q.     The -- if you look at Exhibit 6,
17 the -- on the first page, there's a table that
18 has the word S-T-R-U-C-T at the top.  Do you
19 see that?  It's in -- it's in a black, yeah.
20 Do you see that, S-T-R-U-C-T?
21     A.     Yes.
22     Q.     So if you look at that table --

Case 3:22-cv-00075-RSB-JCH    Document 265-5    Filed 02/14/25    Page 18 of 93
Pageid#: 11081
Transcript of ██████████████████████                    16 (61 to 64)
Conducted on August 28, 2024

61

1  and when I say table, I mean the -- the
2  columns and rows that don't have a break in
3  before the next label S-T-R-U-C-T.  Do you see
4  where that table is I'm referring to?
5      **A.     Yes.**
6      Q.     So at the bottom two rows on the
7  left side, it says religious belief comment
8  and religious comment.  Did that information
9  relate to the -- those two questions that you
10 were just talking about?
11     **A.     I don't remember.**
12     Q.     What -- do you -- what was your
13 ID in the Vax Trax system?  ID number, excuse
14 me.
15     **A.     I don't remember what my ID**
16 **number was in the Vax Trax system.**
17     Q.     I've seen eight and seven.
18 Eight I understand to be ██████████.  And
19 then I've seen 71.
20     **A.     I don't remember what my -- I**
21 **don't remember.**
22     Q.     And then I've seen a four digit

62

1  number.  I've seen 2397.  None of those ring a
2  bell?
3      **A.     No.**
4      Q.     What are your -- I understand
5  that at times employees would put their
6  initials in the -- in the -- in -- well, I'll
7  show you an example.  If you go to page 2385
8  and -- and what I'm referring to as the
9  numbers at the bottom, those are -- those were
10 added as part of the lawsuit.  They're called
11 -- if I refer to them as a Bates label, that's
12 what I'm talking about, or Bates number.  So
13 if you go to the page with 2385 at the bottom.
14     **A.     Uh-hum.**
15     Q.     I'm sorry.  I didn't hear a
16 response.
17     **A.     Yes.**
18     Q.     And if you see up at the top in
19 the partial table that is at the top of page
20 2385, there's a religious admin comment.  Do
21 you see that?
22     **A.     Yes.**

63

1      Q.     And then there's a notation
2  about an email being sent and then ████  Do
3  you see that?
4      **A.     Yes.**
5      Q.     It's my understanding that's
6  ██████████' initials?
7      **A.     Yes.**
8      Q.     What -- what initials did you
9  put in?
10     **A.     I don't remember.**
11     Q.     What -- what are your -- do you
12 have three initials?
13     **A.     Yes.**
14     Q.     What are they?
15     **A.     ████████.**
16     Q.     Probably a good time for a short
17 break.
18     **A.     Yeah.**
19         (Off the record.)
20 BY MR. DIEHL:
21     Q.     All right.  We're back on the
22 record.  Just meaning that the court -- the

64

1  court reporter is going to be taking down the
2  transcript.  And I -- I won't do this every
3  time, but you understand that as we take
4  breaks throughout the day, you're still under
5  oath and -- and as you're testifying?
6      **A.     Yes.**
7      Q.     I'm going to mark a new exhibit,
8  which I believe is 16.  So do you recognize --
9  well, have you seen Exhibit 16 before?  It's
10 my understanding this was created for the
11 lawsuit, but if you look at the top, there's a
12 notation workday information for users with
13 approved COVID-19 religious exemption
14 requests.  Do you see that?
15     **A.     Yes.**
16     Q.     When we talked about the title
17 and department for employees who made requests
18 for religious exemption, is this that type of
19 information?
20     **A.     No.**
21     Q.     What is different?
22     **A.     In Vax -- Vax Trax, it requires**

65

1  the person, the team member's name, title and
2  department.  I have not seen this document
3  before.  I think that was the first question
4  you asked.  So the answer is, no, I have not
5  seen this document before.
6      Q.    Okay.  So looking at the request
7  department, the first line has an ID.  So
8  well, let me -- let me step back.  It's my
9  understanding and -- and counsel can confirm
10 that the first column is a unique ID that was
11 created for the lawsuit.  So those IDs
12 wouldn't have existed before.  So you -- so I
13 understand you wouldn't have seen those, but
14 if you look at the line beginning at with ID
15 eight, do you see where it says MC-2725000
16 Nursing Professional Dev SVCS?
17     A.    Yes.
18     Q.    And is that a -- is that
19 department information?
20     A.    Did you — repeat the question.
21     Q.    Well, so the -- the label on
22 that column is request department.  Do you see

66

1  that?
2      A.    Yes.
3      Q.    And so I'm just trying to
4  understand if this is similar or the same type
5  of department information that you would have
6  seen in the Vax Trax system?
7      A.    No.
8      Q.    How -- what did the information
9  regarding departments, what did that look like
10 in the Vax Trax system?
11     A.    The team member would have to
12 indicate name of the department.  I've never
13 seen this document before.  I don't -- I've
14 never seen this document before.
15     Q.    And so -- so the employee would
16 -- your understanding would type in a
17 department?
18     A.    Yes.  I don't know that once
19 they typed in their department, it would
20 populate this information.  Like, this does
21 not look familiar to me.
22     Q.    And you're referring to the --

67

1      A.    Request department.
2      Q.    -- request department labels
3  listed in the column on Exhibit 16?
4      A.    Yes.
5      Q.    And then there's request job
6  profile name.  Do you see that column on
7  Exhibit 16?
8      A.    Yes.
9      Q.    And there -- there's some
10 information for the different requesters
11 there.  Do those look like the titles that you
12 saw in Vax Trax?
13     A.    In terms of titles, yes.
14     Q.    And I believe you answered this
15 before, but as you reviewed exemption requests
16 as part of your work for the committee in
17 2021, was the title of the employee or the
18 department that was listed in Vax Trax, was
19 that relevant to your review?
20     A.    No.
21         (▓▓▓▓▓ 17, (Highly
22 Confidential)-UVA_0003035-Print-out of

68

1  Information from the Vax Trax system, marked
2  for identification.)
3      Q.    Let's mark Exhibit 17.  And do
4  you recognize Exhibit 17 as a printout of
5  information from the Vax Trax system?
6      A.    Yes.
7      Q.    And, again, the ID 43 relates to
8  a particular employee, but that wouldn't have
9  been part of the Vax Trax system when -- when
10 you reviewed it.  Do you understand that?
11     A.    Yes.
12     Q.    So at the bottom of page 17,
13 there looks like there's -- there was
14 information provided by the requester.  It
15 says they're in the change by ID row.  Do you
16 see that?
17     A.    Yes.
18     Q.    And, again, counsel can confirm,
19 but the requester is -- was changed by the
20 lawyers, but that refers to the same person as
21 ID 43, but it -- rather than have their name
22 or an individual ID, it just says

Transcript of ▮▮▮▮▮▮▮▮▮▮                    18 (69 to 72)
Conducted on August 28, 2024

---

69

1  requester.  So I'm just -- I'm representing
2  that to you, but do you understand that?
3      **A.    I understand that.  So the**
4  **requester is identified as 43.**
5      Q.    Correct.  That's my
6  understanding.
7          MR. DIEHL:  Is that your
8  counsel?
9          MS. McGRAW:  Yes.  The ID 43 at
10 the top is the anonymous number assigned to
11 this person for all documents produced related
12 to this person.
13         MR. DIEHL:  Okay.
14         MS. McGRAW:  And then the change
15 by ID normally Vax Trax assigns a numeric code
16 to each individual user, but to keep this
17 anonymous, we removed the generic code and
18 used the word requester when it was the
19 employee seeking the exemption that needed to
20 be indicated there.
21         MR. DIEHL:  And so 43 in
22 requester refer to the same person, correct,

---

70

1  counsel?
2          MS. McGRAW:  Yes.
3  BY MR. DIEHL:
4      Q.    Okay.  Does that make sense to
5  you?
6      **A.    Yes.**
7      Q.    Thank you.  So if we look at the
8  first table that begins with the row that's
9  labeled S-T-R-U-C-T in the middle of the first
10 page of Exhibit 17, it looks like there was
11 information provided by the requester and then
12 there's information that the requester
13 provided related to religious belief --
14 beliefs.  And if you turn to the second page,
15 there's information provided related to
16 religious conflict.  Do you see that?
17     **A.    Yes.**
18     Q.    And do you recall whether you
19 reviewed this information previously?
20     **A.    This request?**
21     Q.    Yes.
22     **A.    No, I don't.**

---

71

1      Q.    If you were going to go about
2  reviewing this request, if it was assigned to
3  you in 2021 as part of your work -- as part of
4  your work for the committee, how would you
5  have gone about that?
6          MS. McGRAW:  Object to the form.
7  Calls for speculation.
8  BY MR. DIEHL:
9      Q.    Well, you were part of the
10 committee that reviewed religious exemption
11 requests in 2021, correct?
12     **A.    Yes.**
13         THE REPORTER:  I'm sorry.  I
14 didn't hear the answer.
15         THE WITNESS:  Yes.
16     Q.    And so you received requests
17 with information similar to what was -- what
18 is provided in the religious belief comment
19 and religious conflict comment on the first
20 and second pages of Exhibit 17, correct?
21     **A.    Yes.**
22     Q.    And at that time, you knew the

---

72

1  process that you used for reviewing requests,
2  correct?
3      **A.    Yes.**
4      Q.    And do you recall that process,
5  how you would have gone about reviewing
6  requests like this in 2021?
7          MS. McGRAW:  Object to the form.
8  Asked and answered.
9      Q.    You can answer.
10     **A.    Yes.**
11     Q.    Tell me how you would have
12 reviewed a request like this, whether or not
13 you actually reviewed this one, Exhibit 17.
14         MR. KIRSNER:  Object to the
15 form.
16         THE WITNESS:  I can answer?
17     Q.    Yes.  So I should say this.
18 Lawyers make objections.  Sometimes they're
19 important.  Sometimes they're not, but if the
20 -- if the lawyer doesn't instruct you not to
21 answer, then you -- then you can answer the
22 question if you understand the question.

---

Transcript of ▮▮▮▮▮▮▮▮▮

Conducted on August 28, 2024

73

1        MR. KIRSNER:  I agree if you
2   understand the question.  If you do not,
3   please ask the gentleman to rephrase it.
4        MR. DIEHL:  You can coach at
5   another time, counsel.
6        MR. KIRSNER:  Thank you.
7        MR. DIEHL:  So I'll -- I'll
8   start over.  And we'll -- can we just assume
9   the same objections and get a cough drop?
10 Just I'm joking about the cough drop?
11       MS. McGRAW:  We're not going to
12 assume the same objections because every time
13 you ask, you change the question.
14 BY MR. DIEHL:
15       Q.    All right.  We'll -- we'll --
16 we'll just power on.  So when you received a
17 request for a religious exemption in 2021 as
18 part of your work for the committee, how would
19 you review that request?
20       MS. McGRAW:  Object to the form.
21       THE WITNESS:  For completeness.
22 There were two questions that the employee had

74

1   to answer.  So I would review the form for
2   completeness.
3   BY MR. DIEHL:
4        Q.    And what -- I guess, what did it
5   mean to be complete?
6        **A.    To answer the two questions as**
7   **to why they needed a -- I don't remember the**
8   **two questions, but why were they requesting a**
9   **religious exemption.**
10       Q.    What -- what did it mean to be
11 complete?  Was there -- was there a criteria
12 that needed to be included for it to be
13 complete?
14       MS. McGRAW:  Object to the form.
15 Calls for speculation.  Incomplete
16 hypothetical.
17       Q.    But you -- you just talked about
18 the form being complete, correct?
19       **A.    Yes.**
20       Q.    And that was a real thing that
21 you reviewed in 2021, correct?
22       **A.    Yes.**

75

1        Q.    So what -- what would you have
2   reviewed to determine whether it was complete?
3        MS. McGRAW:  Same objection.
4        THE WITNESS:  For sincerity of
5   their religious held beliefs.
6   BY MR. DIEHL:
7        Q.    What -- what do you mean by
8   sincerity?
9        **A.    There --**
10       Q.    Well, actually, let -- let me --
11 let me rephrase that.
12       When you reviewed for sincerity in
13 2021, what would you review for?
14       MS. McGRAW:  Object to the form.
15 Calls for speculation.  Incomplete
16 hypothetical.
17       Q.    You can answer.
18       **A.    For them to list -- for the team**
19 **member to list the reasons why they needed the**
20 **exemption.**
21       Q.    What --
22       **A.    They're --**

76

1        Q.    -- be included, what should be
2   included in that for it to be complete?
3        MS. McGRAW:  Object to the form.
4   Incomplete hypothetical.  Calls for
5   speculation.
6        THE WITNESS:  I don't remember
7   the two questions that was asked.
8   BY MR. DIEHL:
9        Q.    When you're looking at
10 Exhibit 1 -- before you do, let me ask you
11 this.
12       Did you -- when you attended the
13 training where Exhibit 1 was discussed in July
14 of 2021, correct?
15       **A.    Yes.**
16       Q.    And after that training, while
17 you were reviewing requests for religious
18 exemptions as part of your work for the
19 committee, did you go back to that PowerPoint
20 and review the information from it when you
21 were reviewing requests?
22       **A.    Yes.  I used it as a guide.**

Case 3:22-cv-00075-RSB-JCH    Document 265-5    Filed 02/14/25    Page 22 of 93
Pageid#: 11085
Transcript of ▮▮▮▮▮▮▮▮▮▮▮▮    20 (77 to 80)
Conducted on August 28, 2024

77

1    Q.    And did you use any other
2 documents as a guide when you were reviewing
3 requests other than the PowerPoint
4 presentation, Exhibit 1?
5    **A.    So if I was unsure about what**
6 **something meant within the description or the**
7 **answer of the team member, then I would**
8 **discuss it with the committee members.**
9    Q.    And other than discussing
10 something you were unsure about with the other
11 exemption committee members, would you review
12 any -- any documents or other guidance of some
13 kind?
14    **A.    I don't remember.**
15    Q.    Was there a document with
16 information about abortion and objections
17 related to abortion?
18    **A.    Team members would reference**
19 **that information within their request, but,**
20 **no, I did not have a brochure or anything like**
21 **that to refer to.**
22    Q.    What -- what would -- do you

78

1 recall what team members would reference
2 related to abortion in religious exemption
3 requests in 2021?
4    **A.    That -- yes, that the vaccine**
5 **was that fetal cells were incorporated within**
6 **the vaccine or they are used for scientific**
7 **testing.**
8    Q.    What do you mean by they use for
9 scientific testing?
10    **A.    Team members would indicate that**
11 **fetal cells were used in the testing for the**
12 **COVID-19 vaccine.**
13    Q.    Do you have any understanding of
14 whether that -- that is true?  Whether fetal
15 cells were used in the testing of any COVID
16 vaccines?
17    **A.    Yes.**
18    Q.    And -- and it is true?
19        MS. McGRAW:  Object to the form.
20    Q.    Well, yeah.  So I asked you that
21 you have any understanding and -- and you said
22 yes.  So what is your understanding with

79

1 respect to fetal cells being used for testing
2 of COVID vaccines?
3    **A.    I don't remember.**
4    Q.    Did you -- do you believe you
5 had an understanding of whether that testing
6 was a true -- let me -- let me step back.
7        Do you -- do you believe you had an
8 understanding in 2021 regarding whether fetal
9 cells were used to test any of the COVID
10 vaccines?
11    **A.    I don't remember.**
12    Q.    Did you have anyone that you
13 could go to with questions about issues like
14 whether fetal cells were used in testing any
15 of the COVID vaccines in 2021?
16    **A.    Yes.**
17    Q.    Who's that?
18    **A.    Melissa Riley.**
19        MS. McGRAW:  And I'm going to
20 ask the witness not to reveal any
21 communications with Melissa Riley, who's
22 university counsel and assistant AG.

80

1 BY MR. DIEHL:
2    Q.    Melissa Riley is a lawyer.  Not
3 a doctor, correct?
4    **A.    Correct.**
5    Q.    And do you know if Melissa Riley
6 has any scientific training of any kind?
7    **A.    I do not.**
8    Q.    Did you, either alone or as part
9 of the committee, consult with anyone that had
10 knowledge about fetal cells and the COVID
11 vaccine as part of your work for the
12 committee?
13    **A.    I did not.**
14    Q.    If you could look at Exhibit 17
15 and starting on the first page, if you could
16 read the religious belief comment there.
17    **A.    Starting from,** ▮▮▮▮▮▮▮▮▮▮
18 ▮▮▮▮▮▮
19    Q.    Yes.
20    **A.    Okay.** ▮▮▮▮▮▮▮▮▮▮▮▮▮▮
21 ▮▮▮▮▮▮▮▮▮▮▮
22 --

81

1    Q.    I'm sorry.  I meant for you to
2  read to yourself.
3    A.    Oh, okay.
4    Q.    And actually, let me ask you a
5  question before -- before you do.  Where it
6  says find attached, did Vax Trax allow
7  employees to attach other statements or did
8  they have to copy the information into the --
9  the Vax Trax system, to your knowledge?
10   A.    I don't remember.
11   Q.    Do you remember reviewing any
12 documents outside of the Vax Trax system when
13 you were reviewing employee's requests?
14   A.    I don't remember.
15   Q.    You don't believe that you did
16 or you don't remember at all?
17   A.    I don't remember at all.
18   Q.    So if you --
19   A.    I just don't remember if you
20 could attach additional information or not.  I
21 don't remember.
22   Q.    But do you remember reviewing

82

1  any additional information other than
2  information that was in the Vax Trax system?
3    A.    Yes.
4        MS. McGRAW:  Object to the form.
5        THE WITNESS:  If they
6  resubmitted a second request, there may have
7  been different information in the second
8  request.  I don't remember any attachments.
9  BY MR. DIEHL:
10   Q.    Okay.  So if you could read on
11 Exhibit 17, starting with, my face started.
12   A.    To myself?
13   Q.    Yeah, just read to yourself.
14   A.    Okay.
15   Q.    And -- and then just on the
16 second page, continue through the end of that
17 one cell.  That one -- one part of the chart
18 there that ends with, I am required to do so.
19   A.    And stop where?
20   Q.    The -- the end of the religious
21 belief comment, which I understand stops at,
22 I'm required to do so --

83

1    A.    Okay.
2    Q.    -- on the second page.
3    A.    Okay.
4    Q.    And -- well, let me ask you
5  this.  With respect to the two questions that
6  were asked of -- of employees related to their
7  religious exemption requests, did you review
8  those two questions independently or did you
9  review all of the information together as you
10 were evaluating the request in 2021?
11       MS. McGRAW:  Object to the form.
12       THE WITNESS:  Independently.
13 BY MR. DIEHL:
14   Q.    Okay.  So is the religious
15 belief information shown in the religious
16 belief comment cell on the first and second
17 page of Exhibit 17, is that complete to -- to
18 your understanding?
19       MS. McGRAW:  Object to the form.
20       THE WITNESS:  What was the
21 question?  What was the first question?
22   Q.    The first question that was

84

1  asked of employees?
2    A.    Yes.
3    Q.    I will -- I will -- I'll get --
4  I'll find an exhibit on a break.  So maybe --
5  maybe we'll come back to that, this -- this
6  exhibit after the break.
7        Let me ask you this.  With respect to
8  Exhibit 1, while you were reviewing religious
9  exemption requests, did you ever depart from
10 the process and guidance that was shown on the
11 Exhibit 1 in the PowerPoint?
12       MS. McGRAW:  Object to the form.
13   Q.    Well, do you know what the word
14 depart from means?
15   A.    Not used.
16   Q.    Yeah.  Did you ever ignore or
17 use different criteria than what was -- is
18 listed on the PowerPoint in Exhibit 1?
19       MS. McGRAW:  Object to the form.
20       THE WITNESS:  I did not.
21 BY MR. DIEHL:
22   Q.    When employees received

Case 3:22-cv-00075-RSB-JCH    Document 265-5    Filed 02/14/25    Page 24 of 93
Pageid#: 11087
Transcript of ████████████████                    22 (85 to 88)
Conducted on August 28, 2024

85

1  information that their request was denied,
2  did -- to your knowledge, was -- were they
3  told why their request was denied?
4      MS. McGRAW:  Object to the form.
5      THE WITNESS:  I don't remember.
6      Q.    Do you recall ever writing down
7  why you were denying any particular request as
8  you reviewed exempt requests in 2021?
9      **A.    I do not.**
10     Q.    So you didn't ever type your
11 answer somewhere or excuse me.  I'm going to
12 start that over.
13     So when you made decisions related to
14 religious exemption requests, did you type
15 into a system or write down anywhere why you
16 were denying a request?
17     **A.    I don't know.**
18     Q.    Did you take notice regarding
19 your review of religious exemption requests in
20 2021?
21     **A.    So notes only would have been**
22 **incorporated into the spreadsheet that was**

86

1  **being used --**
2      MS. McGRAW:  Okay.  I'm going to
3  ask the witness not to disclose any
4  communications or information regarding the
5  spreadsheet that was kept at the direction of
6  counsel and for counsel's use, which is on our
7  privilege log.
8      Q.    So I guess I'm not asking about
9  any communications with counsel, but just --
10 I'm asking about the existence of a fact,
11 whether there is notes somewhere discussing
12 facts related to your review of religious
13 exemptions in 2021?
14     MS. McGRAW:  Same objection with
15 respect to the spreadsheet that the witness
16 referenced, which is on our privilege log.  I
17 don't want you to tell him anything about the
18 spreadsheet that was kept at Melissa Riley's
19 direction, but if there's something else
20 available, if there's something else you can
21 talk about that.
22     THE WITNESS:  Okay.  In Vax

87

1  Trax, the system -- the -- the system would
2  only allow the reviewer to put approve, deny,
3  and I believe those were the only two options.
4  BY MR. DIEHL:
5      Q.    And I don't want you to tell me
6  its contents, but is there a -- well, as you
7  sit here today, do you recall the specific
8  information of why you review -- let me start
9  that question as a collective question.
10     Do you recall today why you denied or
11 approved individual requests in 2021?
12     **A.    Repeat the question.**
13     Q.    Yeah.  You -- you denied and --
14 and approved some requests in 2021 as part of
15 your work for the religious exemption
16 committee, correct?
17     **A.    Correct.**
18     Q.    And do you recall why you denied
19 or approved different requests?
20     **A.    Yes.**
21     Q.    Why -- why was that?
22     **A.    Why was what?**

88

1      Q.    I guess what were the reasons
2  you denied or approved requests?
3      **A.    Because I was a part of the**
4  **committee.**
5      Q.    But what was the basis for
6  denying or the basis for approving different
7  requests?
8      MS. McGRAW:  Object to the form.
9      THE WITNESS:  If the information
10 was incomplete and not -- yeah.  If the
11 information was incomplete, then the request
12 would have been denied.  Meaning, if they
13 answered the first question, but not the
14 second question, then it would have been
15 denied or vice versa.
16 BY MR. DIEHL:
17     Q.    Other than that completeness
18 issue you just discussed, what other reasons
19 were there for denying requests?
20     MS. McGRAW:  Object to the form.
21 Calls for speculation.  Incomplete
22 hypothetical.

---

89

1      THE WITNESS:  Repeat the
2  question, please.
3  BY MR. DIEHL:
4      Q.    You just discussed information
5  regarding incompleteness, and that would be
6  the reason for denying some requests, correct?
7      **A.    Yes.**
8      Q.    So other than incompleteness,
9  were there other reasons that you denied
10 requests in 2021?
11     MS. McGRAW:  Same objection.
12     THE WITNESS:  If it didn't -- if
13 the request did not demonstrate that it was a
14 sincerely held belief.
15     Q.    And how would you decide whether
16 a request was sincerely held or -- let me ask
17 that again.
18     How would you decide whether a request
19 demonstrated a sincerely held belief or it was
20 not sincerely?
21     MS. McGRAW:  Object to the form.
22 Calls for speculation.  Incomplete

---

90

1  hypothetical.
2  BY MR. DIEHL:
3      Q.    Well, let's just ask this
4  question.  You actually did this in 2021,
5  correct?
6      **A.    Yes, I did.**
7      Q.    So this isn't a hypothetical, is
8  it?
9      MR. KIRSNER:  Object to the
10 form.
11     MS. McGRAW:  Argumentative.
12     MR. DIEHL:  Well, I'm with you,
13 counsel.  You're -- you're objecting to the
14 actual --
15     MS. McGRAW:  The witness --
16     MR. DIEHL:  You're objecting --
17 I'm -- well, I'm trying to lay a foundation
18 for your ridiculous objections that are just
19 interrupting the -- the flow today --
20     MS. McGRAW:  My objection is not
21 ridiculous.
22     MR. DIEHL:  -- and confusing the

---

91

1  witness.
2      MS. McGRAW:  You're asking ▓ a
3  hypothetical.  You're not asking ▓ about any
4  specific request.
5      MR. DIEHL:  I -- ▓ -- I'm
6  asking about all of that work.  That is not
7  hypothetical.
8  BY MR. DIEHL:
9      Q.    So in 2021, you reviewed
10 multiple requests?
11     **A.    Yes, I did.**
12     Q.    And I believe you testified
13 earlier that you recall reasons why you denied
14 requests, correct?
15     **A.    Yes, I did.**
16     Q.    Okay.  So what were those
17 reasons other than incompleteness?
18     MS. McGRAW:  Objection.  Asked
19 and answered.
20     Q.    She's going to keep doing that,
21 I think, and we might need to get the judge on
22 the phone, but I just -- I apologize, but we

---

92

1  -- we need to try to power through that until
2  we -- counsel stops interrupting.  So the --
3  I'll -- I'll ask the question again.
4      What were reasons that you decided to
5  deny requests for religious exemption in 2021
6  other than incompleteness?
7      MS. McGRAW:  Same objection.
8      THE WITNESS:  So I can answer?
9      MS. McGRAW:  Yes, you can.
10     THE WITNESS:  If the information
11 was inconsistent with their -- with what they
12 had written on -- on the form.
13 BY MR. DIEHL:
14     Q.    Do you recall any example of how
15 that would be an issue in a -- in a -- in a
16 religious exemption request that you reviewed?
17     **A.    I don't remember.**
18     Q.    What -- what do you mean by
19 inconsistent with what they had written?
20     **A.    If the employee -- if the**
21 **employee indicated that they couldn't take the**
22 **vaccine for religious reasons, but also**

Transcript of ██████████████████                    24 (93 to 96)
Conducted on August 28, 2024

---

93

1  indicated that they take Aspirin every day,
2  then that would be inconsistent.
3       Q.    Did -- did the form, to your
4  knowledge, that employees filled out or
5  questions that they answered ask about
6  Aspirin?
7       A.    No, it did not.
8       Q.    Why would an employee have
9  reference -- do you -- do you recall any
10 employee referencing Aspirin in their -- in
11 the information that they provided in support
12 of their request?
13      A.    I vaguely remember and -- and
14 not just Aspirin.  Any other medications or --
15 yes.  I'm -- I'm not a doctor, but any other
16 medications or other medications or pain
17 relief.
18      Q.    And -- and why were those -- why
19 was that relevant to your review?
20      A.    It was inconsistent.
21      Q.    Did employees talk about other
22 medications that they took in their exemption

---

94

1  requests?
2       A.    Some employees did.
3       Q.    And those employees that did
4  talk about it, did they say, I don't take any
5  medications?
6       A.    An employee may say, I don't
7  take any medications.  I've never taken any
8  medications.  I do take medication for this or
9  for that.
10      Q.    And the fact and it was relevant
11 that those -- well, I guess let me ask you a
12 separate question.
13      The information about whether they take
14 other medications, how is that relevant to
15 your review?
16      A.    I don't remember.
17      Q.    Was that only relevant to the
18 issue of abortion, or was that relevant to
19 other issues?
20      MS. McGRAW:  Objection.  Asked
21 and answered.
22      THE WITNESS:  I don't -- I don't

---

95

1  understand the question.
2  BY MR. DIEHL:
3       Q.    Other than we talked about
4  incompleteness and you talked about the issue
5  of other medications, what other issues were
6  relevant to decide whether to approve or deny
7  a request?
8       MS. McGRAW:  Objection.  Asked
9  and answered.  Mischaracterizes prior
10 testimony.  You can answer.
11      THE WITNESS:  Just sincerely
12 held beliefs.
13      Q.    What does -- what does sincerely
14 held mean in the context of your review of
15 religious exemptions in 2021?
16      A.    Honesty.  Faithfulness to their
17 religion.  Profess religion.  Exam --
18 providing examples of their sincerely held
19 religious and how it's applied to their daily
20 life.
21      Q.    Anything else?
22      A.    Not that I can remember.

---

96

1       Q.    Not that you can what?  I'm
2  sorry.
3       A.    Remember.
4       Q.    And so other than the issue of
5  whether beliefs were sincerely held, were
6  there any other issues that you haven't
7  discussed already that were relevant to your
8  review of religious exemption requests?
9       A.    No.
10      Q.    Do you know if your review of
11 exemption requests was similar to the review
12 that was performed by other members of the
13 religious exemption committee in 2021?
14      A.    Can you repeat the question,
15 please?
16      Q.    Sure.  Do you know if your
17 review of religious exemption requests in 2021
18 was similar to the review that was performed
19 by other members of the committee?
20      A.    Yes.
21      Q.    Did the committee as a group
22 talk about the criteria that you used for

---

97

1 reviewing exemption requests?

2    **A.    Yes.  We talked about the**

3 **criteria that was provided within the training**

4 **that we received.**

5    Q.    And you're referring to

6 Exhibit 1, the PowerPoint?

7    **A.    Yes.**

8    Q.    Was there any other training

9 besides the PowerPoint that you and the

10 committee considered as part of your review of

11 religious exemption requests?

12   **A.    No.**

13   Q.    And to your knowledge, did other

14 members of the committee use the same criteria

15 that -- that was set forth in the PowerPoint

16 Exhibit 1?  Yes?  Sorry.  I just trailed off

17 there.

18     To your knowledge, did other members of

19 the committee also use the criteria that was

20 provided in the PowerPoint Exhibit 1 for their

21 review of exemption requests in 2021?

22   **A.    Yes.**

98

1    Q.    If you could turn to page 13 of

2 Exhibit 1.  Do you see at the bottom there is

3 a -- some bullet points that list certain

4 faiths or denominations.  Do you see those?

5    **A.    I'm reading now.  Yes.**

6    Q.    And do you know where that list

7 came from?

8    **A.    I do not.**

9    Q.    Do -- do you have any idea how

10 University of Virginia came up with these

11 specific denominations or faiths to list

12 there?

13   **A.    I do not.**

14   Q.    How long have you been a

15 Seventh-day Adventist?

16   **A.    Twenty-seven years.**

17   Q.    Do you eat -- do you eat meat?

18   **A.    I do not.**

19   Q.    Do you take medications?

20   **A.    I do.**

21   Q.    Do you understand that some

22 Seventh-day Adventist don't take medications

99

1 because of their faith?

2    **A.    I am aware.  Yes.**

3    Q.    And is that a common belief held

4 by Seventh-day Adventist?

5        MS. McGRAW:  Object to the form.

6        THE WITNESS:  I don't know.

7 BY MR. DIEHL:

8    Q.    You don't know how many -- let

9 me ask you this.  Separate question.

10     Do you know Seventh-day Adventist that

11 don't take medication?

12   **A.    Yes, I do.**

13   Q.    And those that you know, do they

14 do so because of their faith?

15       MS. McGRAW:  Object to the form.

16 Calls for speculation.

17       THE WITNESS:  Yes.

18   Q.    Do you know why Seventh-day

19 Adventist isn't listed on slide 13 of

20 Exhibit 1?

21   **A.    I do not know.**

22   Q.    When the committee -- how often

100

1 did the committee meet in 2021?

2    **A.    I don't remember.**

3    Q.    Was it -- was it to my

4 understanding that there was an announcement

5 in August regarding the COVID vaccination

6 requirement in August of 2021.  Is that

7 consistent with -- with your memory?

8    **A.    I don't remember.**

9    Q.    Well, if we -- if we assume it

10 was August and then as my understanding that

11 the -- the deadline for vaccination was in

12 November of 2021.  Do you -- do you recall

13 that?

14   **A.    I don't remember.**

15   Q.    Well, if you just assume that

16 for the sake of these questions, during that

17 period when the vaccine requirement when --

18 when the -- during this period when -- after

19 the vaccination requirement had been

20 announced, but before the deadline when

21 individuals had to be vaccinated, that's when

22 most of the requests were reviewed by the

101

1  committee and members of the committee,
2  correct?
3      A.    I don't remember.
4      Q.    Do you remember meeting on a
5  weekly basis for some period of time with
6  other members of the committee?
7      A.    Yes.
8      Q.    And who was present at those
9  meetings?
10     A.    ████████████████████
11  ████████████████    Those were the
12  committee members.
13     Q.    Was there anyone other than the
14  committee members present at those regular
15  committee meetings?
16     A.    Melissa Frederick and Melissa
17  Riley.
18     Q.    What was Melissa Frederick's
19  role with respect to the exemption, religious
20  exemption review committee in 2021?
21     A.    What was her role as the senior
22  director?

102

1      Q.    Well, yeah. I guess with
2  respect to the committee itself. Did she have
3  a role in the committee or on the committee in
4  any way?
5      A.    No, she did not.
6      Q.    Did she provide guidance to
7  members of the committee?
8      A.    She may have coordinated the
9  meetings, but in terms of what type of
10  guidance. Maybe I just don't understand the
11  question.
12     Q.    Well, when the committee got
13  together --
14     A.    Uh-hum.
15     Q.    -- the committee would discuss
16  different requests for religious exemption,
17  correct?
18     A.    Correct.
19     Q.    And as part of those
20  discussions, did Melissa Frederick
21  participate?
22     A.    No, she did not participate.

103

1      Q.    She was -- was she more of an
2  observer?
3      A.    An observer. If we had
4  additional questions maybe for guidance, but
5  she was not responsible for reviewing
6  religious exemptions.
7      Q.    What type of guidance did
8  Melissa Frederick provide?
9      A.    What type of guidance? I don't
10  remember. I don't remember.
11     Q.    Do you know if Melissa Fredrick
12  took notes during the meetings?
13     A.    I don't remember. Not that I'm
14  aware of. I don't remember.
15     Q.    If you could go to slide 17 of
16  Exhibit 1. And -- and I want to ask you about
17  the information after paragraph five. What do
18  you recall about the operations being involved
19  in the exemption process?
20     A.    I don't know what operations.
21     Q.    Okay. Do you know if someone --
22  well, let me ask you this. When it says the

104

1  designated HRBP panelist, that would be a
2  member of the committee, correct?
3      A.    Correct.
4      Q.    So that would be you or ██████
5  ████ or the other members of the committee?
6      A.    Yes.
7      Q.    So did you forward information
8  about approving any religious exemption to
9  operations?
10     A.    I did not.
11     Q.    Was that --
12     A.    So if it was approved or denied,
13  that was indicated in Vax Trax. If it was
14  routed to another individual to determine
15  I — I don't know. So I — I was not
16  responsible for determining if it was — pose
17  undue hardship. I checked.
18     Q.    Let me ask you this. If you go
19  back to slide 15, that's -- and -- and you can
20  also look at slide 14, but that we've already
21  looked at that with respect to the process.
22  The -- the first bullet point there, if the

Transcript of ██████████

27 (105 to 108)

Conducted on August 28, 2024

105

1  exemption request fits within a known category
2  and then it continues and ends with the
3  exemption will be approved by the designated
4  HRBP panelist. Do you see that?
5      **A.    Yes.**
6      Q.    And that's referring to the HRBP
7  panelist's individual review before the
8  committee review?
9      **A.    Yes.**
10        MS. McGRAW: Object to the form.
11     Q.    That's yes?
12     **A.    Yes.**
13     Q.    And so because then if you look
14 two bullets down, it says all other requests
15 should be forwarded to the committee for
16 discussion. Do you see that?
17     **A.    Yes.**
18     Q.     So those requests the -- the --
19 those that fit within a known category, the
20 -- those weren't forwarded to the rest of the
21 committee; is that correct?
22        MS. McGRAW: Object to the form.

106

1  Mischaracterizes.
2        THE WITNESS: If the request
3  with -- was within a known category, but was
4  not complete, then it would be denied, then it
5  would be denied. So if they listed in the
6  known category, but it was not complete and
7  demonstrated sincerely held religious, then it
8  may have been denied.
9  BY MR. DIEHL:
10     Q.    So, if a request was complete
11 and referenced a known category, then the
12 exemption would be approved by the committee
13 member?
14        MS. McGRAW: Object to the form.
15 Mischaracterizes the document.
16        THE WITNESS: If it demonstrated
17 -- if it demonstrated in that -- if -- yeah,
18 if it -- ask me again.
19     Q.    Sure.
20     **A.    Every time that happens then**
21 **I --**
22     Q.    So just maybe it's helpful to go

107

1  back to page 14 just to kinda walk through
2  those. And if you could read one, two and
3  three there on slide 14 of Exhibit 1.
4      **A.    Okay.**
5      Q.    And -- and I'm going to shorten
6  these just to walk through them more quickly,
7  but tell me if I get anything wrong. The team
8  member, the employee, submits the exemption
9  request, and that's in Vax Trax --
10     **A.    Correct.**
11     Q.    -- then that's assigned to you
12 somehow as a member of the committee, correct?
13     **A.    Yes.**
14     Q.    And then you review the request.
15 That's the first step?
16     **A.    Yes.**
17     Q.    For your work on -- as part of
18 the committee?
19     **A.    Yes.**
20     Q.    Then -- and then turning to page
21 15, if the exemption request fits within a
22 known category and then if the request is also

108

1  complete, then that would be approved by you
2  as a committee member, correct?
3        MS. McGRAW: Object to the form.
4  Mischaracterizes the document that you're
5  reading from.
6        THE WITNESS: I don't remember.
7  BY MR. DIEHL:
8      Q.    Well, did you do anything
9  different than what is said on the form here?
10 Or excuse me, I shouldn't say form. Did you
11 do anything different than what's said on page
12 15 of Exhibit 1?
13     **A.    No.**
14     Q.    And -- and so I guess asked
15 another way in case I had too many negatives
16 in there. You followed the exemption process
17 that was set forth on page 15 of Exhibit 1?
18     **A.    Yes.**
19     Q.    And so -- and -- and you
20 mentioned completeness. Is -- does that mean
21 answering both of the questions?
22        MS. McGRAW: Object to the form.

109

1 Asked and answered.
2       THE WITNESS: Yes.
3 BY MR. DIEHL:
4    Q.    So then if we go to the next
5 part of the process that's discussed on page
6 16 of Exhibit 1, the committee, this committee
7 consideration that's discussed here on -- on
8 slide 16, that's when the committee would meet
9 and talk together about exemption requests; is
10 that correct?
11   A.    Yes.
12   Q.    Do you recall any exemption
13 requests that were approved as a result of the
14 committee's consideration?
15   A.    I don't remember.
16   Q.    You don't recall that any
17 were -- were approved?
18       MS. McGRAW: Object to the form.
19   Q.    Is that correct?
20       MR. KIRSNER: Object to the
21 form.
22       THE WITNESS: Yes. There were

110

1 some exemptions that were approved.
2 BY MR. DIEHL:
3    Q.    Can you describe the committee's
4 consideration or discussion?
5       MS. McGRAW: Object to the form.
6    Q.    Well, just to break it down.
7 The committee's consideration, would that
8 involve discussing the request?
9    A.    Yes.
10   Q.    And the criteria that are listed
11 here on Exhibit 16, there's bullet points
12 there. Do you see those?
13   A.    Yes.
14   Q.    I guess it calls them factors,
15 but when I say criteria, I mean factors. Does
16 that make sense?
17   A.    Yes.
18   Q.    Okay. So the factors here that
19 are listed, the committee would -- would
20 review and discuss those factors, correct?
21   A.    Yes.
22   Q.    And then the committee -- how

111

1 would the committee make decisions?
2    A.    The committee would make
3 decisions based on what was written on the
4 religious request.
5    Q.    Well, was -- how would -- how
6 would the committee decide whether it had
7 reached a decision?
8    A.    I don't remember.
9    Q.    Was there a vote? Did you vote
10 on them?
11   A.    I don't remember.
12   Q.    Do you remember if there was
13 just a consensus that that kind of came about
14 during a conversation based on comments?
15   A.    Consensus, yes.
16   Q.    And then if you turn to slide 17
17 of Exhibit 1, I asked you about this -- this
18 step five in the exemption process, but just
19 to make sure I recall correctly, you don't
20 know of any request that you forwarded as a
21 designated HRB panelist to operations?
22   A.    In the Vax Trax system you could

112

1 indi -- indicate approve or deny or need
2 additional information. After you indicated
3 that, I don't know where the form went. I
4 don't know.
5    Q.    And if you indicated needs more
6 information, is it your understanding that the
7 employee would receive a notification that
8 there was a need for more information?
9    A.    Yes.
10   Q.    Entering into Vax Trax as I read
11 slide 17, is that -- that's step six. Is that
12 what -- is that your understanding?
13   A.    Yes.
14   Q.    If the team members submitted
15 additional information as referenced on step
16 seven there, what happened then?
17   A.    Then the request would be -- so
18 the team member would only submit additional
19 information if their request was denied, or
20 the team member could provide additional
21 information if they wanted any -- any
22 information that they wanted to with their

113

1  request.
2      Q.    How would they know what
3  additional information they needed to submit?
4  Do you know?
5              MS. McGRAW:  Object to the form.
6              THE WITNESS:  No, I don't know.
7  BY MR. DIEHL:
8      Q.    Did the committee explain when
9  it denied an exempt request?  Did it explain
10 to the employee the reasons for the denial?
11             MS. McGRAW:  Object to the form.
12             THE WITNESS:  I don't remember.
13     Q.    Did -- did you, as an individual
14 member of the committee, did you provide any
15 explanation to employees who were denied as to
16 why their request for religious exemption was
17 denied?
18             MS. McGRAW:  Object to the form.
19             THE WITNESS:  No, I did not.
20 BY MR. DIEHL:
21     Q.    And do you recall that some
22 exemption requests were denied because there

114

1  was information missing?
2              MS. McGRAW:  Object to the form.
3              THE WITNESS:  I don't remember.
4      Q.    If we go back to slide 16 in
5  Exhibit 1, one of the criteria that's listed
6  is how long the team member -- and I'm adding
7  team member for today, but how long the team
8  member has held the belief.  Do you see that?
9      A.    Yes.
10     Q.    Were there any requests where
11 the employee did not discuss how long they'd
12 held the belief?
13             MS. McGRAW:  Object to the form.
14             THE WITNESS:  I don't remember.
15 BY MR. DIEHL:
16     Q.    If an employee had not addressed
17 any one of these -- the issues discussed in
18 any of these bullet points on page 16 of
19 Exhibit 1, were they informed that they had
20 not addressed an issue that was important to
21 the committee's consideration?
22     A.    I don't remember.

115

1      Q.    And then you don't remember, you
2  don't remember, but they might have been or
3  you don't believe that they were informed of
4  information, specific information that was
5  missing?
6      A.    They were informed if the form
7  was not completed.  Was not complete if they
8  had not answered the two questions that were
9  asked.
10     Q.    If they answered both questions,
11 but they hadn't addressed these factors that
12 are referenced on slide 16, would they be
13 informed of that information, that what --
14 what was missing with respect to the factors
15 listed on slide 16?
16     A.    I don't remember.
17     Q.    You don't believe so or you
18 don't recall they might have been?
19     A.    I don't -- I don't remember.
20 I -- I don't remember.
21     Q.    The communications that
22 employees received related to the religious

116

1  exemption requests in 2021 were through the
2  Vax Trax system, correct?
3      A.    Correct.
4      Q.    And so if there was information
5  that was communicated to them about their
6  denial, that would have been provided to them
7  through the Vax Trax system?
8      A.    Yes.
9      Q.    Back to step seven on slide 17,
10 the next page, I believe.  If -- if a team
11 member submitted information -- I'm sorry.
12 You may have answered this, but what would
13 happen if a team member submitted additional
14 information in response to a denial?
15     A.    They would reenter their
16 request.
17     Q.    And then that request would --
18 would --- what would happen with the request
19 after they put any information into the Vax
20 Trax system?
21     A.    Their request would be reviewed
22 again.

117

1    Q.    And it would -- who would be
2    reviewed by?
3    **A.    It randomly is assigned to**
4    **someone on the committee.**
5    Q.    Do you know if it was assigned
6    to the same vaccine committee member that
7    reviewed their -- their exemption request the
8    first time?
9    **A.    I don't remember.**
10    Q.    When you were reviewing requests
11    in 2021 as part of the committee, do you
12    recall reviewing additional information
13    submitted by an employee for an exemption
14    request that you had previously reviewed?
15    **A.    I don't remember.**
16    Q.    You might have or you don't
17    remember ever doing that?
18         MS. McGRAW: Objection.  Asked
19    and answered.
20         THE WITNESS:  I don't remember.
21    It's 2021.  I -- I don't remember.
22    BY MR. DIEHL:

118

1    Q.    As you were a member of the
2    committee, what did you understand the
3    consequence to be if an employee failed to
4    comply with the COVID vaccine requirement and
5    they were not granted an exemption?
6    **A.    The employee may be terminated**
7    **from their role.**
8    Q.    Did you -- did you think about
9    that as part of your work on the exemption
10    committee?
11    **A.    Think about what?**
12    Q.    Well, the potential consequences
13    for the employee if their request was denied?
14    **A.    I don't remember.**
15    Q.    It wasn't something that was
16    important to your review?
17         MS. McGRAW: Objection to form.
18         THE WITNESS: I -- I don't
19    remember.
20    BY MR. DIEHL:
21    Q.    Was this -- was this being a
22    part of this committee, was this a big part of

119

1    your job in terms of the time that it took in
2    2021 while the committee was meeting?
3    **A.    Rephrase that.**
4    Q.    How many hours -- what was your
5    normal work schedule in 2021?
6    **A.    I don't remember.**
7    Q.    Did you work full time?
8    **A.    Yeah, full-time employee.**
9    Q.    Okay.  So did you work more than
10    40 hours or less than 40 hours or around 40
11    hours a week?
12    **A.    More than 40 hours.**
13    Q.    And do you recall how much of a
14    workweek in the fall of 2021 did you spend
15    working on the exemption committee and your --
16    and your duties related to that as opposed to
17    your normal duties?
18    **A.    I don't remember.**
19    Q.    Would you remember if it was the
20    majority of your time?
21    **A.    I don't remember.  I -- I cannot**
22    **tell you how many hours per week that was**

120

1    **dedicated to reviewing religious exemptions.**
2    Q.    I guess I'm not asking for a
3    number of hours.
4    **A.    Or time.**
5    Q.    Do you know that if it was more
6    than half your time?
7    **A.    I don't remember.**
8    Q.    Was it more than one day a week
9    during the fall of 2021?
10         MS. McGRAW: Object to the form.
11         THE WITNESS: Yes.
12    Q.    And do you know -- do you recall
13    if it was your work for the exemption
14    committee in the fall of 2021 was more than
15    two days of work per week?
16    **A.    I don't remember.**
17    Q.    So some -- some amount between
18    one and two days?
19    **A.    More than one day.**
20    Q.    But it could have been more than
21    two days per week?
22    **A.    I don't remember.**

121

1    Q.    And as you sit here today, you
2 don't remember whether you thought about
3 employees who might be fired if their requests
4 were denied while you were doing that work for
5 the committee?
6    A.    I don't remember.
7    Q.    But you're aware that that was a
8 possibility if requests were denied?
9    A.    I was aware.  Yes, I was aware.
10        MR. DIEHL:  Maybe a good time
11 for lunch?
12        MS. McGRAW:  Yeah.
13        (Off the record.)
14 BY MR. DIEHL:
15        MR. DIEHL:  So we just took
16 lunch and we're back on the record.  I'm going
17 to ask -- obviously continue the deposition,
18 but I just want to put on the record that I'm
19 concerned about counsel's behavior and
20 improper objections during the morning that
21 appear designed to impact the witness'
22 testimony and seem to have, in fact, impacted

122

1 the testimony at certain points.  And so I
2 note that for the record and I hope that such
3 behavior will stop in the afternoon.
4        MS. McGRAW:  I assume that's
5 directed to me, and I would say that there's
6 nothing improper about the objections.  It's
7 required that you make the objection on the
8 record when they're waived.  Tried to limit
9 the objections to form, which is what I asked
10 you to do during your chance at defending a
11 deposition and you refused.
12        MR. DIEHL:  Done?
13        MS. McGRAW:  Yes.
14 BY MR. DIEHL:
15    Q.    All right.  We talked briefly
16 about a spreadsheet that included the reasons
17 why requests were denied.  Do you recall that
18 testimony from this morning?
19        MS. McGRAW:  Object to the form.
20 Mischaracterizes.
21        THE WITNESS:  Yes.
22 BY MR. DIEHL:

123

1    Q.    So there was a spreadsheet that
2 exists that was created in 2021 that includes
3 the reasons why members of the committee
4 denied particular request for exemption
5 submitted by employees; is that correct?
6    A.    No.  The spreadsheet --
7        MS. McGRAW:  I'm going to stop
8 you.
9        THE WITNESS:  Okay.
10        MS. McGRAW:  And he may
11 disagree, but I do not want you to disclose
12 anything about a spreadsheet that was created
13 and maintained at the direction of counsel.
14 It's on our privilege.
15        MR. DIEHL:  I don't have your
16 privilege log.
17        MS. McGRAW:  You do have my
18 privilege log.
19 BY MR. DIEHL:
20    Q.    With respect to -- well, counsel
21 has instructed you not to answer about a
22 spreadsheet or the contents of the

124

1 spreadsheet.  Are you going to follow that
2 instruction?
3    A.    Yes.
4    Q.    And just want to be clear.  I'm
5 asking you about a spreadsheet that was
6 referenced earlier that included, you know,
7 notations or information regarding the reason
8 why different employee exemption requests were
9 denied.  Do you understand that's what I'm
10 talking about?
11    A.    I understand that's what you're
12 talking about.
13    Q.    And are you going to follow
14 counsel's instruction not to discuss that
15 spreadsheet?
16        MS. McGRAW:  I think you just
17 cut her off.
18    Q.    Sorry.  I didn't mean to.  Go
19 ahead.
20    A.    Yes.  I'm going to follow
21 counsel's instructions.
22    Q.    Mark another exhibit.  What

Transcript of ████████████████

Conducted on August 28, 2024

125

1 number are we on?

2       THE REPORTER:  Eighteen.

3       (████████ 18, (Highly

4 Confidential)-Email sent on 9.3.2021-from

5 Qualtrics Religious Exemption to UVA HR Health

6 Screenings-Pre-Hire Religious Request, marked

7 for identification.)

8    Q.    Do you recognize Exhibit 18?

9       MR. KIRSNER:  Do you have an

10 additional copy?

11       MS. McGRAW:  Oh, I'm sorry.

12 It's one big stack.

13       MR. KIRSNER:  Appreciate it.

14       THE WITNESS:  I don't remember

15 this.

16 BY MR. DIEHL:

17    Q.    Now, it looks like on its face,

18 do you see that this is an email sent on

19 September 3rd, 2021?

20    A.    Yes.

21    Q.    And do you know what Qualtrics

22 Vaccine Exemption, what that references?

126

1    A.    I do not.

2    Q.    And then it says, it's two UVA

3 HR health screenings, and then there's an

4 email address of

5 uvahrhealthscreening@virginia.edu.  Do you --

6 do you recognize that email address?

7    A.    I do not.

8    Q.    Do you know -- are you aware

9 that applicants who submitted requests for

10 religious exemption related to the job they're

11 applying for, that information was submitted

12 through the Qualtrics system?

13    A.    I do not.

14    Q.    Do you recall reviewing any

15 exemption requests in 2021 as part of your

16 work for the committee related to an

17 applicant?

18    A.    No, I do not.

19    Q.    And, again, there's information

20 that's been redacted that, for example, where

21 it says requester information and then there's

22 a number 126 at the bottom.  I'm just

127

1 representing, counsel, to confirm that that

2 was provided by or that was done by UVA's

3 lawyers related to this case.  So that number

4 126 at the top and that requester information

5 wasn't there.  Do you understand that?

6    A.    I don't see where you're

7 referring to 126.

8    Q.    At the very top in the left hand

9 corner of the document.

10    A.    Yes.

11    Q.    So, yeah, that number -- I

12 understand that number was added by UVA's

13 lawyers, and then as where the boxes here that

14 say requester information, does that -- does

15 that make sense to you?

16    A.    That it was added?

17    Q.    Yes.

18    A.    Yes.

19    Q.    Okay.  And then if you go down,

20 there's a list of -- of questions here, and

21 I'm just going to point you to the question.

22 Actually, question two on the first page of

128

1 Exhibit 18.  Do you see that Q2?

2    A.    Yes.

3    Q.    And it says, please select the

4 exemption you're requesting, and then it says

5 religious there.  And do you understand -- do

6 you understand what this information is after

7 reviewing that question or the others in this

8 Exhibit 18?

9       MS. McGRAW:  Object to the form.

10       THE WITNESS:  Yes.  I -- I see

11 what the form is.  What it entails.

12    Q.    And what -- where did these

13 questions come from?

14       MS. McGRAW:  Object to the form.

15 Go ahead.

16       THE WITNESS:  This form is used

17 for team members, which are UVA Health

18 employees.  So I am not familiar with this

19 form.

20 BY MR. DIEHL:

21    Q.    So but the questions themselves,

22 do you understand that the -- do you have any

129

1  reason -- well, it's my understanding that the
2  questions here are, where it says Q1, or
3  excuse me.  It says Q4 on the first page of
4  Exhibit 18, and then the -- the -- then it
5  goes down to Q14 on the second page that has
6  Bates labeled 6765.  Do you see that?
7      A.    Yes.
8      Q.    And I'm not talking about the
9  information in -- below the question, but the
10 bold questions or -- or requests related to
11 right after the Q and then there's a number.
12 Do you understand that information is the
13 information that UVA required employees to
14 provide when they were seeking a religious
15 exemption request?
16        MS. McGRAW:  Object to the form.
17 Mischaracterizes.
18        THE WITNESS:  Yes.
19 BY MR. DIEHL:
20     Q.    So we were looking earlier at
21 Exhibit 17, the Vax Trax printout.  Tell me
22 when you've got that in front of you.  And

130

1  then at the bottom of the first page where it
2  says religious belief comment.
3      A.    On which document?  On 18?
4      Q.    On Exhibit 17.
5      A.    Okay.
6      Q.    And then you see on the first
7  page the bottom row where on the left it says
8  religious belief comment?
9      A.    On Exhibit 18?
10     Q.    Exhibit 17.
11     A.    Yes.
12     Q.    Yes.  So you see religious
13 beliefs comment at the bottom left of Exhibit
14 17?  Page --
15     A.    Yes.
16     Q.    And then if you go to Exhibit 18
17 and go to the second page that has a Bates
18 label at the bottom of 6765.  And then if you
19 could look at Q12.  Do you see that?
20     A.    Yes, I do.
21     Q.    And do you understand that Q12
22 was listed in bold on Exhibit 18 is the

131

1  question that was posed related to religious
2  belief comment on Exhibit 17?
3        MS. McGRAW:  Object to the form.
4        THE WITNESS:  Exhibit 18 is not
5  a document that I am familiar with.  This --
6  I'm not familiar with this document.  It was
7  not used by the committee.  The committee used
8  Exhibit 17.  I am not familiar with the UVA.
9  I mean, with the Qualtrics form.
10     Q.    So I'm not -- I guess I'm not
11 asking about the whole form.  I'm just asking
12 about Q12.
13     A.    Okay.
14     Q.    That's listed on the second page
15 of Exhibit 18.
16     A.    Yes.
17     Q.    So read Q12.  Just the bold
18 portion, please, and tell me when you're done
19 reading that.
20     A.    I'm done.
21     Q.    Okay.  Does that refresh --
22 we're just reading Q12 on the second page of

132

1  Exhibit 18.  Refresh your memory regarding
2  what question employees answered when they
3  filled out the information on Vax Trax related
4  to religious belief comment such as at the
5  bottom of the first page of Exhibit 17?
6      A.    Yes.
7      Q.    And so the -- so the bold
8  language next to Q12 is the -- the religious
9  belief comment question?
10     A.    Because -- because the question
11 is not listed, so what I don't know is the
12 religious belief comment and -- and Q12 are --
13 are related.  In that -- since the question --
14 there isn't a question above religious belief
15 comment.  Since the question isn't above it, I
16 am not sure that that is the question, that
17 Exhibit 17.  I don't know that there's a
18 correlation because I don't see a question
19 before it.  Are you -- unless you are --
20 unless you are saying that exhibit -- Exhibit
21 18 is the information that it coincides with
22 Exhibit 17.  I would need to know the

Case 3:22-cv-00075-RSB-JCH   Document 265-5   Filed 02/14/25   Page 36 of 93
Pageid#: 11099
Transcript of
Conducted on August 28, 2024

34 (133 to 136)

**133**

1 correlation. Does that -- am I making sense?

2      Q.    Well, I guess I'm not saying

3 anything. I'm trying to ask you and I was

4 trying to refresh your recollection of what

5 the question was that UVA posed related to the

6 religious belief comment portion of the -- of

7 the form, of the Vax Trax form or what was --

8 excuse me. What employees were prompted to

9 respond to when they're filling out that form?

10     **A.**    **Yeah. So Vax -- Vax Trax and**

11 **Qualtrics are two different tools. So you're**

12 **saying that you have a Qualtrics form and then**

13 **I'm looking at a Vax Trax form. And what I'm**

14 **saying is I don't know if those two are**

15 **relative to each other because the information**

16 **that you provided in Exhibit 17, I understand**

17 **that all the filters are not there, so.**

18      Q.    Would you have an understanding

19 that the questions that were asked of

20 applicants related to requests for exemption,

21 do -- do you know if those questions were

22 different than the questions that were posed

**134**

1 to employees who filled out and provided

2 information in the Vax Trax system?

3     **A.**    **I do not know. I was not on**

4 **that review. I didn't review pre-hire**

5 **religious request.**

6      Q.    If you could look at Q13 on the

7 second page of Exhibit 18. Just talking about

8 the bold information there that says, please

9 describe why this principle tenant or belief

10 conflicts with or precludes you from receiving

11 a vaccination, immunization, et cetera. While

12 it is from the Qualtrics system, does that --

13 reading that Q13 on the second page of Exhibit

14 18, does that your -- does that refresh your

15 memory with respect to what employees were

16 prompted to provide with respect to the

17 religious conflict comment portion of the Vax

18 Trax system?

19     **A.**    **Yes.**

20      Q.    And so that religious conflict

21 box on the left side of the second page of

22 Exhibit 17 where it says religious conflict

**135**

1 comment all thrown together there. Do you see

2 that?

3     **A.**    **Yes.**

4      Q.    So employees would be responding

5 to the question or request posed by Q13 on the

6 second page of Exhibit 18?

7     **A.**    **I -- I don't understand. Can**

8 **you rephrase? So I'm -- I'm sensing your**

9 **frustration.**

10      Q.    No. No. I'm just trying to

11 understand how to -- how to ask the question.

12     **A.**    **Well --**

13      Q.    You just don't remember the

14 questions that were asked at all? In -- in --

15     **A.**    **No.**

16      Q.    -- in the prompt, sorry. That

17 prompted employees to fill out the religious

18 belief comment and religious conflict comment

19 on the Vax Trax system.

20     **A.**    **So on Exhibit 18, Q12 and Q13,**

21 **yes. Those are the questions. However, you**

22 **have provided Exhibit 17, a document that it**

**136**

1 **says religious belief comment. It -- it does**

2 **not tell me that that is related to Q12 and**

3 **one is related to Q13. That's all I'm saying.**

4 **I'm -- I'm comparing.**

5      Q.    Yeah. I'm not asking you to --

6 to -- to testify that -- that Q18, Exhibit 18,

7 you know, specifically talks about that. I'm

8 just trying to use those questions that are

9 listed there to refresh your memory about what

10 questions were posed to employees so that they

11 would then fill out the religious belief

12 comment and religious conflict comment in the

13 Vax Trax system. So does that explain, I

14 guess --

15     **A.**    **Yes.**

16      Q.    -- does that make sense?

17     **A.**    **Yes, it does.**

18      Q.    Okay. So with that preface and

19 knowing it was in a different system, does the

20 bold language next to Q12 on the second page

21 of Exhibit 18, is that the language that

22 prompted employees to fill out the religious

137

1  belief comment information in Vax Trax?
2      A.    Yes.
3      Q.    And with respect to Q13 and just
4  the bold language right after Q13 on Exhibit
5  18, does that refresh your memory that that
6  bold language, that sentence, is that the
7  prompt that employees were given through the
8  Vax Trax system when they had to fill out the
9  religious conflict comment box?
10     A.    Yes.
11     Q.    Do you recall whether when --
12 when you filled out information in the Vax
13 Trax system, did you put your initials when --
14 when you performed an action, did you -- did
15 you put -- type your initials into the Vax
16 Trax system?
17     A.    I don't remember.
18     Q.    I haven't seen it and obviously
19 I -- I just -- in the documents that were
20 produced, but do you know if there's some
21 other way to determine which religious
22 exemption requests were assigned to you?

138

1  Never mind.  Strike that.
2      Do you know if there's a document that
3  exists that shows what your ID number was in
4  the Vax Trax system?
5      A.    Is there a document -- I'm
6  sorry.  Can you repeat the question?
7      Q.    Sure.  So if you go take Exhibit
8  17 from the Vax Trax system, and if you go to
9  the page that has the number at the bottom of
10 3040 and -- and do you see at the bottom
11 there's a new table that begins with the black
12 separator bar there that has S-T-R-U-C-T-M.
13 Do you see that?
14     A.    Yes.
15     Q.    And then going to three boxes
16 down it says change by ID?
17     A.    Yes.
18     Q.    It's my understanding that the
19 number listed by the change by ID is the -- is
20 the employee that changed the information or
21 did something in Vax Trax.  Is that your
22 understanding?

139

1      A.    I don't know.  I don't remember.
2      Q.    And you don't -- as you sit
3  here, you don't remember if 17192 was your Vax
4  Trax's ID number?
5      A.    No.
6      Q.    And then if you continue with
7  the table that begins on 3040, if you continue
8  down and you see that table continues on 3041,
9  3042, and then there's a break in between
10 tables on 3043.  Do you see that?
11     A.    Yes.
12     Q.    And then there's a religious
13 review comment.  Do you see that box at the
14 top of Bates label, page 3043 in Exhibit 17?
15     A.    Yes.
16     Q.    And it has the dear applicant.
17 Do you see the language there?
18     A.    Yes.
19     Q.    Now, I've seen some of these.
20 I'll just represent to you that I've seen some
21 of these that have an initial after this
22 communication and some that don't.

140

1      MS. McGRAW:  Objection to the
2  mischaracterization.
3      MR. DIEHL:  Well, you know,
4  counsel, you were there yesterday and you
5  looked at them.  So what am I misrepresenting?
6      MS. McGRAW:  I think ████ was
7  clear that you saw initials when it was in the
8  admin comment field.
9  BY MR. DIEHL:
10     Q.    If you go to the last page of
11 Exhibit 17, there's a -- there's a religious
12 review comment that is the second to last row
13 on the left, and then there's a religious
14 admin comment.  Do you know what the
15 difference is between those two boxes?  Box --
16 excuse me.  Do you know what the difference --
17 well, let me just ask that again.  I use --
18 missed my verbs on it.
19     Do you know of any differences between
20 what the religious review comment information
21 is and the religious admin comment information
22 is?

141

1    A.    I don't remember. So the
2 difference between a religious review comment
3 and a religious admin comment?
4    Q.    Yes.
5    A.    The difference between the two?
6 Yeah. I mean, the religious review comment
7 looks like -- like a standard response to the
8 requester, and the religious admin comment
9 appears that some additional information was
10 received about the request or that the
11 requestor provided some additional
12 information.
13    Q.    Do you know that, or are you
14 just reading the language and speculating?
15    A.    I guess I'm speculating.
16    Q.    Do you see that where it says
17 12162▮
18    A.    Yes.
19    Q.    And I understand that that's
20 ▮▮▮▮▮▮▮▮     from testimony we had
21 yesterday. Does that sound correct to you?
22    A.    Yes.

142

1    Q.    Do you recall in -- did you ever
2 fill out the religious admin comment field in
3 Vax Trax?
4    A.    I don't remember.
5    Q.    Did ▮▮▮▮▮▮▮▮▮ have a
6 different role on the committee than your role
7 on the committee, to your knowledge?
8    A.    Not that I'm aware of. No.
9    Q.    Was ▮ more -- did ▮ -- do
10 you know if ▮ did more administrative
11 functions related to the committee's work than
12 you did?
13    A.    I don't remember.
14    Q.    If you could go to the first
15 page of Exhibit 17 and read the religious
16 belief comment starting at my -- ignore the
17 attached language in the first sentence, but
18 starting with the second sentence that says,
19 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ and
20 continue until the end of that box where it
21 says, ▮▮▮▮▮▮▮▮▮ at the top of the
22 second page and just read that to yourself and

143

1 tell me when you're done.
2        MS. McGRAW: Sam, can we take a
3 moment? Neither one of us seems to have
4 Exhibit 17.
5        MR. KIRSNER: Was that a
6 yesterday exhibit?
7        MR. DIEHL: No. I handed it to
8 you today.
9        MR. KIRSNER: For some reason I
10 don't have that on my stack.
11        MS. McGRAW: I found mine. It's
12 at the top.
13        MR. KIRSNER: Okay.
14        MR. DIEHL: So yeah.
15        MS. McGRAW: Apologies.
16 BY MR. DIEHL:
17    Q.    You could keep reading that and
18 tell me when you're done.
19    A.    I'm done.
20    Q.    So as you understand it, this
21 person would be responding to a description of
22 their religious principle, tenet, or belief

144

1 related to their request for an exemption. Is
2 that fair?
3    A.    Yes.
4    Q.    And then if you could review the
5 next box and the information in that box
6 related to the religious conflict comment and
7 tell me when you're done with -- done reading
8 that.
9    A.    Okay. Okay. I'm done.
10    Q.    And whether you reviewed this
11 earlier and recall that or just
12 hypothetically, I want you to -- to based on
13 your review of that information, tell me
14 whether the information would be complete
15 based on your criteria that you used as a
16 exemption committee member in 2021?
17        MS. McGRAW: Objection.
18 Compound. Calls for speculation.
19    Q.    Well, let's just ask about that.
20 First of all, the religious conflict comment.
21 The employee would be answering the prompt
22 next to Q13 on Exhibit 18 that says, please

145

1  describe why this principle tenet or belief
2  conflicts with or precludes you from receiving
3  a vaccination, immunization, et cetera. Do
4  you see that?
5      A.    Yes.
6      Q.    And when the employee provided
7  the information that's in the box next to
8  religious conflict comment, the prompt Q13
9  from Exhibit 18 is what that employee would
10 have been responding to; is that correct?
11     A.    Yes.
12     Q.    So and in 2021 you, as part of
13 your work on the religious exemption
14 committee, actually reviewed religious belief
15 comments and religious conflict comments
16 similar to or at least the same format as is
17 shown on Exhibit 17, correct?
18     A.    Correct.
19     Q.    And I'm not asking -- well, do
20 you recall if you reviewed this specific
21 request in 2021?
22     A.    I don't remember.

146

1      Q.    But whether you actually
2  reviewed it or whether it's just hypothetical,
3  I want you to -- after reading this
4  information, I want you to talk about how you
5  would have evaluated this in 2021. Do you
6  understand that?
7      A.    I do understand.
8            MS. McGRAW: Object to the form.
9  Calls for speculation.
10     Q.    Well, you -- you recall and
11 testified earlier about the process you used
12 for reviewing religion exemption requests,
13 correct?
14     A.    Yes.
15     Q.    So I just want you to use that
16 -- those same criteria. And I want you to
17 explain based on what you meant by complete
18 earlier is -- is the information and provided
19 by the employee in the box that starts at the
20 bottom of page one of Exhibit 17 and continues
21 on to the second page and then in the second
22 box below, would that information have been

147

1  considered complete based on that same
2  criteria you used in 2021?
3            MS. McGRAW: Same objection.
4  Extent you're asking ███ to recreate a thought
5  process from three years ago.
6            MR. DIEHL: Counsel, stop doing
7  that. You cannot tell the witness about their
8  recollection. You cannot prompt the witness
9  and you cannot instruct the witness. You're
10 interfering with the testimony intentionally,
11 and you can't do it. That's not proper
12 objection.
13            MS. McGRAW: Your questions are
14 improper. I can make my objections.
15            MR. DIEHL: That's not a proper
16 objection. You were just lecturing me about
17 your -- your form. You know, you're going to
18 make everything form. So if you want to
19 object to the form, if there's a proper form
20 objection, that's fine, but don't try to
21 prompt the witness anymore. Do you
22 understand, counsel?

148

1            MS. McGRAW: I will make my
2  objections, Sam.
3  BY MR. DIEHL:
4      Q.    All right. So I think we have
5  to ask that again.
6            Using the same criteria you would have
7  used in 2021 -- well, again, you reviewed, I'm
8  asking you a different question now. You
9  reviewed exemption requests in 2021 including
10 regarding their completeness; is that correct?
11     A.    Yes.
12     Q.    And using the same criteria you
13 used in 2021, please tell me if this request
14 as you read it is complete?
15            MS. McGRAW: Same objections.
16            THE WITNESS: Yeah. I don't
17 remember.
18     Q.    You don't remember?
19     A.    So --
20     Q.    What don't you remember? I
21 guess, what do you mean by I don't remember?
22     A.    Yeah. I mean, looking at this

149

1  information today and looking at it three
2  years ago, I -- I don't remember.  Number one,
3  I don't know that I reviewed this particular
4  request that is in front of me on Exhibit 17.
5  And three years later, I don't know or four
6  years whatever, that I would have -- that it
7  would be the same.  I mean, I don't.
8        Q.    I guess I'm not asking you to
9  remember this.
10       A.    Well --
11       Q.    I thought that was clear.  So
12 I -- I don't know whether you reviewed this
13 specific information on Exhibit 17.
14       A.    And neither do I.
15       Q.    Okay.  And so -- so just pretend
16 -- let's just assume for this that it's a
17 hypothetical question and -- and all I want
18 you to do is use the criteria regarding
19 completeness that you used in 2021 and -- and
20 look at this request and tell me whether it's
21 complete.
22             MR. KIRSNER:  Objection.  Calls

150

1  for speculation.
2             THE WITNESS:  So I can -- so
3  what I will need to do is look back at the
4  PowerPoint training.
5        Q.    Okay.  If that -- if that helps.
6  Where in the PowerPoint -- and you're
7  referring to Exhibit 1 when you say the
8  PowerPoint?
9        A.    It doesn't have a number on it,
10 so.
11       Q.    Oh, let's pause for one second,
12 and it looks like the first page is off there
13 and I think it's on the bottom of your stack
14 of documents.  Sorry.  It's a little -- a
15 little overkill of a clip, but there's a --
16 there's a clip to put that together because I
17 don't think I have a stapler that'll hold that
18 together, but so -- so again, you're looking
19 at Exhibit 1, the training PowerPoint, and can
20 you show me in Exhibit 1 where there's
21 information about completeness?
22       A.    So I am looking at page 15 of

151

1  the exemption process, and I am reviewing the
2  bullet points.
3        Q.    Okay.
4        A.    And so I think you're -- so
5  restate your question.
6        Q.    What just -- I guess you're -- I
7  think you're doing -- I just wanted you to
8  walk through the process as you would have
9  done it back then.  So I don't want to -- I
10 think you're -- you're doing that, so I don't
11 want to interrupt your description.
12       A.    So as I am reading this
13 document, I am looking for demonstrative
14 examples of the reason they are denying their
15 religious held beliefs, but also demonstrative
16 reasons as to why they are requesting
17 exemption.
18       Q.    So when -- when you look at
19 Exhibit 1, the PowerPoint presentation, what
20 -- what are you specifically referring to
21 regarding that?  The part of the process you
22 were just discussing?

152

1        A.    So I'm -- I'm looking for
2  sincerity.  I'm looking for sincerity in the
3  -- in the answers that the requester
4  submitted.
5        Q.    Where is sincerity in the
6  process in -- in Exhibit 1?
7             MS. McGRAW:  In the process are
8  you pointing to a particular page?
9        Q.    Exhibit 1 where you've brought
10 us to page 15 of the PowerPoint where it says
11 exemption process, and it looks like that
12 process -- well, the first place where it says
13 the process is on page 14 of Exhibit 1.  Do
14 you see that?
15       A.    Yeah.  So I'm -- I'm -- I have
16 read it for completeness.  I have read it
17 thoroughly to see if the requestor has given
18 examples as to why they are requesting.  I am
19 looking -- yeah.  So I'm looking for the
20 reasons.  I'm looking for the reasons why the
21 person requested an exemption.
22       Q.    And when you say I have read it,

Case 3:22-cv-00075-RSB-JCH   Document 265-5   Filed 02/14/25   Page 41 of 93
Pageid#: 11104
Transcript of ████████████████                              39 (153 to 156)
Conducted on August 28, 2024

153

1  you're referring to the -- the language on the
2  first page continuing on to the second page
3  Exhibit 17 related to religious belief
4  comments and religious conflict comments?
5      A.    Yes.
6      Q.    And then if you talked about
7  completeness, where in the -- in Exhibit 1
8  does it discuss completeness?
9      A.    So I am restating.  I am -- I am
10 looking at Exhibit 18 at the two questions.
11     Q.    Okay.  And by the two questions,
12 you mean Q12 and Q13?
13     A.    Yes.
14     Q.    And you're looking at those
15 questions with respect to the issue of
16 completeness?
17     A.    That they have the answer --
18 that they have answered the two questions.
19     Q.    And so then that's -- that's how
20 you would determine completeness?
21     A.    Well, yes.
22     Q.    Okay.  So using that criteria,

154

1  is the information listed in the religious
2  belief comment, religious conflict comment on
3  the first two pages of Exhibit 17, is that
4  complete?
5          MR. KIRSNER:  Object to the
6  form.
7          THE WITNESS:  No.
8  BY MR. DIEHL:
9      Q.    What's incomplete about it?
10     A.    That the requester doesn't
11 provide any examples or -- yeah, any examples
12 of or proof of how they carry out their
13 religious faith thoroughly, or how it would
14 impact -- how it would impact them.  And it --
15 it also doesn't indicate or nor does the
16 person share -- you don't not or any other
17 information related to as to why they are
18 requesting an exemption.
19     Q.    And if you look back at Q12 and
20 Q13 on Exhibit 18, a number of the things you
21 just mentioned don't seem to be listed in Q12
22 or Q13; is that fair?

155

1      A.    Yes.
2      Q.    Do you know if there was some
3  other document where employees were informed
4  that they needed to talk about those other
5  issues that you just referenced with respect
6  to completeness when they were answering the
7  questions at Q12 and Q13?
8      A.    Not that I'm aware of.  No.
9      Q.    So employees might have had
10 answers to those questions and just not known
11 that they were required to provide that
12 information; is that fair?
13         MS. McGRAW:  Object to the form.
14         MR. KIRSNER:  Objection.  Calls
15 for speculation.
16         THE WITNESS:  Can you restate
17 the question?
18     Q.    Sure.  So in your previous
19 answer, you talked about an employee should
20 provide examples of or proof of how they carry
21 out their religious faith.  Do you recall that
22 testimony?

156

1      A.    Yes.
2      Q.    So in Q12 and Q13, the --
3  there's nothing about -- nothing prompting an
4  employee to talk about how they live out their
5  faith; is that fair?
6          MS. McGRAW:  Object to the form.
7          THE WITNESS:  Well, it -- it
8  says beliefs.
9  BY MR. DIEHL:
10     Q.    Okay.  And -- and so employees
11 should know when it says describe their
12 belief, describe the religious belief for
13 their request, they should know that that
14 means that they need to describe how they live
15 that out?
16     A.    It -- it depends on how the
17 employee interprets it.  I -- I can't tell you
18 how an employee should or I didn't write the
19 question, right?  So I can't tell you how an
20 employee should interpret the question.  It's
21 -- every employee is different and how they
22 may interpret the question.

157

1    Q.    Well, so yeah. I'm ask -- I
2 want to ask you about your process and what
3 you did when you were reviewing applications.
4 So you did evaluate employee's requests to
5 determine whether employees talked about how
6 they live out their faith, correct?
7    A.    Yes.
8    Q.    And if a request was denied
9 because it didn't include that information,
10 you didn't provide the employee with an
11 explanation that they had not described how
12 they live out their faith in their responses
13 and that they needed to provide that in order
14 to obtain their exemption request, did you?
15    A.    No, I did not.
16    Q.    Do you know if anyone else at
17 UVA explained that problem with a request that
18 -- for employees that had that problem?
19    A.    Not that I'm aware of. No.
20    Q.    Is there anything else regarding
21 completeness that is -- that would indicate
22 that the request that is shown on the bottom

158

1 of page -- first page of 17, Exhibit 17 and
2 then continuing on to the second page, is
3 there anything else other than what you've
4 said regarding why this is not complete?
5    A.    No, there isn't.
6    Q.    And as I look through the
7 exemption process slides and you can look
8 around in Exhibit 1, but I understand it looks
9 like the exemption process is described on
10 pages 14, 15, 16, 17 and 17. I don't see
11 anything about completeness in -- in the
12 exemption process PowerPoint, Exhibit 1.
13        MS. McGRAW: Object to the form.
14 Are you referring -- I'm -- I'm just going to
15 tell you there's a problem with your question.
16 BY MR. DIEHL:
17    Q.    Well, as you look at Exhibit 1,
18 do you see anything in the PowerPoint
19 regarding the issue of completeness?
20    A.    So as I look -- as I look at the
21 document, no.
22    Q.    And then I see this -- I -- I

159

1 don't see a known religion referenced in
2 Exhibit 17 in the religious belief comment or
3 religious conflict comment. Do you -- do you
4 see one?
5    A.    On Exhibit 17, on what page?
6    Q.    Sure. On the first, you know,
7 we've been talking about the box that begins
8 -- on the first page of Exhibit 17 that begins
9 with the language, please find my -- excuse
10 me. I can't read. We've been talking about
11 the box on the bottom of the first page of
12 Exhibit 17 where the language begins, please
13 find attached my religious belief statement?
14    A.    Yes.
15    Q.    And then that box as it
16 continues on to the second page, and then the
17 information provided by the employee in the
18 box just below that, that begins with ▓▓▓▓
19 ▓▓▓▓▓▓▓▓▓▓ and then ends with
20 ▓▓▓▓▓▓▓. Do you see that?
21    A.    Yes.
22    Q.    So do you see in those two boxes

160

1 any information that an employee listed a no
2 religion?
3        MS. McGRAW: Object to the form.
4 Vague and ambiguous.
5    Q.    Let me clarify that before --
6 before you answer. If you go to Exhibit 14 or
7 I'm saying Exhibit 14. I mean Exhibit 1, page
8 14. Sorry about that. Looking at the
9 exemption process, and then there's the one,
10 two, three. And so if you were at the third
11 step in the process where a panelist such as
12 you, reviews the request, do you see that?
13    A.    Yes.
14    Q.    And then on the next page, the
15 bullet point says, if the exemption -- do you
16 see the bullet point that begins, if the
17 exemption request fits within a known category
18 and then continues?
19    A.    Yes.
20    Q.    So as you evaluate the
21 information provided on the two boxes we've
22 been discussing on Exhibit 17, does that --

161

1  those two boxes reference a known category as
2  that is used in the first bullet point on page
3  15 of Exhibit 1?
4       A.    No.
5       Q.    So the next bullet point.  The
6  next step in the exemption process would be
7  that it's -- sorry.
8       A.    Excuse me.  So this -- so -- so
9  not listed, but this list is not all
10 inclusive.
11      Q.    What do you mean this list is
12 not all inclusive?
13      A.    Well, what I'm saying is it says
14 within a known category and then it provides
15 some examples.  So I'm just saying that that
16 is not all inclusive.
17      Q.    The description of known
18 categories?
19      A.    Yes.
20      Q.    Whatever -- whatever the known
21 categories are, is it fair to say that the
22 information listed by the employee or the

162

1  information provided by the employee on those
2  boxes on Exhibit 17 does not provide
3  information regarding a known category as
4  that's used in page 15 of Exhibit 1?
5       A.    It does not.
6       Q.    Okay.  So then if I follow the
7  exemption process bullet points on page 15,
8  are -- are you there?
9       A.    Yes.
10      Q.    So the next step says if it
11 doesn't identify any religious support for the
12 belief, the exemption will be denied.  Do you
13 see that?
14      A.    Yes.
15      Q.    Now, as you use that criteria as
16 the next step, does the information provided
17 by the employee and those boxes, those two
18 boxes on Exhibit 17, does that identify
19 religious support for the employee's beliefs
20 using the criteria you would have used in
21 2021?
22            MR. KIRSNER:  Object to the

163

1  form.  Calls for speculation.
2            THE WITNESS:  No.
3  BY MR. DIEHL:
4       Q.    It does not identify it -- well,
5  no.  I guess, what do you mean by, no?  Like,
6  can you explain that?
7       A.    Well, yes, it does identify.
8  Excuse me.
9       Q.    Okay.  And then because it does
10 identify rel -- some religious support, then
11 that means it would be forwarded to the
12 committee; is that correct?  Using the bullet
13 points on Exhibit 15 or excuse me.
14      A.    Yes.
15      Q.    Let me -- let me ask you a
16 better question because I said the wrong
17 thing.
18            Using the bullet points on page 15 of
19 Exhibit 1, the next step having identified
20 some religious support, that would have been
21 forwarded to the committee for discussion; is
22 that correct?

164

1       A.    Yes.  Well, not forward it, but
2  whatever -- whatever HRBP was assigned to this
3  particular one, they would bring it to the
4  meeting for further discussion.
5       Q.    It wouldn't necessarily have
6  been forwarded, but it would have been
7  discussed by the committee?
8       A.    Yes.
9       Q.    And then it looks like on page
10 16 of Exhibit 1, are you there?
11      A.    I'm there.
12      Q.    Is this how the committee would
13 -- is this the process that the committee
14 would use to evaluate exempt requests that
15 were considered by the committee?
16      A.    Yes, but what was missed if the
17 requestor submitted this type of request and
18 in looking at the second bullet point, they
19 also had an opportunity to submit additional
20 information.
21      Q.    Okay.  Well, I'll get to that
22 because -- but, you know, in Vax Trax if we

165

1  look at this, this looks like the first entry.
2  It says August 26. So as I read Exhibit 17
3  and you feel free to look at it and tell me if
4  I'm wrong, but it looks like the boxes we've
5  been talking about would have been the first
6  information the employee provided as part of
7  their request for religious exemption. Is
8  that a fair understanding of the boxes at the
9  bottom of page one of Exhibit 17 and
10 continuing on to page two of Exhibit 17?
11 **A.    Yes.**
12    Q.    And so they might have been able
13 to provide information later, but the
14 information they provided, that's what the
15 employee provided. Is that a fair
16 understanding of Exhibit 17?
17 **A.    Yes.**
18    Q.    And, again, you reviewed
19 information like this. Whether or not you
20 reviewed this Exhibit 17 information, you
21 reviewed information like this regularly as
22 part of your work for the exemption committee

166

1  in 2021?
2  **A.    Yes.**
3     Q.    And the committee would have
4  considered the criteria in the three bullet
5  points or excuse me, factors in the three
6  bullet points; is that correct?
7  **A.    Correct.**
8     Q.    And using that criteria, does
9  the request and information shown in Exhibit
10 17 in the boxes we've been discussing, does
11 that provide the information sufficient to
12 grant this request based on the criteria that
13 was used in 2021?
14        MS. McGRAW: Object to the form.
15 Calls for speculation.
16        THE WITNESS: I can answer now?
17    Q.    Yes.
18        MS. McGRAW: Yeah, you can
19 answer if you can.
20        THE WITNESS: No.
21    Q.    What's missing? Or what's I
22 guess, what do you -- why does it not meet

167

1  those criteria? To ask a broader question.
2  And again, I'm asking you to use -- applied
3  those criteria listed on page 16 of Exhibit 1
4  in the same way you would have used the
5  criteria in 2021 as part of the committee's
6  work?
7        MS. McGRAW: Are you limiting
8  ▮▮ to those criteria?
9        MR. DIEHL: Well, that's the
10 question I'm asking counsel.
11        MS. McGRAW: Object to the form.
12        MR. DIEHL: Why don't we have a
13 standing objection to the form for every
14 question since you do it every time.
15        MS. McGRAW: I don't think I do
16 it every time, Sam.
17        MR. DIEHL: Do you want to just
18 do that? Just have a standing objection form?
19        MS. McGRAW: I just I want to
20 make --
21        MR. DIEHL: I'm not joking,
22 counsel. You're -- you seem to be laughing.

168

1  I'm not joking.
2        MS. McGRAW: Sam, I wanted to
3  make sure I understood your question. You
4  replied, you told me what the question was,
5  and I'm telling you that I object to the
6  question. If you want to rephrase the
7  question because of my objection, you can do
8  that.
9        MR. DIEHL: I don't need to.
10 It's a proper question, counsel, but you
11 obviously confused the witness or prompted the
12 witness not to answer or recall. So I'll ask
13 the question again.
14 BY MR. DIEHL:
15    Q.    My question is -- well, do you
16 understand that the question I'm about to ask
17 relates to applying the criteria or factors
18 listed on page 16 of Exhibit 1 as you would
19 have applied them in 2021 as part of your work
20 for the committee? Do you understand that
21 premise?
22 **A.    Yes.**

Case 3:22-cv-00075-RSB-JCH    Document 265-5    Filed 02/14/25    Page 45 of 93
Pageid#: 11108
Transcript of ▇▇▇▇▇▇▇▇▇
Conducted on August 28, 2024    43 (169 to 172)

169

1    Q.    Okay.  So looking at the
2  information provided to the employee on the
3  first page and continuing on to the second
4  page of Exhibit 17, you indicated that the
5  employee does not meet those criteria or can
6  you explain what -- what -- well, just can you
7  explain how you would have applied those
8  criteria?
9    **A.    So this particular request, this**
10 **particular request does not give -- it does**
11 **not give, number one, the -- the religion that**
12 **they are associated with.  The person did**
13 **incorporate some Bible verses, but it does not**
14 **have the religion that they firmly believe in.**
15 **And it -- it also doesn't give -- let's see.**
16 **Yeah, is -- it is -- it is written very**
17 **generally.  So it doesn't really go into**
18 **detail as to why they would not -- why they**
19 **are requesting the exemption.**
20   Q.    Any -- any other problems with
21 this with respect to approval using the
22 criteria on page 16 of Exhibit 1?

170

1    **A.    No.**
2    Q.    And religion associated with --
3  when you say religion, do you mean religious
4  denomination or particular label of their
5  faith?
6    **A.    Yes.**
7    Q.    And ignoring the other issue you
8  mentioned that not identifying the religion
9  associate -- the religion with which they are
10 associated that made this, that this would be
11 required to be denied based on that criteria?
12        MS. McGRAW: Object to the form.
13   Q.    Let me ask it again.  Just
14 ignoring anything else that might be deficient
15 with this request, you mentioned that one of
16 the issues or that -- that could result in
17 denial was that this didn't identify the
18 religion this individual was associated with;
19 is that fair?
20   **A.    Yes.  Yes.**
21   Q.    And if there were no other
22 issues, would that have been sufficient to

171

1  deny this request?
2        MS. McGRAW: Object to the form.
3        THE WITNESS:  I -- I don't know.
4  I mean, again, I don't know.
5  BY MR. DIEHL:
6    Q.    It might have been.  It might
7  not have been.  You're not sure?
8    **A.    I'm not sure.**
9    Q.    And then you also mentioned that
10 this is written very generally.  What did you
11 mean by that?
12   **A.    Well, it -- the request itself,**
13 **it doesn't elaborate on -- it doesn't**
14 **elaborate on lifestyle.  It doesn't elaborate**
15 **on -- yeah.  It's -- it's just -- it's just**
16 **very -- it's just very general.  So they're --**
17 **it -- it doesn't give or it doesn't share how**
18 **-- even how they've handled previous lifestyle**
19 **changes or lifestyle choices.**
20   Q.    What do you mean by lifestyle
21 choices?
22   **A.    So in terms of lifestyle**

172

1  **choices, in terms of diet, in terms of other,**
2  **you know, if they do or they don't take any**
3  **other medications for healing.**
4    Q.    It doesn't indicate that I guess
5  the opposite isn't included in here; is that
6  correct?  Like, it doesn't say I don't take
7  care of my body or I -- do you know -- do you
8  know what I'm asking?
9    **A.    I know what you're asking.**
10   Q.    So is the opposite of what you
11 were just saying in here, is there any
12 indication that this person doesn't -- does
13 not make healthy lifestyle choices or whatever
14 choi -- well, let me ask you this.  What would
15 be consistent?  What information would be
16 consistent with this request that they could
17 have provided regarding lifestyle choices?
18   **A.    It in -- in my opinion, this is**
19 **very generally written and it does not spec --**
20 **it does not specify -- it -- it doesn't go**
21 **into detail necessarily about what they --**
22 **what they do or what they don't do.  It's just**

Transcript of █████████████████                44 (173 to 176)

Conducted on August 28, 2024

173

1  very -- in my opinion, it's just very
2  generally written.
3      Q.    What would have -- what could
4  they have provided that would have shown that,
5  with respect to lifestyle choices, that would
6  have demonstrated consistent -- consistency
7  with the beliefs related as that pertains to
8  the criteria listed on page 16 of Exhibit 1?
9          MS. McGRAW: Objection. Calls
10 for speculation.
11         THE WITNESS: Just in terms of
12 -- just in terms of medications or you don't
13 -- how they -- how they or three years ago, so
14 at the time, how they handle taking
15 medications or if they listed any other
16 information about vaccinations within their
17 lifetime or it's -- it's -- yeah, it's just --
18 it's, you know, written very -- it's just
19 written very general.  It doesn't provide
20 examples and that's it.
21 BY MR. DIEHL:
22     Q.    What I'm asking -- when I'm

174

1  asking about what you applied in 2021, you
2  actually looked for those issues in 2021 when
3  you were reviewing employee requests for
4  exemptions, correct?
5      A.    Yeah.  So I looked for
6  information that was included in the training
7  document for consider -- to take into
8  consideration.  So if I did not see any of
9  those considerations listed, yeah.  If I
10 didn't see any of those considerations listed,
11 then maybe I had additional questions or may
12 have denied it.
13     Q.    So the process and the training
14 shown on Exhibit 1 at page 16 does
15 specifically reference medication,
16 vaccinations, and lifestyle choices.  Do you
17 see that?
18     A.    Yes.
19     Q.    So turning back to Exhibit 17,
20 there's no reference to vaccinations, use of
21 medication, or lifestyle choices, is there in
22 this -- the information provided by the

175

1  employee on the first two pages of Exhibit 17?
2          MR. KIRSNER: Objection.  Asked
3  and answered.
4      Q.    You can go ahead.
5      A.    So it does not.
6      Q.    And did members of the committee
7  when they were reviewing religious belief and
8  religious conflict comments from Vax Trax, did
9  -- did you go and obtain vaccination records
10 related to employees to evaluate the issue of
11 taking other vaccinations?
12     A.    I didn't have authority to
13 access other vaccination records.  I'm not a
14 doctor, so.
15     Q.    Sure.  I'm not asking whether
16 you did it improperly.  I just mean just as a
17 fact, you did not access vaccination records
18 or review vaccination records related to
19 employees like this person identified as 43 on
20 the first and second pages of Exhibit 17?
21     A.    No, I did not.  However, on the
22 form the employee vaccine information, they

176

1  may have been asked if they previously had the
2  flu vaccination or something like that, but
3  no.
4      Q.    Were you referencing vaccine
5  information?
6      A.    On the first page.
7      Q.    Okay.  It looks like that
8  relates to the COVID vaccine.
9      A.    Okay.  So -- so, no, I didn't --
10     Q.    I'm telling you that.  I'm just
11 saying, do you read that the same way I do
12 where it says --
13     A.    Yes.
14     Q.    -- received COVID vaccine, no,
15 and then vaccine count zero?
16     A.    Yes.
17     Q.    Those two references to vaccines
18 would both refer to a COVID vaccine?
19     A.    Correct.
20     Q.    So this is -- this request or
21 let me strike that.
22         The information provided by the

Transcript of [REDACTED]

Conducted on August 28, 2024

45 (177 to 180)

177

1 employee on the first page and the second page
2 of Exhibit 17 is silent as to other vaccines,
3 correct? That's -- that's correct?
4    **A.    Correct.**
5    Q.    And it's silent as to the use of
6 medications, correct?
7    **A.    Correct.**
8    Q.    And is it silent with respect to
9 lifestyle choices?
10    **A.    Correct.**
11    Q.    And so when you -- if you had
12 read this in 2021 using the same criteria,
13 would you -- you would have denied this
14 request at that time?
15        MS. McGRAW: Object to the form.
16 Calls for speculation.
17        THE WITNESS: Yes.
18 BY MR. DIEHL:
19    Q.    And because it was missing that
20 information that you just referenced?
21    **A.    Yes.**
22    Q.    Would that be similar to

178

1 criteria that you applied to the different
2 exemption requests that you reviewed in 2021?
3    **A.    Every -- every request was**
4 **different.**
5    Q.    What --
6    **A.    So.**
7    Q.    It was different in their
8 answer, correct?
9    **A.    That is correct.**
10    Q.    Did you apply different criteria
11 to each one when you reviewed them?
12    **A.    No, I did not.**
13    Q.    Okay. So with respect to the
14 criteria, if they made it to step four in the
15 committee consideration, you would apply the
16 same criteria related to vaccinations,
17 medication, and lifestyle choice; is that
18 fair?
19    **A.    For consideration, yes.**
20    Q.    And if they were silent like the
21 information provided to the employee on
22 Exhibit 17 with respect to those issues

179

1 related to vaccination, medications and
2 lifestyle choices, that would have resulted in
3 the denial?
4        MS. McGRAW: Objection to the
5 form. Mischaracterizes.
6        THE WITNESS: And to obtain
7 additional information.
8    Q.    What do you mean by to obtain
9 additional information?
10    **A.    So if it was denied, the**
11 **employee could resubmit the request with**
12 **additional information.**
13    Q.    Do you know if when the employee
14 was denied -- well, I'm not asking about the
15 specific employee, so let me ask you more
16 broadly. Do you know when if employees were
17 denied based on the application of the
18 criteria on page 16 of Exhibit 1, do you know
19 if they were told that they needed to provide
20 additional information?
21    **A.    Within the -- within the bad**
22 **Trax -- Vax Trax form, those were automated**

180

1 **messages. So I can't recall what it says. If**
2 **it's denied, send additional information. I**
3 **just know that employees have the option to**
4 **submit additional information if it was**
5 **denied.**
6    Q.    If you could go to the page on
7 Exhibit 17 that is numbered 3038 at the
8 bottom. Tell me when you're there.
9    **A.    I'm there.**
10    Q.    And then there's a -- in the
11 middle of the page, there's the bottom of a
12 table that has a religious review comment on
13 the left side. You see that?
14    **A.    Yes.**
15    Q.    And religious review comment is
16 what -- what is that information, to your
17 knowledge, in the Vax Trax system?
18    **A.    It is automated message that**
19 **went to an employee if the exemption was**
20 **denied.**
21    Q.    And if you could look at the
22 text to the right of religious view comment

Case 3:22-cv-00075-RSB-JCH    Document 265-5    Filed 02/14/25    Page 48 of 93
Pageid#: 11111
Transcript of █████████████    46 (181 to 184)
Conducted on August 28, 2024

181

1  that starts with, dear applicant. Do you see
2  that?
3      A.    Yes.
4      Q.    Now, before I ask you about
5  that, there's -- there's a number of kind of
6  symbols in there. Like a -- I don't know what
7  -- is that a greater than, less than symbol?
8  Whatever it is, BR/greater than less than BR.
9  Do you see that where I'm reading?
10     A.    Yes.
11     Q.    Those symbols wouldn't have been
12 in the communication to the employee, correct?
13     A.    Not that I'm aware of. I don't
14 know what those symbols.
15     Q.    Well, it looks like one of them
16 is a -- is a hyperlink. Do you see where it
17 says H Ref equals and then there's a website
18 listed. Do you see that?
19     A.    Yes.
20     Q.    So ignoring those symbols and
21 looking at the language, please read that
22 language that starts with, dear applicant and

182

1  ends with please visit immuni -- please visit
2  immunize UVA period.
3      A.    I see the information.
4      Q.    Is that consistent with your
5  recollection of the message that an employee
6  would have received if they were denied after
7  the initial review by a member of the
8  committee based on the criteria listed in on
9  page 16 of Exhibit 1?
10     A.    So on Exhibit 1, page 16, these
11 are committee consideration and this -- I
12 believe that this list is not all inclusive.
13     Q.    In terms of all inclusive,
14 what's missing on -- on page 16 of Exhibit 1?
15     A.    Well, because it says
16 consideration. It doesn't say -- it doesn't
17 say mandatory consideration. It says
18 committee considerations, but, yes, the
19 employee would receive this automated message
20 via email if their request was denied.
21     Q.    And that would include if their
22 request was denied based on -- for example,

183

1  there wasn't information about medication or
2  lifestyle choices? Would they receive the
3  same message?
4      A.    I don't remember. I don't
5  remember.
6      Q.    But do you remember there was a
7  different message that was provided to
8  employees that were denied after the
9  committee's review?
10     A.    I don't remember.
11     Q.    And whatever message was
12 provided, is it your understanding that would
13 have been sent to them through the Vax Trax
14 system?
15     A.    Yes.
16     Q.    At the bottom of the slide 16 of
17 Exhibit 1, there's a line that says, it may be
18 necessary to ask for additional information
19 from the team member. Do you see that?
20     A.    Yes.
21     Q.    Do you recall ever asking for
22 additional information from a team member?

184

1      A.    I don't remember.
2      Q.    You don't recall ever doing
3  that?
4      A.    I -- I don't remember.
5      Q.    You don't remember. You might
6  have?
7            MR. KIRSNER: Objection.
8  Badgering the witness.
9  BY MR. DIEHL:
10     Q.    No. I'm trying to understand.
11 Do you -- do you understand why I ask that?
12 And -- and I'm not trying to badger you at
13 all. I'm not a badger. I'm gopher. That's a
14 joke. It's a Minnesota/Wisconsin joke, but a
15 bad one.
16     But you might not remember because you
17 don't remember any -- any part of that. And
18 so you don't remember whether you did or did
19 not do something, but you also might not
20 remember in that you're saying you don't
21 recall ever doing that. So do you -- do you
22 understand the distinction I'm making?

185

1    A.    Yes.

2    Q.    So with respect to -- let me

3  just ask it again, just to make it clear here.

4        Do you recall if you ever asked for

5  additional information from a team member?

6    A.    I -- I don't know.

7    Q.    And do you know if any other

8  members of the committee asked for additional

9  information from the team member?

10    A.    They may have.

11    Q.    If a -- if a committee member --

12  well, let's just ask you about you.

13        If you were to ask an employee for

14  additional communication, have your

15  communication have been through the Vax Trax

16  system?

17    A.    Yes.

18    Q.    And do you know if other members

19  of the committee communicated with team

20  members who made requests exclusively through

21  the Vax Trax system?

22    A.    Yes.

186

1    Q.    And -- and -- and that's correct

2  that members, all of the members of the

3  committee would have exclusively communicated

4  with team members regarding the request

5  through the Vax Trax system?

6    A.    Yes.

7        MR. DIEHL:  It's a good time for

8  a break.

9        MS. McGRAW:  Okay.

10        (Off the record.)

11 BY MR. DIEHL:

12    Q.    We've been talking about

13 Exhibit 1, the training that was provided to

14 members of the exemption committee.  I

15 understand that Melissa Wolf Riley is an

16 attorney; is that correct?

17    A.    Yes.

18    Q.    Other than Ms. Riley, what

19 leader at UVA decided how the process should

20 be set up, to your knowledge?

21        MS. McGRAW:  Object to the form.

22    Q.    Well, I'm asking about the

187

1  process for reviewing -- let me just -- yeah.

2  Let me break that up a little bit.

3        There's a process for reviewing

4  religious accommodation requests that's

5  described in Exhibit 1, the PowerPoint, and

6  any decisions that weren't legal advice, do

7  you know if there was a decisionmaker that is

8  a leader at UVA that made decisions regarding

9  the review process?

10    A.    I don't know.

11    Q.    So do you know, for example, if

12 Melissa Frederick was in charge of making

13 decisions related to the review process from

14 as a nonattorney?

15    A.    **Melissa was not in charge of**

16 **making decisions.  Melissa coordinated and was**

17 **a part of the meeting, but Melissa did not ad**

18 **-- Melissa Frederick did not advise the**

19 **committee.**

20    Q.    What was Melissa's role in the

21 reporting structure of -- of the UVA Health HR

22 Business Partners?

188

1    A.    **Melissa's title was a senior**

2  **director and Melissa Fred -- Melissa**

3  **Frederick's title was a senior director I**

4  **think of operations and the health system**

5  **HRBPs, and the School of Medicine, HRBPs**

6  **reported up to Melissa.**

7    Q.    Okay.  So, well, she might not

8  have been a part of the committee.  She was

9  the committee members supervisor or --

10    A.    **Yes.**

11    Q.    -- at some level their

12 supervisor?

13    A.    **Yes.**

14    Q.    And you -- you do not know who

15 as a nonattorney made any decisions regarding

16 the religious exemption process in 2021 that

17 was used by the committee of the religious

18 exemption committee?

19    A.    **No, I don't.  I'm not clear of**

20 **what you're asking me.  And so we had the**

21 **committee members.  We had Melissa Riley and**

22 **we had Melissa Frederick.  And so in terms of**

Transcript of ████████

48 (189 to 192)

Conducted on August 28, 2024

189

1  — so what are you asking me specifically
2  about Melissa Frederick's role?
3      Q.   Well, I guess I'm not
4  specifically asking about Melissa Frederick.
5      A.   Okay.
6      Q.   I was, but I'm not right at this
7  moment.  I -- I just -- well, is -- is it
8  likely that someone who was not an attorney
9  was involved in decisions related to the
10 religious accommodation review process --
11         MS. McGRAW:  Object to --
12     Q.   -- in 2021?
13         MS. McGRAW:  Object to the form.
14 Calls for speculation.
15         THE WITNESS:  Melissa Frederick
16 is not an attorney.
17 BY MR. DIEHL:
18     Q.   Right.  So I'm saying, do you --
19 well, how about this.  Do you know if a
20 nonattorney was involved in making decisions
21 regarding the religious accommodation request
22 review process in 2021, to your knowledge?

190

1      A.   Melissa Frederick did not make
2  any decisions regarding the review process.
3      Q.   How do you know that?
4      A.   She -- when the committee was
5  formed -- when the committee was formed, it
6  was stated that she would not be making any
7  decisions.  That she would -- that she would
8  be there for the HR Business Partners as a
9  support system, but would not make any
10 decisions on the request that had been
11 submitted.
12     Q.   But -- and the comments from
13 Melissa Frederick that you're referring to,
14 those were at the time when the committee was
15 starting its work or performing its work; is
16 that correct?
17     A.   What comments?  What comments?
18 I'm sorry.  I just — I want to make sure —
19     Q.   Yeah, sure.  That's fine.
20     A.   -- that we're clear.
21     Q.   I'm just going back to we've got
22 a --

191

1      A.   Okay.
2      Q.   -- transcription going on here.
3      A.   Okay.
4      Q.   And so you said it was stated
5  that she, Melissa Frederick, would not be
6  making any decisions that she would be there
7  for the business, HR Business Partners, but
8  not making decisions effectively.  Does that
9  -- do you recall that testimony?
10     A.   As regards to the religious
11 exemptions.  That is correct.
12     Q.   And who stated that?
13     A.   I — I don't remember.
14     Q.   And but whoever stated it, that
15 was after the July 1st training, correct?
16     A.   I don't remember.
17     Q.   Do you think what -- did you
18 learn about their religious accommodation
19 request review process before the July 1st,
20 2021 training at which Exhibit 1 was
21 discussed?
22     A.   I did not.  I did not know about

192

1  this particular document prior to the date
2  that you just gave.
3      Q.   And so any comments about Ms.
4  Frederick's role in the religious
5  accommodation request review process, those
6  would have been after this document Exhibit 1
7  was created?
8      A.   I don't remember.
9      Q.   Well, did the comments about Ms.
10 Frederick's role in the process occur before
11 the training on July 1st, 2021?
12     A.   I don't remember.
13     Q.   And you don't know who was
14 involved in creating or making decisions
15 related to the PowerPoint in Exhibit 1 other
16 than Melissa Wolf Riley?
17     A.   Correct.
18     Q.   Are you aware that UVA's policy
19 related to religious accommodations changed at
20 some point in 2022?
21     A.   No.
22     Q.   At some point in 2020 -- well,

193

1  just generally let me ask you a question.
2       When did your work reviewing religious
3  exemptions as part of the religious exemption
4  committee, when did that end?
5       **A.     I don't remember the exact day**
6  **that it ended.**
7       Q.     Whether or not you remember the
8  exact day, do you remember was it in 2021 or
9  in 2022?
10      **A.     I don't remember.**
11      Q.     Did your work with the religious
12 exemption committee continue on after other
13 members of the committee ceased reviewing
14 exemptions through the religious exemption
15 committee?
16      **A.     No.**
17      Q.     So you would've ended at the
18 same time as other members of the committee
19 ended their work, to your knowledge?
20      **A.     Yes.**
21      Q.     Do you recall whether there was
22 an announcement about that or how did you

194

1  learn that you were no longer going to be
2  required to review requests made through the
3  Vax Trax system?
4       **A.     It was — it was communicated**
5  **through — it was communicated during our**
6  **meeting via Zoom.**
7       Q.     The meeting of the religious
8  exemption committee?
9       **A.     Yes.**
10      Q.     And who informed you that your
11 work with it -- well, let me step back.
12 communication was to the members of the
13 committee that the work of the committee was
14 done; is that correct?
15      **A.     Yes.**
16      Q.     Who -- who said that?
17      **A.     I don't remember.**
18      Q.     Was it a supervisor or leader in
19 the HR area?
20      **A.     So it may have been Melissa**
21 **Frederick, given that that was the supervisor**
22 **that I reported to at the time.**

195

1       Q.     Do you recall when -- well,
2  Melissa Frederick is no longer an employee of
3  UVA; is that correct?
4       **A.     That is correct.**
5       Q.     Do you recall when she left UVA?
6       **A.     I don't remember.**
7       Q.     It's my understanding I can -- I
8  can show you.  I'm looking at her LinkedIn
9  profile online.  I'll just represent that I'm
10 doing that, and I can show it if you'd like to
11 look at it, but it looks like she -- her
12 employment is listed as ending in December
13 2021.  Does that sound correct to you based on
14 your memory of when she left UVA?
15      **A.     I don't remember when she left**
16 **UVA.**
17      Q.     Well, setting aside whether
18 Melissa Frederick was -- when she left UVA,
19 was Melissa Frederick a part of the meeting or
20 present at the meeting when members of the
21 committee were informed that their work was
22 done?

196

1       **A.     I don't remember.**
2       Q.     Have you been involved with
3  religious accommodation requests related to
4  issues other than vaccine as part of your work
5  at UVA?
6       **A.     Religious accommodations?**
7       Q.     Correct.
8       **A.     I have not.**
9       Q.     In any of your previous
10 positions that involved human resources, did
11 you -- were you involved in any decisions or
12 consideration of religious accommodation
13 requests that were unrelated to vaccination?
14      **A.     I don't remember.**
15      Q.     And you understand what I mean
16 by religious accommodation request?
17      **A.     I do.**
18      Q.     So, for example, if an employee
19 wanted additional breaks because they're
20 Muslim and they would like to have time off on
21 a break to pray, do you understand that?
22      **A.     Yes, I do understand that.**

Case 3:22-cv-00075-RSB-JCH    Document 265-5    Filed 02/14/25    Page 52 of 93
Pageid#: 11115
Transcript of ▮▮▮▮▮▮▮▮▮▮▮▮▮▮    50 (197 to 200)
Conducted on August 28, 2024

197

1    Q.    And with that refresher, do you
2 recall anything, any religious accommodation
3 request that came up as part of your job of
4 any human resources job that you've had?
5    **A.    I -- I don't remember.**
6    Q.    Have you received any training
7 while you were an employee at UVA about
8 whether religious accomodation requests that
9 are unrelated to vaccination?
10    **A.    So the training would not have**
11 **been specifically for religious accommodation.**
12 **It would've been accommodations in general.**
13    Q.    What training was that?  Do you
14 recall?
15    **A.    A training conducted by the**
16 **Equal Opportunity Civil Rights office at UVA.**
17    Q.    Is the process different for
18 accommodation requests that involve a
19 disability or medical issue as opposed to a
20 religious issue?  Again, separate from
21 vaccination or the COVID vaccine policy?
22    **A.    So is a religious accommodation**

198

1 **different -- excuse me.  Is a religious**
2 **accommodation request different from American**
3 **Disabilities Act request?  Yes.  The two are**
4 **different.  Different steps are involved.**
5    Q.    And do you have an understanding
6 of how religious accommodation requests that
7 are unrelated to vaccines are handled and
8 accommodation requests that are made related
9 to a disability or medical condition?  You're
10 aware of how those are handled at UVA?
11    **A.    I'm not sure.**
12    Q.    Well, you mentioned a training.
13 What was that training that you mentioned
14 about?
15    **A.    Yeah.  So it was -- it was a**
16 **training conducted by EOCR, Equal Opportunity**
17 **Civil Rights office a few years ago.**
18    Q.    Mark exhibit -- are we on 19?
19    THE REPORTER:  Yes, sir.
20    (▮▮▮▮▮ 19, UVA Office for
21 Equal Opportunity and Civil Rights-Religious
22 Workplace Accommodation Request Procedures,

199

1 marked for identification.)
2    Q.    I've handed you a document
3 marked -- that's been marked as Exhibit 19.
4 And -- and I'd like you to take a look at it
5 and tell me if you've seen this or something
6 similar before, but I'll just point out that
7 there's a date that looks like a printed date
8 of May 24th, 2024 at the top.  Do you see
9 that?
10    **A.    I do.**
11    Q.    And then the -- there's a date
12 at the end that looks -- it's the second to
13 last page of this exhibit, and it says July
14 24th, 2023.  Do you see that?
15    **A.    Yes.**
16    Q.    Okay.  And so if you could take
17 a look at this request or withdrawn.
18    Please take a look at Exhibit 19 and
19 tell me if you've seen this before, this
20 exhibit before?
21    **A.    Yes.**
22    Q.    And it looks like this is the

200

1 religious accommodation procedures that are
2 used by UVA or -- well, I guess you tell me
3 what it is.  I don't want to tell you what --
4 you tell me.
5    **A.    So this particular document is**
6 **listed on a UVA website under the Office for**
7 **Equal Opportunity and Civil Rights.  So it --**
8 **it appears to be the same information guiding**
9 **employees as to how they can submit an**
10 **accommodation.**
11    Q.    And, well, this has a date of
12 July 24th, 2023 at the end.  Do you know if
13 the process and procedures related to
14 religious accommodation requests were
15 substantially different than Exhibit 19, for
16 example, in 2021?
17    **A.    I -- I don't know.**
18    Q.    Did you have training regarding
19 religious accommodation procedures at UVA in
20 2020 or 2021?
21    **A.    I don't remember.  So as an**
22 **employee relations consultant manager, I had**

201

1  training, but not during my time as a senior
2  HR Business Partner.
3      Q.    When?
4      A.    So from 2019 -- I'm sorry. Let
5  me let you finish.
6      Q.    Well, you -- you're -- you're --
7  I'm sure you're going to answer my question,
8  but just to get it out there. You received
9  training related religious accommodations in
10 -- in what role was that?
11     A.    Well, what I said was in my
12 position as an employee relations manager, I
13 received training in terms of accommodations.
14 And I think it was ADA accommodations. So
15 that would have been any time between June of
16 2019 to November of 2020. During my time as a
17 senior HR business partner, I did not have any
18 training that I am aware of regarding
19 religious workplace in -- in terms of
20 accommodations in general.
21     Q.    Did you have an understanding of
22 what the proper procedures are for religious

202

1  workplace accommodation requests in any of
2  your jobs, from any of your work, before
3  coming to UVA?
4      A.    Yes.
5      Q.    And where -- where did you learn
6  about that?
7      A.    University of Missouri and
8  University of Rochester.
9      Q.    And as you look at Exhibit 19,
10 is the procedures outlined in this consistent
11 with what you learned were appropriate
12 procedures in any of those previous positions?
13          MS. McGRAW: Object to the form.
14          THE WITNESS: I don't know
15 because the other two universities are
16 different than UVA. So the process may be
17 different in terms of where you make the
18 request. So every university is different.
19     Q.    Well, do you know -- I know
20 you're not a lawyer, but human resources
21 personnel often are familiar with employment
22 laws such as Title VII of the Civil Rights Act

203

1  of 1964. And I'm not asking you as a lawyer,
2  but are you familiar that it is that law or
3  similar state laws where the law talks about
4  religious accommodations?
5      A.    Yes.
6      Q.    And Title VII, again, I'm not
7  asking you as a lawyer, but do you understand
8  that Title VII is a federal law that applies
9  across the country?
10     A.    Yes.
11     Q.    And the Americans with
12 Disabilities Act, that's also a federal law?
13 Again, as a nonlawyer HR person. That's yes?
14     A.    Yes.
15     Q.    And so as far as you know, as a
16 nonattorney, UVA and the University of
17 Missouri are required to comply with Title VII
18 of the Civil Rights Act of 1964?
19          MS. McGRAW: Object to the form.
20 Calls for a legal conclusion. You can say
21 [REDACTED] not an attorney as much as you want, but
22 you're -- you're asking [REDACTED] legal questions.

204

1  BY MR. DIEHL:
2      Q.    Well, I'm just asking if your
3  human resources people at UVA -- not your --
4  your -- your clients. Human resources
5  personnel at UVA are aware of the Title VII
6  applies across the country?
7          MS. McGRAW: Objection. Calls
8  for a legal conclusion.
9      Q.    Do you know?
10     A.    Yes.
11     Q.    And it does apply, again, to
12 your knowledge? So same objection, I'm sure,
13 from counsel.
14     A.    Yes.
15     Q.    And as you look at Exhibit 19 --
16 well, stepping back for a moment. What --
17 what do you know are the differences between
18 the Americans with Disability Act and the
19 Title VII religious accommodation process?
20 What are the differences in the accommodation
21 process as -- as those are -- as those
22 processes are undertaken by human resources

Transcript of ████████████████

52 (205 to 208)

Conducted on August 28, 2024

205

1   personnel at UVA?
2           MS. McGRAW:  Object to the form.
3   Calls for speculation.
4           THE WITNESS:  I can answer?
5           MS. McGRAW:  Yes.  Yes.  I'm
6   sorry.
7           MR. KIRSNER:  You understand?
8           THE WITNESS:  I do, counsel.
9           MR. DIEHL:  Yeah, don't add
10  that.  That's instructing the witness.  You're
11  trying to -- you're trying to testify.  And I
12  know that's the point of your objections
13  today, it seems like, but if you -- if you
14  cannot add improper objections and not smirk
15  and smile about it either, I'd appreciate
16  that.
17          MR. KIRSNER:  Do you have a
18  question?
19          MR. DIEHL:  No.  I'm just -- I'm
20  asking you to not disrupt the testimony as it
21  seems like that's your intention and Ms.
22  McGraw's intention today.

206

1   BY MR. DIEHL:
2       Q.   Do you recall the question?
3       **A.   So an ADA accommodation requires**
4   **an approval from a physician and a religious**
5   **accommodation does not.**
6       Q.   On the page with the Bates label
7   25 on Exhibit 19, it talks about evaluation of
8   request and the interactive process.  Do you
9   see where I'm referencing that?
10      **A.   Yes.**
11      Q.   And you understand that UVA's
12  process is that the interactive process
13  applies to -- or let me ask a different
14  question.  I -- I jumbled my words.
15          There's a -- there's an interactive
16  process that's -- that's undertaken by UVA
17  when an employee makes a disability
18  accommodation request; is that right?
19      **A.   Yes.**
20      Q.   And does UVA have an interactive
21  process when supervisors or human resources
22  personnel consider a religious accommodation

207

1   request?
2           MS. McGRAW:  Objection.  Calls
3   for speculation.
4       Q.   You can answer.
5           MS. McGRAW:  He's not asking you
6   to read the document.
7           THE WITNESS:  No, I --
8           MS. McGRAW:  He's asking do you
9   know independently of the document.
10          THE WITNESS:  I don't know.
11  BY MR. DIEHL:
12      Q.   If the document helps refresh
13  your memory.  It talks about interactive
14  process on page 25 or excuse me.  Bates
15  labeled page 25 of Exhibit 19.
16          MS. McGRAW:  Is your question
17  now whether that document --
18          MR. DIEHL:  I will ask
19  questions, counsel.
20          MS. McGRAW:  Sometimes they
21  never come out of your mouth.  You just keep
22  talking, but go ahead.

208

1           MR. DIEHL:  Do you have any
2   other comments about my deposition style?
3           MS. McGRAW:  I'd like to --
4           MR. DIEHL:  Are you done?
5           MS. McGRAW:  I'd like --
6           MR. DIEHL:  Can you just be done
7   and make proper objections, counsel?  I just
8   --
9           MS. McGRAW:  You asked me a
10  question.  I was going to respond, but go
11  ahead.
12          MR. DIEHL:  With your
13  permission.
14  BY MR. DIEHL:
15      Q.   As you look at page 25 -- sorry
16  about lawyers.  We tend to do this stuff.
17          As you look at Exhibit 19, page 25,
18  there's a discussion about an inter -- the
19  interactive process.  Do you see that?
20      **A.   Yes, I do.**
21      Q.   And either based on this
22  document refreshing your memory or any

Transcript of ████████████                    53 (209 to 212)

Conducted on August 28, 2024

209

1  training or knowledge that you have, does UVA
2  undertake interactive process as part of its
3  review of religious accommodations?
4           MS. McGRAW: Objection. Calls
5  for speculation.
6           THE WITNESS: So we -- we -- you
7  are only referring to -- you're referring to
8  religious?
9  BY MR. DIEHL:
10     Q.    Yes.
11     A.    Okay. And does the univer --
12 you're asking me if the university uses the
13 interactive process?
14     Q.    Yes.
15     A.    Yes.
16     Q.    And do you know if the
17 university used the interactive process with
18 respect to religious accommodation requests in
19 2019 or 2020?
20     A.    As it related to?
21     Q.    Religious accommodation
22 requests?

210

1      A.    As it related to the vaccine?
2      Q.    Well, the -- yeah, that's fine.
3      A.    I just want to be clear. I
4  mean --
5      Q.    So I'm talking about before you
6  were part of the -- you weren't on the
7  religious exemption committee related to the
8  vaccine requirement in 2019 or 2020, correct?
9      A.    Correct.
10     Q.    So I'm asking you about 2019 or
11 2020. And -- and at that time period in 2019
12 or 2020, you didn't have any role related to
13 religious accommodation or exemption requests
14 involving the flu vaccine, for example,
15 correct?
16     A.    No, I did not.
17     Q.    Okay. And so at that time,
18 based on your, you know, working in human
19 resources at UVA, were you aware that UVA used
20 an interactive process with respect to
21 religious accommodation requests in 2019 and
22 2020?

211

1      A.    Yes.
2      Q.    And -- and, in fact, UVA did use
3  an interactive process with respect to
4  religious accommodation request -- requests in
5  2019 or 2020?
6      A.    Yes.
7      Q.    Do you know if the procedures
8  for religious accommodation request in 2019 or
9  2020 were similar to the information provided
10 in Exhibit 19?
11     A.    Yes.
12     Q.    And they were -- the -- the
13 processes and procedures used in 2019 and 2020
14 related to religious workplace accommodations,
15 those procedures were in 2019 and 2020 were
16 similar to those set forth in Exhibit 19?
17          MS. McGRAW: Object to the form.
18          THE WITNESS: Yes.
19          MR. DIEHL: No further
20 questions.
21          EXAMINATION
22 BY MS. McGRAW:

212

1      Q.    I have just a couple of
2  questions. If you could get Exhibit 1. And
3  if you could turn to page 16. We spent a lot
4  of time on page 16 today. Do you remember
5  that testimony?
6      A.    Yes.
7      Q.    When you were trained, was the
8  whole PowerPoint reviewed with you?
9      A.    Yes.
10     Q.    It wasn't limited to just page
11 16?
12     A.    No.
13     Q.    And when you reviewed religious
14 exemption request, did you rely on the
15 entirety of your training?
16          MR. DIEHL: Objection. Leading.
17          THE WITNESS: Can you restate
18 the question, please?
19 BY MS. McGRAW:
20     Q.    Sure. When you were reviewing
21 religious exemption requests, did you rely on
22 all of the training that you had received

Transcript of ████████████

Conducted on August 28, 2024

213

1 through the PowerPoint presentation and any
2 other training?
3          MR. DIEHL:  Objection.
4 Mischaracterizes prior testimony.  Leading.
5     Q.    You can respond.
6     A.    Yes.
7     Q.    Okay.  And if you turn to page
8 four of the document, was page four with the
9 heading religion one of the topics covered at
10 the training?
11    A.    Yes.
12          MR. DIEHL:  Objection.  Asked
13 and answered.  Leading.
14    Q.    And did you have an opportunity
15 to ask questions at the training?
16    A.    Yes.
17    Q.    And when you reviewed religious
18 exemptions, you had the PowerPoint available
19 to you?  If you want to refer back to it.
20    A.    Yes.
21    Q.    They are the only questions I
22 have.

214

1          MR. KIRSNER:  No questions for
2 you, ████████.  You'll have an opportunity
3 to review your transcript after the court
4 reporter has finished completing it, and we
5 recommend that you do so and note any errata
6 on the transcript.
7          And as I mentioned yesterday, there's
8 an agreement as amongst counsel to maintain
9 the confidentiality of the senior human
10 resources business professional's identity, so
11 we reinforce that for purposes of any future
12 use of the transcript and her testimony.
13 Thank you.
14          MR. DIEHL:  Done.
15          THE REPORTER:  Counsel, did
16 anyone need to order the transcript?
17          MR. KIRSNER:  Yes, please.
18          MS. McGRAW:  Yes.
19          MR. DIEHL:  Yes, please.
20          THE REPORTER:  All right.
21 Standard turnaround for everyone, or does
22 anyone need a expedite?

215

1          MR. DIEHL:  Let me think about
2 that.  I'll let you know if we need it
3 expedited.  What's the standard turnaround, 10
4 days?
5          THE REPORTER:  Yes.  Ten
6 business days.  Yes, sir.
7          (Concluded 3:04 p.m.)
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22

216

1
2          CERTIFICATE OF TRANSCRIBER
3
4          I, Cynthia Bauerle, do hereby certify
5 that this transcript was prepared from the
6 digital audio recording of the foregoing
7 proceeding; that said transcript is a true and
8 accurate record of the proceedings to the best
9 of my knowledge, skills, and ability; and that
10 I am neither counsel for, related to, nor
11 employed by any of the parties to the case and
12 have no interest, financial or otherwise, in
13 its outcome.
14
15
16          *Cynthia Bauerle*
17 _____
18 CYNTHIA BAUERLE, CSR
19 9/10/24
20
21
22

217

1  CERTIFICATE OF COURT REPORTER-NOTARY PUBLIC
2      I, Danny Terry, the officer before whom
3  the foregoing proceedings were taken, do
4  hereby certify that any witness(es) in the
5  foregoing proceedings were fully sworn; that
6  the proceedings were recorded by me and
7  thereafter reduced to typewriting by a
8  qualified transcriptionist; that said digital
9  audio recording of said proceedings are a true
10 and accurate record to the best of my
11 knowledge, skills, and ability; and that I am
12 neither counsel for, related to, nor employed
13 by any of the parties to this case and have no
14 interest, financial or otherwise, in its
15 outcome.
16
17 Notary Registration No.: 7748549
18 My Commission Expires: 2/28/25
19
20 _____
21 DANNY TERRY,
22 NOTARY PUBLIC FOR THE COMMONWEALTH OF VIRGINIA

Transcript of

Conducted on August 28, 2024

56

| A | | | |
|---|---|---|---|
| **a-print-out** | **across** | 115:11 | 126:19, 140:17, |
| 4:11 | 10:21, 203:9, | **admin** | 148:5, 148:7, |
| **ability** | 204:6 | 62:20, 140:8, | 150:18, 165:18, |
| 216:9, 217:11 | **act** | 140:14, 140:21, | 167:2, 168:13, |
| **able** | 198:3, 202:22, | 141:3, 141:8, | 170:13, 171:4, |
| 10:11, 165:12 | 203:12, 203:18, | 142:2 | 185:3, 197:20, |
| **abortion** | 204:18 | **administrative** | 203:6, 203:13, |
| 77:16, 77:17, | **action** | 142:10 | 204:11 |
| 78:2, 94:18 | 33:10, 137:14 | **adventist** | **against** |
| **above** | **actual** | 15:2, 15:3, | 7:18, 159:19 |
| 132:14, 132:15 | 90:14 | 15:4, 15:7, | **ago** |
| **academic** | **actually** | 15:10, 15:14, | 147:5, 149:2, |
| 23:18, 23:19, | 21:5, 21:7, | 98:15, 98:22, | 173:13, 198:17 |
| 23:21, 23:22 | 52:21, 72:13, | 99:4, 99:10, | **agree** |
| **access** | 75:10, 81:4, | 99:19 | 73:1 |
| 175:13, 175:17 | 90:4, 127:22, | **advice** | **agreed** |
| **accommodation** | 145:14, 146:1, | 187:6 | 9:2 |
| 6:21, 32:2, | 174:2 | **advise** | **agreement** |
| 187:4, 189:10, | **ad** | 187:18 | 2:9, 214:8 |
| 189:21, 191:18, | 187:17 | **affect** | **ahead** |
| 192:5, 196:3, | **ada** | 58:21 | 124:19, 128:15, |
| 196:12, 196:16, | 201:14, 206:3 | **affirm** | 175:4, 207:22, |
| 197:2, 197:11, | **add** | 7:3 | 208:11 |
| 197:18, 197:22, | 205:9, 205:14 | **after** | **al** |
| 198:2, 198:6, | **added** | 7:8, 30:4, | 1:6, 1:10 |
| 198:8, 198:22, | 51:18, 62:10, | 31:8, 31:10, | **all** |
| 200:1, 200:10, | 127:12, 127:16 | 35:8, 35:11, | 8:18, 43:11, |
| 200:14, 200:19, | **adding** | 56:22, 76:16, | 63:21, 69:11, |
| 202:1, 204:19, | 114:6 | 84:6, 100:18, | 73:15, 81:16, |
| 204:20, 206:3, | **additional** | 103:17, 112:2, | 81:17, 83:9, |
| 206:5, 206:18, | 20:15, 20:16, | 116:19, 128:6, | 91:6, 105:14, |
| 206:22, 209:18, | 38:15, 81:20, | 129:11, 137:4, | 122:15, 133:17, |
| 209:21, 210:13, | 82:1, 103:4, | 139:21, 146:3, | 135:1, 135:14, |
| 210:21, 211:4, | 112:2, 112:15, | 182:6, 183:8, | 136:3, 144:20, |
| 211:8 | 112:18, 112:20, | 191:15, 192:6, | 148:4, 149:17, |
| **accommodations** | 113:3, 116:13, | 193:12, 214:3 | 161:9, 161:12, |
| 192:19, 196:6, | 117:12, 125:10, | **afternoon** | 161:16, 182:12, |
| 197:12, 201:9, | 141:9, 141:11, | 122:3 | 182:13, 184:13, |
| 201:13, 201:14, | 164:19, 174:11, | **ag** | 186:2, 212:22, |
| 201:20, 203:4, | 179:7, 179:9, | 79:22 | 214:20 |
| 209:3, 211:14 | 179:12, 179:20, | **again** | **allow** |
| **accomodation** | 180:2, 180:4, | 7:15, 11:2, | 81:6, 87:2 |
| 197:8 | 183:18, 183:22, | 22:12, 24:15, | **alone** |
| **accurate** | 185:5, 185:8, | 46:2, 46:8, | 80:8 |
| 216:8, 217:10 | 185:14, 196:19 | 46:17, 52:7, | **already** |
| **acommodation** | **address** | 68:7, 68:18, | 96:7, 104:20 |
| 4:12 | 126:4, 126:6 | 89:17, 92:3, | **also** |
| | **addressed** | 106:18, 116:22, | 8:22, 24:2, |
| | 114:16, 114:20, | | |

31:16, 38:6,
47:6, 48:5,
92:22, 97:19,
104:20, 107:22,
151:15, 154:15,
164:19, 169:15,
171:9, 184:19,
203:12
**ambiguous**
160:4
**american**
198:2
**americans**
203:11, 204:18
**among**
39:13, 39:19,
49:18
**amongst**
214:8
**amount**
120:17
**analysis-produced**
6:8
**andrews**
3:17
**announced**
100:20
**announcement**
100:4, 193:22
**anonymized**
51:16
**anonymous**
69:10, 69:17
**another**
56:19, 73:5,
104:14, 108:15,
124:22
**answer**
8:2, 9:18,
9:21, 10:4,
11:14, 16:3,
34:11, 34:14,
55:3, 60:12,
65:4, 71:14,
72:9, 72:16,
72:21, 74:1,
74:6, 75:17,
77:7, 85:11,

92:8, 95:10,
123:21, 153:17,
155:19, 160:6,
166:16, 166:19,
168:12, 178:8,
201:7, 205:4,
207:4
**answered**
44:1, 47:17,
56:6, 67:14,
72:8, 88:13,
91:19, 93:5,
94:21, 95:9,
109:1, 115:8,
115:10, 116:12,
117:19, 132:2,
153:18, 175:3,
213:13
**answering**
108:21, 144:21,
155:6
**answers**
4:15, 32:5,
152:3, 155:10
**anymore**
147:21
**anyone**
55:4, 57:1,
57:7, 79:12,
80:9, 101:13,
157:16, 214:16,
214:22
**anything**
29:22, 48:9,
77:20, 86:17,
95:21, 107:7,
108:8, 108:11,
123:12, 133:3,
157:20, 158:3,
158:11, 158:18,
170:14, 197:2
**anywhere**
52:3, 85:15
**apart**
47:6, 51:10,
55:10
**apologies**
143:15

**apologize**
91:22
**appear**
121:21
**appearances**
3:1
**appears**
141:9, 200:8
**applicant**
126:17, 139:16,
181:1, 181:22
**applicants**
126:9, 133:20
**application**
179:17
**applications**
157:3
**applied**
95:15, 167:2,
168:19, 169:7,
174:1, 178:1
**applies**
203:8, 204:6,
206:13
**apply**
178:10, 178:15,
204:11
**applying**
126:11, 168:17
**appreciate**
9:11, 125:13,
205:15
**appropriate**
202:11
**approval**
56:19, 56:21,
169:21, 206:4
**approvals**
57:5
**approve**
54:17, 55:5,
55:16, 56:22,
60:7, 87:2,
95:6, 112:1
**approved**
54:21, 57:2,
57:17, 58:1,
58:4, 58:19,

64:13, 87:11,
87:14, 87:19,
88:2, 104:12,
105:3, 106:12,
108:1, 109:13,
109:17, 110:1
**approving**
88:6, 104:8
**area**
50:1, 194:19
**areas**
18:18, 22:22
**argumentative**
90:11
**around**
33:15, 54:7,
119:10, 158:8
**aside**
195:17
**asked**
35:12, 43:20,
43:22, 44:2,
44:16, 47:16,
56:6, 65:4,
72:8, 76:7,
78:20, 83:6,
84:1, 91:18,
94:20, 95:8,
108:14, 109:1,
111:17, 115:9,
117:18, 122:9,
133:19, 135:14,
175:2, 176:1,
185:4, 185:8,
208:9, 213:12
**asking**
22:12, 30:1,
34:5, 41:4,
41:10, 41:11,
45:3, 45:6,
86:8, 86:10,
91:2, 91:3,
91:6, 120:2,
124:5, 131:11,
136:5, 145:19,
147:4, 148:8,
149:8, 167:2,
167:10, 172:8,

Transcript of
Conducted on August 28, 2024

58

172:9, 173:22,
174:1, 175:15,
179:14, 183:21,
186:22, 188:20,
189:1, 189:4,
203:1, 203:7,
203:22, 204:2,
205:20, 207:5,
207:8, 209:12,
210:10
**aspirin**
93:1, 93:6,
93:10, 93:14
**assigned**
40:16, 49:10,
49:14, 49:16,
69:10, 71:2,
107:11, 117:3,
117:5, 137:22,
164:2
**assigns**
69:15
**assistance**
20:16
**assistant**
79:22
**associate**
27:5, 170:9
**associated**
169:12, 170:2,
170:10, 170:18
**assume**
11:15, 73:8,
73:12, 100:9,
100:15, 122:4,
149:16
**attach**
81:7, 81:20
**attached**
80:18, 80:20,
81:6, 142:17,
159:13
**attachments**
82:8
**attend**
15:9
**attended**
76:12

**attendees**
34:19
**attending**
34:21
**attorney**
41:6, 186:16,
189:8, 189:16,
203:21
**attorneys**
7:16
**audibly**
10:19
**audio**
1:13, 216:6,
217:9
**august**
1:17, 100:5,
100:6, 100:10,
165:2
**authority**
175:12
**automated**
179:22, 180:18,
182:19
**automatically**
58:3
**available**
86:20, 213:18
**aware**
57:19, 58:14,
99:2, 103:14,
121:7, 121:9,
126:8, 142:8,
155:8, 157:19,
181:13, 192:18,
198:10, 201:18,
204:5, 210:19
**awareness**
17:8

**B**

**b-uva**
5:10
**babcock**
19:4, 19:8,
19:9
**babcock's**
19:5, 19:6

**back**
11:18, 18:1,
19:19, 21:5,
46:5, 46:19,
47:19, 48:18,
53:16, 53:21,
54:6, 57:20,
63:21, 65:8,
76:19, 79:6,
84:5, 104:19,
107:1, 114:4,
116:9, 121:16,
150:3, 151:9,
154:19, 174:19,
190:21, 194:11,
204:16, 213:19
**bad**
179:21, 184:15
**badger**
184:12, 184:13
**badgering**
184:8
**bar**
138:12
**based**
46:6, 54:20,
55:15, 111:3,
111:14, 144:12,
144:15, 146:17,
147:1, 166:12,
170:11, 179:17,
182:8, 182:22,
195:13, 208:21,
210:18
**basis**
88:5, 88:6,
101:5
**bates**
62:11, 62:12,
129:6, 130:17,
139:14, 206:6,
207:14
**bauerle**
1:20, 216:4,
216:18
**because**
10:17, 10:20,
46:2, 56:10,

73:12, 88:3,
99:1, 99:14,
105:13, 113:22,
132:10, 132:18,
133:15, 150:16,
157:9, 163:9,
163:16, 164:22,
168:7, 177:19,
182:15, 184:16,
196:19, 202:15
**been**
7:8, 22:18,
32:10, 33:2,
44:12, 44:14,
45:16, 48:2,
53:12, 58:19,
68:9, 82:7,
85:21, 88:12,
88:14, 98:14,
100:19, 106:8,
115:2, 115:18,
116:6, 120:20,
126:20, 145:10,
146:22, 159:7,
159:10, 160:22,
163:20, 164:6,
165:5, 165:12,
166:10, 170:22,
171:6, 171:7,
176:1, 181:11,
183:13, 185:15,
186:12, 188:8,
190:10, 192:6,
194:20, 196:2,
197:11, 197:12,
199:3, 201:15
**before**
2:9, 7:14,
7:19, 8:8, 9:21,
12:9, 12:17,
12:18, 13:17,
27:19, 28:1,
33:5, 35:20,
45:7, 55:20,
56:19, 59:20,
61:3, 64:9,
65:3, 65:5,
65:12, 66:13,

66:14, 67:15,
76:10, 81:5,
100:20, 105:7,
132:19, 160:5,
160:6, 181:4,
191:19, 192:10,
199:6, 199:19,
199:20, 202:2,
210:5, 217:2
**beginning**
28:7, 65:14
**begins**
70:8, 138:11,
139:7, 159:7,
159:8, 159:12,
159:18, 160:16
**behalf**
3:3, 3:14,
3:25, 4:4, 4:6,
8:20
**behavior**
121:19, 122:3
**being**
29:17, 31:11,
47:5, 47:6,
63:2, 74:18,
79:1, 86:1,
103:18, 118:21
**belated**
41:3
**belief**
61:7, 70:13,
71:18, 80:16,
80:21, 82:21,
83:15, 83:16,
89:14, 89:19,
99:3, 114:8,
114:12, 130:2,
130:8, 131:2,
132:4, 132:9,
132:12, 132:14,
133:6, 134:9,
135:18, 136:1,
136:11, 137:1,
142:16, 143:22,
145:1, 145:14,
153:3, 154:2,
156:12, 159:2,

159:13, 162:12,
175:7
**beliefs**
70:14, 75:5,
95:12, 96:5,
130:13, 151:15,
156:8, 162:19,
173:7
**believe**
8:10, 46:20,
56:10, 56:22,
64:8, 67:14,
79:4, 79:7,
81:15, 87:3,
91:12, 115:3,
115:17, 116:10,
169:14, 182:12
**bell**
62:2
**below**
129:9, 146:22,
159:18
**besides**
97:9
**best**
216:8, 217:10
**better**
23:1, 163:16
**between**
18:9, 26:12,
27:1, 120:17,
139:9, 140:15,
140:19, 141:2,
141:5, 201:15,
204:17
**bible**
169:13
**big**
118:22, 125:12
**biggest**
26:12
**bit**
187:2
**black**
60:19, 138:11
**body**
172:7
**bold**
129:10, 130:22,

131:17, 132:7,
134:8, 136:20,
137:4, 137:6
**both**
9:6, 108:21,
115:10, 176:18
**bottom**
34:4, 61:6,
62:9, 62:13,
68:12, 98:2,
126:22, 130:1,
130:7, 130:13,
130:18, 132:5,
138:9, 138:10,
146:20, 150:13,
157:22, 159:11,
165:9, 180:8,
180:11, 183:16
**box**
134:21, 137:9,
139:13, 140:15,
142:20, 144:5,
145:7, 146:19,
146:22, 159:7,
159:11, 159:15,
159:18
**boxes**
127:13, 138:15,
140:15, 159:22,
160:21, 161:1,
162:2, 162:17,
162:18, 165:4,
165:8, 166:10
**br**
181:8
**break**
51:10, 53:18,
55:10, 61:2,
63:17, 84:4,
84:6, 110:6,
139:9, 186:8,
187:2, 196:21
**breaks**
64:4, 196:19
**briefly**
122:15
**bring**
164:3

**broader**
167:1
**broadly**
179:16
**brochure**
77:20
**brought**
152:9
**bullet**
98:3, 104:22,
110:11, 114:18,
151:2, 160:15,
160:16, 161:2,
161:5, 162:7,
163:12, 163:18,
164:18, 166:4,
166:6
**bullets**
105:14
**burden**
40:19
**business**
4:19, 12:4,
12:10, 14:5,
17:2, 18:3,
19:2, 22:13,
22:17, 37:13,
37:17, 187:22,
190:8, 191:7,
201:2, 201:17,
214:10, 215:6
**byrd**
3:19

                C
**call**
20:11
**called**
62:10
**calls**
30:20, 71:7,
74:15, 75:15,
76:4, 88:21,
89:22, 99:16,
110:14, 144:18,
146:9, 149:22,
155:14, 163:1,
166:15, 173:9,

Transcript of
Conducted on August 28, 2024

60

177:16, 189:14,
203:20, 204:7,
205:3, 207:2,
209:4
**came**
49:17, 98:7,
98:10, 111:13,
197:3
**can't**
147:11, 156:17,
156:19, 159:10,
180:1
**cannot**
119:21, 147:7,
147:8, 147:9,
205:14
**capacity**
9:7
**care**
172:7
**carry**
154:12, 155:20
**case**
1:4, 108:15,
127:3, 216:11,
217:13
**categories**
161:18, 161:21
**category**
105:1, 105:19,
106:3, 106:6,
106:11, 107:22,
160:17, 161:1,
161:14, 162:3
**ceased**
193:13
**cell**
30:13, 30:17,
82:17, 83:16
**cells**
78:5, 78:11,
78:15, 79:1,
79:9, 79:14,
80:10
**center**
18:7, 24:9,
29:6
**centers**
18:13

**centralized**
26:20
**certain**
57:2, 98:3,
122:1
**certificate**
216:2, 217:1
**certify**
216:4, 217:4
**cetera**
134:11, 145:3
**chance**
122:10
**change**
51:17, 68:15,
69:14, 73:13,
138:16, 138:19
**changed**
68:19, 138:20,
192:19
**changes**
171:19
**charge**
187:12, 187:15
**charlottesville**
1:3, 2:6,
15:13, 25:3
**chart**
82:17
**check**
49:8
**checked**
104:17
**chief**
15:21
**choi**
172:14
**choice**
178:17
**choices**
171:19, 171:21,
172:1, 172:13,
172:17, 173:5,
174:16, 174:21,
177:9, 179:2,
183:2
**church**
15:10, 15:12,

15:14
**civil**
6:20, 20:19,
197:16, 198:17,
198:21, 200:7,
202:22, 203:18
**clarification**
24:11
**clarify**
19:18, 160:5
**class**
33:9
**clear**
46:4, 50:21,
124:4, 140:7,
149:11, 185:3,
188:19, 190:20,
210:3
**clearly**
10:21
**clients**
204:4
**clinics**
25:5, 25:11
**clip**
150:15, 150:16
**coach**
73:4
**coaching**
20:6
**code**
69:15, 69:17
**coincides**
132:21
**collective**
87:9
**column**
65:10, 65:22,
67:3, 67:6
**columns**
61:2
**com**
3:11, 3:23,
3:33
**come**
10:21, 17:22,
19:1, 53:16,
53:21, 84:5,

128:13, 207:21
**coming**
202:3
**comment**
61:7, 61:8,
62:20, 71:18,
71:19, 80:16,
82:21, 83:16,
130:2, 130:8,
130:13, 131:2,
132:4, 132:9,
132:12, 132:15,
133:6, 134:17,
135:1, 135:18,
136:1, 136:12,
137:1, 137:9,
139:13, 140:8,
140:12, 140:14,
140:20, 140:21,
141:2, 141:3,
141:6, 141:8,
142:2, 142:16,
144:6, 144:20,
145:8, 154:2,
159:2, 159:3,
180:12, 180:15,
180:22
**comments**
111:14, 145:15,
153:4, 175:8,
190:12, 190:17,
192:3, 192:9,
208:2
**commission**
217:18
**committee's**
41:19, 46:14,
47:8, 47:10,
109:14, 110:3,
110:7, 114:21,
142:11, 167:5,
183:9
**common**
38:22, 39:4,
57:17, 99:3
**commonwealth**
2:10, 217:22
**communicated**
31:11, 55:21,

56:20, 116:5,
185:19, 186:3,
194:4, 194:5
**communication**
22:4, 22:9,
139:22, 181:12,
185:15, 194:12
**communications**
79:21, 86:4,
86:9, 115:21
**comparing**
136:4
**compensation**
18:20
**complete**
38:18, 74:5,
74:11, 74:13,
74:18, 75:2,
76:2, 83:17,
106:4, 106:6,
106:10, 108:1,
115:7, 144:14,
146:17, 147:1,
148:14, 149:21,
154:4, 158:4
**completed**
18:22, 115:7
**completeness**
43:21, 54:17,
59:18, 60:11,
73:21, 74:2,
88:17, 108:20,
148:10, 149:19,
150:21, 152:16,
153:7, 153:8,
153:16, 153:20,
155:6, 157:21,
158:11, 158:19
**completing**
214:4
**complex**
21:13
**complexity**
21:11
**comply**
118:4, 203:17
**compound**
144:18

**comprised**
18:12
**concerned**
121:19
**concluded**
215:7
**conclusion**
41:4, 203:20,
204:8
**concur**
8:19
**condition**
198:9
**conducted**
197:15, 198:16
**confidential**
5:3, 5:6, 5:13,
6:1, 6:4, 6:12,
6:15
**confidential)-em-
ail**
125:4
**confidential)-pr-
eliminary**
6:7
**confidential)-pr-
int-out**
5:17
**confidential)-uv-
a_-print-out**
50:10, 67:22
**confidentiality**
214:9
**confirm**
33:19, 65:9,
68:18, 127:1
**conflict**
20:5, 20:9,
20:15, 21:4,
21:18, 70:16,
71:19, 134:17,
134:20, 134:22,
135:18, 136:12,
137:9, 144:6,
144:20, 145:8,
145:15, 153:4,
154:2, 159:3,
175:8

**conflicts**
21:6, 21:9,
21:21, 21:22,
22:3, 134:10,
145:2
**confused**
168:11
**confusing**
90:22
**consensus**
111:13, 111:15
**consequence**
118:3
**consequences**
118:12
**consider**
59:7, 174:7,
206:22
**consideration**
43:12, 47:1,
47:14, 109:7,
109:14, 110:4,
110:7, 114:21,
174:8, 178:15,
178:19, 182:11,
182:16, 182:17,
196:12
**considerations**
174:9, 174:10,
182:18
**considered**
60:2, 97:10,
147:1, 164:15,
166:4
**considering**
60:7
**consistency**
173:6
**consistent**
100:7, 172:15,
172:16, 173:6,
182:4, 202:10
**constant**
18:19
**consult**
13:9, 80:9
**consultant**
12:19, 12:21,

13:5, 13:12,
20:12, 20:13,
27:4, 200:22
**consultants**
20:2, 20:3
**consultation**
18:20
**consulting**
13:11
**contents**
87:6, 123:22
**context**
95:14
**continue**
82:16, 121:17,
139:6, 139:7,
142:20, 193:12
**continues**
34:18, 105:2,
139:8, 146:20,
159:16, 160:18
**continuing**
153:2, 158:2,
165:10, 169:3
**contractor**
13:7
**conversation**
8:1, 29:20,
30:5, 111:14
**coordinated**
102:8, 187:16
**copy**
81:8, 125:10
**corner**
127:9
**correct**
8:15, 9:10,
13:13, 37:19,
40:7, 44:15,
45:11, 54:12,
69:5, 69:22,
71:11, 71:20,
72:2, 74:18,
74:21, 76:14,
80:3, 80:4,
87:16, 87:17,
89:6, 90:5,
91:14, 101:2,

Transcript of
Conducted on August 28, 2024

62

102:17, 102:18,
104:2, 104:3,
105:21, 107:10,
107:12, 108:2,
109:10, 109:19,
110:20, 116:2,
116:3, 123:5,
141:21, 145:10,
145:17, 145:18,
146:13, 148:10,
157:6, 163:12,
163:22, 166:6,
166:7, 172:6,
174:4, 176:19,
177:3, 177:4,
177:6, 177:7,
177:10, 178:8,
178:9, 181:12,
186:1, 186:16,
190:16, 191:11,
191:15, 192:17,
194:14, 195:3,
195:4, 195:13,
196:7, 210:8,
210:9, 210:15
**correctly**
24:14, 111:19
**correlation**
132:18, 133:1
**corresponds**
53:14
**cough**
73:9, 73:10
**could**
17:14, 17:17,
32:22, 37:1,
37:13, 37:14,
38:19, 44:20,
57:3, 57:5,
79:13, 80:14,
80:15, 81:20,
82:10, 98:1,
103:15, 107:2,
111:22, 112:20,
120:20, 130:19,
134:6, 142:14,
143:17, 144:4,
170:16, 172:16,

173:3, 179:11,
180:6, 180:21,
199:16, 212:2,
212:3
**couldn't**
92:21
**counsel**
8:10, 9:8,
33:19, 44:18,
65:9, 68:18,
69:8, 70:1,
73:5, 79:22,
86:6, 86:9,
90:13, 92:2,
123:13, 123:20,
127:1, 140:4,
147:6, 147:22,
167:10, 168:10,
204:13, 205:8,
207:19, 208:7,
214:8, 214:15,
216:10, 217:12
**counsel's**
86:6, 121:19,
124:14, 124:21
**counselor**
167:22
**count**
176:15
**country**
203:9, 204:6
**couple**
212:1
**court**
1:1, 1:21, 8:4,
8:8, 8:12, 8:17,
63:22, 64:1,
214:3, 217:1
**cover**
8:7
**covered**
213:9
**covid**
5:11, 48:15,
58:4, 60:3,
64:13, 78:12,
78:15, 79:2,
79:9, 79:15,

80:10, 100:5,
118:4, 176:8,
176:14, 176:18,
197:21
**created**
64:10, 65:11,
123:2, 123:12,
192:7
**creating**
192:14
**criteria**
60:6, 74:11,
84:17, 96:22,
97:3, 97:14,
97:19, 110:10,
110:15, 114:5,
144:15, 146:16,
147:2, 148:6,
148:12, 149:18,
153:22, 162:15,
162:20, 166:4,
166:8, 166:12,
167:1, 167:3,
167:5, 167:8,
168:17, 169:5,
169:8, 169:22,
170:11, 173:8,
177:12, 178:1,
178:10, 178:14,
178:16, 179:18,
182:8
**crosscastle**
3:5
**csr**
1:20, 216:18
**current**
18:3, 19:12
**cut**
124:17
**cynthia**
1:20, 216:4,
216:18

**D**

**daily**
95:19
**danny**
1:21, 2:9,

217:2, 217:21
**database**
50:20
**date**
192:1, 199:7,
199:11, 200:11
**day**
11:4, 49:17,
64:4, 93:1,
120:8, 120:19,
193:5, 193:8
**days**
120:15, 120:18,
120:21, 215:4,
215:6
**deadline**
100:11, 100:20
**dean**
23:11, 27:5
**dear**
139:16, 181:1,
181:22
**december**
195:12
**decentralized**
26:19
**decide**
89:15, 89:18,
95:6, 111:6
**decided**
40:17, 92:4,
186:19
**decision**
55:5, 55:7,
55:20, 111:7
**decisionmaker**
187:7
**decisions**
85:13, 111:1,
111:3, 187:6,
187:8, 187:13,
187:16, 188:15,
189:9, 189:20,
190:2, 190:7,
190:10, 191:6,
191:8, 192:14,
196:11
**declaration**
5:9

Transcript of

Conducted on August 28, 2024

63

dedicated
120:1
defendant
3:14, 3:25,
4:6, 4:14, 32:4
defendants
1:11
defending
122:10
deficient
170:14
define
16:12, 23:4,
24:12, 24:13
defines
26:2
degree
14:11, 14:13,
14:16, 14:17,
14:20, 15:1
demonstrate
40:14, 89:13
demonstrated
43:10, 89:19,
106:7, 106:16,
106:17, 173:6
demonstrative
151:13, 151:15
denial
113:10, 116:6,
116:14, 170:17,
179:3
denied
38:19, 54:22,
85:1, 85:3,
87:10, 87:13,
87:18, 88:2,
88:12, 88:15,
89:9, 91:13,
104:12, 106:4,
106:5, 106:8,
112:19, 113:9,
113:15, 113:17,
113:22, 118:13,
121:4, 121:8,
122:17, 123:4,
124:9, 157:8,
162:12, 170:11,

174:12, 177:13,
179:10, 179:14,
179:17, 180:2,
180:5, 180:20,
182:6, 182:20,
182:22, 183:8
denomination
170:4
denominations
98:4, 98:11
deny
54:18, 55:6,
60:8, 87:2,
92:5, 95:6,
112:1, 171:1
denying
47:7, 85:7,
85:16, 88:6,
88:19, 89:6,
151:14
depart
84:9, 84:14
department
4:21, 18:5,
18:10, 18:13,
18:15, 18:16,
26:13, 37:9,
40:19, 50:8,
52:2, 52:12,
53:2, 53:22,
54:3, 64:17,
65:2, 65:7,
65:19, 65:22,
66:5, 66:12,
66:17, 66:19,
67:1, 67:2,
67:18
departments
18:12, 26:4,
66:9
depended
21:10
depends
156:16
deposition
1:13, 2:2,
7:19, 8:16, 9:3,
121:17, 122:11,

208:2
depositions
7:22
describe
110:3, 134:9,
145:1, 156:11,
156:12, 156:14
described
157:11, 158:9,
187:5
description
4:9, 5:1, 77:6,
143:21, 151:11,
161:17
designated
48:22, 104:1,
105:3, 111:21
designed
121:21
detail
169:18, 172:21
determine
47:9, 75:2,
104:14, 137:21,
153:20, 157:5
determining
104:16
dev
65:16
development
14:14, 17:14
diabetes
18:7
diehl@crosscastle
3:11
diet
172:1
difference
18:9, 56:9,
56:13, 56:14,
140:15, 140:16,
141:2, 141:5
differences
26:12, 140:19,
204:17, 204:20
different
8:3, 8:8, 17:3,
25:21, 26:6,

26:22, 27:9,
39:13, 53:9,
64:21, 67:10,
82:7, 84:17,
87:19, 88:6,
102:16, 108:9,
108:11, 124:8,
133:11, 133:22,
136:19, 142:6,
148:8, 156:21,
178:1, 178:4,
178:7, 178:10,
183:7, 197:17,
198:1, 198:2,
198:4, 200:15,
202:16, 202:17,
202:18, 206:13
differently
26:2, 26:3,
42:2
digit
61:22
digital
8:17, 216:6,
217:8
directed
122:5
direction
86:5, 86:19,
123:13
director
19:7, 27:7,
101:22, 188:2,
188:3
disabilities
198:3, 203:12
disability
197:19, 198:9,
204:18, 206:17
disagree
123:11
disclose
86:3, 123:11
discuss
20:12, 20:14,
38:17, 39:14,
77:8, 102:15,
110:20, 114:11,

Transcript of

Conducted on August 28, 2024

64

124:14, 153:8
**discussed**
35:5, 36:11,
39:1, 39:8,
39:20, 46:9,
54:18, 76:13,
88:18, 89:4,
96:7, 109:5,
109:7, 114:17,
164:7, 191:21
**discussing**
41:17, 47:15,
58:18, 77:9,
86:11, 110:8,
151:22, 160:22,
166:10
**discussion**
105:16, 110:4,
163:21, 164:4,
208:18
**discussions**
102:20
**disrupt**
205:20
**distinction**
184:22
**district**
1:1, 1:2
**diversity**
15:21, 16:5,
16:10, 16:17,
17:8
**divided**
49:18
**division**
1:3
**divisions**
18:16
**doctor**
80:3, 93:15,
175:14
**document**
32:9, 32:19,
33:5, 33:8,
33:20, 45:7,
47:6, 50:13,
52:1, 65:2,
65:5, 66:13,

66:14, 77:15,
106:15, 108:4,
127:9, 130:3,
131:5, 131:6,
135:22, 138:2,
138:5, 151:13,
155:3, 158:21,
174:7, 192:1,
192:6, 199:2,
200:5, 207:6,
207:9, 207:12,
207:17, 208:22,
213:8
**documents**
50:21, 69:11,
77:2, 77:12,
81:12, 137:19,
150:14
**doe**
3:25
**doing**
10:15, 11:2,
91:20, 117:17,
121:4, 147:6,
151:7, 151:10,
184:2, 184:21,
195:10
**done**
25:22, 34:8,
122:12, 127:2,
131:18, 131:20,
143:1, 143:18,
143:19, 144:7,
144:9, 151:19,
194:14, 195:22,
208:4, 208:6,
214:14
**down**
8:5, 64:1,
85:6, 85:15,
105:14, 110:6,
127:19, 129:5,
138:16, 139:8
**drop**
73:9, 73:10
**duly**
7:8
**during**
11:3, 58:16,

100:16, 100:18,
103:12, 111:14,
120:9, 121:20,
122:10, 194:5,
201:1, 201:16
**duties**
16:10, 16:12,
16:13, 16:16,
18:2, 19:11,
19:12, 19:13,
22:16, 22:18,
25:16, 25:19,
27:20, 28:1,
28:6, 42:5,
42:15, 42:20,
119:16, 119:17
**dwayne**
1:6

**E**

**each**
9:16, 21:17,
26:1, 30:8,
53:14, 69:16,
133:15, 178:11
**earlier**
53:17, 91:13,
124:6, 129:20,
144:11, 146:11,
146:18
**east**
3:18, 3:19
**eat**
98:17
**edu**
126:5
**education**
17:8
**effectively**
191:8
**eight**
20:1, 39:22,
40:3, 44:15,
44:17, 45:11,
45:18, 46:9,
61:17, 61:18,
65:15
**eighteen**
125:2

**either**
38:19, 39:12,
41:12, 80:8,
205:15, 208:21
**elaborate**
171:13, 171:14
**else**
55:4, 55:19,
86:19, 86:20,
95:21, 157:16,
157:20, 158:3,
170:14
**email**
6:15, 30:9,
63:2, 125:18,
126:4, 126:6,
182:20
**email-re-vax**
5:16
**employed**
216:11, 217:12
**employee**
12:11, 12:22,
13:4, 13:6,
18:21, 19:20,
20:2, 20:4,
20:14, 23:22,
29:5, 37:8,
40:15, 40:17,
44:9, 50:1,
50:6, 50:7,
52:2, 52:10,
52:20, 52:22,
53:3, 54:4,
55:1, 55:2,
55:21, 56:20,
58:18, 59:7,
66:15, 67:17,
68:8, 69:19,
73:22, 92:20,
92:21, 93:8,
93:10, 94:6,
107:8, 112:7,
113:10, 114:11,
114:16, 117:13,
118:3, 118:6,
118:13, 119:8,
124:8, 138:20,

144:21, 145:6,
145:9, 146:19,
155:19, 156:4,
156:17, 156:18,
156:20, 156:21,
157:10, 159:17,
160:1, 161:22,
162:1, 162:17,
165:6, 165:15,
169:2, 169:5,
174:3, 175:1,
175:22, 177:1,
178:21, 179:11,
179:13, 179:15,
180:19, 181:12,
182:5, 182:19,
185:13, 195:2,
196:18, 197:7,
200:22, 201:12,
206:17
**employee's**
40:16, 81:13,
157:4, 162:19
**employees**
20:11, 21:8,
27:16, 28:15,
28:18, 48:5,
48:14, 52:14,
57:22, 58:3,
62:5, 64:17,
81:7, 83:6,
84:1, 84:22,
93:4, 93:21,
94:2, 94:3,
113:15, 115:22,
121:3, 123:5,
128:18, 129:13,
132:2, 133:8,
134:1, 134:15,
135:4, 135:17,
136:10, 136:22,
137:7, 155:3,
155:9, 156:10,
157:5, 157:18,
175:10, 175:19,
179:16, 180:3,
183:8, 200:9
**employer**
40:13, 44:10

**employment**
195:12, 202:21
**end**
82:16, 82:20,
142:20, 193:4,
199:12, 200:12
**ended**
193:6, 193:17,
193:19
**ending**
195:12
**ends**
82:18, 105:2,
159:19, 182:1
**ensure**
16:4, 16:5,
18:21
**ensuring**
43:22
**entails**
16:1, 128:11
**enter**
37:7, 37:8,
37:10
**entering**
112:10
**entirety**
212:15
**entities**
25:11
**entry**
165:1
**eocr**
20:17, 198:16
**equal**
6:19, 20:19,
197:16, 198:16,
198:21, 200:7
**equals**
181:17
**equity**
16:5, 16:10,
16:17, 17:9
**er**
20:12, 20:13
**errata**
214:5
**esquire**
3:4, 3:16, 3:26

**et**
1:6, 1:10,
134:11, 145:3
**evaluate**
157:4, 160:20,
164:14, 175:10
**evaluated**
146:5
**evaluating**
83:10
**evaluation**
206:7
**evaluations**
18:22, 20:7
**even**
171:18
**ever**
7:19, 84:9,
84:16, 85:6,
85:10, 117:17,
142:1, 183:21,
184:2, 184:21,
185:4
**every**
64:2, 73:12,
93:1, 106:20,
156:21, 167:13,
167:14, 167:16,
178:3, 202:18
**everyone**
17:20, 17:21,
214:21
**everything**
147:18
**exact**
193:5, 193:8
**exam**
95:17
**examination**
4:4, 4:6, 7:11,
211:21
**examined**
7:9
**example**
49:17, 50:1,
55:13, 62:7,
92:14, 126:20,
182:22, 187:11,

196:18, 200:16,
210:14
**examples**
95:18, 151:14,
152:18, 154:11,
155:20, 161:15,
173:20
**exclusively**
185:20, 186:3
**excuse**
27:20, 35:8,
45:18, 61:13,
85:11, 108:10,
129:3, 133:8,
140:16, 159:9,
161:8, 163:8,
163:13, 166:5,
198:1, 207:14
**exempt**
85:8, 113:9,
164:14
**exemptions**
28:2, 28:7,
28:12, 28:14,
28:18, 34:6,
35:21, 36:10,
38:2, 38:4,
38:6, 43:10,
46:22, 57:3,
58:8, 76:18,
86:13, 95:15,
103:6, 110:1,
120:1, 174:4,
191:11, 193:3,
193:14, 213:18
**existed**
65:12
**existence**
86:10
**exists**
123:2, 138:3
**expedite**
214:22
**expedited**
215:3
**experience**
22:2
**expires**
217:18

Transcript of
Conducted on August 28, 2024                                                66

**explain**
43:5, 53:8,
113:8, 113:9,
136:13, 146:17,
163:6, 169:6,
169:7
**explained**
157:17
**explanation**
113:15, 157:11
**extent**
10:2, 41:3,
147:4

**F**

**face**
82:11, 125:17,
142:19
**fact**
86:10, 94:10,
121:22, 175:17,
211:2
**factors**
110:14, 110:15,
110:18, 110:20,
115:11, 115:14,
166:5, 168:17
**facts**
86:12
**failed**
118:3
**fair**
11:15, 25:14,
39:9, 55:16,
144:2, 154:22,
155:12, 156:5,
161:21, 165:8,
165:15, 170:19,
178:18
**faith**
80:21, 99:1,
99:14, 154:13,
155:21, 156:5,
157:6, 157:12,
159:19, 170:5
**faithfulness**
95:16
**faiths**
98:4, 98:11

**fall**
119:14, 120:9,
120:14
**familiar**
51:12, 66:21,
128:18, 131:5,
131:6, 131:8,
202:21, 203:2
**far**
10:16, 43:5,
203:15
**fax**
3:10, 3:22,
3:32
**federal**
203:8, 203:12
**feel**
165:3
**felt**
38:13
**fetal**
78:5, 78:11,
78:14, 79:1,
79:8, 79:14,
80:10
**few**
8:6, 198:17
**field**
140:8, 142:2
**filed**
33:16
**fill**
135:17, 136:11,
136:22, 137:8,
142:2
**filled**
93:4, 132:3,
134:1, 137:12
**filling**
133:9
**filters**
133:17
**financial**
216:12, 217:14
**find**
80:17, 80:20,
81:6, 84:4,
159:9, 159:13

**fine**
11:6, 147:20,
190:19, 210:2
**finish**
9:17, 9:20,
53:20, 201:5
**finished**
214:4
**finishing**
53:21
**fired**
121:3
**firmly**
169:14
**first**
4:15, 6:10,
7:8, 29:7, 32:5,
32:12, 32:20,
34:13, 35:8,
35:11, 60:17,
65:3, 65:7,
65:10, 70:8,
70:9, 71:19,
80:15, 83:16,
83:21, 83:22,
88:13, 104:22,
107:15, 117:8,
127:22, 129:3,
130:1, 130:6,
132:5, 142:14,
142:17, 144:20,
150:12, 152:12,
153:2, 154:3,
158:1, 159:6,
159:8, 159:11,
161:2, 165:1,
165:5, 169:3,
175:1, 175:20,
176:6, 177:1
**fit**
41:18, 105:19
**fits**
105:1, 107:21,
160:17
**fittes**
5:9
**five**
103:17, 111:18

**flow**
90:19
**flu**
58:2, 58:13,
176:2, 210:14
**focus**
16:22
**follow**
124:1, 124:13,
124:20, 162:6
**followed**
108:16
**follows**
7:9
**foregoing**
216:6, 217:3,
217:5
**formal**
8:3
**formality**
11:10
**format**
51:9, 145:16
**formed**
190:5
**forth**
97:15, 108:17,
211:16
**forward**
104:7, 164:1
**forwarded**
105:15, 105:20,
111:20, 163:11,
163:21, 164:6
**found**
143:11
**foundation**
31:6, 90:17
**four**
61:22, 149:5,
178:14, 213:8
**fred**
188:2
**frederick**
101:16, 102:20,
103:8, 187:12,
187:18, 188:22,
189:4, 189:15,

190:1, 190:13,
191:5, 194:21,
195:2, 195:18,
195:19
**frederick's**
101:18, 188:3,
189:2, 192:4,
192:10
**fredrick**
29:18, 31:9,
31:11, 35:12,
103:11
**free**
165:3
**front**
40:4, 54:9,
129:22, 149:4
**frustration**
135:9
**full**
119:7
**full-time**
119:8
**fully**
217:5
**functionally**
18:18
**functions**
142:11
**further**
54:18, 164:4,
211:19
**future**
214:11

**G**

**gather**
20:13
**gathering**
20:3
**gave**
192:2
**general**
19:1, 19:13,
171:16, 173:19,
197:12, 201:20
**generally**
42:19, 169:17,

171:10, 172:19,
173:2, 193:1
**generic**
69:17
**gentleman**
▮▮▮▮▮▮▮
**give**
7:5, 169:10,
169:11, 169:15,
171:17
**given**
40:18, 137:7,
152:17, 194:21
**go**
15:1, 46:5,
47:19, 54:6,
62:7, 62:13,
71:1, 76:19,
79:13, 103:15,
104:18, 106:22,
109:4, 114:4,
124:18, 127:19,
128:15, 130:16,
130:17, 138:7,
138:8, 140:10,
142:14, 160:6,
169:17, 172:20,
175:4, 175:9,
180:6, 207:22,
208:10
**goes**
129:5
**going**
9:1, 10:17,
17:22, 19:19,
32:22, 33:1,
40:20, 44:6,
46:1, 50:13,
64:1, 64:7,
71:1, 73:11,
79:19, 85:11,
86:2, 91:20,
107:5, 121:16,
123:7, 124:1,
124:13, 124:20,
127:21, 138:15,

147:17, 158:14,
190:21, 191:2,
194:1, 201:7,
208:10
**gone**
71:5, 72:5
**good**
7:13, 11:2,
63:16, 121:10,
186:7
**gopher**
184:13
**grant**
57:3, 57:8,
166:12
**granted**
57:5, 57:16,
118:5
**granting**
47:7
**great**
10:15
**greater**
181:7, 181:8
**group**
38:4, 39:1,
39:9, 96:21
**guess**
14:2, 16:16,
16:19, 25:2,
52:18, 54:1,
74:4, 86:8,
88:1, 94:11,
102:1, 108:14,
110:14, 120:2,
131:10, 133:2,
136:14, 141:15,
148:21, 149:8,
151:6, 163:5,
166:22, 172:4,
189:3, 200:2
**guidance**
77:12, 84:10,
102:6, 102:10,
103:4, 103:7,
103:9
**guide**
76:22, 77:2

**guiding**
200:8

**H**

**half**
120:6
**hall**
34:18
**hand**
7:2, 33:1,
50:13, 127:8
**handed**
143:7, 199:2
**handing**
32:9
**handle**
173:14
**handled**
171:18, 198:7,
198:10
**happen**
54:22, 116:13,
116:18
**happened**
31:13, 112:16
**happens**
54:15, 106:20
**hardship**
40:7, 40:10,
40:12, 40:13,
40:14, 41:17,
42:5, 42:15,
42:16, 42:21,
43:6, 43:11,
44:5, 44:7,
44:9, 44:10,
44:13, 45:14,
46:7, 46:13,
47:1, 47:5,
47:9, 47:14,
104:17
**heading**
213:9
**healing**
172:3
**health**
4:20, 5:10,
6:17, 23:5,

23:10, 23:11,
23:13, 23:14,
24:2, 24:4,
24:6, 24:16,
24:18, 25:10,
25:12, 29:4,
50:1, 57:9,
125:5, 126:3,
128:17, 187:21,
188:4
**healthy**
172:13
**hear**
62:15, 71:14
**held**
2:3, 12:6,
12:10, 34:17,
75:5, 89:14,
89:16, 89:19,
95:12, 95:14,
95:18, 96:5,
99:3, 106:7,
114:8, 114:12,
151:15
**helped**
21:9
**helpful**
8:7, 9:15,
10:16, 36:20,
37:5, 44:22,
106:22
**helps**
150:5, 207:12
**here**
8:9, 8:12,
11:10, 27:6,
41:4, 87:7,
108:9, 109:7,
110:11, 110:18,
121:1, 127:13,
127:20, 129:2,
139:3, 172:5,
172:11, 185:3,
191:2
**hereby**
216:4, 217:4
**highly**
5:3, 5:6, 5:13,

5:17, 6:1, 6:4,
6:7, 6:12, 6:15,
50:9, 67:21,
125:3
**highway**
3:6
**hiring**
16:6
**hoffman**
19:10
**hold**
54:18, 150:17
**honesty**
95:16
**hope**
122:2
**hos-**
24:8
**hospital**
13:10, 24:7,
24:10, 24:19,
24:21, 25:6,
25:11, 29:5
**hours**
119:4, 119:10,
119:11, 119:12,
119:22, 120:3
**housekeeping**
9:1
**however**
17:17, 135:21,
175:21
**hr**
4:18, 6:17,
12:10, 16:21,
16:22, 17:2,
18:3, 19:1,
19:2, 19:7,
22:13, 22:17,
26:4, 26:12,
27:4, 37:12,
37:17, 41:13,
125:5, 126:3,
187:21, 190:8,
191:7, 194:19,
201:2, 201:17,
203:13
**hrb**
111:21

**hrbp**
37:17, 37:20,
48:22, 104:1,
105:4, 105:6,
164:2
**hrbps**
188:5
**human**
12:4, 12:19,
13:5, 14:5,
14:11, 16:18,
17:19, 27:7,
196:10, 197:4,
202:20, 204:3,
204:4, 204:22,
206:21, 210:18,
214:9
**hunton**

▮▮▮▮▮▮

**hyperlink**
181:16
**hypothetical**
74:16, 75:16,
76:4, 88:22,
90:1, 90:7,
91:3, 91:7,
146:2, 149:17
**hypothetically**
144:12

**I**

**id**
51:15, 51:17,
61:13, 61:15,
65:7, 65:10,
65:14, 68:7,
68:15, 68:21,
68:22, 69:9,
69:15, 138:3,
138:16, 138:19,
139:4
**idea**
13:8, 98:9
**identification**
32:3, 32:7,

50:12, 68:2,
125:7, 199:1
**identified**
69:4, 163:19,
175:19
**identify**
162:11, 162:18,
163:4, 163:7,
163:10, 170:17
**identifying**
170:8
**identity**
214:10
**ids**
65:11
**ignore**
32:14, 84:16,
142:16
**ignoring**
170:7, 170:14,
181:20
**immuni**
182:1
**immunization**
134:11, 145:3
**immunize**
182:2
**impact**
121:21, 154:14
**impacted**
121:22
**important**
72:19, 114:20,
118:16
**improper**
121:20, 122:6,
147:14, 205:14
**improperly**
175:16
**in-person**
30:5, 30:9
**incidents**
20:5, 20:9
**include**
25:5, 25:10,
157:9, 182:21
**included**
74:12, 76:1,

Transcript of ▮▮▮▮▮▮
Conducted on August 28, 2024

69

76:2, 122:16,
124:6, 172:5,
174:6
**includes**
123:2
**including**
34:21, 44:8,
148:9
**inclusion**
16:5, 16:11,
16:18, 17:9
**inclusive**
161:10, 161:12,
161:16, 182:12,
182:13
**incomplete**
38:14, 39:7,
74:15, 75:15,
76:4, 88:10,
88:11, 88:21,
89:22, 154:9
**incompleteness**
39:12, 89:5,
89:8, 91:17,
92:6, 95:4
**inconsistent**
92:11, 92:19,
93:2, 93:20
**incorporate**
169:13
**incorporated**
78:5, 85:22
**independent**
13:7, 13:11
**independently**
83:8, 83:12,
207:9
**index**
4:1
**indi**
112:1
**indicate**
48:1, 54:17,
59:19, 66:12,
78:10, 112:1,
154:15, 157:21,
172:4
**indicated**
69:20, 92:21,

93:1, 104:13,
112:2, 112:5,
169:4
**indicates**
53:2
**indication**
172:12
**individual**
9:7, 68:22,
69:16, 87:11,
104:14, 105:7,
113:13, 170:18
**individually**
38:3, 38:4,
38:6, 38:13,
38:14
**individuals**
51:16, 100:21
**infor**
53:3
**informal**
8:18
**informed**
114:19, 115:3,
115:6, 115:13,
155:3, 194:10,
195:21
**initial**
139:21, 182:7
**initials**
62:6, 63:6,
63:8, 63:12,
137:13, 137:15,
140:7
**institutes**
18:13
**instruct**
72:20, 147:9
**instructed**
123:21
**instructing**
205:10
**instruction**
124:2, 124:14
**instructions**
124:21
**intention**
205:21, 205:22

**intentionally**
147:10
**inter**
208:18
**interactive**
206:8, 206:12,
206:15, 206:20,
207:13, 208:19,
209:2, 209:13,
209:17, 210:20,
211:3
**interest**
216:12, 217:14
**interfering**
147:10
**interposing**
41:3
**interpret**
156:20, 156:22
**interprets**
156:17
**interrogatories**
4:16, 6:11,
32:6, 33:22
**interrogatory**
34:2, 34:4,
34:8, 34:14
**interrupt**
151:11
**interrupting**
90:19, 92:2
**intro**
7:21
**introduced**
7:14
**introduction**
7:22
**introductory**
9:19
**involve**
110:8, 197:18
**involved**
21:12, 103:18,
189:9, 189:20,
192:14, 196:2,
196:10, 196:11,
198:4
**involving**
210:14

**issue**
10:7, 21:11,
41:16, 41:18,
42:16, 43:6,
43:18, 44:4,
46:7, 46:12,
46:16, 46:22,
57:19, 58:18,
88:18, 92:15,
94:18, 95:4,
96:4, 114:20,
153:15, 158:19,
170:7, 175:10,
197:19, 197:20
**issues**
26:22, 39:1,
39:11, 39:13,
39:18, 48:11,
53:22, 79:13,
94:19, 95:5,
96:6, 114:17,
155:5, 170:16,
170:22, 174:2,
178:22, 196:4
**itself**
34:8, 53:11,
102:2, 171:12

──── **J** ────

▮▮▮▮▮▮

**jenny**
19:4

▮▮▮▮▮▮

**job**
1:18, 10:15,
11:3, 12:15,
16:1, 16:13,
18:2, 18:4,
19:22, 23:19,
28:3, 40:16,
67:5, 119:1,
126:10, 197:3,
197:4
**jobs**
202:2

Transcript of
Conducted on August 28, 2024

70

**join**
9:5
**joke**
184:14
**joking**
73:10, 167:21,
168:1
**judge**
43:17, 91:21
**july**
34:17, 34:22,
35:7, 35:10,
36:10, 76:13,
191:15, 191:19,
192:11, 199:13,
200:12
**jumbled**
206:14
**jump**
19:19, 54:7
**june**
12:16, 14:9,
201:15

**K**

**karmen**
5:9
**katy**
19:10
**keep**
32:22, 69:16,
91:20, 143:17,
207:21
**kent**
23:11
**kept**
86:5, 86:18

**kind**
32:14, 77:13,
80:6, 111:13,
181:5
**kinda**
107:1
**kirsner**
3:26, 8:19,
9:4, 43:2,
47:16, 72:14,
73:1, 73:6,
90:9, 109:20,
125:9, 125:13,
143:5, 143:9,
143:13, 149:22,
154:5, 155:14,
162:22, 175:2,
184:7, 205:7,
205:17, 214:1,
214:17
**knew**
71:22
**knowing**
136:19
**knowledge**
42:14, 48:13,
49:21, 55:5,
55:19, 80:10,
81:9, 85:2,
93:4, 97:13,
97:18, 142:7,
180:17, 186:20,
189:22, 193:19,
204:12, 209:1,
216:9, 217:11
**known**
105:1, 105:19,
106:3, 106:6,
106:11, 107:22,
155:10, 159:1,
160:17, 161:1,
161:14, 161:17,
161:20, 162:3
**kurth**
3:17

**L**

**label**
61:3, 62:11,

65:21, 130:18,
139:14, 170:4,
206:6
**labeled**
70:9, 129:6,
207:15
**labels**
67:2
**lack**
22:22, 31:6
**language**
132:8, 136:20,
136:21, 137:4,
137:6, 139:17,
141:14, 142:17,
153:1, 159:9,
159:12, 181:21,
181:22
**last**
140:10, 140:12,
199:13
**later**
34:19, 149:5,
165:13
**laughing**
167:22
**law**
203:2, 203:3,
203:8, 203:12
**laws**
202:22, 203:3
**lawsuit**
7:17, 10:13,
32:14, 32:17,
33:10, 33:12,
33:13, 51:16,
51:19, 62:10,
64:11, 65:11
**lawyer**
72:20, 80:2,
202:20, 203:1,
203:7
**lawyers**
33:21, 34:12,
46:3, 51:18,
68:20, 72:18,
127:3, 127:13,
208:16

**lay**
90:17
**layers**
27:10
**leader**
186:19, 187:8,
194:18
**leading**
20:6, 212:16,
213:4, 213:13
**learn**
29:7, 191:18,
194:1, 202:5
**learned**
202:11
**least**
145:16
**lecturing**
147:16
**left**
61:7, 127:8,
130:7, 130:13,
134:21, 140:13,
180:13, 195:5,
195:14, 195:15,
195:18
**legal**
41:4, 41:10,
187:6, 203:20,
203:22, 204:8
**less**
119:10, 181:7,
181:8
**let's**
11:18, 40:13,
44:18, 68:3,
90:3, 144:19,
149:16, 150:11,
169:15, 185:12
**level**
188:11
**life**
95:20
**lifestyle**
171:14, 171:18,
171:19, 171:20,
171:22, 172:13,
172:17, 173:5,

Transcript of ███████████
Conducted on August 28, 2024

71

174:16, 174:21,
177:9, 178:17,
179:2, 183:2
**lifetime**
173:17
**likely**
33:15, 189:8
**limit**
57:4, 122:8
**limited**
212:10
**limiting**
167:7
**line**
65:7, 65:14,
183:17
**linkedin**
4:17, 17:16,
17:17, 195:8
**list**
34:20, 75:18,
75:19, 98:3,
98:6, 98:11,
127:20, 161:9,
161:11, 182:12
**listed**
33:21, 67:3,
67:18, 84:18,
99:19, 106:5,
110:10, 110:19,
114:5, 115:15,
130:22, 131:14,
132:11, 136:9,
138:19, 154:1,
154:21, 160:1,
161:9, 161:22,
167:3, 168:18,
173:8, 173:15,
174:9, 174:10,
181:18, 182:8,
195:12, 200:6
**little**
8:2, 8:3,
150:14, 150:15,
187:2
**live**
156:4, 156:14,
157:6, 157:12

**llp**
3:17
**located**
59:16
**log**
37:7, 86:7,
86:16, 123:16,
123:18
**logging**
52:22
**login**
49:1, 52:21
**long**
11:17, 12:6,
13:14, 14:7,
98:14, 114:6,
114:7, 114:11
**longer**
194:1, 195:2
**look**
33:4, 33:5,
46:19, 51:11,
60:16, 60:22,
64:11, 65:14,
66:9, 66:21,
67:11, 70:7,
80:14, 104:20,
105:13, 130:19,
134:6, 149:20,
150:3, 151:18,
154:19, 158:6,
158:7, 158:17,
158:20, 165:1,
165:3, 180:21,
195:11, 199:4,
199:17, 199:18,
202:9, 204:15,
208:15, 208:17
**looked**
104:21, 140:5,
174:2, 174:5
**looking**
32:20, 65:6,
76:9, 129:20,
133:13, 148:22,
149:1, 150:18,
150:22, 151:13,
152:1, 152:2,

152:19, 152:20,
153:10, 153:14,
160:8, 164:18,
169:1, 181:21,
195:8
**looks**
52:22, 68:13,
70:10, 125:17,
141:7, 150:12,
152:11, 158:8,
164:9, 165:1,
165:4, 176:7,
181:15, 195:11,
199:7, 199:12,
199:22
**lot**
212:3
**lunch**
121:11, 121:16

**M**
██████████████

**made**
47:3, 52:15,
55:6, 55:21,
64:17, 85:13,
170:10, 178:14,
185:20, 187:8,
188:15, 194:2,
198:8
**maintain**
214:8
**maintained**
123:13
**majority**
119:20
**make**
9:3, 10:22,
29:13, 29:14,
36:17, 41:14,
46:3, 46:4,
48:5, 50:20,
70:4, 72:18,
110:16, 111:1,
111:2, 111:19,
122:7, 127:15,
136:16, 147:14,

147:18, 148:1,
167:20, 168:3,
172:13, 185:3,
190:1, 190:9,
190:18, 202:17,
208:7
**makes**
9:8, 206:17
**making**
44:9, 133:1,
184:22, 187:12,
187:16, 189:20,
190:6, 191:6,
191:8, 192:14
**management**
14:21
**manager**
12:11, 19:20,
20:4, 20:14,
200:22, 201:12
**managers**
13:9, 20:11
**mandatory**
17:18, 182:17
**many**
39:19, 57:8,
99:8, 108:15,
████████, 119:22
██████████████████
**mark**
64:7, 68:3,
124:22, 198:18
**marked**
4:10, 5:2,
32:3, 32:6,
32:10, 33:2,
50:11, 50:14,
68:1, 125:6,
199:1, 199:3
**married**
15:15
**master's**
14:17
**matter**
20:12
**matters**
9:2, 10:12,

Transcript of
Conducted on August 28, 2024

72

17:9, 18:21,
19:1
**matthew**
3:26
**maybe**
23:3, 84:4,
84:5, 102:10,
103:4, 106:22,
121:10, 174:11
**mayo**
14:2

**mcgraw's**
205:22
**mckim**
34:18
**mean**
22:8, 23:5,
24:9, 29:3,
43:5, 48:22,
49:2, 56:18,
61:1, 74:5,
74:10, 75:7,
78:8, 92:18,
95:14, 108:20,
110:15, 124:18,
131:9, 141:6,
148:21, 148:22,
149:7, 153:12,
160:7, 161:11,
163:5, 170:3,
171:4, 171:11,
171:20, 175:16,
179:8, 196:15,
210:4
**meaning**
63:22, 88:12
**means**
8:13, 29:4,

84:14, 156:14,
163:11
**meant**
77:6, 81:1,
146:17
**meat**
98:17
**medical**
24:9, 29:6,
48:9, 48:10,
48:15, 197:19,
198:9
**medication**
94:8, 99:11,
174:15, 174:21,
178:17, 183:1
**medications**
93:14, 93:16,
93:22, 94:5,
94:7, 94:8,
94:14, 95:5,
98:19, 98:22,
172:3, 173:12,
173:15, 177:6,
179:1
**medicine**
13:6, 18:6,
18:9, 18:10,
18:11, 18:14,
18:15, 18:16,
23:9, 23:10,
23:21, 24:2,
27:6, 27:8,
188:5
**meet**
35:21, 38:17,
100:1, 109:8,
166:22, 169:5
**meeting**
31:10, 31:15,
35:11, 101:4,
119:2, 164:4,
187:17, 194:6,
194:7, 195:19,
195:20
**meetings**
35:19, 101:9,
101:15, 102:9,

103:12
**melissa**
29:18, 32:21,
35:11, 79:18,
79:21, 80:2,
80:5, 86:18,
101:16, 101:18,
102:20, 103:8,
103:11, 186:15,
187:12, 187:15,
187:16, 187:17,
187:18, 188:2,
188:6, 188:21,
188:22, 189:2,
189:4, 189:15,
190:1, 190:13,
191:5, 192:16,
194:20, 195:2,
195:18, 195:19
**melissa's**
187:20, 188:1
**member**
29:2, 37:6,
44:1, 48:1,
48:3, 48:19,
59:18, 59:19,
60:12, 66:11,
75:19, 77:7,
104:2, 106:13,
107:8, 107:12,
108:2, 112:18,
112:20, 113:14,
114:6, 114:7,
114:8, 116:11,
116:13, 117:6,
118:1, 144:16,
182:7, 183:19,
183:22, 185:5,
185:9, 185:11
**member's**
65:1
**members**
17:11, 37:21,
43:13, 49:11,
49:14, 49:19,
77:8, 77:11,
77:18, 78:1,
78:10, 96:12,

96:19, 97:14,
97:18, 101:1,
101:6, 101:12,
101:14, 102:7,
104:5, 112:14,
123:3, 128:17,
175:6, 185:8,
185:18, 185:20,
186:2, 186:4,
186:14, 188:9,
188:21, 193:13,
193:18, 194:12,
195:20
**members-dated**
5:12
**memory**
10:8, 100:7,
132:1, 134:15,
136:9, 137:5,
195:14, 207:13,
208:22
**mental**
10:7
**mentioned**
46:21, 108:20,
154:21, 170:8,
170:15, 171:9,
198:12, 198:13,
214:7
**message**
180:18, 182:5,
182:19, 183:3,
183:7, 183:11
**messages**
180:1
**met**

**middle**
34:15, 70:9,
180:11
**might**
10:11, 10:12,
21:12, 22:3,
53:20, 58:20,
91:21, 115:2,
115:18, 117:16,

121:3, 155:9,
165:12, 170:14,
171:6, 184:5,
184:16, 184:19,
188:7
**mind**
138:1
**mine**
143:11
**minnesota**
14:1, 184:14
**minnetonka**
3:8
**minute**
34:3
**mischaracterization**
140:2
**mischaracterizes**
43:2, 95:9,
106:1, 106:15,
108:4, 122:20,
129:17, 179:5,
213:4
**misrepresenting**
140:5
**missed**
140:18, 164:16
**missing**
114:1, 115:5,
115:14, 166:21,
177:19, 182:14
**missouri**
12:20, 25:17,
25:20, 26:13,
27:2, 27:4,
202:7, 203:17
**misunderstanding**
22:4, 22:9
**mkirsner@williamsmullen**
3:33
**mn**
3:8
**moment**
143:3, 189:7,
204:16
**monthly**
17:7

**more**
8:3, 10:3,
21:13, 27:10,
103:1, 107:6,
112:5, 112:8,
119:9, 119:12,
120:5, 120:8,
120:14, 120:19,
120:20, 142:9,
142:10, 179:15
**morning**
7:13, 121:20,
122:18
**most**
100:22
**mouth**
207:21
**move**
22:11, 22:13
**much**
119:13, 203:21
**mullen**
3:27
**multiple**
91:10
**muslim**
196:20
**myself**
7:14, 82:12

**N**

**name**
7:15, 11:19,
15:17, 15:18,
37:8, 53:1,
65:1, 66:12,
67:6, 68:21
**names**
16:20
**necessarily**
9:4, 164:5,
172:21
**necessary**
9:4, 183:18
**need**
9:14, 53:18,
91:21, 92:1,
112:1, 112:8,

132:22, 150:3,
156:14, 168:9,
214:16, 214:22,
215:2
**needed**
20:16, 38:15,
69:19, 74:7,
74:12, 75:19,
113:3, 155:4,
157:13, 179:19
**needing**
24:11
**needs**
112:5
**negatives**
108:15
**neither**
8:11, 143:3,
149:14, 216:10,
217:12
**never**
66:12, 66:14,
94:7, 138:1,
207:21
**new**
13:20, 13:21,
51:15, 60:3,
64:7, 138:11
**next**
31:13, 61:3,
109:4, 116:10,
132:8, 136:20,
144:5, 144:22,
145:7, 160:14,
161:5, 161:6,
162:10, 162:16,
163:19
**nine**
18:15
**nonattorney**
187:14, 188:15,
189:20, 203:16
**none**
62:1
**nonlawyer**
203:13
**normal**
11:5, 119:5,

119:17
**normally**
11:6, 69:15
**notary**
1:21, 2:10,
217:17, 217:22
**notation**
63:1, 64:12
**notations**
124:7
**note**
122:2, 214:5
**notes**
85:21, 86:11,
103:12
**nothing**
7:6, 122:6,
156:3
**notice**
49:5, 85:18
**notification**
55:2, 112:7
**notified**
33:9, 33:13,
55:2
**november**
22:15, 22:18,
100:12, 201:16
**number**
49:22, 57:2,
57:4, 61:13,
61:16, 62:1,
62:12, 69:10,
120:3, 125:1,
126:22, 127:3,
127:11, 127:12,
129:11, 138:3,
138:9, 138:19,
139:4, 149:2,
150:9, 154:20,
169:11, 181:5
**numbered**
180:7
**numbers**
53:14, 62:9
**numeric**
69:15
**nursing**
65:16

---

**O**

**oath**
64:5
**object**
8:17, 9:18,
16:2, 22:5,
23:7, 23:15,
24:17, 25:7,
25:13, 26:8,
26:14, 27:12,
28:20, 30:19,
31:5, 35:14,
37:3, 39:3,
42:6, 42:9,
43:1, 44:6,
45:20, 55:8,
56:5, 57:12,
59:2, 71:6,
72:7, 72:14,
73:20, 74:14,
75:14, 76:3,
78:19, 82:4,
83:11, 83:19,
84:12, 84:19,
85:4, 88:8,
88:20, 89:21,
90:9, 99:5,
99:15, 105:10,
105:22, 106:14,
108:3, 108:22,
109:18, 109:20,
110:5, 113:5,
113:11, 113:18,
114:2, 114:13,
120:10, 122:19,
128:9, 128:14,
129:16, 131:3,
146:8, 147:19,
154:5, 155:13,
156:6, 158:13,
160:3, 162:22,
166:14, 167:11,
168:5, 170:12,
171:2, 177:15,
186:21, 189:11,
189:13, 202:13,
203:19, 205:2,

211:17
**objecting**
90:13, 90:16
**objection**
9:3, 9:9, 41:3,
45:17, 47:2,
47:16, 75:3,
86:14, 89:11,
90:20, 91:18,
92:7, 94:20,
95:8, 117:18,
118:17, 122:7,
140:1, 144:17,
147:3, 147:12,
147:16, 147:20,
149:22, 155:14,
167:13, 167:18,
168:7, 173:9,
175:2, 179:4,
184:7, 204:7,
204:12, 207:2,
209:4, 212:16,
213:3, 213:12
**objections**
4:14, 6:9,
8:18, 9:6, 32:5,
34:12, 34:16,
44:21, 46:3,
46:6, 72:18,
73:9, 73:12,
77:16, 90:18,
121:20, 122:6,
122:9, 147:14,
148:2, 148:15,
205:12, 205:14,
208:7
**objects**
8:12
**observer**
103:2, 103:3
**obtain**
15:1, 157:14,
175:9, 179:6,
179:8
**obviously**
8:4, 9:13,
13:12, 34:6,
121:17, 137:18,

168:11
**occur**
20:10, 56:4,
192:10
**occurred**
35:11, 56:3,
56:10, 56:12
**occurring**
8:14, 56:11
**office**
6:19, 20:21,
197:16, 198:17,
198:20, 200:6
**officer**
15:21, 217:2
**often**
21:22, 99:22,
202:21
**oh**
19:17, 81:3,
125:11, 150:11
**okay**
19:17, 33:11,
55:11, 65:6,
69:13, 70:4,
80:20, 81:3,
82:10, 82:14,
83:1, 83:3,
83:14, 86:2,
86:22, 91:16,
103:21, 107:4,
110:18, 119:9,
123:9, 127:19,
130:5, 131:13,
131:21, 136:18,
143:13, 144:9,
149:15, 150:5,
151:3, 153:11,
153:22, 156:10,
162:6, 163:9,
164:21, 169:1,
176:7, 176:9,
178:13, 186:9,
188:7, 189:5,
191:1, 191:3,
199:16, 209:11,
210:17, 213:7
**once**
66:18

**one**
7:16, 9:15,
10:16, 49:17,
53:14, 72:13,
82:17, 107:2,
114:5, 114:17,
120:8, 120:18,
120:19, 125:12,
136:3, 143:3,
146:20, 149:2,
150:11, 159:4,
160:9, 164:3,
165:9, 169:11,
170:15, 178:11,
181:15, 184:15,
213:9
**ones**
49:7
**online**
195:9
**only**
53:2, 58:7,
85:21, 87:2,
87:3, 94:17,
112:18, 209:7,
213:21
**operations**
103:18, 103:20,
104:9, 111:21,
188:4
**opinion**
41:11, 41:12,
41:13, 172:18,
173:1
**opportunity**
6:19, 20:19,
38:17, 164:19,
197:16, 198:16,
198:21, 200:7,
213:14, 214:2
**opposed**
119:16, 197:19
**opposite**
172:5, 172:10
**option**
180:3
**options**
87:3

Transcript of
Conducted on August 28, 2024

75

order
157:13, 214:16
organization
26:2
organizational
14:14, 14:21,
17:13
originally
32:18, 32:19
other
9:16, 10:10,
13:2, 18:2,
21:17, 29:22,
30:8, 35:19,
36:8, 36:10,
49:10, 49:14,
49:22, 55:6,
59:8, 77:1,
77:3, 77:9,
77:10, 77:12,
81:7, 82:1,
88:17, 88:18,
89:8, 89:9,
91:17, 92:6,
93:14, 93:15,
93:16, 93:21,
94:14, 94:19,
95:3, 95:5,
96:4, 96:6,
96:12, 96:19,
97:8, 97:13,
97:18, 101:6,
101:13, 104:5,
105:14, 133:15,
137:21, 154:16,
155:3, 155:4,
158:3, 169:20,
170:7, 170:21,
172:1, 172:3,
173:15, 175:11,
175:13, 177:2,
185:7, 185:18,
186:18, 192:15,
193:12, 193:18,
196:4, 202:15,
208:2, 213:2
others
31:16, 57:9,

128:7
otherwise
216:12, 217:14
out
20:17, 93:4,
132:3, 133:9,
134:1, 135:17,
136:11, 136:22,
137:8, 137:12,
142:2, 154:12,
155:21, 156:4,
156:15, 157:6,
157:12, 199:6,
201:8, 207:21
outcome
216:13, 217:15
outlined
36:14, 202:10
outside
17:12, 81:12
over
9:1, 9:16,
10:2, 22:1,
27:22, 35:9,
45:14, 73:8,
85:12
overkill
150:15
own
30:16, 31:4,
38:20

**P**

page-uva
4:18
pages
1:19, 32:16,
71:20, 154:3,
158:10, 175:1,
175:20
pain
93:16
panelist
37:20, 48:22,
104:1, 105:4,
111:21, 160:11
panelist's
105:7

panelists
54:11
paragraph
103:17
part
13:11, 21:4,
21:15, 21:18,
24:2, 25:5,
25:12, 28:3,
28:10, 28:11,
29:8, 30:1,
31:12, 31:16,
41:18, 47:5,
54:2, 59:9,
60:2, 60:8,
62:10, 67:16,
68:9, 71:3,
71:9, 73:18,
76:18, 80:8,
80:11, 82:17,
87:14, 88:3,
97:10, 102:19,
107:17, 109:5,
117:11, 118:9,
118:22, 126:15,
145:12, 151:21,
165:6, 165:22,
167:5, 168:19,
184:17, 187:17,
188:8, 193:3,
195:19, 196:4,
197:3, 209:2,
210:6
partial
62:19
participate
21:7, 35:12,
102:21, 102:22
participated
58:8
participation
31:14
particular
10:3, 68:8,
85:7, 123:4,
149:3, 152:8,
164:3, 169:9,
169:10, 170:4,

panelists
54:11
paragraph
103:17
part
13:11, 21:4,

192:1, 200:5
parties
216:11, 217:13
partner
12:5, 14:6,
18:3, 19:2,
22:13, 22:17,
37:13, 37:18,
201:2, 201:17
partners
4:19, 17:2,
187:22, 190:8,
191:7
party
8:11
past
45:14
patients
40:17, 57:10
pause
150:11
penalty
7:4
people
16:20, 16:21,
21:16, 34:20,
204:3
performance
18:22, 20:7
performed
96:12, 96:18,
137:14
performing
190:15
period
14:7, 100:17,
100:18, 101:5,
182:2, 210:11
perjury
7:4
permission
208:13
person
11:6, 41:13,
56:19, 65:1,
68:20, 69:11,
69:12, 69:22,
143:21, 152:21,

154:16, 169:12,
172:12, 175:19,
203:13
**personal**
11:5, 41:11,
41:12
**personally**
15:6, 16:9,
23:18, 23:19
**personnel**
17:20, 202:21,
204:5, 205:1,
206:22
**pertains**
173:7
**phillips**
1:6
**phone**
2:7, 3:9, 3:21,
3:31, 30:9,
30:14, 30:17,
31:4, 91:22
**phrase**
44:7
**physical**
10:7
**physician**
206:4
**place**
152:12
**plaintiff**
3:3, 4:4
**plaintiffs**
1:7, 4:15,
6:10, 7:17,
32:5, 34:1
**plaza**
3:18
**please**
7:2, 73:3,
80:17, 80:20,
89:2, 96:15,
128:3, 131:18,
134:8, 144:22,
148:13, 159:9,
159:12, 181:21,
182:1, 199:18,
212:18, 214:17,

214:19
**pllc**
3:5
**point**
34:2, 34:13,
53:17, 57:1,
104:22, 127:21,
160:15, 160:16,
161:2, 161:5,
164:18, 192:20,
192:22, 199:6,
205:12
**pointing**
152:8
**points**
98:3, 110:11,
114:18, 122:1,
151:2, 162:7,
163:13, 163:18,
166:5, 166:6
**policy**
192:18, 197:21
**populate**
66:20
**portion**
131:18, 133:6,
134:17
**pose**
40:18, 104:16
**posed**
34:1, 131:1,
133:5, 133:22,
135:5, 136:10
**position**
12:3, 12:7,
12:10, 13:15,
26:3, 27:6,
201:12
**positions**
196:10, 202:12
**possibility**
121:8
**possible**
10:2, 53:20
**potential**
118:12
**power**
73:16, 92:1

**powerpoint**
35:3, 35:4,
36:5, 40:2,
40:3, 54:8,
76:19, 77:3,
84:11, 84:18,
97:6, 97:9,
97:15, 97:20,
150:4, 150:6,
150:8, 150:19,
151:19, 152:10,
158:12, 158:18,
187:5, 192:15,
212:8, 213:1,
213:18
**powerpoint-uva**
4:11, 32:2
**pray**
196:21
**pre-hire**
6:18, 134:4
**precludes**
134:10, 145:2
**preface**
136:18
**premise**
168:21
**prepared**
216:5
**present**
22:19, 101:8,
101:14, 195:20
**presentation**
77:4, 151:19,
213:1
**president**
23:11
**pretend**
149:15
**previous**
60:1, 155:18,
171:18, 196:9,
202:12
**previously**
4:10, 5:2,
27:16, 32:10,
33:2, 47:3,
50:14, 70:19,

117:14, 176:1
**principle**
134:9, 143:22,
145:1
**print-out**
4:18, 32:1
**printed**
199:7
**printing**
53:9
**printout**
50:15, 50:19,
68:4, 129:21
**prior**
9:2, 13:18,
95:9, 192:1,
213:4
**privilege**
86:7, 86:16,
123:14, 123:16,
123:18
**probably**
63:16
**problem**
157:17, 157:18,
158:15
**problems**
169:20
**procedures**
6:21, 198:22,
200:1, 200:13,
200:19, 201:22,
202:10, 202:12,
211:7, 211:13,
211:15
**proceeding**
216:7
**proceedings**
216:8, 217:3,
217:5, 217:6,
217:9
**process**
21:7, 21:16,
21:19, 36:13,
36:14, 36:16,
36:18, 37:2,
37:15, 40:11,
48:14, 72:1,

Transcript of
Conducted on August 28, 2024

77

72:4, 84:10,
103:19, 104:21,
108:16, 109:5,
111:18, 146:11,
147:5, 151:1,
151:8, 151:21,
152:6, 152:7,
152:11, 152:12,
152:13, 157:2,
158:7, 158:9,
158:12, 160:9,
160:11, 161:6,
162:7, 164:13,
174:13, 186:19,
187:1, 187:3,
187:9, 187:13,
188:16, 189:10,
189:22, 190:2,
191:19, 192:5,
192:10, 197:17,
200:13, 202:16,
204:19, 204:21,
206:8, 206:12,
206:16, 206:21,
207:14, 208:19,
209:2, 209:13,
209:17, 210:20,
211:3
**processes**
204:22, 211:13
**produced**
53:13, 69:11,
137:20
**profess**
95:17
**professional**
41:13, 65:16
**professional's**
214:10
**profile**
4:17, 67:6,
195:9
**prompt**
135:16, 137:7,
144:21, 145:8,
147:8, 147:21
**prompted**
133:8, 134:16,

135:17, 136:22,
168:11
**prompting**
156:3
**proof**
154:12, 155:20
**proper**
25:6, 44:20,
147:11, 147:15,
147:19, 168:10,
201:22, 208:7
**proposal**
40:15
**provide**
7:21, 17:11,
18:19, 30:13,
102:6, 103:8,
112:20, 113:14,
129:14, 134:16,
154:11, 155:11,
155:20, 157:10,
157:13, 162:2,
165:13, 166:11,
173:19, 179:19
**provided**
17:10, 33:20,
36:5, 51:15,
59:22, 68:14,
70:11, 70:13,
70:15, 71:18,
93:11, 97:3,
97:20, 116:6,
127:2, 133:16,
134:1, 135:22,
141:11, 145:6,
146:18, 159:17,
160:21, 162:1,
162:16, 165:6,
165:14, 165:15,
169:2, 172:17,
173:4, 174:22,
176:22, 178:21,
183:7, 183:12,
186:13, 211:9
**provides**
17:7, 17:16,
161:14
**providing**
95:18

**public**
1:21, 2:10,
217:1, 217:22
**pull**
49:1, 49:7
**pulled**
48:21, 49:2
**purposes**
8:16, 214:11
**pursuant**
2:9
**put**
62:5, 63:9,
87:2, 116:19,
121:18, 137:13,
137:15, 150:16

**Q**

**q1**
129:2
**q2**
128:1
**q4**
129:3
**qualified**
217:8
**qualtrics**
6:16, 125:5,
125:21, 126:12,
131:9, 133:11,
133:12, 134:12
**question**
9:17, 9:20,
9:21, 10:19,
11:8, 11:11,
11:14, 11:15,
23:2, 25:1,
30:22, 53:20,
59:16, 65:3,
65:20, 72:22,
73:2, 73:13,
81:5, 83:21,
83:22, 87:9,
87:12, 88:13,
88:14, 89:2,
90:4, 92:3,
94:12, 95:1,
96:14, 99:9,

102:11, 127:21,
127:22, 128:7,
129:9, 131:1,
132:2, 132:9,
132:10, 132:13,
132:14, 132:15,
132:16, 132:18,
133:5, 135:5,
135:11, 138:6,
148:8, 149:17,
151:5, 155:17,
156:19, 156:20,
156:22, 158:15,
163:16, 167:1,
167:10, 167:14,
168:3, 168:4,
168:6, 168:7,
168:10, 168:13,
168:15, 168:16,
193:1, 201:7,
205:18, 206:2,
206:14, 207:16,
208:10, 212:18
**questions**
8:2, 33:22,
41:9, 43:19,
43:22, 44:1,
44:4, 45:15,
46:2, 60:11,
60:14, 61:9,
73:22, 74:6,
74:8, 76:7,
79:13, 83:5,
83:8, 93:5,
100:16, 103:4,
108:21, 115:8,
115:10, 127:20,
128:13, 128:21,
129:2, 129:10,
133:19, 133:21,
133:22, 135:14,
135:21, 136:8,
136:10, 147:13,
153:10, 153:11,
153:15, 153:18,
155:7, 155:10,
174:11, 203:22,
207:19, 211:20,

212:2, 213:15,
213:21, 214:1
**quickly**
107:6

---

**R**

**raise**
7:2
**random**
49:21, 50:3
**randomly**
117:3
**rather**
        68:21

**reach**
20:17
**reached**
111:7
**read**
34:4, 34:7,
44:17, 45:7,
45:10, 80:16,
81:2, 82:10,
82:13, 107:2,
112:10, 131:17,
142:15, 142:22,
148:14, 152:16,
152:22, 159:10,
165:2, 176:11,
177:12, 181:21,
207:6
**reading**
34:8, 98:5,
108:5, 131:19,
131:22, 134:13,
141:14, 143:17,
144:7, 146:3,
151:12, 181:9
**real**
74:20
**really**
169:17
**reason**
10:6, 10:10,

38:8, 89:6,
124:7, 129:1,
143:9, 151:14
**reasons**
57:17, 75:19,
88:1, 88:18,
89:9, 91:13,
91:17, 92:4,
92:22, 113:10,
122:16, 123:3,
151:16, 152:20
**recall**
29:16, 29:19,
29:22, 31:13,
31:18, 34:21,
36:4, 38:22,
46:20, 52:18,
56:10, 56:17,
57:16, 58:17,
60:13, 70:18,
72:4, 78:1,
85:6, 87:7,
87:10, 87:18,
91:13, 92:14,
93:9, 100:12,
103:18, 109:12,
109:16, 111:19,
113:21, 115:18,
117:12, 119:13,
120:12, 122:17,
126:14, 137:11,
142:1, 144:11,
145:20, 146:10,
155:21, 168:12,
180:1, 183:21,
184:2, 184:21,
185:4, 191:9,
193:21, 195:1,
195:5, 197:2,
197:14, 206:2
**receive**
14:15, 36:8,
49:5, 50:5,
112:7, 182:19,
183:2
**received**
14:17, 50:4,
53:5, 53:6,

55:2, 57:22,
59:20, 71:16,
73:16, 84:22,
97:4, 115:22,
141:10, 176:14,
182:6, 197:6,
201:8, 201:13,
212:22
**receiving**
60:1, 134:10,
145:2
**recognize**
64:8, 68:4,
125:8, 126:6
**recollection**
133:4, 147:8,
182:5
**recommend**
214:5
**record**
7:15, 8:11,
9:14, 10:17,
11:9, 11:19,
32:11, 46:3,
63:19, 63:22,
121:13, 121:16,
121:18, 122:2,
122:8, 186:10,
216:8, 217:10
**record's**
46:4
**recorded**
1:13, 217:6
**recording**
216:6, 217:9
**records**
175:9, 175:13,
175:17, 175:18
**recreate**
147:4
**rector**
1:9, 3:14
**redacted**
126:20
**reduced**
217:7
**reenter**
116:15

**ref**
181:17
**refer**
29:11, 62:11,
69:22, 77:21,
176:18, 213:19
**reference**
77:18, 78:1,
93:9, 161:1,
174:15, 174:20
**referenced**
27:1, 86:16,
106:11, 112:15,
115:12, 124:6,
155:5, 159:1,
177:20
**references**
125:22, 176:17
**referencing**
93:10, 176:4,
206:9
**referring**
24:5, 36:17,
36:20, 37:21,
45:1, 45:16,
46:8, 59:14,
61:4, 62:8,
66:22, 97:5,
105:6, 127:7,
150:7, 151:20,
153:1, 158:14,
190:13, 209:7
**refers**
68:20
**refresh**
131:21, 132:1,
133:4, 134:14,
136:9, 137:5,
207:12
**refresher**
197:1
**refreshing**
208:22
**refused**
122:11
**regarding**
66:9, 79:8,
85:18, 86:4,

Transcript of
Conducted on August 28, 2024

79

89:5, 100:5,
124:7, 132:1,
148:10, 149:18,
151:21, 157:20,
158:4, 158:19,
162:3, 172:17,
186:4, 187:8,
188:15, 189:21,
190:2, 200:18,
201:18
**regardless**
9:8
**regards**
16:6, 18:20,
191:10
**registration**
217:17
**regular**
101:14
**regularly**
165:21
**reinforce**
214:11
**rel**
163:10
**relate**
61:9
**related**
16:10, 19:1,
27:20, 28:2,
28:6, 31:3,
33:12, 34:6,
35:19, 36:5,
36:9, 37:11,
42:5, 42:15,
42:20, 44:4,
48:10, 60:3,
69:11, 70:13,
70:15, 77:17,
78:2, 83:6,
85:13, 86:12,
115:22, 119:16,
126:10, 126:16,
127:3, 129:10,
131:1, 132:3,
132:13, 133:5,
133:20, 136:2,
136:3, 142:11,

144:1, 144:6,
153:3, 154:17,
173:7, 175:10,
175:18, 178:16,
179:1, 187:13,
189:9, 192:15,
192:19, 196:3,
198:8, 200:13,
201:9, 209:20,
210:1, 210:7,
210:12, 211:14,
216:10, 217:12
**relates**
40:10, 43:8,
43:9, 68:7,
168:17, 176:8
**relation**
18:21, 20:2
**relations**
12:11, 19:21,
200:22, 201:12
**relative**
133:15
**relevant**
10:12, 37:11,
54:4, 67:19,
93:19, 94:10,
94:14, 94:17,
94:18, 95:6,
96:7
**relief**
93:17
**religion**
95:17, 146:12,
159:1, 160:2,
169:11, 169:14,
170:2, 170:3,
170:8, 170:9,
170:18, 213:9
**rely**
212:14, 212:21
**remarks**
9:19
**remind**
11:3, 11:8,
11:9
**removed**
69:17

**repeat**
23:2, 30:21,
65:20, 87:12,
89:1, 96:14,
138:6
**repeated**
39:19
**rephrase**
42:1, 73:3,
75:11, 119:3,
135:8, 168:6
**replied**
168:4
**report**
19:3, 19:4,
19:9, 27:7
**reported**
27:4, 188:6,
194:22
**reporter**
1:21, 7:1, 8:5,
8:9, 8:12, 8:17,
64:1, 71:13,
125:2, 198:19,
214:4, 214:15,
214:20, 215:5
**reporter-notary**
217:1
**reporting**
26:16, 27:8,
27:11, 187:21
**reports**
23:10, 23:11
**represent**
139:20, 195:9
**representing**
7:17, 69:1,
127:1
**request-religious**
5:20
**requested**
52:19, 52:20,
58:19, 59:7,
152:21
**requester**
51:18, 68:14,
68:19, 69:1,
69:4, 69:18,

69:22, 70:11,
70:12, 126:21,
127:4, 127:14,
141:8, 152:3,
154:10
**requesters**
67:10
**requesting**
59:19, 74:8,
128:4, 151:16,
152:18, 154:18,
169:19
**requestor**
141:11, 152:17,
164:17
**requests**
4:13, 28:13,
29:9, 32:3,
39:2, 39:14,
39:19, 46:15,
46:22, 47:15,
48:5, 49:6,
49:13, 50:4,
52:9, 52:15,
55:14, 57:15,
58:12, 59:6,
64:14, 64:17,
67:15, 71:11,
71:16, 72:1,
72:6, 76:17,
76:21, 77:3,
78:3, 81:13,
83:7, 84:9,
85:8, 85:14,
85:19, 87:11,
87:14, 87:19,
88:2, 88:7,
88:19, 89:6,
89:10, 91:10,
91:14, 92:5,
94:1, 96:8,
96:11, 96:17,
97:1, 97:11,
97:21, 100:22,
102:16, 105:14,
105:18, 109:9,
109:13, 113:22,
114:10, 116:1,

Transcript of
Conducted on August 28, 2024                                                80

117:10, 121:3,
121:8, 122:17,
124:8, 126:9,
126:15, 129:10,
133:20, 137:22,
146:12, 148:9,
157:4, 164:14,
174:3, 178:2,
185:20, 187:4,
194:2, 196:3,
196:13, 197:8,
197:18, 198:6,
198:8, 200:14,
202:1, 209:18,
209:22, 210:13,
210:21, 211:4,
212:21
**require**
27:16
**required**
5:10, 82:18,
82:22, 122:7,
129:13, 142:21,
155:11, 170:11,
194:2, 203:17
**requirement**
48:16, 58:2,
58:5, 100:6,
100:17, 100:19,
118:4, 210:8
**requirements**
28:3
**requires**
64:22, 206:3
**research**
18:12
**reserve**
8:18
**resolution**
21:18
**resolve**
18:21, 20:15,
21:9
**resolving**
20:9, 21:6
**resources**
12:4, 12:19,
13:5, 14:5,

14:12, 16:18,
17:20, 27:7,
196:10, 197:4,
202:20, 204:3,
204:4, 204:22,
206:21, 210:19,
214:10
**respect**
21:6, 31:13,
39:2, 39:11,
41:16, 46:13,
46:16, 56:18,
57:15, 58:2,
59:22, 79:1,
83:5, 84:7,
86:15, 101:19,
102:2, 104:21,
115:14, 123:20,
134:15, 134:16,
137:3, 153:15,
155:5, 169:21,
173:5, 177:8,
178:13, 178:22,
185:2, 209:18,
210:20, 211:3
**respond**
133:9, 208:10,
213:5
**responding**
135:4, 143:21,
145:10
**responds**
45:8
**response**
6:9, 62:16,
116:14, 141:7
**responses**
157:12
**responsibility**
47:8, 47:10
**responsible**
20:3, 20:5,
103:5, 104:16
**rest**
51:20, 105:20
**restate**
151:5, 155:16,
212:17

**restating**
153:9
**resubmit**
179:11
**resubmitted**
82:6
**result**
21:22, 22:3,
46:6, 109:13,
170:16
**resulted**
179:2
**retrieve**
49:3
**reveal**
79:20
**review**
28:17, 35:21,
37:13, 37:14,
38:2, 38:4,
47:10, 47:11,
49:4, 49:6,
49:7, 52:9,
53:1, 54:4,
54:14, 54:16,
54:20, 55:5,
55:14, 55:15,
55:19, 59:9,
60:2, 67:19,
73:19, 74:1,
75:13, 76:20,
77:11, 83:7,
83:9, 85:19,
86:12, 87:8,
93:19, 94:15,
95:14, 96:8,
96:10, 96:11,
96:17, 96:18,
97:10, 97:21,
101:20, 105:7,
105:8, 107:14,
110:20, 118:16,
134:4, 139:13,
140:12, 140:20,
141:2, 141:6,
144:4, 144:13,
175:18, 180:12,
180:15, 182:7,

183:9, 187:9,
187:13, 189:10,
189:22, 190:2,
191:19, 192:5,
194:2, 209:3,
214:3
**reviewed**
28:12, 28:13,
29:9, 38:5,
38:9, 38:10,
38:19, 43:12,
46:22, 54:1,
56:19, 58:12,
59:5, 67:15,
68:10, 70:19,
71:10, 72:12,
72:13, 74:21,
75:2, 75:12,
85:8, 91:9,
92:16, 100:22,
116:21, 117:2,
117:7, 117:14,
144:10, 145:14,
145:20, 146:2,
148:7, 148:9,
149:3, 149:12,
165:18, 165:20,
165:21, 178:2,
178:11, 212:8,
212:13, 213:17
**reviewer**
87:2
**reviewing**
36:9, 43:9,
43:20, 46:14,
59:17, 60:10,
71:2, 72:1,
72:5, 76:17,
76:21, 77:2,
81:11, 81:13,
81:22, 84:8,
97:1, 103:5,
117:10, 117:12,
120:1, 126:14,
128:7, 146:12,
151:1, 157:3,
174:3, 175:7,
187:1, 187:3,

193:2, 193:13,
212:20
**reviews**
        :12

**richmond**
3:20, 3:30,
159:20
**ridiculous**
90:18, 90:21
**right**
7:2, 36:18,
63:21, 73:15,
122:15, 129:11,
137:4, 148:4,
156:19, 180:22,
189:6, 189:18,
206:18, 214:20
**rights**
20:20, 197:16,
198:17, 200:7,
202:22, 203:18
**rights-religious**
6:20, 198:21
**riley**
32:21, 79:18,
79:21, 80:2,
80:5, 101:17,
186:15, 186:18,
188:21, 192:16
**riley's**
86:18
**ring**
62:1
**riverfront**
3:18
**rochester**
13:19, 13:20,
13:21, 14:1,
14:4, 14:8,
14:18, 25:20,
202:8
**role**
22:14, 27:3,
101:19, 101:21,
102:3, 118:7,
142:6, 187:20,

189:2, 192:4,
192:10, 201:10,
210:12
**roles**
17:3, 17:4
**routed**
104:14
**row**
68:15, 70:8,
130:7, 140:12
**rows**
61:2, 61:6

**S**

**s-t-r-u-c-t**
60:18, 60:20,
61:3, 70:9
**s-t-r-u-c-t-m**
138:12
**said**
8:5, 32:11,
78:21, 108:9,
108:11, 158:4,
163:16, 191:4,
194:16, 201:11,
216:7, 217:8,
217:9
**sake**
100:16
**sam**
3:11, 7:16,
8:22, 143:2,
148:2, 167:16,
168:2
**same**
10:1, 19:11,
19:13, 22:18,
22:21, 36:18,
46:1, 47:2,
66:4, 68:20,
69:22, 73:9,
73:12, 75:3,
86:14, 89:11,
92:7, 97:14,
117:6, 145:16,
146:16, 147:1,
147:3, 148:6,
148:12, 148:15,

149:7, 167:4,
176:11, 177:12,
178:16, 183:3,
193:18, 200:8,
204:12
**samuel**
3:4
**saw**
67:12, 140:7
**say**
9:14, 10:3,
10:19, 11:19,
29:11, 42:3,
47:20, 53:17,
56:16, 61:1,
72:17, 94:4,
94:6, 108:10,
110:15, 122:5,
127:14, 150:7,
152:22, 161:21,
170:3, 172:6,
182:16, 182:17,
203:20
**saying**
11:7, 41:2,
59:15, 132:20,
133:2, 133:12,
133:14, 136:3,
160:7, 161:13,
161:15, 172:11,
176:11, 184:20,
189:18
**says**
32:21, 34:15,
34:19, 37:17,
51:17, 61:7,
65:15, 68:15,
68:22, 81:6,
103:22, 105:14,
126:2, 126:21,
128:3, 128:4,
129:2, 129:3,
130:2, 130:7,
134:8, 134:22,
136:1, 138:16,
141:16, 142:18,
142:21, 144:22,
152:10, 152:12,

156:8, 156:11,
160:15, 161:13,
162:10, 165:2,
176:12, 180:1,
181:17, 182:15,
182:17, 183:17,
199:13
**schedule**
119:5
**school**
13:6, 18:6,
18:9, 18:11,
23:9, 23:21,
24:1, 27:6,
27:8, 188:5
**scientific**
78:6, 78:9,
80:6
**scope**
26:3, 26:16
**screenings**
6:17, 126:3
**screenings-pre-h-ire**
125:6
**se**
2:4
**second**
70:14, 71:20,
82:6, 82:7,
82:16, 83:2,
83:16, 88:14,
129:5, 130:17,
131:14, 131:22,
134:7, 134:13,
134:21, 135:6,
136:20, 140:12,
142:18, 142:22,
146:21, 150:11,
153:2, 158:2,
159:16, 164:18,
169:3, 175:20,
177:1, 199:12
**see**
9:18, 22:2,
40:13, 51:22,
52:2, 60:19,
60:20, 61:3,

Transcript of ███████████
Conducted on August 28, 2024                    82

62:18, 62:21,
63:3, 64:14,
65:15, 65:22,
67:6, 68:16,
70:16, 98:2,
98:4, 105:4,
105:16, 110:12,
114:8, 125:18,
127:6, 128:1,
128:10, 129:6,
130:6, 130:12,
130:19, 132:18,
135:1, 138:10,
138:13, 139:8,
139:10, 139:13,
139:17, 141:16,
145:4, 152:14,
152:17, 158:10,
158:18, 158:22,
159:1, 159:4,
159:20, 159:22,
160:12, 160:16,
162:13, 169:15,
174:8, 174:10,
174:17, 180:13,
181:1, 181:9,
181:16, 181:18,
182:3, 183:19,
199:8, 199:14,
206:9, 208:19

**seeking**
69:19, 129:14

**seem**
121:22, 154:21,
167:22

**seems**
143:3, 205:13,
205:21

**seen**
33:5, 33:7,
33:11, 61:17,
61:19, 61:22,
62:1, 64:9,
65:2, 65:5,
65:13, 66:6,
66:13, 66:14,
137:18, 139:19,
139:20, 199:5,

199:19
**sees**
53:8
**select**
51:3, 128:3
**send**
31:3, 180:2
**senior**
12:4, 12:10,
13:5, 18:3,
22:13, 22:17,
27:4, 37:12,
101:21, 188:1,
188:3, 201:1,
201:17, 214:9
**sense**
10:22, 29:14,
41:14, 70:4,
110:16, 127:15,
133:1, 136:16
**sensing**
135:8
**sent**
6:15, 63:2,
125:4, 125:18,
183:13
**sentence**
34:14, 137:6,
142:17, 142:18
**sentences**
34:19
**separate**
47:6, 94:12,
99:9, 197:20
**separator**
138:12
**september**
125:19
**serve**
16:17
**set**
4:15, 6:10,
32:6, 97:15,
108:17, 186:20,
211:16
**setting**
195:17
**seven**
61:17, 112:16,

116:9
**seventh-day**
15:3, 15:6,
15:10, 15:13,
98:15, 98:22,
99:4, 99:10,
99:18
**several**
18:12, 45:14
**shall**
7:5
**share**
154:16, 171:17
**short**
63:16
**shorten**
107:5
**shorter**
29:13
**shorthand**
23:14
**should**
19:17, 72:17,
76:1, 105:15,
155:19, 156:11,
156:13, 156:18,
156:20, 186:19
**shouldn't**
108:10
**show**
62:7, 150:20,
195:8, 195:10
**showing**
40:14
**shown**
52:18, 83:15,
84:10, 145:17,
157:22, 166:9,
173:4, 174:14
**shows**
48:4, 52:1,
138:3
**side**
23:18, 23:20,
61:7, 134:21,
180:13
**signature-mig2k**
216:16

**signature-p1kal**
217:19
**silent**
177:2, 177:5,
177:8, 178:20
**similar**
39:13, 66:4,
71:17, 96:11,
96:18, 145:16,
177:22, 199:6,
203:3, 211:9,
211:16
**simple**
11:7
**since**
132:13, 132:15,
167:14
**sincerely**
89:14, 89:16,
89:19, 89:20,
95:11, 95:13,
95:18, 96:5,
106:7
**sincerity**
75:4, 75:8,
75:12, 152:2,
152:5
**sir**
198:19, 215:6
**sit**
87:7, 121:1,
139:2
**sitting**
50:22
**six**
34:3, 34:5,
59:12, 59:13,
112:11
**size**
26:15
**skills**
216:9, 217:11
**slide**
99:19, 103:15,
104:19, 104:20,
107:3, 109:8,
111:16, 112:11,
114:4, 115:12,

Transcript of
Conducted on August 28, 2024

83

**somewhere**
85:11, 86:11
**soon**
53:19
**sorry**
13:3, 22:12,
40:1, 40:2,
40:22, 43:4,
54:7, 62:15,
71:13, 81:1,
96:2, 97:16,
116:11, 124:18,
125:11, 135:16,
138:6, 150:14,
160:8, 161:7,
190:18, 201:4,
205:6, 208:15
**sort**
23:13
**sorts**
8:5
**sound**
141:21, 195:13
**sounded**
39:6
**south**
3:28
**speak**
9:16, 10:2,
10:19
**speakers**
17:15
**speaking**
30:8
**spec**
172:19
**specific**
34:7, 87:7,
91:4, 98:11,
115:4, 145:20,
149:13, 179:15
**specifically**
136:7, 151:20,
174:15, 189:1,
189:4, 197:11
**specifics**
42:8, 42:11,
42:17, 42:19

115:15, 116:9,
183:16
**slides**
158:7
**smile**
205:15
**smirk**
205:14
**solemnly**
7:3
**some**
7:21, 7:22,
9:13, 13:2,
21:21, 38:9,
42:20, 49:9,
49:10, 49:13,
54:12, 55:13,
67:9, 77:12,
87:14, 89:6,
94:2, 98:3,
98:21, 101:5,
110:1, 113:21,
120:17, 137:20,
139:19, 139:20,
139:22, 141:9,
141:11, 143:9,
155:2, 161:15,
163:10, 163:20,
169:13, 188:11,
192:20, 192:22
**somebody**
30:17
**somehow**
31:10, 107:12
**someone**
11:7, 55:19,
103:21, 117:4,
189:8
**something**
21:13, 32:13,
33:11, 77:6,
77:10, 86:19,
86:20, 118:15,
138:21, 176:2,
184:19, 199:5
**sometimes**
72:18, 72:19,
207:20

**specify**
172:20
**speculating**
141:14, 141:15
**speculation**
30:20, 71:7,
74:15, 75:15,
76:5, 88:21,
89:22, 99:16,
144:18, 146:9,
150:1, 155:15,
163:1, 166:15,
173:10, 177:16,
189:14, 205:3,
207:3, 209:5
**spell**
11:19
**spend**
119:14
**spent**
212:3
**spoken**
8:10
**spreadsheet**
53:7, 53:13,
85:22, 86:5,
86:15, 86:18,
122:16, 123:1,
123:6, 123:12,
123:22, 124:1,
124:5, 124:15
**st**
2:4
**stack**
125:12, 143:10,
150:13
**standard**
141:7, 214:21,
215:3
**standing**
167:13, 167:18
**stapler**
150:17
**start**
9:21, 11:18,
12:14, 22:1,
27:22, 35:9,
73:8, 85:12,

87:8
**started**
7:14, 19:15,
19:18, 19:20,
32:19, 35:21,
80:21, 82:11,
142:19
**starting**
80:15, 80:17,
82:11, 142:16,
142:18, 190:15
**starts**
146:19, 181:1,
181:22
**state**
203:3
**stated**
190:6, 191:4,
191:12, 191:14
**statement**
80:21, 159:13
**statements**
81:7
**states**
1:1, 34:17
**stenography**
8:13
**step**
21:5, 35:8,
65:8, 79:6,
107:15, 111:18,
112:11, 112:15,
116:9, 160:11,
161:6, 162:10,
162:16, 163:19,
178:14, 194:11
**stepping**
204:16
**steps**
198:4
**stick**
44:21
**still**
64:4
**stop**
82:19, 122:3,
123:7, 147:6
**stops**
82:21, 92:2

Transcript of ███████████
Conducted on August 28, 2024

84

**street**
3:19, 3:28
**strike**
138:1, 176:21
**structure**
4:22, 26:17,
27:9, 27:11,
187:21
**student**
16:7
**stuff**
208:16
**style**
208:2
**subject**
6:8, 34:16
**submit**
48:19, 112:18,
113:3, 164:19,
180:4, 200:9
**submits**
107:8
**submitted**
28:14, 32:13,
112:14, 116:11,
116:13, 117:13,
123:5, 126:9,
126:11, 152:4,
164:17, 190:11
**subsequent**
32:16
**substantially**
25:21, 26:5,
200:15
**success**
16:7
**sufficient**
166:11, 170:22
**suite**
2:5, 3:7, 3:29
**summer**
31:20
**supervise**
21:8
**supervised**
20:1
**supervisor**
188:9, 188:12,

194:18, 194:21
**supervisors**
206:21
**support**
18:5, 93:11,
162:11, 162:19,
163:10, 163:20,
190:9
**supported**
22:21, 23:9
**supposed**
20:10
**sure**
36:17, 36:19,
46:4, 50:20,
56:11, 96:16,
106:19, 111:19,
132:16, 138:7,
155:18, 159:6,
168:3, 171:7,
171:8, 175:15,
190:18, 190:19,
198:11, 201:7,
204:12, 212:20
**svcs**
65:16
**swear**
7:3
**sworn**
7:8, 217:5
**symbol**
181:7
**symbols**
181:6, 181:11,
181:14, 181:20
**system**
5:5, 5:8, 5:15,
5:18, 6:3, 6:6,
6:14, 23:14,
24:6, 25:12,
47:22, 50:11,
50:16, 51:7,
51:21, 51:22,
52:8, 52:11,
52:14, 57:10,
61:13, 61:16,
66:6, 66:10,
68:1, 68:5,

68:9, 81:9,
81:12, 82:2,
85:15, 87:1,
111:22, 116:2,
116:7, 116:20,
126:12, 134:2,
134:12, 134:18,
135:19, 136:13,
136:19, 137:8,
137:13, 137:16,
138:4, 138:8,
180:17, 183:14,
185:16, 185:21,
186:5, 188:4,
190:9, 194:3
**system-diagram**
4:21

**T**

**table**
60:17, 60:22,
61:1, 61:4,
62:19, 70:8,
138:11, 139:7,
139:8, 180:12
**tables**
50:19, 51:4,
53:9, 139:10
**take**
33:18, 34:3,
47:14, 53:18,
53:19, 64:3,
85:18, 92:21,
93:1, 94:4,
94:7, 94:8,
94:13, 98:19,
98:22, 99:11,
138:7, 143:2,
172:2, 172:6,
174:7, 199:4,
199:16, 199:18
**taken**
7:19, 43:11,
47:1, 51:7,
94:7, 217:3
**taking**
8:5, 64:1,
173:14, 175:11

**talk**
21:17, 86:21,
93:21, 94:4,
96:22, 109:9,
146:4, 155:4,
156:4
**talked**
22:16, 29:16,
46:7, 46:12,
64:16, 74:17,
95:3, 95:4,
97:2, 122:15,
153:6, 155:19,
157:5
**talking**
44:8, 44:12,
44:14, 45:13,
61:10, 62:12,
124:10, 124:12,
129:8, 134:7,
159:7, 159:10,
165:5, 186:12,
207:22, 210:5
**talks**
40:7, 136:7,
203:3, 206:7,
207:13
**team**
5:11, 20:6,
28:11, 29:2,
37:6, 38:7,
44:1, 48:1,
48:3, 48:19,
49:18, 58:15,
59:18, 59:19,
60:12, 65:1,
66:11, 75:18,
77:7, 77:18,
78:1, 78:10,
107:7, 112:14,
112:18, 112:20,
114:6, 114:7,
116:10, 116:13,
128:17, 183:19,
183:22, 185:5,
185:9, 185:19,
186:4
**technically**
23:18

Transcript of
Conducted on August 28, 2024

85

**tell**
34:7, 45:4,
46:15, 57:1,
57:7, 72:11,
86:17, 87:5,
107:7, 119:22,
129:21, 131:18,
136:2, 143:1,
143:18, 144:7,
144:13, 147:7,
148:13, 149:20,
156:17, 156:19,
158:15, 165:3,
180:8, 199:5,
199:19, 200:2,
200:3, 200:4
**telling**
168:5, 176:10
**ten**
215:5
**tenant**
134:9
**tend**
208:16
**tenet**
143:22, 145:1
**term**
23:1, 23:4,
23:5, 24:4,
29:2, 29:3,
44:14
**terminated**
118:6
**terms**
17:15, 20:4,
26:15, 26:16,
49:21, 67:13,
102:9, 119:1,
171:22, 172:1,
173:11, 173:12,
182:13, 188:22,
201:13, 201:19,
7

**test**
79:9

**testified**
7:9, 91:12,
146:11
**testify**
10:11, 136:6,
205:11
**testifying**
64:5
**testimony**
1:14, 2:2, 7:4,
44:19, 44:20,
46:20, 95:10,
121:22, 122:1,
122:18, 141:20,
147:10, 155:22,
191:9, 205:20,
212:5, 213:4,
214:12
**testing**
78:7, 78:9,
78:11, 78:15,
79:1, 79:5,
79:14
**text**
30:17, 31:3,
180:22
**th**
3:28, 199:8,
199:14, 200:12
**thank**
8:21, 70:7,
73:6, 214:13
**themes**
57:16
**themselves**
128:21
**thereafter**
217:7
**they'd**
114:11
**thing**
9:15, 74:20,
163:17
**things**
8:6, 9:13,
10:16, 154:20
**think**
9:2, 13:22,

40:1, 53:4,
65:3, 91:21,
118:8, 118:11,
124:16, 140:6,
148:4, 150:13,
150:17, 151:4,
151:7, 151:10,
167:15, 188:4,
191:17, 201:14,
215:1
**third**
160:10
**thoroughly**
43:12, 152:17,
154:13
**thought**
121:2, 147:4,
149:11
**three**
13:16, 63:12,
107:3, 138:15,
147:5, 149:1,
149:5, 160:10,
166:4, 166:5,
173:13
**three-and-a-half**
12:8
**through**
14:9, 17:12,
17:13, 37:1,
46:5, 46:19,
82:16, 92:1,
107:1, 107:6,
116:1, 116:7,
126:12, 137:7,
151:8, 158:6,
183:13, 185:15,
185:20, 186:5,
193:14, 194:2,
194:5, 213:1
**throughout**
64:4
**thrown**



**till**
9:17, 9:20
**time**
14:7, 33:15,
58:16, 63:16,
64:3, 71:22,
73:5, 73:12,
101:5, 106:20,
117:8, 119:1,
119:7, 119:20,
120:4, 120:6,
121:10, 167:14,
167:16, 173:14,
177:14, 186:7,
190:14, 193:18,
194:22, 196:20,
201:1, 201:15,
201:16, 210:11,
210:17, 212:4
**times**
62:5
**title**
19:6, 37:8,
50:8, 53:2,
54:4, 64:16,
65:1, 67:17,
188:1, 188:3,
202:22, 203:6,
203:8, 203:17,
204:5, 204:19
**titles**
26:2, 52:13,
53:22, 67:11,
67:13
**today**
8:6, 8:13,
9:14, 10:8,
24:5, 41:10,
44:19, 87:7,
87:10, 90:19,

114:7, 121:1,
143:8, 149:1,
205:13, 205:22,
212:4
**together**
83:9, 102:13,
109:9, 135:1,
150:16, 150:18
**told**
85:3, 168:4,
179:19
**took**
93:22, 103:12,
119:1, 121:15
**tools**
133:11
**top**
32:15, 60:18,
62:18, 62:19,
64:11, 69:10,
127:4, 127:8,
139:14, 142:21,
143:12, 199:8
**topic**
53:21
**topics**
213:9
**tower**
3:18
**trailed**
97:16
**trained**
212:7
**training**
17:11, 17:16,
17:17, 34:5,
34:17, 34:22,
35:5, 35:7,
35:10, 36:2,
36:9, 36:10,
43:8, 47:5,
76:13, 76:16,
80:6, 97:3,
97:8, 150:4,
150:19, 174:6,
174:13, 186:13,
191:15, 191:20,
192:11, 197:6,

197:10, 197:13,
197:15, 198:12,
198:13, 198:16,
200:18, 201:1,
201:9, 201:13,
201:18, 209:1,
212:15, 212:22,
213:2, 213:10,
213:15
**trainings**
17:7, 17:8,
17:16, 17:18,
17:19
**transcribed**
1:20
**transcriber**
216:2
**transcript**
10:18, 64:2,
214:3, 214:6,
214:12, 214:16,
216:5, 216:7
**transcription**
1:13, 191:2
**transcriptionist**
217:8
**trax**
5:5, 5:8, 5:15,
5:16, 5:18,
5:20, 6:3, 6:6,
6:14, 37:7,
37:9, 37:10,
47:20, 47:21,
47:22, 48:20,
49:8, 50:11,
50:16, 50:19,
50:22, 51:7,
51:21, 52:8,
52:14, 53:9,
61:13, 61:16,
64:22, 66:6,
66:10, 67:12,
67:18, 68:1,
68:5, 68:9,
69:15, 81:6,
81:9, 81:12,
82:2, 87:1,
104:13, 107:9,

111:22, 112:10,
116:2, 116:7,
116:20, 129:21,
132:3, 133:7,
133:10, 133:13,
134:2, 134:18,
135:19, 136:13,
137:1, 137:8,
137:13, 137:16,
138:4, 138:8,
138:21, 142:3,
164:22, 175:8,
179:22, 180:17,
183:13, 185:15,
185:21, 186:5,
194:3
**trax's**
139:4
**tried**
122:8
**true**
78:14, 78:18,
79:6, 216:7,
217:9
**truth**
7:5, 7:6
**truthfully**
10:11
**try**
9:15, 9:17,
53:19, 92:1,
147:20
**trying**
53:8, 66:3,
90:17, 133:3,
133:4, 135:10,
136:8, 184:10,
184:12, 205:11
**turn**
33:3, 70:14,
98:1, 111:16,
212:3, 213:7
**turnaround**
214:21, 215:3
**turning**
107:20, 174:19
**twenty-seven**
98:16

**two**
34:19, 43:19,
43:21, 44:1,
53:20, 60:11,
61:6, 61:9,
73:22, 74:6,
74:8, 76:7,
83:5, 83:8,
87:3, 105:14,
107:2, 115:8,
120:15, 120:18,
120:21, 126:2,
127:22, 133:11,
133:14, 140:15,
141:5, 153:10,
153:11, 153:18,
154:3, 159:22,
160:10, 160:21,
161:1, 162:11,
165:10, 175:1,
176:17, 198:3,
202:15
**type**
13:2, 32:15,
64:18, 66:4,
66:16, 85:10,
85:14, 102:9,
103:7, 103:9,
137:15, 164:17
**typed**
66:19
**typewriting**
217:7

---

**U**

**uba**
9:8
**uh-huh**
10:20, 11:7
**uh-hum**
62:14, 102:14
**uh-ugh**
10:20
**under**
7:3, 18:16,
64:4, 200:6
**undergraduate**
14:20

Transcript of 

Conducted on August 28, 2024                                   87

understand
11:4, 11:11,
11:22, 21:17,
22:8, 23:17,
24:15, 25:1,
28:6, 32:17,
39:8, 44:13,
46:10, 50:15,
51:1, 53:10,
56:8, 56:12,
56:14, 61:18,
62:4, 64:3,
65:13, 66:4,
68:10, 69:2,
69:3, 72:22,
73:2, 82:21,
95:1, 98:21,
102:10, 118:2,
124:9, 124:11,
127:5, 127:12,
128:5, 128:6,
128:22, 129:12,
130:21, 133:16,
135:7, 135:11,
141:19, 143:20,
146:6, 146:7,
147:22, 158:8,
168:16, 168:20,
184:10, 184:11,
184:22, 186:15,
196:15, 196:21,
196:22, 203:7,
205:7, 206:11
understanding
35:2, 38:16,
39:12, 50:17,
51:6, 51:14,
51:19, 57:21,
58:6, 58:11,
63:5, 64:10,
65:9, 66:16,
69:6, 78:13,
78:21, 78:22,
79:5, 79:8,
83:18, 100:4,
100:10, 112:6,
112:12, 129:1,
133:18, 138:18,

138:22, 165:8,
165:16, 183:12,
195:7, 198:5,
201:21
understood
11:15, 45:15,
168:3
undertake
209:2
undertaken
204:22, 206:16
undo
40:7, 45:14
undue
40:9, 40:12,
40:13, 40:14,
41:17, 42:5,
42:15, 42:16,
42:20, 43:6,
43:11, 44:4,
44:7, 44:9,
44:10, 44:13,
46:7, 46:13,
47:1, 47:5,
47:9, 47:14,
104:17
unfortunately
46:2
unique
65:10
united
1:1
univer
209:11
universities
26:6, 27:15,
202:15
university
1:10, 3:15,
4:20, 7:18,
12:1, 12:20,
13:4, 13:10,
13:19, 14:1,
14:2, 14:3,
14:8, 14:18,
15:2, 22:22,
25:17, 25:19,
25:20, 26:13,

27:1, 27:2,
27:3, 30:12,
79:22, 98:10,
202:7, 202:8,
202:18, 203:16,
209:12, 209:17
unless
132:19, 132:20
unrelated
196:13, 197:9,
198:7
unsafe
57:8
unsure
77:5, 77:10
until
22:18, 22:19,
92:1, 142:20
upload
37:11
use
23:4, 24:4,
29:1, 30:16,
31:3, 43:16,
43:17, 44:7,
48:14, 77:1,
78:8, 84:17,
86:6, 97:14,
97:19, 136:8,
140:17, 146:15,
149:18, 162:15,
164:14, 167:2,
174:20, 177:5,
211:2, 214:12
user
69:16
users
64:12
uses
209:12
using
37:4, 148:6,
148:12, 153:22,
162:20, 163:12,
163:18, 166:8,
169:21, 177:12
uva
6:17, 6:19,

12:10, 12:12,
12:13, 15:21,
16:6, 17:14,
17:15, 17:16,
23:4, 23:10,
23:11, 23:13,
23:14, 24:2,
24:4, 24:5,
24:14, 24:15,
24:18, 25:10,
25:12, 25:22,
27:6, 27:11,
28:3, 28:14,
28:19, 29:3,
29:4, 34:1,
34:17, 50:1,
55:19, 57:3,
125:5, 126:2,
128:17, 129:13,
131:8, 133:5,
157:17, 182:2,
186:19, 187:8,
187:21, 195:3,
195:5, 195:14,
195:16, 195:18,
196:5, 197:7,
197:16, 198:10,
198:20, 200:2,
200:6, 200:19,
202:3, 202:16,
203:16, 204:3,
204:5, 205:1,
206:16, 206:20,
209:1, 210:19,
211:2
uva's
4:14, 26:12,
32:4, 33:20,
127:2, 127:12,
192:18, 206:11
uva_-email-dated
5:19
uva_-print-out
5:4, 5:7, 5:14,
6:2, 6:5, 6:13
uvahrhealthscree-
ning@virginia
126:5

Transcript of

Conducted on August 28, 2024                                    88

| **V** | | | |
|---|---|---|---|

**va**
2:6, 3:20, 3:30
**vaccinated**
27:17, 48:2,
48:4, 100:21
**vaccination**
5:11, 27:20,
28:2, 28:6,
100:5, 100:11,
100:19, 134:11,
145:3, 175:9,
175:13, 175:17,
175:18, 176:2,
179:1, 196:13,
197:9, 197:21
**vaccinations**
173:16, 174:16,
174:20, 175:11,
178:16
**vaccine**
4:12, 32:2,
34:6, 40:18,
48:16, 58:2,
58:5, 58:13,
59:8, 59:16,
59:20, 60:1,
60:4, 78:4,
78:6, 78:12,
80:11, 92:22,
100:17, 117:6,
118:4, 125:22,
175:22, 176:4,
176:8, 176:14,
176:15, 176:18,
196:4, 197:21,
210:1, 210:8,
210:14
**vaccines**
78:16, 79:2,
79:10, 79:15,
176:17, 177:2,
198:7
**vague**
160:4
**vaguely**
93:13

**variety**
17:4
**various**
17:14
**vax**
5:5, 5:8, 5:15,
5:18, 5:20, 6:3,
6:6, 6:14, 37:7,
37:9, 37:10,
47:20, 47:21,
47:22, 48:20,
49:8, 50:11,
50:16, 50:19,
50:22, 51:7,
51:21, 52:8,
52:14, 53:9,
61:13, 61:16,
64:22, 66:6,
66:10, 67:12,
67:18, 68:1,
68:5, 68:9,
69:15, 81:6,
81:9, 81:12,
82:2, 86:22,
104:13, 107:9,
111:22, 112:10,
116:2, 116:7,
116:19, 129:21,
132:3, 133:7,
133:10, 133:13,
134:2, 134:17,
135:19, 136:13,
137:1, 137:8,
137:12, 137:15,
138:4, 138:8,
138:21, 139:3,
142:3, 164:22,
175:8, 179:22,
180:17, 183:13,
185:15, 185:21,
186:5, 194:3
**verbs**
140:18
**versa**
9:5, 88:15
**verses**
169:13
**versus**
26:19, 49:14

**via**
182:20, 194:6
**vice**
9:5, 88:15
**video**
8:18, 30:8
**view**
180:22
**vii**
202:22, 203:6,
203:8, 203:17,
204:5, 204:19
**virginia**
1:2, 1:10,
2:11, 3:15,
4:20, 7:18,
12:1, 21:1,
25:3, 27:2,
30:13, 98:10,
159:20, 217:22
**visit**
182:1
**visitors**
1:9, 3:15
**volume**
49:16
**vote**
111:9

| **W** | | | |
|---|---|---|---|

**wait**
9:17, 9:20
**waived**
122:8
**waiving**
34:16
**walk**
37:1, 107:1,
107:6, 151:8
**want**
18:1, 24:13,
34:1, 34:10,
34:13, 36:17,
44:19, 46:4,
50:20, 53:18,
86:17, 87:5,
103:16, 121:18,
123:11, 124:4,

144:12, 146:3,
146:4, 146:15,
146:16, 147:18,
149:17, 151:9,
151:11, 157:2,
167:17, 167:19,
168:6, 190:18,
200:3, 203:21,
210:3, 213:19
**wanted**
112:21, 112:22,
151:7, 168:2,
196:19
**washington**
15:2
**way**
102:4, 108:15,
137:21, 167:4,
176:11
**ways**
7:22, 20:15
**we'll**
73:8, 73:15,
73:16, 84:5
**we're**
9:1, 10:17,
36:17, 41:4,
46:8, 63:21,
73:11, 121:16,
131:22, 190:20
**we've**
8:10, 44:12,
45:15, 104:20,
159:7, 159:10,
160:21, 165:4,
166:10, 186:12,
190:21
**web**
4:18
**website**
181:17, 200:6
**week**
119:11, 119:22,
120:8, 120:15,
120:21
**weekly**
101:5
**wendy**
3:16, 8:20

Transcript of
Conducted on August 28, 2024

89

went
112:3, 180:19
weren't
105:20, 187:6,
210:6
western
1:2
whatever
59:21, 149:6,
161:20, 164:2,
172:13, 181:8,
183:11
whether
30:8, 42:18,
44:8, 56:2,
56:3, 56:11,
56:18, 58:18,
59:7, 60:7,
70:18, 72:12,
75:2, 78:14,
79:5, 79:8,
79:14, 86:11,
89:15, 89:18,
94:13, 95:6,
96:5, 111:6,
121:2, 137:11,
144:10, 144:14,
146:1, 146:2,
149:12, 149:20,
157:5, 165:19,
175:15, 184:18,
193:7, 193:21,
195:17, 197:8,
207:17
whoever
191:14
whole
7:5, 131:11,
212:8
williams
3:27
wisconsin
184:14
withdrawn
199:17
within
16:6, 17:14,
17:15, 18:6,

77:6, 77:19,
78:5, 97:3,
105:1, 105:19,
106:3, 107:21,
160:17, 161:14,
173:16, 179:21
without
34:16, 54:21,
55:7
witness(es
217:4
wmcgraw@huntonak
3:23
wolf
32:21, 186:15,
192:16
word
60:18, 69:18,
84:13
words
34:7, 206:14
work
11:22, 12:18,
13:14, 14:8,
24:14, 28:19,
30:18, 31:3,
41:19, 42:5,
46:14, 58:7,
60:9, 67:16,
71:3, 71:4,
73:18, 76:18,
80:11, 87:15,
91:6, 107:17,
118:9, 119:5,
119:7, 119:9,
120:13, 120:15,
121:4, 126:16,
142:11, 145:13,
165:22, 167:6,
168:19, 190:15,
193:2, 193:11,
193:19, 194:11,
194:13, 195:21,
196:4, 202:2
workday
53:7, 64:12
worked
26:5, 26:7,

27:16, 50:2,
50:6, 50:7,
52:2, 52:10
worker
13:2
working
40:16, 119:15,
210:18
workplace
6:20, 198:22,
201:19, 202:1,
211:14
works
29:5
workweek
119:14
would've
193:17, 197:12
wouldn't
65:12, 65:13,
68:8, 164:5,
181:11
write
85:15, 156:18
writing
85:6
written
10:18, 45:16,
92:12, 92:19,
111:3, 169:16,
171:10, 172:19,
173:2, 173:18,
173:19
wrong
107:7, 163:16,
165:4

**Y**

yeah
13:1, 18:19,
19:17, 20:1,
26:21, 31:2,
38:3, 40:15,
41:1, 43:4,
51:1, 52:6,
60:19, 63:18,
78:20, 82:13,
84:16, 87:13,

88:10, 102:1,
106:17, 119:8,
121:12, 127:11,
133:10, 136:5,
141:6, 143:14,
148:16, 148:22,
152:15, 152:19,
154:11, 157:1,
166:18, 169:16,
171:15, 173:17,
174:5, 174:9,
187:1, 190:19,
198:15, 205:9,
210:2
years
12:8, 13:16,
98:16, 147:5,
149:2, 149:5,
149:6, 173:13,
198:17
yesterday
32:12, 140:4,
141:21, 143:6,
214:7
york
13:20, 13:21
young
142:19
yourself
21:8, 55:7,
55:15, 81:2,
82:13, 142:22

**Z**

zero
176:15
zoom
194:6

**.**

.2020
5:20
.2021
5:12, 6:16,
125:4
.5700
2:7

**0**

0002235
5:7

Transcript of 

Conducted on August 28, 2024

90

**0002368**
5:4, 50:10
**0002396**
6:2
**0002421**
5:14
**0002672**
6:5
**0003035**
6:13, 67:22
**0006795**
5:19
**0075**
1:4
**04**
215:7

_____
**1**

**1**
1:19
**10**
3:28, 5:13,
215:3, 216:19
**10.23**
5:20
**11**
5:16
**12**
5:17, 130:19,
130:21, 131:12,
131:17, 131:22,
132:8, 132:12,
135:20, 136:2,
136:20, 153:12,
154:19, 154:21,
155:7, 156:2
**121621**
141:17
**125**
6:18
**126**
126:22, 127:4,
127:7
**13**
5:19, 98:1,
99:19, 134:6,
134:13, 135:5,
135:20, 136:3,

137:3, 137:4,
144:22, 145:8,
153:12, 154:20,
154:22, 155:7,
156:2
**14**
6:1, 36:16,
36:20, 37:16,
47:19, 48:18,
54:6, 54:8,
104:20, 107:1,
107:3, 129:5,
152:13, 158:10,
160:6, 160:7,
160:8
**14525**
3:6
**15**
6:4, 104:19,
107:21, 108:12,
108:17, 150:22,
152:10, 158:10,
161:3, 162:4,
162:7, 163:13,
163:18
**16**
6:7, 14:9,
64:8, 64:9,
67:3, 67:7,
109:6, 109:8,
110:11, 114:4,
114:18, 115:12,
115:15, 158:10,
164:10, 167:3,
168:18, 169:22,
173:8, 174:14,
179:18, 182:9,
182:10, 182:14,
183:16, 212:3,
212:4, 212:11
**1600**
3:29
**17**
6:12, 67:21,
68:3, 68:4,
68:12, 70:10,
71:20, 72:13,
80:14, 82:11,

83:17, 103:15,
111:16, 112:11,
116:9, 129:21,
130:4, 130:10,
130:14, 131:2,
131:8, 132:5,
132:17, 132:22,
133:16, 134:22,
135:22, 138:8,
139:14, 140:11,
142:15, 143:4,
145:17, 146:20,
149:4, 149:13,
153:3, 154:3,
158:1, 158:10,
159:2, 159:5,
159:8, 159:12,
160:22, 162:2,
162:18, 165:2,
165:9, 165:10,
165:16, 165:20,
166:10, 169:4,
174:19, 175:1,
175:20, 177:2,
178:22, 180:7
**17192**
139:3
**18**
6:15, 125:3,
125:8, 128:1,
128:8, 129:4,
130:3, 130:9,
130:16, 130:22,
131:4, 131:15,
132:1, 132:21,
134:7, 134:14,
135:6, 135:20,
136:6, 136:21,
137:5, 144:22,
145:9, 153:10,
154:20
**19**
5:11, 6:19,
64:13, 78:12,
198:18, 198:20,
199:3, 199:18,
200:15, 202:9,
204:15, 206:7,

207:15, 208:17,
211:10, 211:16
**1964**
203:1, 203:18
**198**
6:21
**1st**
34:18, 34:22,
35:7, 35:10,
36:10, 191:15,
191:19, 192:11

_____
**2**

**20**
14:9, 199:8
**200**
3:28
**2013**
14:18
**2016**
14:9
**2019**
12:16, 14:10,
58:1, 58:13,
58:20, 201:4,
201:16, 209:19,
210:8, 210:10,
210:11, 210:21,
211:5, 211:8,
211:13, 211:15
**2020**
19:13, 22:15,
22:18, 58:1,
58:13, 58:20,
192:22, 200:20,
201:16, 209:19,
210:8, 210:11,
210:12, 210:22,
211:5, 211:9,
211:13, 211:15
**2021**
19:14, 27:19,
28:1, 28:7,
31:21, 34:18,
35:7, 35:10,
40:11, 52:9,
54:2, 58:22,
59:9, 60:3,

Transcript of

Conducted on August 28, 2024

91

60:8, 67:17,
71:3, 71:11,
72:6, 73:17,
74:21, 75:13,
76:14, 78:3,
79:8, 79:15,
83:10, 85:8,
85:20, 86:13,
87:11, 87:14,
89:10, 90:4,
91:9, 92:5,
95:15, 96:13,
96:17, 97:21,
100:1, 100:6,
100:12, 101:20,
116:1, 117:11,
117:21, 119:2,
119:5, 119:14,
120:9, 120:14,
123:2, 125:19,
126:15, 144:16,
145:12, 145:21,
146:5, 147:2,
148:7, 148:9,
148:13, 149:19,
162:21, 166:1,
166:13, 167:5,
168:19, 174:1,
174:2, 177:12,
178:2, 188:16,
189:12, 189:22,
191:20, 192:11,
193:8, 195:13,
200:16, 200:20
**2022**
192:20, 193:9
**2023**
199:14, 200:12
**2024**
1:17, 199:8
**211**
4:7
**217**
1:19
**22**
1:4
**22902**
2:6

**23219**
3:20, 3:30
**234**
3:10
**2385**
62:7, 62:13,
62:20
**2397**
62:1
**24**
199:8, 199:14,
200:12, 216:19
**25**
206:7, 207:14,
207:15, 208:15,
208:17, 217:18
**26**
165:2
**2725000**
65:15
**28**
1:17, 217:18
**2nd**
2:4

**3**

**3**
215:7
**3038**
180:7
**3040**
138:10, 139:7
**3041**
139:8
**3042**
139:9
**3043**
139:10, 139:14
**32**
4:13, 4:16
**323**
2:4
**345**
3:7
**36**
1:17
**3:cv-rsb-jch**
1:4

**3rd**
125:19

**4**

**40**
119:10, 119:12
**420**
3:31, 3:32
**429**
3:9
**43**
68:7, 68:21,
69:4, 69:9,
69:21, 175:19
**434.951**
2:7
**4766**
3:10

**5**

**50**
5:5, 49:17
**551153**
1:18
**55345**
3:8

**6**

**6074**
3:31
**612**
3:9, 3:10
**6507**
3:32
**67**
6:14
**6765**
129:6, 130:18

**7**

**71**
61:19
**7221**
3:21
**7748549**
217:17
**788**
3:21, 3:22

**8**

**8.25**
5:12
**804**
3:21, 3:22,
3:31, 3:32
**8100**
3:9
**8218**
3:22

**9**

**9**
1:17
**9.3**
6:16, 125:4
**900**
2:5
**951**
3:19